# IN THE UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Luis Ramiro AVILES, Guillermo BENELLI, Alejandro BERGER, Hector Ruben BIRCZ, Ricardo Osvaldo BLUTHGEN, Jose Maria CABRERA, Gustavo CANIL, Hugo Leonardo CARLINI, Pablo CODEVILLA, Matias Luis COLL, Maria Teresa del Carmen CORREA AVILA, Moises Luis COTLER, Marcello Luis DE LEO, Diego DI MAGGIO, Jorge Daniel DIZ, Silvio Roberto DONATO, Cristian Horacio ERNST, Carlos Adrian FERRETI, Jorge Alberto FORLANO, FUNDACION FIORENZO, Jose Antonio GARCIA, Sebastian GIL GARRO, Luis Miguel GIRARDOTTI, Francisco Javier GOMEZ RONCO, Jose Antonio GONZALEZ, Maria Elena GONZALEZ, Fernando E. GRANDA, Manuel HERRERA, Tomas Victoriano HERRERO, Monica HUISMAN, Ana Maria KRIEGER, KP VENTURES, S.A., Graciela Stella Maris MAGLIANO, Maria Beatriz MARQUINEZ, Alberto MARTINEZ, Fernando MATARAZZO, Rafael MENDOZA DE LA TORRE, Mariano Jorge MIRANDA, Martin MIRANDA, Carlos Gabriel MIYAGI, Silvana MONTEFIORE, Jose Luis PATRIGNANI, Enrique Horacio PICADO, Lucila Elena PAILLARD POLERO, Pablo Gabriel POTOKSKI, Victor Roberto POGGI, PRENTON INDUSTRY LTD, Ricardo PUJALS, Diego Luis RIOS, Norberto Vicente RODRIGUEZ, Pablo RODRIGUEZ FALCON, Gonzalo SANCHEZ PUPULLO, Graciela Silva SIGUENZA, Marcelo SUGIER, Hugo A. UNTERSANDER, ULAN BATOR PROJECT, LTD, Christine A. VERSE, Juan Antonio VIRAG, Carlos Alberto WEHBI, Cesar R. ZUCCHINO, <br><br>    Plaintiffs. <br><br> vs. | **CIVIL ACTION NO. 14-CV-02987** <br><br><br><br><br><br><br><br><br><br> **COMPLAINT** <br><br><br><br><br><br><br><br><br><br><br><br> **JURY TRIAL DEMAND** |

S&P GLOBAL, INC., WELLS FARGO )
BANK, N.A., WELLS FARGO BANK )
NORTHWEST, N.A., WELLS FARGO )
DELAWARE TRUST COMPANY, ITM )
TWENTYFIRST, LLC, PORTSMOUTH )
SETTLEMENT COMPANY I, LLC & )
Roy G. SMITH, )
)

     Defendants.

## PLAINTIFFS' ORIGINAL COMPLAINT

Plaintiffs Hugo Leonardo Carlini, Rafael Mendoza de la Torre, Martin Miranda and Carlos Alberto Wehbi bring this action (1) individually on their own behalves; (2) derivatively on behalf of the shareholders of The Lifetrade Fund B.V., LTrade Plus Ltd. and LTrade Fixed Capital (BVI) Ltd. (collectively "the Lifetrade Entities"); and (3) as representatives of a class of all offshore stockholders of the Lifetrade Entities. The remaining Plaintiffs, Luis Ramiro Aviles et al., join in this Complaint to assert their individual claims on their own behalves. All Plaintiffs assert claims herein against S&P Global, Inc., Wells Fargo Bank, N.A., Wells Fargo Bank Northwest, N.A., Wells Fargo Delaware Trust Company, KPMG LLP, ITM Twentyfirst, LLC, Portsmouth Settlement Company I, LLC, and Roy G. Smith as more fully set forth below:

## INTRODUCTION

1.    Plaintiffs are offshore investors who have only recently learned that they have lost the entirety of their investments in the Lifetrade Entities. The Lifetrade Fund, B.V. ("Lifetrade"), was a stockholder/investor-owned corporation that operated as an open-ended mutual fund. LTrade Plus Ltd. and LTrade Fixed Capital (BVI) Ltd were also stockholder/investor-owned corporations, but served as feeder funds for Lifetrade and invested in bond-like, fixed-return securities issued by Lifetrade.

2.    Lifetrade itself invested exclusively in the secondary market for life insurance policies issued in the United States on the lives of U.S. citizens ("life insureds"), approximately

25 percent of whom were located in the State of New York. Life settlement originators or providers (hereinafter called "life settlement providers") in the United States created a secondary market for life insurance policies known as viatical settlements or life settlements (hereinafter collectively "life settlements"). Investors in life settlements acquire life insurance policies from life insureds, typically age 65 or older, who have made an investment in whole or universal life coverage, but no longer require life insurance protection and desire to realize cash from their policies before their deaths in order to pay medical, long-term care or other expenses.

3. Investors acquire such policies and pay the premiums thereon until the deaths of the life insureds with the expectation of substantial gains that are supposedly guaranteed by the undeniable mortality of the life insureds, whose life expectancy in months is determined by underwriters located in the United States, including Defendants 21st Services Holdings, LLC and ITM TWENTYFIRST, LLC.

4. Plaintiffs, and other investors in Lifetrade, were led by Defendants to believe that life settlements are an alternative asset class, not correlated with the price of stocks or bonds, and that such investments would diversify an investment portfolio to protect against the volatility of traditional stock and bond investments during recessions or market panics. Plaintiffs and other investors in Lifetrade were further led by Defendants to believe that life settlements are a safe investment class comparable to investment-grade corporate bonds. Defendant S&P Global Inc. ("S&P") created and then fostered this belief by issuing, month after month, investment-grade ratings of "Af" for Lifetrade between June 27, 2006 and January 25, 2011, with full knowledge and expectation that such ratings would be relied upon by investors, including Plaintiffs, as evidence of the safety of Lifetrade investments. Plaintiffs and other investors were also lead to believe that an investment in Lifetrade would generate steady capital growth in excess of

benchmark stock and bond indices, an impression created by price charts for Lifetrade and the benchmark indices included in S&P's monthly reports.

5.   Instead, as Plaintiffs have only-recently learned, life settlements are an extremely risky asset class, so risky in fact that S&P issued a confidential research report on October 13, 2009 attached hereto as Exhibit A, stating untruthfully that it "has not to date rated a life settlement transaction." S&P further stated that it could not rate a life settlement transaction without first addressing five concerns set forth in its report, and then only after publishing criteria for rating securitizations of the life settlement asset class, something it has yet to do. Notwithstanding these carefully articulated reasons for being wary of the safety of these investments, S&P gave Lifetrade high "Af" ratings prior to 2009, and continued thereafter to give "Af" ratings to Lifetrade, without mentioning, let alone addressing, what it knew were serious risks inherent in this asset class.

6.   Reasons given by S&P in its 2009 report for its aversion to rating life settlement transactions included: (1) a lack of statistical credibility for the actuarial assumptions underlying life settlement transactions based upon a pool of less than 1,000 lives (the Lifetrade fund had far fewer: only approximately 236 to 500 lives insured during the period it was rated by S&P); (2) uncertainty about the potential of life settlement transactions to violate insurable interest laws, which vary from state-to-state; (3) concerns about the accuracy of independent medical reviews used to underwrite mortality calculations; (4) concerns about the lack of track records for most life settlement originators and the alignment of their interest with that of investors, i.e. the potential for fraud; and (5) concerns about the timing of cash flows from life settlement transactions.

7.     All of these very real concerns were certainly known or knowable to S&P during the period that it rated the Fund between June 27, 2006 and January 25, 2011. These concerns either should have prevented S&P from rating the Fund in the first place, or at a minimum should have been clearly communicated to investors. Instead, S&P continued to issue "Af," investment-grade ratings for Lifetrade monthly through at least January 25, 2011, failing to mention its subscriber-only research conclusions and thereafter silently ceasing its ratings without explaining why. S&P did so with full knowledge that Plaintiffs and other investors did rely and would continue to rely upon S&P's ratings.

8.     S&P's concerns about the risks inherent in life settlement assets proved to be well-founded. The Lifetrade Entities lost the entire $685,835,380 raised from the putative Class of investors, together with an additional $178,000,000 that Lifetrade borrowed from Wells Fargo Bank N.A.. The Fund itself was based upon a statistically-invalid pool of policies that ranged in number from 236 to 500, which never performed as anticipated and never should have been expected to do so because the policies were purchased for prices greatly in excess of their actual value. These purchase prices were set based upon false life expectancy evaluations ("LE evaluations) prepared by Defendant 21st Services, a party widely-known in the life settlements industry to have been accused of issuing fraudulently-understated LE evaluations before Defendant S&P issued its first ratings report on Lifetrade in 2006.

9.     Delays in collecting upon policies because life insureds lived longer than projected caused Lifetrade difficulties in renewing its loans with Wells Fargo Bank and placed the interest of Lifetrade's insiders, Roy G. Smith and his affiliates or co-conspirators, into conflict with the interests of Plaintiffs and class members. Rather than risk losing the $130,000,000 or more that Smith and his co-conspirators had skimmed for themselves from the

investors' funds through fees, commissions and undisclosed profits, they chose to surrender Lifetrade's policies. Those polices had a face value of $912,000,000 in death benefits, which were used to satisfy a bank debt of only a fraction of that amount: approximately $200,000,000. As such, Defendants' were unjustly enriched and Plaintiffs and class members lost their entire investment.

10.     Under the terms of its agreements with Lifetrade, Wells Fargo served not only as Lifetrade's lender, but also in a fiduciary role as "custodian" of Lifetrade's life insurance policies, a role pursuant to which it was charged with the possession and safe keeping of those policies for the benefit of the Lifetrade Entities and their stockholders. Moreover, two affiliates of Wells Fargo known as Wells Fargo Bank Northwest and Wells Fargo Delaware Trust Company served as the legal owners of Lifetrade's life insurance policies under a trust agreement for the benefit of Lifetrade and its investors.

11.     Despite (1) Wells Fargo's conflicts of interest; (2) Wells Fargo's knowledge that investors in the Lifetrade Entities had voted against surrendering the life insurance policies to the lender; and (3) Wells Fargo's knowledge that the investors in the Lifetrade Entities had been victimized by the frauds described herein, Wells Fargo nevertheless allowed and encouraged Smith and his affiliates or co-conspirators to breach their duties to the Plaintiffs by surrendering $912,000,000 in policies in exchange for the extinguishment of a debt of only about $193,000,000. No notice was given to Plaintiffs, who have only recently learned of these events which occurred in late 2012.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332 because (a) this is a civil action where the matter in controversy exceeds the sum or value of $75,000,

exclusive of interest and costs, and is between citizens of a state and non-resident citizens of one or more foreign states; and (b) this is a civil action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action in which at least one member of the class of plaintiffs is a citizen or subject of a foreign state and at least one defendant is a citizen of a State. In addition, Plaintiffs also invoke, if necessary, the supplemental jurisdiction of the Court pursuant to 28 U.S.C. § 1367 in that all claims asserted herein arise from the same misconduct and form part of the same case or controversy.

13.     This Court has personal jurisdiction over all Defendants pursuant to 31 U.S.C. § 3732(a) because they can be found in, reside or transact or have transacted business within the Southern District of New York or have purposely availed themselves of the protections of the laws of the State of New York.

14.     Venue is proper in this district because Defendant S & P Global, Inc., has its principal place of business in this district and because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred within this district.

## PARTIES

15.     Plaintiffs Hugo Leonardo Carlini, Rafael Mendoza de la Torre, Martin Miranda and Carlos Alberto Wehbi are citizens of the foreign state of Argentina who bring this action individually on their own behalves. derivatively on behalf of the Lifetrade Entities and in a representative capacity on behalf of the class of investors defined hereinbelow.

16.     Plaintiffs Luis Ramiro Aviles, Guillermo Benelli, Alejandro Berger, Hector Ruben Bircz, Diego Di Maggio, Ricardo Osvaldo Bluthgen, Jose Maria Cabrera, Gustavo Canil, Matias Luis Coll, Pablo Codevilla, Maria Teresa del Carmen Correa Avila, Moises Luis Cotler, Marcello Luis De Leo, Jorge Daniel Diz, Silvio Roberto Donato, Cristian Horacio Ernst, Carlos

Adrian Ferreti, Jorge Alberto Forlano, Jose Antonio Garcia, Sebastian Gil Garro, Luis Miguel Girardotti, Jose Antonio Gonzalez, Maria Elena Gonzalez, Fernando E. Granda, Manuel Herrera, Tomas Victoriano Herrero, Monica Huisman, Ana Maria Krieger, Graciela Stella Maris Magliano, Maria Beatriz Marquinez, Alberto Martinez, Fernando Matarazzo, Rafael Mendoza de la Torre, Mariano Jorge Miranda, Carlos Gabriel Miyagi, Silvana Montefiore, Jose Luis Patrignani, Lucila Elena Paillard Polero, Pablo Gabriel Potokski, Enrique Horacio Picado, Victor Roberto Poggi, Ricardo Pujals, Diego Luis Rios, Norberto Vicente Rodriguez, Pablo Rodriguez Falcon, Gonzalo Sanchez Pupullo, Graciela Silvia Siguenza, Marcelo Sugier, Hugo A. Untersander, Juan Antonio Virag, Cesar R. Zucchino,  are citizens of the foreign state of Argentina who bring this action individually on their own behalves.

17.    Plaintiff Christine A. Verse is a citizen of the foreign state of Belgium who brings this action individually on her own behalf.

18.    Plaintiff Francisco Javier Gomez Ronco is a citizen of the foreign state of Spain who brings this action individually on his own behalf.

19.    Plaintiffs Prenton Industry LTD and Ulan Bator Project LTD are corporations organized under the laws of the British Virgin Island, that have their principal places of business in the foreign state of Argentina and bring this action in their own behalves.

20.    Plaintiff KP Ventures, S.A. is a corporation organized under the laws of Uruguay, that has its principal place of business in the foreign state of Uruguay and brings this action in its own behalf.

21.    Plaintiff Fundacion Fiorenzo is a legal entity organized under the laws of Liechtenstein that has its principal place of business in the foreign state of Liechtenstein and brings this action in its own behalf.

22.     Defendant S&P Global, Inc. is a New York corporation formerly known as The McGraw-Hill Companies, Inc. ("S&P").  It has its principal place of business in New York, New York and may be served with process herein through its general counsel at 55 Water St., 47th Fl., New York, NY 10041.

23.     Defendant Wells Fargo Bank, N.A., ("Wells Fargo") is a national banking association doing business in New York, which may be served with process herein through any officer of the bank.  Wells Fargo and its affiliates occupied several conflicting roles in relation to the Lifetrade fund, including secured lender, hedge counterparty, trustee, custodian, administrative agent, escrow agent and verification agent.

24.     Defendant Wells Fargo Bank Northwest, N.A., formerly known as First Security Bank of Idaho, N.A. (hereinafter "Wells Fargo Utah"), is a national banking association that serves foreign nationals and maintains its principal place of business at 299 South Main Street, 12th Floor, MAC U1228-120, Salt Lake City, UT 84111. It may be served with process herein through any officer of the bank.  Wells Fargo Utah was one of the two co-trustees, along with Wells Fargo Delaware, who held legal title as a fiduciary to the life insurance policies of Lifetrade.

25.     Defendant Wells Fargo Delaware Trust Company (hereinafter "Wells Fargo Delaware"), is a Delaware corporation which may be served with process herein at 919 Market Street, Suite 1600, Wilmington, Delaware 1980.  Wells Fargo Delaware was one of the two co-trustees, along with Wells Fargo Utah, who held legal title as a fiduciary to the life insurance policies of Lifetrade.

26.     Defendant ITM Twentyfirst, LLC, ("21st Services"), was formerly known as 21st Services, LLC and 21st Services Acquisition, LLC.  It is a Delaware limited liability company

with its principal place of business in the State of Minnesota, and may be served with process herein through its New York agent for service of process, Corporation Service Company, 80 State Street, Albany, New York 12207. 21st Services provided underwriting services to settlement providers and, from Lifetrade's inception in 2004 until 2012, provided all of Lifetrade's LE projections. In a 2004 lawsuit widely-publicized in the life settlement industry, but completely unknown to Plaintiffs, attached hereto as Exhibit B, 21st Services was accused of fraudulently overstating LE projections with potentially devastating consequences for investors.

27.    Defendant Portsmouth Settlement Company I, LLC, ("Portsmouth Settlement") is a Georgia limited liability company with its principal place of business at 101 Beckett Lane, Suite 101, Fayetteville, Georgia 30214. It may be served with process herein through its registered agent, Charles H. Davis, Jr., 7 NW Broad Street, Fairburn, Georgia 30213. Portsmouth Settlement, which was the principal life settlement provider to Lifetrade, has done extensive life settlement business in the State of New York, is registered with the New York Insurance Department and has purposely availed itself of the protections of the laws of the State of New York by filing suit over a life settlement matter in the case of *Portsmouth Settlement Co. I, LLC v. Aviva USA Corp.*, 28 Misc.3d 1219(A) (2010).

28.    Defendant Roy G. Smith (hereinafter "Smith") is a citizen of the State of Georgia who may be served with process herein at 115 Pebble Beach Drive, Fayetteville, GA 30215. Smith was the founder and *de facto* investment manager of Lifetrade who, through fees, commissions and other charges by his affiliates and co-conspirators, fraudulently skimmed off approximately twenty percent of the $685,835,380 raised from investors in Lifetrade. Through his conspiracy with, and *de facto* control over, Lifetrade, Portsmouth Settlement and Portsmouth Securities, Smith has engaged in numerous life settlement transactions in the State of New York

and has thereby purposely availed himself of the protections of the laws of the State of New York.

## **BACKGROUND**

29.   Changing circumstances for life insurance policyholders and other factors have combined to create a secondary market for life insurance where one sells his or her life insurance policy to another person. This secondary market for life insurance policies primarily involves two categories of policyholders: those who are terminally ill and those who are of advanced age. A sale of a life insurance policy by one who is terminally ill is called a "viatical settlement" and a sale by one of advanced age is called a "life settlement." Both types of settlements will be referred to herein as "life settlements."

30.   A viatical settlement is a financial option for a terminally ill life insurance policyholder (a "viator") who wants to sell his or her life insurance policy and wishes to assign the policy proceeds, payable upon death of the viator, to a third party (a "settlement provider") in exchange for immediate payment. The amount of the payment to the viator exceeds the policy's surrender value but is less than the total policy benefit.

31.   Thus, the viator is able to obtain cash during his or her lifetime, and the settlement provider (who must keep the policy in force during the viator's lifetime by paying premiums) can, upon death of the viator, recover more than its payment to the viator. The settlement provider will make a profit if the amount it receives when the viator dies is greater than the sum of: (1) the amount paid to the viator; (2) the interim premium payments made up to the point of death; (3) the settlement procedure costs (including the cost of life expectancy evaluations); (4) any fees or commissions paid to settlement brokers, and various other out of pocket costs; and (5) and the cost of capital committed to the foregoing

costs in the period between purchase of the life policies and the payment of the death benefit.

32.     Life settlements generally operate under the same principles and procedures; the distinguishing difference between the two is that, in viatical settlements, a terminal illness is involved.  A life settlement, on the other hand, involves an insured who is of advanced age.   Hereinafter, persons who are the insureds on life policies sold into the secondary market, whether by a viatical settlement or a life settlement, are referred to as the "life insureds."

33.     Two primary factors heavily influence the amount of a viatical or life settlement: (1) the amount of the policy proceeds at issue; and (2) the life expectancy of the individual whose life is at issue. The amount of the policy proceeds is already established before a viatical or life settlement takes place. As part of the valuation process, settlement providers routinely obtain life expectancy evaluations in connection with viatical and life settlements.

34.     The amount paid by the settlement provider to purchase the right to eventually receive policy proceeds depends primarily upon the individual's life expectancy; the longer the individual is expected to live, the lower the payment will be.  The reason is clear: given the time value of money, the settlement provider will generally pay less for a benefit it must wait longer to receive. In addition, the settlement provider must pay premiums to keep the policy in force during the individual's lifetime, thereby reducing the settlement provider's profit from the transaction as time goes on. If the individual significantly outlives his or her life expectancy, then the settlement provider can lose money in the transaction because it will have paid more in settlement funds, policy premiums and other costs than the amount of

the policy's death benefit assigned to it. Life expectancy ("LE") evaluations are provided by companies such as Defendant 21st Services.

35.     The single most important factor determining both the availability of capital from investors to buy life insurance policies from life insureds and the price that can be offered to a particular policy owner in a life settlement transaction is the life expectancy of the life insured. Settlement providers such as Defendant Portsmouth Settlement Company, an affiliate of Defendant Roy G. Smith, obtain information about the life expectancy of a given insured from an underwriter such as Defendant 21st Services. The underwriter is, in essence, the fulcrum of any settlement transaction, effectively balancing the interest of investors in accurate projections of life expectancy and the interest of policy owners in obtaining a price that fairly reflects the financial value of their insurance policies.

36.     Legitimate underwriters assess mortality risk (and, therefore, life expectancy) based on established risk classification principles.  In doing so, they differentiate among different classes of insureds according to sound actuarial principles and reasonably anticipated mortality and morbidity experience. The underwriting process is more complicated than simply adding a column of numbers based on raw data; instead, underwriters are required to exercise sound, objective, and consistent professional judgment, and to act independently and without bias.

37.     Because both the financial return expectations of investors and the price expectations of policy owners are based on life expectancy projections generated by underwriters, any pattern of understating life expectancy necessarily has a significant negative effect on individual settlement transactions. In particular, legitimate settlement providers lose contracts to bids based on falsely understated life expectancy projections.

38.     These false statements also affect the settlement market more broadly. The willingness of investors to commit capital to fund the purchase of life insurance policies from policy owners is predicated on the assumption that underwriter-generated assessments of life expectancy are legitimate and in accordance with accepted professional standards. Because the life settlement market is a relatively new phenomenon, any underwriter conduct that calls into question that assumption creates a significant risk that investors will flee the market, and that the access to the secondary market enjoyed by policy owners will be jeopardized in the long term.

39.     The conduct alleged and described herein was of a type that entitles Plaintiffs and class members to recover punitive damages.   Upon information and belief, all Defendants acted in concert, through a pattern of improper activity, for a common and improper purpose, which caused injury to the Plaintiffs and each of the class members.

## CROOKED DEALINGS OF 21ST SERVICES
## AND PORTSMOUTH SETTLEMENT

40.     During the period when Plaintiffs and the Class made their investments in the Lifetrade Entities (2004 through 2011), Lifetrade bought almost all of its life insurance policies from life settlement provider Portsmouth Settlement, which used 21st Services as its exclusive underwriter.

41.     As alleged more particularly in Exhibit B, a complaint filed against 21st Century in 2004 by a life settlement provider named Coventry, Defendant 21st Century was widely known among insiders in the life settlement industry as early as 2004 to have been accused of systematically and significantly overstating its LE evaluations in order to make it easier for unscrupulous life settlement providers like Portsmouth Settlement to outbid competitors in the very competitive market to acquire life policies from policy owners.

42.     21st Services' underwriting fees were paid on a per case basis, including not just its initial evaluations, but also periodic update evaluations during the life of the policy. Therefore, 21st Services made more money if its fraudulent underwriting practices caused its life settlement clients to win more competitive bids and buy more policies for 21st Services to evaluate on a continuing basis. As long as 21st Services' settlement provider clients such as Portsmouth Settlement were spending other people's money on the LE evaluations and were acting in the capacity of a broker paid on commission only, then the fraudulent evaluations worked equally well for both 21st Services and its client such as Portsmouth Settlement.

43.     The ultimate victims in this scheme were retail investors like Plaintiffs who had no idea that life insurance policies in which they were investing through the Lifetrade Entities were significantly overvalued and would not generate the expected cash flows required to service debt and provide a reasonable return on investment.  As Coventry stated in its complaint, "when underwriters consistently and significantly understate life expectancy projections, investors suffer enormous financial losses." Exhibit B, ¶ 6.

44.     Coventry accurately predicted in 2004 that investors in pools underwritten using 21st Service's information would suffer large losses, see Exhibit B ¶ 9, and spoke of "investors, who are duped by 21st Services's life expectancy projections into pouring money into settlement investments that are virtually guaranteed to lose significant sums." Id. Coventry also stated that " 21st Services's falsely understated life expectancy projections systematically and significantly harm investors, potentially robbing them of their entire investment, and further put at risk the entire settlement market and the benefits it creates for policyowners." Id, at ¶ 40.

45.     Coventry also observed that "If a settlement is based on a false life expectancy, not only do investors suffer considerable losses because they paid too much for the policy, but

they are also at risk of losing their entire investment . . . These losses are not realized until after the policyowner outlives the fraudulent life expectancy and, therefore, investors are generally unable to identify the fraud until a considerable time after the initial investment." *Id.*

46.     On information and belief, Plaintiffs allege that Defendant Roy G. Smith, as the founder and primary investment manager of the Lifetrade Entities, knew about the fraudulent LE evaluations provided by Portsmouth Settlement and 21st Services as early as 2004, if not earlier, yet initiated and continued Lifetrade's business with 21st Services and Portsmouth Settlement because Smith, his affiliates and co-conspirators pocketed some $40,000,000 to $130,000,000 in self-dealing commissions and other compensation in connection with the Portsmouth Settlement transactions.

47.     Plaintiffs also allege on information and belief that Smith, at some point, became a controlling shareholder of Portsmouth Settlement as he appropriated the Portsmouth trade name and subsequently used it for affiliated businesses, including Portsmouth Financial Group of Fayetteville, Georgia, and Portsmouth Securities Limited, his current operation in the tax haven of Labuan, Malaysia.

48.     One example of the outrageous fees, commissions and "overhead" charged by Smith and Portsmouth Settlement to Lifetrade is revealed in the reported decision in *Portsmouth Settlement* Company *I, LLC v. Aviva USA Corporation,* 957 N.Y.S.2d 638, 2010 N.Y. Slip Op. 51395(U) (2010).  It is reported there that Portsmouth Settlement was paid fees and commissions of $74,201.75 and "overhead recovery" of $30,000 on a life settlement transaction of $770,000.  2010 N.Y. Slip Op. at 8.  In addition, Lifetrade's management company operated by Smith was paid $90,000 in fees not disclosed in the prospectus provided to investors. *Id.*  These undisclosed fees and commissions total

$194,201.75 and comprise 25.22% of the already over-priced amount that Lifetrade paid for the policy in question, thereby further reducing the odds that investors in Lifetrade would ever see a positive return on their investments.

## S&P'S INEXPLICABLE ENDORSEMENT
## OF THE LIFETRADE SCAM

49.     The Lifetrade fund was launched on January 1, 2004 and by August 31, 2006, some two and a half years later, had been only moderately successful in raising capital, with total assets of $234 million.  S&P entered the picture on June 27, 2007.   Some six months later, on December 31, 2007, the assets of the fund had doubled to $427 million from their level of $234 million on August 31, 2006. *See* 2007 audited Financial Statements. By December 31, 2010, assets of the fund had doubled again to $823 million, *see* 2010 audited Financial Statements, reflecting the confidence that Plaintiffs and members of the Class placed in Lifetrade because of S&P's ratings.  S&P's ratings were a tremendous marketing tool for Lifetrade's promoters, and indeed Plaintiffs each relied upon S&P's ratings in deciding to invest in Lifetrade.

50.     Copies of some of S&P's monthly ratings are attached as Exhibit D.  The rating sheets generally stated that "the 'Af' credit rating reflect the strong credit quality of the Portfolio's eligible investments and counterparties."  They also stated that "The rating indicates that the fund's portfolio holdings and counterparties provide strong protection from losses due to credit defaults."

51.     The ratings sheets further reported statistics for the fund's portfolio of policies, a pie chart showing the distribution of life expectancies for the portfolio (information that apparently came from 21st Services) and a line chart for historical values of the fund per share  (information again apparently derived from policy valuation reports

prepared by 21st Services) that could be compared to U.S. stock and bond indexes to demonstrate to potential investors that the fund was steadily growing in value and outperforming benchmark indexes.

52.     The key ingredient missing from these rating reports was any critical analysis whatsoever of the 21st Services evaluation reports on which the performance and valuation data hinged or any critical examination of the track record and trustworthiness of Lifetrade or its management.  Obviously, S&P conducted no due diligence investigation whatsoever before commencing its ratings in June 2006; otherwise, it would have learned from industry insiders about the serious fraud allegations that had been made by Coventry about 21st Services in 2004 (Exhibit B).

53.     Moreover, S&P issued a confidential research report on October 13, 2009 attached hereto as Exhibit A, stating the blatant falsehood that it "has not to date rated a life settlement transaction" and could not do so without addressing five concerns set forth in its report and then only after publishing criteria for rating securitizations of the life settlement asset class, something it has yet to do.

54.     Reasons given by Standard & Poor's for its aversion to rating life settlement transactions included (1) a lack of statistical credibility for the actuarial assumptions underlying life settlement transactions based upon a pool of less than 1,000 lives (the Lifetrade fund had only approximately 236 to 500 lives insured during the period it was rated by S&P); (2) uncertainty about the potential of life settlement transactions to violate insurable interest laws, which vary from state to state; (3) concerns about the accuracy of independent medical reviews used to underwrite mortality calculations; (4) concerns about the lack of track records for most life settlement originators and the alignment of their interest with that of investors, i.e. the

potential for fraud; and (5) concerns about the timing of cash flows from life settlement transactions.

55.     All of these were very real concerns that should have prevented S & P from rating the Fund between June 27, 2006 and January 25, 2011 and which should have been communicated to investors together with the ratings that were issued, and certainly should have been disclosed to the market, at the very latest, once S&P issued its confidential research report on October 13, 2009.   Instead, S&P continued to issue "Af," investment-grade ratings for Lifetrade monthly through at least January 25, 2011, failing to mention its confidential research conclusions and thereafter silently ceasing its ratings without explaining why.

56.     Motivated by its own business concerns, and without regard for the truth of its representations or the harm that might be suffered by Plaintiffs and other retail investors, S&P issued glowing ratings reports for Lifetrade investments.  S&P's ratings were largely responsible for the success of the Lifetrade Entities in raising some $685,835,000 from offshore investors. S&P issued these ratings in violation of its own policies and conclusions set forth in the confidential research report attached as Exhibit A.

## WELLS FARGO'S CONFLICT-RIDDLED ACTIONS
## AS LENDER, TRUSTEE AND CUSTODIAN

57.     On June 25, 2008, Lifetrade entered into a loan and security agreement for a $500 million credit facility with Wells Fargo Bank's predecessor Wachovia Bank, N.A., secured by Lifetrade's life insurance policies and bank accounts.  Wachovia Bank failed during the 2008 financial crisis and was merged into Wells Fargo effective October 12, 2008.  Thereafter, Wells Fargo reduced the credit facility amount to $225 million on June 28, 2009 and to $200 million on June 30, 2011.

58.   Although Plaintiffs had no knowledge of these matters at the time, it now appears to Plaintiffs' counsel that Wells Fargo reduced the amount available on the credit line because the bank did not believe the LE evaluations provided by 21st Services. At some point, the date of which is unknown to Plaintiffs, Wells Fargo retained the reputable life settlement underwriter Milliman, Inc. to provide LE evaluations the bank could trust.

59.   On March 25, 2011, Lifetrade was completely restructured in a complicated transaction that was done to avoid U.S. withholding taxes on life insurance proceeds. As part of the restructuring, Lifetrade exchanged its portfolio of life insurance policies for notes issued by a new Irish company, Lifetrade Life Settlements Ltd. ("LT Ireland"), owned by an Irish charitable trust, and for preferred shares issued by a new Delaware corporation known as LT Investment, Inc., the common stock of which was owned by Defendant Roy G. Smith.

60.   As part of this transaction, two Wells Fargo affiliates, Wells Fargo Northwest, N.A. and Wells Fargo Delaware Trust Company, obtained legal title to the Lifetrade insurance policies as trustees of a Delaware trust known as LT Opportunity Trust, which became the sole borrower under the line of credit. Lifetrade, LT Ireland and Roy G. Smith and/or his affiliated entities are believed to have signed as guarantors. Wells Fargo Bank was named custodian of the policies pursuant to the terms of a custodian agreement and was also given the roles of verification agent and escrow agent for the Lifetrade Entities. Another Wells Fargo affiliate, Wells Fargo Securities, was appointed as administrative agent.

61.   In all, Wells Fargo and its affiliates held the fiduciary or contractual roles of trustee, custodian, verification agent and escrow agent on behalf of Lifetrade and its affiliates, but at the same time held the conflicting roles of secured lender and counterparty on Lifetrade's interest-rate hedges. What is more, Wells Fargo was on both sides of the key transaction: Wells

Fargo affiliates were both the borrowers (Wells Fargo Northwest and Wells Fargo Delaware Trust Company as trustees of the LT Opportunity Trust) and the secured lender (Wells Fargo Bank).

62.    On or about March 8th and 15th, 2012 Plaintiffs were notified by Lifetrade that fund valuations and redemptions were being *suspended* for Lifetrade because, *inter alia*, the fund was a guarantor on a credit facility being re-negotiated that, if unsuccessful, would represent over 40% of the net asset value of the fund.  At this time, the outstanding debt on the Wells Fargo credit line was $178 million, plus $15 million owed for a negative mark on the interest rate hedge.

63.    On or about April 25, 2012, Plaintiffs and other investors received notice of a special shareholders meeting to be held on the island of Curacao in the Dutch Antilles on May 17, 2012 to consider options for dealing with the fund's expiring line of credit with Wells Fargo. Investors were presented with three options: (1) a surrender of the fund's life insurance policies to Wells Fargo in payment of the debt; (2) a short-term extension of the line of credit for one year on difficult terms; or (3) a long-term refinancing plan. Lifetrade and its insiders pushed the surrender option as the "preferred route," emphasizing that with that action "the only recourse is to the life insurance policies" and that "[i]f Wells Fargo is unable to recoup 100% of its obligations, the Fund and /or investors will not be required to fund the difference." Plaintiffs did not attend the shareholders meeting, but understand that those who did voted for the fund to seek a long-term financing solution and rejected the idea of a surrender of Lifetrade's life insurance policies to Wells Fargo.  However, Plaintiffs were never specifically notified of the outcome of the meeting.

64.     Thereafter, the new Irish corporation notified the Irish stock exchange on August 16, 2012, that Wells Fargo as "Administrative Agent" under a Loan and Security Agreement dated March 28, 2011, had served on LT Ireland "(in its capacity as a guarantor under the Loan and Security Agreement) a notice of public sale dated 8 August 2012 (the 'Foreclosure Notice') arising from the occurrence of certain termination events pursuant to the Loan and Security Agreement."

65.     LT Ireland's announcement further stated that "Subsequent to the service of the Foreclosure Notice, [LT Ireland] and the Administrative Agent, *as well as relevant other parties*, entered into a settlement agreement (the 'Settlement Agreement') on 14 August 2012, pursuant to which a consensual foreclosure process has been agreed in respect of the various rights and obligations arising under, among others, the Loan and Security Agreement and certain other relationships and arrangements of [LT Ireland]." (Emphasis added.)

66.     In an undated letter sent to its investors about the same time, Lifetrade called attention to the LT Ireland announcement and explained that "The situation is that the foreclosure issued by Wells Fargo is in accordance with the Irish structure's legal requirements. On August 14, 2012 a settlement agreement was reached which ensures that the Fund has four months to implement a replacement line to remove Wells Fargo from the position of collateral owner. As per the agreement the option termination date will be November 30, 2012. The directors are still working to achieve a satisfactory outcome for investors and will update the website with developments as they happen."

67.     Thereafter, Plaintiffs were reassured on two occasions in 2013 that refinancing solutions for the Wells Fargo situation were being sought and that their "continued patience" was requested. *See* Exhibit E attached.  Then on or about November 21, 2016, some of the Plaintiffs

received e-mails from their brokers with attached undated letters from Lifetrade's management indicating for the first time that the bank was legally the owner of the life insurance policies that formerly belonged to Lifetrade; that the Lifetrade fund held no assets; and that the investors had suffered a "total loss." See attached Exhibit F.

68.     Based upon the foregoing, and although it was concealed from Plaintiffs at the time, Wells Fargo and its affiliates, acting as the Plaintiffs' fiduciaries in their capacities as trustees and custodians of the life insurance policies, surrendered those policies to itself pursuant to the terms of the Settlement Agreement of August 14, 2012, reserving to the Lifetrade Entities only a four-month option to reacquire the policies upon repayment of the debt. It also appears that "*other relevant parties*," likely including Lifetrade, Roy G. Smith and Smith's affiliated entities, signed off on the settlement agreement to indicate their approval of Wells Fargo's conflicted action serving its own financial interests.

69.     That Smith and others would consent to this arrangement knowing that shareholders of Lifetrade had opposed any surrender of the policies at the shareholder's meeting on May 17, 2012 bespeaks a complete disregard for Plaintiffs and other investors whom they had a fiduciary duty to protect. Their conduct is most likely explained by personal guaranties of the debt executed by Smith and/or his affiliated entities, who had skimmed off some $40 million to $130 million from Lifetrade and had considerable fortunes to lose.

70.     In their April 25, 2012, communication with Lifetrade investors proposing a surrender of the collateral in extinguishment of the debt, Lifetrade's management misled investors by emphasizing that "With this option, Wells Fargo will be in control of the selling process. However, the only recourse is to the life insurance policies. If Wells Fargo is unable to recoup 100% of its obligations, the Fund *and /or investors* will not be required to fund the

difference." (Emphasis added).   In reality, Wells Fargo never had any recourse to the shareholders of Lifetrade because they enjoyed limited liability from the corporate form; the real concern here appears to have been Wells Fargo's potential recourse to Smith and/or his affiliated entities as guarantors of the debt.

71.   Because the face value of the policies was $902 million and the amount of the debt was only $193 million, it was a breach of Wells Fargo's fiduciary and contractual duties as trustee and custodian to take all the life insurance policies for its own benefit, excluding the Lifetrade Entities and their stockholders from any benefit of the cash flows certain to be realized as the policies matured through the deaths of the life insureds.

72.   Because Roy Smith and/or his affiliated entities had self-dealing motives for surrender of the life insurance policies to Wells Fargo, it was likewise a breach of fiduciary duty for Smith and his affiliated entities to sign off on the Settlement Agreement transferring the life insurance policies to Wells Fargo.

## DERIVATIVE ACTION ALLEGATIONS

73.   Plaintiffs Rafael Mendoza de la Torre, Martin Miranda and Carlos Alberto Wehbi prosecute some of the claims in this action as a derivative action on behalf of the Lifetrade entities and their stockholders.

74.   Demand upon the management of the Lifetrade entities would be futile because (1) the managers and directors of the Lifetrade entities participated in the wrongful actions described herein and cannot be expected to take any action on behalf of the entities and their shareholders against the Defendants with whom they conspired; (2) the Lifetrade entities are now insolvent and have no funds with which to take any action on behalf of the

entities and their shareholders; and (3) the Lifetrade entities have ceased doing business and no longer hold meetings of their managers and directors.

75.    Nevertheless, contemporaneously with the filing of this action, Plaintiffs have served demands upon the managers and directors of the Lifetrade entities demanding that they pursue the claims set forth in this Complaint.

## CLASS ACTION ALLEGATIONS

### Plaintiff Class — All Offshore Investors in the Lifetrade Entities

76.    Pursuant to Fed. Rule Civ. Proc. 23, Plaintiffs Hugo Leonardo Carlini, Rafael Mendoza de la Torre, Martin Miranda and Carlos Alberto Wehbi bring this action on behalf of the following class:

> All offshore investors in the Lifetrade Entities whose investments have not been redeemed.

77.    Excluded from the Class are the Court, members of the immediate family of the Court, Defendants and the parents, subsidiaries, affiliates, officers, directors, employees and co-conspirators of Defendants.

78.    The proposed class satisfies the requirements of Rule 23(a) -- numerosity, commonality, typicality and adequacy – and the requirements of each of the three subdivisions of Rule 23(b).

### Rule 23(a)

79.    *Numerosity.* The members of the class are so numerous as to render joinder impracticable.  Plaintiffs do not know the precise number of class members. However, investments in the Lifetrade entities were $685,835,000 in total and included investors from both Latin America, Asia, and elsewhere. The Plaintiffs, scores of foreign investors with

{00032315}                              25

approximately $10,000,000 in claims, are only a small fraction of the total number, which is believed to be in the hundreds if not thousands.

80.    *Commonality.*  There *are* numerous questions of law and fact common to all class members.

81.    *Typicality.* The claims of the named plaintiffs and the absent class members are all tangible, have a *common* origin, and have a common basis.  The claims all originate from the same course of wrongful conduct. Defendants acted with regard to all class members in the same or substantially similar way, and all class members have passive investments in the Lifetrade Entities that were calculated and maintained in the same or similar way.   If prosecuted individually, the claims of each class member would necessarily rely upon the same material facts, rely upon the same theories, and seek the same relief.   As a result, the typicality requirement is satisfied.

82.    *Adequacy of Representation.* The named plaintiffs are willing and able to serve as class *representatives* and to undertake the resulting duties and obligations; they will fairly and adequately protect the class members; they have no interests adverse to other class members; and they have retained counsel with substantial experience and success in the prosecution of class actions and complex litigation who are able to represent the interests of the entire class.

## Rule 23(b)(1)

83.    Certification of a Plaintiff class is appropriate under Rule 23(b)(1) because the prosecution of separate actions creates the risk of inconsistent and varying adjudications *which* would establish incompatible standards of conduct for Defendants or because adjudications with respect to individual class members would as a practical matter be dispositive of the interests of others not currently before the court.

### Rule 23(b)(2)

84.    Defendants are acting and have acted in a manner generally applicable to the class, thereby making appropriate final injunctive and declaratory relief for the class as a whole.

### Rule 23(b)(3)

85.    The questions of law and fact common to all class members predominate over any questions affecting only individual members.

86.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy in that among other things:

      a)    Given the extensive common questions of law and fact, there are enormous economies to the courts and the parties in litigating the common issues on a class wide basis, instead of an individual basis;

      b)    The expense and burden of individual litigation in an overseas jurisdiction make it difficult for most of the individual class members to redress the wrongs done to them, such that few individual class members have any interest in controlling the prosecution of separate actions;

      c)    A class action is required for optimal deterrence and to limit the court awarded reasonable expenses incurred by class members in pursuing their claims; and,

      d)    There are no unusual management difficulties posed by this action.  No superior alternative exists for the fair and efficient group-wide adjudication of this controversy.

### Rule 23(c)(4)

87.     Plaintiffs may seek partial certification under Rule 23(c)(4) in that questions of law and fact common to the class exist as to all class members.  Such a partial certification would be an alternative to certification under Rule 23(b)(1), (b)(2), and (b)(3).

88.     Successful prosecution of this matter as a class action is the only way that the rights of the class members will ever be vindicated.

## ALLEGATIONS CONCERNING TIMELINESS

89.     Until very recently, Plaintiffs' investments in the Lifetrade Entities were carried on the account statements Plaintiffs received from their banks or brokerage firms at the last official net asset value provided by the Lifetrade Entities prior to a suspension of valuations that occurred in 2012.

90.     Plaintiffs were advised on or about March 8th and 15th, 2012 that fund valuations and redemptions were being suspended due to various issues affecting the fund's liquidity, including an expiring line of credit, but were told on more than one occasion thereafter that refinancing solutions for the Wells Fargo debt were being sought and that their "continued patience" was requested. *See* Exhibit E attached.

91.     Then on or about November 21, 2016, some of the Plaintiffs received e-mails from their brokers with attached undated letters from Lifetrade's management indicating for the first time that the fund had entered into a "contractual settlement agreement" with Wells Fargo (the date of which was not revealed); that the bank was legally the owner of all of the life insurance policies that formerly belonged to Lifetrade (with no information about how or when this occurred); that the Lifetrade fund held no assets; and that the investors had suffered a "total loss." *See* attached Exhibit F.

92.    One of the letters stated also "It is for this reason that most banks and platforms that guard this fund have decided to assign a zero value to the NAV and assume the loss which enable the banks to remove this fund from their portfolios." *Id.*

93.    Shortly thereafter, on or about February 22, 2017 most of the Plaintiffs received a notice of annual meeting for Lifetrade from HB Management N.V., one of the directors of Lifetrade Management Company N.V., a copy of which is attached as Exhibit G. The February 22, 2017 notice included "drafts" of annual reports for Lifetrade for the years 2012 through 2016, which Plaintiffs had never previously seen, suggesting for the first time that Lifetrade suffered a loss of $472,210,869.14 in 2012; that it had shareholders' equity of only $50,168.01 at year end 2012; and that its shareholder equity disappeared completely in 2013 due to continuing losses.

94.    These reports in November 2016 and February 2017 alerted Plaintiffs to their loss for the first time, caused them to suspect for the first time that they were victims of a fraud in which the Defendants acted with scienter and caused then to retain counsel to investigate.

95.    Plaintiffs learned that Defendant S&P acted with scienter only when they paid $600 on January 24, 2017 to obtain access to S&P's confidential research report attached as Exhibit A.  Plaintiffs learned of the scienter of 21st Services, Portsmouth Settlement, Portsmouth Securities and Roy G. Smith only when counsel uncovered the accusations of the Coventry suit attached as Exhibit B.

96.    Prior to retaining counsel, Plaintiffs did not have sufficient knowledge or information about the fraud to prepare and file a complaint meeting the pleading standards of Fed. Rule Civ. Proc. 9(b), *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950, 173 L. Ed. 2d 868 (2009) and

*Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 557, 127 S. Ct. 1955, 1966, 167 L. Ed. 2d 929

(2007, including the requirement that they plead scienter with particularity.

## COUNT I

### FRAUD - KNOWING MISREPRESENTATION BY S&P

97.    **Incorporation By Reference**. Plaintiffs re-allege paragraphs I through 94, inclusive, of this Complaint.

98.    **Misrepresentation.**   By its words and conduct, knowing that investors in Lifetrade would rely thereon, Defendant S&P represented to Plaintiffs that the securities of Lifetrade were safe, investment-grade securities that had steadily increased in value since their initial offering, exceeding the performance of benchmark indexes for U.S. stocks and bonds.  In truth and in fact, the securities of Lifetrade were exceedingly risky, their value being based almost entirely upon false LE evaluations prepared by 21st Services, which had already been accused of fraud in a lawsuit and reports widely circulated in the life settlements industry before S&P rated Lifetrade's securities.  Defendant S&P itself knew that life settlement transactions were too risky to rate.

99.    **Knowledge of Falsity**.  At the time it made the misrepresentations about the safety and value of Lifetrade's securities, Defendant S&P knew that they were false as shown by its confidential research stating that life settlement transactions are were too risky for it to rate.

100.    **Scienter.** Defendant S&P knew that investors in Lifetrade would rely upon its representations, and intended that they do so.

101.    **Reasonable Reliance by Investors in Lifetrade**. The Plaintiffs were unaware of the falsity of S&P's representations. Plaintiffs reasonably relied upon the false representations of

S&P. Had Plaintiffs known that S&P had issued a confidential report stating that life settlement transactions are too risky to rate, Plaintiffs would not have invested in the securities.

102. **Proximate Cause and Damages.** As a proximate cause of the knowing misrepresentation of Defendant S&P, the Plaintiffs have been damaged in an amount to be established at trial, but the damages of the Class are at least $5 million and the damages of at least one individual Plaintiff exceed $75,000.

## COUNT II

### FRAUD - FALSE STATEMENTS BY S&P
### WITHOUT SUFFICIENT KNOWLEDGE OF TRUTH OR FALSITY

103. **Incorporation by Reference.** Plaintiffs re-allege paragraphs 1 through 94, inclusive, of this Complaint.

104. **False Statement.** By its words and conduct, knowing that investors in Lifetrade would rely thereon, Defendant S&P represented to Plaintiffs that the securities of Lifetrade were safe, investment-grade securities that had steadily increased in value since their initial offering, exceeding the performance of benchmark indexes for U.S. stocks and bonds. In truth and in fact, the securities of Lifetrade were exceedingly risky, their value being based almost entirely upon false LE evaluations prepared by 21st Services, which had already been accused of fraud in a lawsuit and reports widely circulated in the life settlements industry before S&P rated Lifetrade's securities. Defendant S&P itself knew that life settlement transactions were too risky to rate.

105. **Absence of Knowledge of Truth or Falsity.** At the time S&P made its initial false statements about the safety and performance of Lifetrade's securities on June 27, 2006, if S&P did not yet know that the securities were too risky to rate, it nevertheless acted without a sufficient investigation to permit it to know whether its statements were true or false. That is,

Defendant S&P had no idea of the safety or value of Lifetrade's securities, and had not made sufficient inquiry to know one way or the other, yet made the representations anyway.

106.   **Scienter.** Defendant S&P knew that investors in Lifetrade would rely upon its representations, and intended that they do so.

107.   **Reasonable Reliance by Investors in Lifetrade.** The Plaintiffs were unaware of the falsity of S&P's statements. Plaintiffs reasonably relied upon the false statements of S&P. Had Plaintiffs known that S&P, in reality, had no idea about the safety or value of Lifetrade's securities, Plaintiffs would not have invested in the securities.

108.   **Proximate Cause and Damages.** As a proximate cause of the false statements, the Plaintiffs have been damaged in an amount to be established at trial, but the damages of the Class are at least $5 million and the damages of at least one individual Plaintiff exceed $75,000.

## COUNT III

## NEGLIGENT MISREPRESENTATION BY S&P

109.   **Incorporation by Reference.** Plaintiffs re-allege paragraphs I through 94, inclusive, of this Complaint.

110.   **Representations by Defendant.** By its words and conduct, knowing that investors in Lifetrade would rely thereon, Defendant S&P represented to Plaintiffs that the securities of Lifetrade were safe, investment-grade securities that had steadily increased in value since their initial offering, exceeding the performance of benchmark indexes for U.S. stocks and bonds.

111.   **Falsity of Representation.** In truth and in fact, the securities of Lifetrade were exceedingly risky, their value being based almost entirely upon false LE evaluations prepared by

21st Services, which had already been accused of fraud in a lawsuit and reports widely circulated in the life settlements industry before S&P rated Lifetrade's securities.

112. **Special Relationship.** Plaintiffs had a "special relationship" with S&P, in that S&P (1) intended their ratings would be used to evaluate the Lifetrade investment; (2) intended that Plaintiffs – members of a select group of qualified investors – would rely on their ratings to evaluate the investment; and (3) prepared their ratings with the end and aim of inducing investors such as the Plaintiffs to invest.

113. **Reliance by Known Party or Parties in Furtherance of Purpose.** The Plaintiffs reasonably relied upon the false statements of S&P. Had Plaintiffs known that S&P, in reality, had no idea about the safety or value of Lifetrade's securities or in fact knew the securities were too risky to rate, Plaintiffs would not have invested in the securities.

114. **Proximate Cause and Damages.** As a proximate cause of the false statements, the Plaintiffs have been damaged in an amount to be established at trial, but the damages of the Class are at least $5 million and the damages of at least one individual Plaintiff exceed $75,000.

## COUNT IV

## BREACH OF FIDUCIARY DUTY BY WELLS FARGO BANK, WELLS FARGO UTAH & WELLS FARGO DELAWARE

115. **Incorporation by Reference.** Plaintiffs re-allege paragraphs 1 through 94, inclusive, of this Complaint.

116. **Special Relationship of Confidence & Trust.** By virtue of (1) Wells Fargo Bank's role as Custodian, Verification Agent, and Escrow Agent for the Lifetrade fund, (2) the roles of its affiliates Wells Fargo Utah and Wells Fargo Delaware as trustees of the LT Opportunity Trust which held title to Lifetrade's life insurance policies, and (3) the roles of Wells Fargo Utah and Wells Fargo Delaware as trustees of the LT Opportunity Trust, which was

the borrower on loans secured by Lifetrade's life insurance policies, Wells Fargo Bank and its affiliates Wells Fargo Utah and Wells Fargo Delaware had a special relationship of confidence and trust with Lifetrade and its shareholders which gave rise to fiduciary duties.

117.   **Breach of Fiduciary Duty.**   By (1) surrendering the Lifetrade life insurance policies to themselves in satisfaction of a debt owed to and by themselves, (2) ignoring self-dealing conflicts of interest on the part of Lifetrade's management, (3) ignoring a special vote of the shareholders of Lifetrade opposing that action, and (4) failing to provide notice of that action to the shareholders of Lifetrade, Wells Fargo Bank, Wells Fargo Utah and Wells Fargo Delaware breached the fiduciary duties owed to Lifetrade and its shareholders.

118.   **Proximate Cause and Damages.**   As a proximate cause of the breach, the Plaintiffs have been damaged in an amount to be established at trial, but the damages of the Class are at least $5 million and the damages of at least one individual Plaintiff exceed $75,000.

**COUNT V**

**BREACH OF CONTRACT BY WELLS FARGO BANK, WELLS FARGO UTAH & WELLS FARGO DELAWARE**

119.   **Incorporation by Reference.**   Plaintiffs re-allege paragraphs 1 through 94, inclusive, of this Complaint.

120.   **Contractual Relationships.**  Wells Fargo Bank entered into various agreements with Lifetrade by which it assumed the roles of Custodian, Verification Agent, and Escrow Agent for the Lifetrade fund.  Wells Fargo Utah and Wells Fargo Delaware also entered into as various agreements with Lifetrade by which they assumed the role of trustees and agreed to both borrow money on behalf of Lifetrade and its affiliates and to hold title to all life insurance policies belonging to Lifetrade or its affiliates.

121.    **Breach of Fiduciary Duty.**  By (1) surrendering the Lifetrade life insurance policies to themselves in satisfaction of a debt owed by and to themselves, (2) ignoring self-dealing conflicts of interest on the part of Lifetrade's management, (3) ignoring a special vote of the shareholders of Lifetrade opposing that action, and (4) failing to provide notice of that action to the shareholders of Lifetrade, Wells Fargo Bank, Wells Fargo Utah and Wells Fargo Delaware breach their contractual duties owed to Lifetrade and its shareholders.

122.    **Proximate Cause and Damages.**  As a proximate cause of the breach, the Plaintiffs have been damaged in an amount to be established at trial, but the damages of the Class are at least $5 million and the damages of at least one individual Plaintiff exceed $75,000.

## COUNT VI

## UNJUST ENRICHMENT OF WELLS FARGO BANK

123.    **Incorporation by Reference.**  Plaintiffs re-allege paragraphs 1 through 94, inclusive, of this Complaint. They plead additionally and in the alternative, that:

124.    **Defendant was Enriched.**  Defendant Wells Fargo Bank is being enriched by collecting the death benefits on some $912 million in life insurance to satisfy a debt of only $193 million that was owed by Lifetrade.

125.    **At the Plaintiffs' Expense.**  Wells Fargo Bank's enrichment is at the expense of the shareholders of Lifetrade, who invested some $686 million in Lifetrade and have been deprived of the entirety of their investments.

126.    **Against Equity & Good Conscience.**  It is against equity and good conscience for Wells Fargo to be permitted to retain the portion of the life insurance policy death benefits that are in excess of the $193 million debt owed to Wells Fargo, plus its reasonable costs and interest.

## COUNT VII

## FRAUD - KNOWING MISREPRESENTATION BY 21ST CENTURY

127. **Incorporation by Reference.** Plaintiffs re-allege paragraphs 1 through 94, inclusive, of this Complaint.

128. **Misrepresentation.** By its words and conduct, knowing that Lifetrade and its investors would rely thereon, Defendant 21st Services made false representations about the life expectancy of life insureds who engaged in life settlement transactions with Portsmouth Settlement that were to be assigned to Lifetrade.

129. **Knowledge of Falsity.** At the time it made the misrepresentations, Defendant 21st Services knew that they were false and grossly understated the life expectancies of the insured persons.

130. **Scienter.** Defendant S&P knew that Lifetrade and its investors would rely upon its representations, and intended that they do so.

131. **Reasonable Reliance by Lifetrade and its Investors.** Lifetrade and its investors were unaware of the falsity of 21st Services representations. Plaintiffs reasonably relied upon the false representations of 21st Services.  Had Plaintiffs known that 21st Services was providing fraudulent life expectancy evaluations, Plaintiffs would not have invested in the securities.

132. **Proximate Cause and Damages.** As a proximate cause of the knowing misrepresentations of Defendant 21st Services, the Plaintiffs have been damaged in an amount to be established at trial, but the damages of the Class are at least $5 million and the damages of at least one individual Plaintiff exceed $75,000.

## COUNT VIII

## CONSPIRACY TO COMMIT FRAUD
## BY 21ST SERVICES, PORTSMOUTH SETTLEMENT & SMITH

133. **Incorporation by Reference.** Plaintiffs re-allege paragraphs 1 through 94, inclusive, of this Complaint.

134.   **Conspiracy to Defraud.** As alleged in detail above, Defendant 21ST Services and its coconspirators, Portsmouth Settlement and Roy G. Smith, knowingly and/or recklessly, agreed and/or confederated by common design and conspired by common design to make materially false and misleading statements and engage in a fraudulent scheme for the purpose of inducing Plaintiffs to invest in Lifetrade.

135.   **Reasonable Reliance by Lifetrade and its Investors.** Lifetrade and its investors were unaware of the falsity of 21st Services representations made by agreement with Portsmouth Settlement and Roy G. Smith. Plaintiffs reasonably relied upon the false representations. Had Plaintiffs known that Defendants were providing fraudulent life expectancy evaluations, Plaintiffs would not have invested in the securities.

136.   **Proximate Cause and Damages.** As a proximate cause of the knowing misrepresentations of Defendants 21st Services, Portsmouth Settlement and Roy G. Smith, the Plaintiffs have been damaged in an amount to be established at trial, but the damages of the Class are at least $5 million and the damages of at least one individual Plaintiff exceed $75,000.

### COUNT IX

### NEGLIGENT MISREPRESENTATION BY 21ST SERVICES

137.   **Incorporation by Reference.** Plaintiffs re-allege paragraphs I through 94, inclusive, of this Complaint.

138.   **Representations by Defendant.** By its words and conduct, knowing that investors in Lifetrade would rely thereon, Defendant 21st Services made representations about the life expectancy of life insureds who engaged in life settlement transactions with Portsmouth Settlement that were to be assigned to Lifetrade.

139.    **Falsity of Representations.** The representations were false because they did not comport with professional standards and under-estimated the life expectancy of the life insureds.

140.    **Special Relationship.** Lifetrade had a "special relationship" with 21st Services, in that 21st Services (1) intended their life expectancy evaluations would be used to value life policies that Portsmouth Settlement purchased on behalf of Lifetrade; (2) intended that Portsmouth Settlement and Lifetrade would rely on their life expectancy evaluations to value the life insurance policies; and (3) prepared their life expectancy evaluations with the end and aim of permitting Portsmouth Settlement and Lifetrade to outbid other bidders for the policies.

141.    **Reliance by Known Party or Parties in Furtherance of Purpose.** Portsmouth Settlement and Lifetrade reasonably relied upon the false statements of 21st Services.   Had Lifetrade known that 21st Services was understating the life expectancies, it would not have purchased the life settlements in question.

142.    **Proximate Cause and Damages.** As a proximate cause of the false statements, the Lifetrade and its investors have been damaged in an amount to be established at trial, but the damages of the Class are at least $5 million and the damages of at least one individual Plaintiff exceed $75,000.

**COUNT X**

**FRAUD - KNOWING MISREPRESENTATIONS AND CONCEALMENT OF MATERIAL FACTS BY SMITH**

143.    **Incorporation by Reference.** Plaintiffs re-allege paragraphs I through 94, inclusive, of this Complaint.

144.    **Misrepresentations.**   By his words and conduct, knowing that investors in Lifetrade would rely thereon, Smith made false representations about (1) the life expectancy of

life insureds, (2) the value of life insurance policies purchased by Lifetrade and (3) the safety of investments in Lifetrade.

145. **Concealment.** Having a duty of disclosure due to the vague and misleading nature of disclosures he made to Lifetrade investors, Smith also failed to disclose (1) the amount of the fees, commissions and other compensation paid to himself and his affiliates, (2) the true reason that Wells Fargo Bank reduced the amount of Lifetrade's credit line and declined to renew its credit facility, (3) the true reason he viewed a surrender of Lifetrade's policies as a preferred route for dealing with the Wells Fargo debt, and (4) the true status of Lifetrade's life insurance policies after they were surrendered.

146. **Scienter.** At the time he made the misrepresentations and nondisclosures, Smith knew that his statements were false and that his nondisclosure would mislead investors in Lifetrade.

147. **Knowledge of Reliance.** Defendant Smith knew that Lifetrade's investors would rely upon his false representations and concealment, and intended that they do so.

148. **Reasonable Reliance by Lifetrade and its Investors.** Lifetrade and its investors were unaware of the falsity of Smith's misrepresentations. Plaintiffs reasonably relied upon the false representations and are deemed to have relied upon the nondisclosure of material facts. Had Plaintiffs known that matters misrepresented or concealed by Smith, they would not have invested in Lifetrade and/or would have taken other action to protect their interests after making an investment.

149. **Proximate Cause and Damages.** As a proximate cause of the knowing misrepresentations and concealment by Smith, the Plaintiffs have been damaged in an amount to

be established at trial, but the damages of the Class are at least $5 million and the damages of at least one individual Plaintiff exceed $75,000.

## COUNT XI

### BREACH OF FIDUCIARY DUTY BY SMITH

150.     **Incorporation by Reference.** Plaintiffs re-allege paragraphs 1 through 94, inclusive, of this Complaint.

151.     **Special Relationship of Confidence & Trust.** By virtue of his position as the founder and principal investment officer of Lifetrade, Smith had a special relationship of confidence and trust with Lifetrade and its shareholders which gave rise to fiduciary duties.

152.     **Breach of Fiduciary Duty.** By (1) engaging in self-dealing transactions by which his controlled entities, including Portsmouth Settlement, Portsmouth Securities and Lifetrade Management, were allowed to make undisclosed fees and commissions of as much as 25% of the amount Lifetrade paid for life settlements, (2) surrendering Lifetrade's policies to Wells Fargo Bank to avoid potential liability as a guarantor for himself and his controlled entities, (3) ignoring the wishes of Lifetrade shareholders expressed in a special shareholders' and (4) failing to provide clear notice of the surrender of Lifetrade's policies to its shareholders, Smith breached his fiduciary duties owed to Lifetrade and its investors.

153.     **Proximate Cause and Damages.** As a proximate cause of the breach, the Plaintiffs have been damaged in an amount to be established at trial, but the damages of the Class are at least $5 million and the damages of at least one individual Plaintiff exceed $75,000.

### PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs pray for the following relief:

a)     An award of compensatory damages in amounts to be determined at trial resulting from Defendants' wrongful conduct and breach of their legal, contractual and

fiduciary duties;

b)      Pre-judgment and post-judgment interest to the extent allowed by law;

        An award of the cost of prosecuting this action, including reasonable attorneys'

        fees, expert fees and costs reasonably incurred to the extent allowed by law;

c)      Punitive damages; and

d)      Such other and further relief as this Court may deem just and proper.

{00032315}

## DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial on all claims alleged herein.

Dated:   April 24, 2017

Respectfully submitted,


PHILLIPS & PAOLICELLI, LLP

By: _____
Stephen Phillips (SP-9658)
SPhillips@p2law.com
Diane Paolicelli (DP-3067)
dpaolicelli@p2law.com
William Mack (WM-7786)
WMack@p2law.com
747 Third Avenue
New York, N.Y. 10017
Telephone: (212) 388-5100


WATERS & KRAUS, LLP
Wm. Paul Lawrence, II
(*Pro Hac Vice* to be submitted)
plawrence@waterskraus.com
Washington D.C. Metro Office
37163 Mountville Rd.
Middleburg, VA 20117
Telephone: (540) 687-6999
Fax: (540) 687-5457


Charles Siegel
(*Pro Hac Vice* to be submitted)
csiegel@waterskraus.com
3219 McKinney Ave.
Dallas, TX 75204
Telephone: (214) 357-6244
Fax: (214) 357-7252

{00032315}