# IN THE UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Hugo Leonardo CARLINI; Rafael MENDOZA DE LA TORRE, Martin MIRANDA, and Carlos Alberto WEHBI, individually and on behalf of a class of all others similarly situated;<br><br>and<br><br><br>Luis Ramiro AVILES, Ramón Hector ABRIGADANI, Juan José ACOGLANI, , Juan Carlos AFFIF, Susana Mariel ALONSO, Diana Irene ALVAREZ, Diego Rodolfo ANGELO PAPE, Daniel Alberto ARAMBURU, Alberto ARMONI, Lucila ATUCHA, Eduardo Dario AVRUJ, Hugo Omar BARCA, Miguel BARTON, Josue Maximiliano BAUERBERG, Guillermo Walter BENELLI, Sonia BENVENUTO, Alejandro Enrique Julio BERGER, Roberto Teobaldo BIAGIONI, Hector Ruben BIRCZ, Miguel Carlos BLANCO, Ricardo Osvaldo BLUTHGEN, Alicia BONASTRO, Elizabeth BOOTE, Maria Cecilia BRIGANTE, Carlos Alberto BRIGNONE, Juan Horacio BUSANELLO, Benjamin Alberto BYSTROWICZ, Jose Maria CABRERA, Mariano Pablo CAILLET☐BOIS, CAJA MUNICIPAL DE JUBILACIONES Y PENSIONES DE NOGOYA, Miguel Angel CALGARO, Guillermo Jose CAMPOS, Gustavo CANIL, Pablo CARIDE, Hugo Leonardo CARLINI, , Susana Carmen CARNIGLIA, Guillermo CASTILLO, Martin Rodolfo CASTRO, Roxana CATALANO, Marta Graciela CECATI, RodoIfo CENTENO, Eugenia Agustina CERDA, Pablo CODEVILLA, Matias Luis COLL, Gerardo COLLARDIN, Vanina Laura COLUCCIO, CONAISS HOLDING S.A., Maria Teresa del Carmen CORREA AVILA, Maria Alicia Delfa CRAVIOTTO, Diego CUESTA SILVA, Manuel CUESTA SILVA, Daniel Oscar | **CIVIL ACTION NO. 17-CV-02987**<br><br><br><br><br><br><br><br><br><br><br><br><br>**FIRST AMENDED COMPLAINT**<br><br>**CLASS ACTION COMPLAINT**<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>**JURY TRIAL DEMAND** |

DE GIORGIO, Juan Martin DE LA
SERNA, Marcelo DE LEO, Guido
Emilio DEGANO, Jalid Alberto DEL
AZAR, Gabriel Alejandro DEL CAMPO,
Tomas DEL CARRIL, Ramon Santos DI
GIAMBATTISTA, Diego Salvador DI
MAGGIO, DISTRIBUIDORA DE
PRODUCTOS QUIMICOS S.A., Jorge
Daniel DIZ, Claudio DOLLER, DON
SATUR SRL, Silvio Roberto Damian
DONATO, Jorge Alfredo ELIAS,
Gabriel ERKEKDJIAN, Giselle
ERKEKDJIAN, Cristian Horacio
ERNST, Eduardo ESCUDERO, FAFAL
CORP., FERDENAS HOLDING LTD.,
Jorge Anselmo FERNANDEZ, Gabriel
Manuel FERNANDEZ, Miguel
FERNANDEZ MOORES, Carlos Adrian
FERRETI, Jorge Alberto FORLANO,
Oscar Alberto FREI, Fernando R.
FREIXAS PINTOS, FRONTOSA
LIMITED, FUNDACION FIORENZO,
Monica Gallegos, Fernando Antonio
GARABATO, Jose Antonio GARCIA
GARCIA, Raúl Alberto GENCHI,
Ricardo Luis GENTILE, Maria Paola
GERANIO, Mauro GIACOMETTI,
Sebastian GIL GARRO, , Juan Jesus GIL
JUNCAL, Mario Luis GIMENEZ, Carlos
Alberto GIMENEZ HUTTON, Luis
Miguel GIRARDOTTI, Daniel Ergasto
GOMEZ CUSCO, Francisco Javier
GOMEZ RONCO, Jose Elias
GONDOLO, Jose Antonio GONZALEZ,
Maria Elena GONZALEZ, José Luis
GONZALEZ, Héctor Jorge
GONZALEZ, Jorge GOYES, , Fernando
Enrique GRANDA, , Tomás
GUIRALDES, Carlos GURMENDI,
Ricardo Manuel GUTIERREZ, Hortensia
Dominga Teresa GUTIERREZ POSSE,
Magdalena GUZMAN, Marta Alicia
HAPPAR, Enrique Matias HAYZUS,
Susana Ines HERRERA, Manuel Juan
Luciano HERRERA GRAZIOLI, Tomas
Victoriano HERRERO, Horacio Daniel
HOLCMAN, Monica HUISMAN,
Cristian ITURRALDE, Walter Alfredo
JAKOB, Victor Miguel JAMUI, Carlos
Alberto Nicolas JOHANSON, Fraida
KAHAN, Blanca Beatriz Maria
KINBAUM, Edmundo Humberto
KINDSVATER, Alejandro Saul
KORDON, Moises Luis KOTLER, Ana

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Maria Nora KRIEGER, KP VENTURES, )
S.A., Alejandro José LABORDE, Alberto )
LAMM, Martin Juan LANG, Felix Luis )
LEBORGNE, Elsa Beatriz LEDESMA, )
Marcelo Hernan LOFFREDA, Edgardo )
Alfredo LOMBI, Luis Felipe LOPEZ
BLANCO, Natalia LOYATO, Sergio
LUCERO, Graciela Stella Maris
MAGLIANO, Jose Julio MANSILLA
LAMI, Maria Beatriz MARQUINEZ,
Alberto MARTINEZ, Julian Ariel
MARTINEZ, Elena Celina Rosa
MARÚN, Fernando MATARAZZO,
Maria Rosa Irma MATERIA, Roberto
Jose MATERIA, Adrian Marcelo
MATERIA, Ana Cecilia MATERIA,
Gustavo MATERIA, Diana MATERIA,
Esteban Alberto MATERIA, Aldo
Antonio MATERIA, Domingo
MAZZITELLI, Esteban MAZZUCO,
MELBURNE S.A., Romulo Bernardino
MENA, Rafael Leonardo MENDOZA
DE LA TORRE, Carlos A. MENENDEZ,
Matias Rodolfo MEYER, Rodrigo
Hernan MEYER, María Victoria
MIRANDA, Mariano Jorge MIRANDA,
Martin Ricardo MIRANDA, Enrique
Horacio MIRKIN, Carlos Gabriel
MIYAGI, Silvana MONTEFIORE,
Sergio Roman MORGENSTERN, Jorge
A. MOYANO, Maria Concepcion Teresa
MÜLLER, Olga Ines MURO de
NADAL, , NARJA INVESTMENTS
CORP., Enrique Gualterio NEGUS,
Maria Elba OLEAGA, Carlos Alfredo
OLIVA, Roque Manuel OLIVER,
Enrique Hector PAGLIETTINI, Lucila
Elena PAILLARD POLERO, Marco
Alberto PANETTIERI, Camilo
PATRIGNANI, Jose Luis
PATRIGNANI, Alejandra Graciela
PATURAU, Guillermo Ariel PEREYRA,
Silvana PEREZ, Enrique Horacio
PICADO, Domingo PITTALUGA,
Gustavo PITTALUGA, Cecilia Elsa
PIZZINI, Alberto M. POMATO, Pablo
Gabriel POTOKSKI, Victor Roberto
POGGI, PRENTON INDUSTRY LTD,
Ricardo Roberto Eduardo PUJALS,
Paula RADIZZANI HELGUERA,
Ramon Enrique REQUESENS PAZ,
Diego Luis RIOS, Juan Enrique
ROBERTS, Raquel Iris ROBUSTELLI,
María Cristina RODRIGUEZ, Norberto

Vicente RODRIGUEZ, Alfredo Gregorio
RODRIGUEZ, Leonardo RODRIGUEZ,
Maria Lucila RODRIGUEZ
CARNIGLIA, Bernardo ROMEO, Pablo
Jose RODRIGUEZ FALCON, Daniela
Iris ROSSEN, Francisco Alberto
RUETE, Pablo Leonardo SACCO, Juan
Carlos SACCO, Martin SAENZ
VALIENTE, Juan Sebastian SALABER,
María Elisa SALERNO, Haisan
SAMMAN, Nora SAN JUAN, Miguel
SANCHEZ DE BUSTAMANTE,
Gonzalo SANCHEZ PUPPULO,
Guillermo SCHLEICHER,
GracielaSIGUENZA, Javier Jorge Oscar
SILVA, Juan Carlos SOLDANO, Ana
Maria STEINNEKKER, Liliana Noemi
STELLATO, Claudio STEUDLE,
Marcelo Alejandro SUGIER, Ricardo
SZILY, TAFINA ESTABLISHMENT,
Jose TEDESCO, Fabricio TERZANO,
Alfredo Eduardo TERZANO, Ernesto
Miguel TORRE, Salvador TOSCANO,
Eduardo TUZZIO, Hugo Alberto
UNTERSANDER, ULAN BATOR
PROJECT, LTD, Monica URRESTI,
Gustavo Alberto URRUTIA, Ruben
Angel VALSAGNA, Ulises Daniel
VARELA DAMBORIANA, Christine
Alice Marie Marcelle VERSE, Pedro
VIGNEAU, Jose Luis VILLANUEVA
AHUMADA, Juan Antonio VIRAG,
Carlos Alberto WEHBI, Juana Monica
WEHMEYER, Ana Ines WILSON,
Enrique ZANIN, Elsa María Elvira
ZARLENGA, Cesar Emilio
ZUCCHINO,

    Plaintiffs.

vs.

S&P GLOBAL, INC., WELLS FARGO
BANK, N.A., WELLS FARGO BANK
NORTHWEST, N.A., WELLS FARGO
DELAWARE TRUST COMPANY, ATC
REALTY FIFTEEN, INC. THE
LIFETRADE FUND, B.V., LIFETRADE
MANAGEMENT COMPANY, LLC,
LIFETRADE MANAGEMENT
COMPANY, N.V., LIFETRADE ASSET
MANAGEMENT, N.V., LIFETRADE
LIFE SETTLEMENTS LIMITED, LT
INVESTMENTS, INC., PORTSMOUTH

SETTLEMENT COMPANY I, LLC,
PORTSMOUTH SECURITIES
LIMITED, ROY G. SMITH, JOHN
MARCUM, TMF CURACAO N.V., and
ITM TWENTYFIRST, LLC,

Defendants.

## FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiffs Hugo Leonardo Carlini, Rafael Mendoza de la Torre, Martin Miranda and Carlos Alberto Wehbi bring this action (1) individually on their own behalves; (2) derivatively on behalf of The Lifetrade Fund B.V., LTrade Plus Ltd. and LTrade Fixed Capital (BVI) Ltd. (collectively "the Lifetrade Entities"); and (3) as representatives of a class of all offshore stockholders of the Lifetrade Entities. The remaining Plaintiffs, Luis Ramiro Aviles et al., join in this Complaint to assert their individual claims on their own behalves.

All Plaintiffs assert claims herein against (1) S&P Global, Inc. (hereinafter "S&P"); (2) Wells Fargo Bank, N.A., Wells Fargo Bank Northwest, N.A., Wells Fargo Delaware Trust Company and ATC Realty Fifteen, Inc. (hereinafter collectively the "Wells Fargo Defendants"); (3) the Lifetrade Fund, B.V., Lifetrade Management Company, LLC, Lifetrade Management Company, N.V., Lifetrade Asset Management, N.V., Lifetrade Life Settlements Limited, LT Investments, Inc., Portsmouth Settlement Company I, LLC, Portsmouth Securities Limited, Roy G. Smith, John Marcum, TMF Curacao N.V., ("the Equity Trust Defendant") (hereinafter collectively "the Lifetrade Defendants"); and (4) ITM Twentyfirst, LLC, (hereinafter "21st Services"), as more fully set forth below:

## INTRODUCTION

1.     Plaintiffs are offshore investors, who have lost the entirety of their investments – collectively many millions of dollars – in the Lifetrade Entities.  First, they were misled by the Lifetrade Defendants and Defendant S&P to believe that life settlements are an alternative asset

class, not correlated with the price of stocks or bonds, and that such investments would diversify an investment portfolio to protect against the volatility of traditional stock and bond investments during recessions or market panics. Plaintiffs and other investors in Lifetrade were further mislead by the Lifetrade Defendants and S&P to believe that life settlements are a safe investment class comparable to investment-grade corporate bonds. All of these representations were false, as S&P conceded in a 2009 non-public report that was not revealed to Plaintiffs. Plaintiffs' relied on these misrepresentations to their detriment.

2.     To make matters worse, in August 2012, when the Lifetrade Entities were unable to repay their loan obligations to Wells Fargo, the Lifetrade Defendants negotiated and entered into an unconscionable Settlement Agreement which resulted in a fraudulent transfer to the Wells Fargo Defendants of the entire portfolio of Lifetrade – insurance policies valued at over $900,000,000 – to satisfy a debt of only approximately $200,000,000. The Wells Fargo Defendants were unjustly enriched by hundreds of millions of dollars. The Lifetrade managers, Defendants Smith and Marcum, received immunity from personal liability in the bargain, to the detriment of the investors, to whom they owed fiduciary duties.

3.     Not only did the Wells Fargo Defendants and the Lifetrade Defendants rob Plaintiffs and other investors of the entirety of their investments, but they conspired to conceal this fact from Plaintiffs, and to prevent Plaintiffs from learning of their losses sooner. Indeed, the Settlement Agreement specifically precluded the Lifetrade Defendants from making "any statements to investors in the Lifetrade Parties, or any other Persons, whether privately or publicly, relating to the settlement contemplated by this Agreement." Of no small significance, the Agreement also concealed from Plaintiffs any facts that might inform them of the motivations behind Defendants' collusive deal:   it expressly precluded any statements to

investors "relating to the state of mind, motivation, actions or inactions" by the Wells Fargo entities.

4.    By way of background the Lifetrade Fund, B.V. ("Lifetrade"), was a stockholder/investor-owned corporation organized under the laws of the Netherlands Antilles that operated as an open-ended mutual fund.  It was offered to a group of investors in the nations of Argentina, Japan and Korea via a private placement through their investment advisers.

5.    LTrade Plus Ltd. and LTrade Fixed Capital (BVI) Ltd were also stockholder/investor-owned corporations, but were organized under the laws of the British Virgin Islands and served as feeder funds for Lifetrade, allegedly investing in bond-like, fixed-return securities issued by Lifetrade. The securities of LTrade Plus and LTrade Fixed were offered to investors in the same manner as securities in Lifetrade.   Neither offering was registered with any regulatory agency and all of the securities were offered in private placements.   There was no general public offering of shares in any of the funds. Also, the securities of all three funds were illiquid and did not trade on any exchange or recognized over-the-counter market.

6.    Lifetrade itself invested exclusively in the secondary market for life insurance policies issued in the United States on the lives of U.S. citizens ("life insureds"), approximately 25 percent of whom were located in the State of New York. Life settlement originators or providers (hereinafter called "life settlement providers") in the United States created a secondary market for life insurance policies known as viatical settlements or life settlements (hereinafter collectively "life settlements"). Investors in life settlements acquire life insurance policies from life insureds, typically age 65 or older, who have made an investment in whole or universal life

coverage, but no longer require life insurance protection and/or desire to realize cash from their policies before their deaths in order to pay medical, long-term care or other expenses.

7.    Investors acquire such policies and pay the premiums thereon until the deaths of the life insureds with the expectation of substantial gains that are supposedly guaranteed by the undeniable mortality of the life insureds, whose life expectancy in months is determined by underwriters located in the United States, including Defendant 21st Services.

8.    Defendant S&P created and then fostered the false impression that life settlements generally, and Lifetrade funds in particular, were a safe investment option by issuing, month after month, investment-grade ratings of "Af" for Lifetrade between June 27, 2006 and April, 2011, with full knowledge and the expectation that such ratings would be relied upon by investors and their investment advisers, including Plaintiffs and members of the class, as evidence of the safety of the investments in the Lifetrade Entities.

9.    Plaintiffs and other investors were also led by the Lifetrade Defendants and S&P to believe that an investment in the Lifetrade Entities would generate steady capital growth in excess of benchmark stock and bond indices, an impression created by price charts for Lifetrade and the benchmark indices included in S&P's monthly reports.

10.    In fact, as Plaintiffs have now learned, life settlements are an extremely illiquid and risky asset class, so risky in fact that S&P issued a non-public research report on October 13, 2009 attached hereto as Exhibit A, available only to subscribers to its paywall-protected website, stating that it could not rate life settlement transactions without first addressing five concerns set forth in its report, and then only after publishing criteria for rating securitizations of the life settlement asset class, something it has yet to do. S&P also stated falsely that it "has not to date rated a life settlement transaction."

11.     Notwithstanding its carefully articulated reasons for being wary of the safety of these investments, S&P gave Lifetrade high "Af" ratings beginning in January 2007, and continued thereafter to give "Af" ratings to Lifetrade through April 2011, without mentioning, let alone addressing, what it knew were serious risks inherent in this asset class.

12.     Reasons given by S&P in its 2009 report for its aversion to rating life settlement transactions included: (1) a lack of statistical credibility for the actuarial assumptions underlying life settlement transactions based upon a pool of less than 1,000 lives (the Lifetrade fund had far fewer: only approximately 236 to 500 lives insured during the period it was rated by S&P); (2) uncertainty about the potential of life settlement transactions to violate insurable interest laws, which vary from state-to-state; (3) concerns about the accuracy of independent medical reviews used to underwrite mortality calculations; (4) concerns about the lack of track records for most life settlement originators and the alignment of their interest with that of investors, i.e. the potential for fraud; and (5) concerns about the timing of cash flows from life settlement transactions.

13.     All of these very real concerns were certainly known or knowable to S&P during the period that it rated the Fund between June 27, 2006 and April, 2011.  These concerns either should have prevented S&P from rating the Fund in the first place, or at a minimum should have been clearly communicated to investors.

14.     Instead, even after the 2009 report, S&P continued to issue "Af" investment-grade ratings for Lifetrade monthly through at least April, 2011, failing to mention its subscriber-only research conclusions and thereafter silently ceasing its ratings without explaining why.  S&P did so with full knowledge that Plaintiffs and other investors did rely and would continue to rely upon S&P's ratings in making and keeping Lifetrade investments.

15.    S&P's concerns about the risks inherent in life settlement assets proved to be well-founded. The Lifetrade Entities lost the entire $685,835,380 raised from the putative Class of investors, less some $271,176,562 previously redeemed, together with an additional $178,000,000 that Lifetrade borrowed from Wells Fargo Bank N.A., for a net loss to investors of approximately $592,658,438. The Fund itself was based upon a statistically-invalid pool of policies that ranged in number from 236 to 500, that never performed as anticipated and that never should have been expected to do so because the policies were purchased for prices greatly in excess of their actual value.

16.    These purchase prices were set based upon false life expectancy ("LE") evaluations prepared by Defendant 21st Services, a party widely-known in the life settlements industry to have been accused of issuing fraudulently-understated LE evaluations before Defendant S&P issued its first ratings report on Lifetrade in 2006.

17.    Upon information and belief, the purchase prices for policies were also inflated by huge, undisclosed fees, commissions and "overhead charges" skimmed off the investors' funds by Defendants Roy G. Smith and John Marcum or their legal entities, including Lifetrade Management Company, LLC, Lifetrade Management Company, N.V., Lifetrade Asset Management, N.V., Lifetrade Life Settlements Limited, Equity Trust, Portsmouth Settlement Company I, LLC, and Portsmouth Securities Limited.

18.    Delays in collecting upon policies because life insureds lived longer than projected caused Lifetrade difficulties in renewing its loans with Wells Fargo and placed the interest of Lifetrade's insiders, Roy G. Smith, John Marcum and their affiliates, into conflict with the interests of Plaintiffs and class members. Rather than risk losing the $133,000,000 or more that Smith and Marcum and their affiliates had skimmed for themselves from the investors'

funds, the Lifetrade Defendants chose to surrender the life insurance policies to Wells Fargo pursuant to a Settlement Agreement dated August 14, 2012, a copy of which is attached as Exhibit A-1.

19.     Those polices had a face value of $905,759,403 in death benefits and a present value of approximately $451,459,040, yet were used to satisfy a bank debt of only a fraction of that amount: approximately $204,696,178.  As such, the Wells Fargo Defendants were unjustly enriched by a fraudulent conveyance for less than fair consideration that rendered the Lifetrade Entities insolvent and caused Plaintiffs and class members to lose their entire investment.

20.     Under the terms of its agreements with Lifetrade, Wells Fargo served not only as Lifetrade's lender, but also in a fiduciary role as "custodian" of Lifetrade's life insurance policies, a role pursuant to which it was charged with the possession and safe keeping of those policies for the benefit of the Lifetrade Entities and their stockholders.  Moreover, two affiliates of Wells Fargo known as Wells Fargo Bank Northwest and Wells Fargo Delaware Trust Company served as the legal owners of Lifetrade's life insurance policies under a trust agreement for the benefit of Lifetrade and its investors.

21.     Despite (1) the Wells Fargo Defendants' conflicts of interest; (2) the Wells Fargo Defendants' knowledge that investors in the Lifetrade Entities had voted against surrendering the life insurance policies to the lender at the shareholders' meeting of May 17, 2012; and (3) the Wells Fargo Defendants' knowledge that the investors in the Lifetrade Entities had been victimized by the frauds of the Lifetrade Defendants and 21st Services described herein, the Wells Fargo Defendants nevertheless conspired with and aided and abetted the Lifetrade Defendants in the breach their duties to the Plaintiffs by surrendering $905,759,403 in policies

worth at least $451,459,040 in exchange for the extinguishment of a debt of approximately $204,696,178.

22.     No notice of the transfer was given to Plaintiffs, who have only recently learned of these events, and in fact the Settlement Agreement of August 14, 2012, Exhibit A-1, contained a confidentiality clause, which was agreed to by Smith and the Lifetrade Defendants, that precluded the Lifetrade Defendants from sharing a copy of the Settlement Agreement with investors.

## JURISDICTION AND VENUE

23.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332 because this is a civil action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action in which at least one member of the class of plaintiffs is a citizen or subject of a foreign state and at least one defendant is a citizen of a state. The Court also has jurisdiction over this action pursuant to 28 U.S.C. §1331 because this action arises in part under the laws of the United States, in particular 18 U.S.C. 1961, the Racketeer Influenced and Corrupt Organizations Act ("RICO"). In addition, Plaintiffs also invoke, if necessary, the supplemental jurisdiction of the Court pursuant to 28 U.S.C. § 1367 in that all claims asserted herein arise from the same misconduct and form part of the same case or controversy.

24.     This Court has personal jurisdiction over all Defendants pursuant to 31 U.S.C. § 3732(a) because they can be found in, reside or transact or have transacted business within the Southern District of New York or have purposely availed themselves of the protections of the laws of the State of New York in relation to the matters at issue in this case. The Wells Fargo Defendants, the Equity Trust Defendant, and all of the Lifetrade Defendants, with the exceptions

of Lifetrade Management Company, LLC, Portsmouth Settlement, Portsmouth Securities and John Marcum, are known to have signed various loan documents and the Settlement Agreement of August 14, 2012, which provided that any state or federal court located within the city of New York has exclusive jurisdiction in connection with any action or proceeding arising out of or relating to the loan agreements or the Settlement Agreement.  Those defendants further waived any objection based on *forum non conveniens* and any objection to venue of any action instituted in any of the aforementioned courts and consented to the granting of such legal or equitable relief as is deemed appropriate by this Court.

25.     Lifetrade Management Company, LLC, Portsmouth Settlement, Portsmouth Securities and John Marcum may have signed agreements as yet unknown to Plaintiffs that elect the state or federal courts of the City of New York as courts of exclusive jurisdiction for this matter, but in any event they have transacted business at issue herein in the State of New York by purchasing life insurance policies on the lives of New York residents and participating in various lender and investor meetings in the City of New York relating to the subject matter of this lawsuit.

26.     Venue is proper in this district because Defendant S & P Global, Inc., has its principal place of business in this district and because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred within this district or arise from the loan and/or settlement agreements at issue herein, which chose the state or federal courts of the City of New York as the exclusive venue for this action and waive any objections based upon venue or *forum non conveniens*.

## PARTIES

### The Plaintiffs

27.     Plaintiffs Hugo Leonardo Carlini, Rafael Mendoza de la Torre, Martin Miranda and Carlos Alberto Wehbi are citizens of the foreign state of Argentina who bring this action individually on their own behalves, derivatively on behalf of the Lifetrade Entities and in a representative capacity on behalf of the class of investors defined herein below.

28.     Plaintiffs Diana Irene Alvarez, Juan Carlos Affif, Susana Mariel Alonso, Alberto Armoni, Miguel Barton, Guillermo Walter Benelli, Alejandro Enrique Julio Berger, Hector Ruben Bircz, Miguel Carlos Blanco, Diego Salvador Di Maggio, Ricardo Osvaldo Bluthgen, Jose Maria Cabrera, Mariano Pablo Caillet-Bois, Miguel Angel Calgaro, Gustavo Canil, Pablo Caride, Rodolfo Centeno, Matias Luis Coll, Pablo Codevilla, Maria Teresa del Carmen Correa Avila, Moises Luis Kotler, Diego Cuesta Silva, Manuel Cuesta Silva, Daniel De Giorgio, Juan Martin De La Serna, Marcel De Leo, Jorge Daniel Diz, Silvio Roberto Damian Donato, Cristian Horacio Ernst, Carlos Adrian Ferreti, Jorge Alberto Forlano, Fernando R. Freixas Pintos, , Fernando Antonio Garabato, Mauro Giacometti, Sebastian Gil Garro, Raúl Alberto Genchi, Ricardo Luis Gentile, Luis Miguel Girardotti, Héctor Jorge Gonzalez, Jose Antonio Gonzalez, José Luis Gonzalez, Maria Elena Gonzalez, Fernando Enrique Granda, Tomás Güiraldes, Magdalena Guzman, , Tomas Victoriano Herrero, Monica Huisman, Ana Maria Nora Krieger, Alberto Lamm, Luis Felipe López Blanco, Graciela Stella Maris Magliano, Maria Beatriz Marquinez, Alberto Martinez, Julian Ariel Martinez, Elena Celina Rosa Marun, Fernando Matarazzo, , Esteban Mazzuco, María Victoria Miranda, Mariano Jorge Miranda, Carlos Gabriel Miyagi, Silvana Montefiore, Sergio Roman Morgenstern, Jorge A. Moyano, Caja Municipal de Jubilaciones y Pensiones de Nogoya, Camilo Patrignani, Jose Luis Patrignani, Guillermo Ariel Pereyra, Silvana Perez, Lucila Elena Paillard Polero, Pablo Gabriel Potokski, Enrique Horacio Picado, Victor Roberto Poggi, Ricardo Roberto Eduardo Pujals, Diego Luis Rios, María Cristina

Rodriguez, Norberto Vicente Rodriguez, Pablo José Rodriguez Falcon, Daniela Iris Rossen, Juan Sebastian Salaber, Miguel Sanchez de Bustamante, Gonzalo Sanchez Pupullo, Juan Carlos Sacco, Pablo Leonardo Sacco, María Elisa Salerno, Guillermo Schleicher, Graciela Siguenza, Juan Carlos Soldano, Ana Maria Steinnekker, Claudio Steudle, Marcelo Alejandro Sugier, Fabricio Terzano, Hugo Alberto Untersander, Gustavo Aberto Urrutia, Pedro Vigneau, Juan Antonio Virag, Elsa María Elvira Zarlenga, Cesar Emilio Zucchino, Ramon Hector Abrigador, Juan Jose Acoglani, Diego Rodolfo Angelo Pape, Daniel Alberto Aramburu, Lucila Atucha, Eduardo Dario, Avruj, Hugo Omar Barca, Josue Maximiliano Bauerberg, Sonia Benvenuto, Roberto Teobaldo Biagioni, Alicia Bonastro, Elizabeth Boote, Maria Cecilia Brigante, Carlos Alberto Brignone, Juan Horacio Busanello, Benjamin Alberto Bystrowicz, Guillermo Jose Campos, Susana Carmen Carniglia, Guillermo Castillo, Martin Rodolfo Castro, Roxana Catalano, Marta Graciela Cecati, Eugenia Agustina Cerda, Gerardo Collardin, Vanina Laura Coluccio, Maria Alicia Delfa Craviotto, Guido Emilio Degano, Jalid Alberto Del Azar, Gabriel Alejandro Del Campo, Tomas Del Carril, Ramon Santos Di Giambattista, Claudio Doller, Don Satur Srl, Jorge Alfredo Elias, Gabriel Erkekdjian, Giselle Erkekdjian, Eduardo Escudero, Jorge Anselmo Fernandez, Gabriel Manuel Fernandez, Muguel Fernandes Moores, Oscar Alberto Frei, Maria Paola Geranio, Mario Luis Gimenez, Carlos Alberto Gimenez Hutton, Daniel Ergasto Gomez Cusco, Jose Elias Gondolo, Jorge Goyes, Carlos Gurmendi, Ricardo Manuel Gutierrez, Hortensia Dominga Teresa Gutierrez Posse, Marta Alicia Happar, Enrique Matias Hayzus, Susana Ines Herrera, Horacio Daniel Holcman, Cristan Iturralde, Walter Alfredo Jakob, Victor Miguel Jamui, Carlos Alberto Nicolas Johanson, Fraida Kahan, Blanca Beatriz Maria Kinbaum, Edmundo Humberto Kindsvater, Alejandro Saul Kordon, Alejandro Jose Laborde, Martin Juan Lang, Elsa Beatriz Ledesma, Marcelo Hernan Lofreda, Edgardo Alfredo Lombi, Natalia Loyato,

Sergio Lucero, Juse Julio Mansilla Lami, Maria Rosa Irma Materia, Roberto Jose Materia, Adrian Marcelo Materia, Ana Cecilia Materia, Gustavo Materia, Diana Materia, Esteban Alberto Materia, Aldo Antonio Materia, Domingo Mazzitelli, Romulo Bernardino Mena, Carlos A. Menendez, Matias Rodolfo Meyer, Rodrigo Hernan Meyer, Enrique Horacio Mirkin, Maria Concepcion Teresa Muller, Olga Ines Muro de Nadal, Enrique Gualterio Negus, Maria Elba Oleaga, Carlos Alfredo Oliva, Roque Manuel Oliver, Enrique Hector Pagliettini, Marco Alberto Panettieri, Alejandra Graciela Paturau, Silvana Perez, Domingo Pittaluga, Gustavo Pittaluga, Cecilia Elsa Pizzini, Alberto M. Pomato, Pablo Gabriel Potokski, Paula Radizzani Helguera, Juan Enrique Roberts, Raquel iris Robustelli, Alfredo Gregorio Rodriguez, Leonardo Rodriguez, Maria Lucila Rodriguez Carniglia, Bernardo Romeo, Francisco Alberto Ruete, Martin Saenz Valiente, Haisan Samman, Nora San Juan, Javier Jorge Oscar Silva, Liliana Noemi Stellato, Ricardo Szily, Jose Tedesco, Alfredo Eduardo Terzano, Ernesto Miguel Torre, Salvator Toscano, Eduardo Tuzzio, Monica Urresti, Ruben Angel Valsagna, Juana Monica Wehmeyer, Ana Ines Wilson, Monica Gallegos, and Enrique Zanin are citizens of the foreign state of Argentina who bring this action individually on their own behalves.

29.    Plaintiff Christine A. Verse is a citizen of the foreign state of Belgium who brings this action individually on her own behalf.

30.    Plaintiffs Francisco Javier Gomez Ronco, José Antonio García García and Juan Jesus Gil Juncal, are citizens of the foreign state of Spain who brings this action on their own behalves.

31.    Plaintiff Luis Ramiro Aviles is a citizen of the foreign state of Ecuador who brings this action individually on his own behalf.

32.     Plaintiffs Prenton Industry LTD, Conaiss Holding S.A., Ferdenas Holding Ltd, Frontosa Limited and Ulan Bator Project LTD are corporations organized under the laws of the British Virgin Islands, that have their principal places of business in the foreign state of Argentina and bring this action on their own behalves.

33.     Plaintiffs KP Ventures, S.A., Melburne S.A. and Fafal Corp., are corporation organized under the laws of Uruguay, that have their principal place of business in the foreign state of Uruguay and bring this action on their own behalves.

34.     Plaintiffs Juan Manuel Luciano Herrera Grazioli, Ramon Enrique Requesens Paz, Ulises Daniel Varela Damboriana and Felix Luis Leborgne are citizen of the foreign state of Uruguay who bring this action individually on their own behalves.

35.     Plaintiff Jose Luis Villanueva Ahumada is a citizen of the foreign state of Chile who brings this action individually on his own behalf.

36.     Plaintiff Fundación Fiorenzo and Tafina Establishment is a legal entity organized under the laws of Liechtenstein that has its principal place of business in the foreign state of Liechtenstein and brings this action on its own behalf.

**The S&P Defendant**

37.     Defendant S&P Global, Inc. is a New York corporation formerly known as The McGraw-Hill Companies, Inc.  It has its principal place of business in New York, New York and may be served with process herein through its general counsel at 55 Water St., 47th Fl., New York, NY 10041.

**The Wells Fargo Defendants**

38.     Defendant Wells Fargo Bank, N.A., ("Wells Fargo") is a national banking association doing business in New York, which may be served with process herein through any

officer of the bank.  Wells Fargo and its affiliates occupied several conflicting roles in relation to the Lifetrade fund, including secured lender, hedge counterparty, trustee, custodian, administrative agent, escrow agent and verification agent.

39.     Defendant Wells Fargo Bank Northwest, N.A., formerly known as First Security Bank of Idaho, N.A. (hereinafter "Wells Fargo Utah"), is a national banking association that serves foreign nationals and maintains its principal place of business at 299 South Main Street, 12th Floor, MAC U1228-120, Salt Lake City, UT 84111. It may be served with process herein through any officer of the bank.  Wells Fargo Utah was one of the two co-trustees, along with Wells Fargo Delaware, who held legal title as a fiduciary to the life insurance policies of Lifetrade.

40.     Defendant Wells Fargo Delaware Trust Company (hereinafter "Wells Fargo Delaware"), is a Delaware corporation which may be served with process herein at 919 Market Street, Suite 1600, Wilmington, Delaware 1980.  Wells Fargo Delaware was one of the two co-trustees, along with Wells Fargo Utah, who held legal title as a fiduciary to the life insurance policies of Lifetrade.

41.     Defendant, ATC Realty Fifteen, Inc. (hereinafter "ATC"), is a California corporation which may be served with process herein via mail pursuant to the New York long arm statute at its principal place of business, 420 Montgomery Street, San Francisco, California, 94163.  ATC is a subsidiary of Wells Fargo and was a transferee without fair consideration of the life insurance policies of Lifetrade under the terms of the Settlement Agreement dated August 14, 2012, attached as Exhibit A-1.

**The Lifetrade Defendants**

42.     Defendant Lifetrade Fund, B.V. ("Lifetrade") is a Netherlands Antilles limited company with its principal place of business at and may be served with process herein via mail pursuant to the New York long arm statute at Pietermaai 15 Willemstad, Curacao.

43.     Defendant Lifetrade Management Company, LLC. ("LMC LLC") is a Delaware limited liability company that may be served with process herein via mail pursuant to the New York long arm statute through its owner, Roy Smith, at 115 Pebble Beach Drive, Fayetteville, GA 30215.  LMC LLC held various positions in connection with the Lifetrade Entities, including investment manager for Lifetrade.

44.     Defendant Lifetrade Management Company, N.V., ("LMC NV") is a Netherlands Antilles limited company that may be served with process herein via mail pursuant to the New York long arm statute at Pietermaai 15 Willemstad, Curacao.  LMC NV served in various capacities with the Lifetrade Entities, including managing director of Lifetrade during the period 2008 to 2017 and Lifetrade's administrator during the period 2008 and 2009 and, as such, responsible for calculating the net asset value of the fund.

45.     Defendant Lifetrade Asset Management, N.V. ("LAM NV") is a Netherlands Antilles limited company that may be served with process herein via mail pursuant to the New York long arm statute at Pietermaai 15 Willemstad, Curacao.  LAM NV served as the delegate investment manager of Lifetrade during the relevant period.

46.     Defendant Lifetrade Life Settlements Limited ("Lifetrade Ireland") is an Irish company that may be served with process herein via mail pursuant to the New York long arm statute at 2nd Floor, Beaux Lane House, Mercer Street Lower, Dublin 2, Ireland.  Lifetrade Ireland was the beneficial owner of the Lifetrade policy portfolio under the terms of the tax organization of Lifetrade that occurred in 2011.

{00033897}                                          19

47.     Defendant LT Investments, Inc., is a Delaware corporation, and may be served with process herein via mail pursuant to the New York long arm statute addressed to its chief executive officer, Roy Smith at 115 Pebble Beach Drive, Fayetteville, GA 30215. LT Investments was the holder of certain life insurance policies under the terms of the tax reorganization that occurred in 2011.

48.     Defendant Portsmouth Settlement Company I, LLC, ("Portsmouth Settlement") is a Georgia limited liability company with its principal place of business at 101 Beckett Lane, Suite 101, Fayetteville, Georgia 30214.   It may be served with process herein through its registered agent, Charles H. Davis, Jr., 7 NW Broad Street, Fairburn, Georgia 30213. Portsmouth Settlement, which was the principal life settlement provider to Lifetrade, has done extensive life settlement business in the State of New York, is registered with the New York Insurance Department and has purposely availed itself of the protections of the laws of the State of New York in connection with the matters at issue herein by filing suit over a life settlement matter in the case of *Portsmouth Settlement Co. I, LLC v. Aviva USA Corp.*, 28 Misc.3d 1219(A) (2010).

49.     Defendant Portsmouth Securities Limited ("Portsmouth Securities") is a Malaysian corporation with its principal place of business at Jalan Bahasa, Labuan, Federal Territory of Labuan, Malaysia. It may be served with process herein via mail under the New York long arm statute at its principal office or the residence of its sole office, director and shareholder, Roy Smith, at 115 Pebble Beach Drive, Fayetteville, GA 30215.   Portsmouth Securities served as Lifetrade's investment manager and has engaged in life settlement business in the State of New York because 25% of the policies in which Lifetrade invested insured the lives of persons who are or were residents of this state.

50.     Defendant Roy G. Smith (hereinafter "Smith") is believed to be a citizen of both the United Kingdom and the State of Georgia and may be served with process herein at his principal residence, which is located at 115 Pebble Beach Drive, Fayetteville, GA 30215. Smith was the founder and *de facto* investment manager of Lifetrade. He held all of the Class B voting stock of Lifetrade, which was the only class of stock that had voting rights. He also served as one of the controlling directors of many of the Lifetrade Defendants, some of which in turn served as directors or investment managers of the Lifetrade Entities. Upon information and belief, through fees, commissions and other charges by some of the Lifetrade Defendants such as Portsmouth Settlements, Smith fraudulently skimmed off approximately twenty-five percent of the $370,037,565 that Lifetrade spent to acquire life insurance policies. Through his conspiracy with, and *de facto* control over certain Lifetrade Defendants such as Portsmouth Settlement, Smith has engaged in numerous life settlement transactions in the State of New York and has thereby purposely availed himself of the protections of the laws of the State of New York with respect to the specific matters at issue herein.

51.     Defendant John Marcum is a citizen of the state of Connecticut and may be served with process herein at 18 Linnea Lane, Killingworth, Connecticut 06419-2436. Marcum served as one of the controlling directors of many of the Lifetrade Defendants, some of which in turn served as directors or investment managers of the Lifetrade Entities. He was the chief marketing officer for the Lifetrade Entities and was in charge of investor communications. Through his conspiracy with, and *de facto* control over certain Lifetrade Defendants such as Portsmouth Settlement, Marcum has engaged in numerous life settlement transactions in the State of New York and has thereby purposely availed himself of the protections of the laws of the State of New York with respect to the specific matters at issue herein.

52.     Defendant TMF Curacao N.V., formerly known as Equity Trust (Curacao) N.V. (hereinafter "Equity Trust") is a Netherlands Antilles limited company that may be served with process herein via mail pursuant to the New York long arm statute at Pietermaai 15, Willemstad, Curacao. Equity Trust was Lifetrade's Administrator from 2006 through 2009, either directly or as a managing director of Lifetrade Management Company N.V. ("LMC"), which served as Administrator for a part of this period.  As such, Equity Trust was responsible for calculating the net asset value ("NAV") of the fund using a fraudulent straight-line method discussed below. Equity Trust also served from 2003 until approximately 2008 as Lifetrade's first managing director and, from 2010 to June 2012 as a managing director of LMC which, in turn, was a managing director of Lifetrade from 2008 through the present. In that capacity, Equity Trust executed various loan agreements that elected the state or federal courts of the City of New York as the exclusive jurisdiction for this suit.  As such, Equity Trust is included as a "Lifetrade Defendant," as that term in defined herein.

**The 21st Services Defendant**

53.     Defendant ITM Twentyfirst, LLC, (hereinafter "21st Services"), was formerly known as 21st Services, LLC and 21st Services Acquisition, LLC.  It is a Delaware limited liability company with its principal place of business in the State of Minnesota, and may be served with process herein through its New York agent for service of process, Corporation Service Company, 80 State Street, Albany, New York 12207.  21st Services provided underwriting services to settlement providers and, from Lifetrade's inception in 2004 until 2012, provided all of Lifetrade's LE projections.  In a 2004 lawsuit widely-publicized in the life settlement industry, but completely unknown to Plaintiffs, attached hereto as Exhibit B, 21st

Services was accused of fraudulently overstating LE projections with potentially devastating consequences for investors.

## BACKGROUND ON LIFE SETTLEMENTS

54.     Changing circumstances for life insurance policyholders and other factors have combined to create a secondary market for life insurance where one sells his or her life insurance policy to another person. This secondary market for life insurance policies primarily involves two categories of policyholders: those who are terminally ill and those who are of advanced age. A sale of a life insurance policy by one who is terminally ill is called a "viatical settlement" and a sale by one of advanced age is called a "life settlement." Both types of settlements will be referred to herein as "life settlements."

55.     A viatical settlement is a financial option for a terminally ill life insurance policyholder (a "viator") who wants to sell his or her life insurance policy and wishes to assign the policy proceeds, payable upon death of the viator, to a third party (a "settlement provider") in exchange for immediate payment. The amount of the payment to the viator exceeds the policy's surrender value but is less than the total policy benefit.

56.     Thus, the viator is able to obtain cash during his or her lifetime, and the settlement provider (who must keep the policy in force during the viator's lifetime by paying premiums) can, upon death of the viator, recover more than its payment to the viator.  The settlement provider will make a profit if the amount it receives when the viator dies is greater than the sum of: (1) the amount paid to the viator; (2) the interim premium payments made up to the point of death; (3) the settlement procedure costs (including the cost of life expectancy evaluations); (4) any fees or commissions paid to settlement brokers, and various other out-of-pocket costs; and (5) the cost of capital committed to the foregoing

costs in the period between purchase of the life policies and the payment of the death benefit.

57.     Life settlements generally operate under the same principles and procedures; the distinguishing difference between the two is that, in viatical settlements, a terminal illness is involved.  A life settlement, on the other hand, involves an insured who is of advanced age.    Hereinafter, persons who are the insureds on life policies sold into the secondary market, whether by a viatical settlement or a life settlement, are referred to as the "life insureds."

58.     Two primary factors heavily influence the amount of a viatical or life settlement: (1) the amount of the policy proceeds at issue; and (2) the life expectancy of the individual whose life is at issue.  The amount of the policy proceeds is already established before a viatical or life settlement takes place. As part of the valuation process, settlement providers routinely obtain life expectancy evaluations in connection with viatical and life settlements.

59.     The amount paid by the settlement provider to purchase the right to eventually receive policy proceeds depends primarily upon the individual's life expectancy; the longer the individual is expected to live, the lower the payment will be.  The reason is clear: given the time value of money, the settlement provider will generally pay less for a benefit it must wait longer to receive. In addition, the settlement provider must pay premiums to keep the policy in force during the individual's lifetime, thereby reducing the settlement provider's profit from the transaction as time goes on. If the individual significantly outlives his or her life expectancy, then the settlement provider can lose money in the transaction because it will have paid more in settlement funds, policy premiums and other costs than the amount of

the policy's death benefit assigned to it. Life expectancy ("LE") evaluations are provided by companies such as Defendant 21st Services.

60.    The single most important factor determining both the availability of capital from investors to buy life insurance policies from life insureds and the price that can be offered to a particular policy owner in a life settlement transaction is the life expectancy of the life insured. Settlement providers such as Defendant Portsmouth Settlement Company, an affiliate of Defendant Smith, obtain information about the life expectancy of a given insured from an underwriter such as Defendant 21st Services. The underwriter is, in essence, the fulcrum of any settlement transaction, effectively balancing the interest of investors in accurate projections of life expectancy and the interest of policy owners in obtaining a price that fairly reflects the financial value of their insurance policies.

61.    Legitimate underwriters assess mortality risk (and, therefore, life expectancy) based on established risk classification principles.  In doing so, they differentiate among different classes of insureds according to sound actuarial principles and reasonably anticipated mortality and morbidity experience. The underwriting process is more complicated than simply adding a column of numbers based on raw data; instead, underwriters are required to exercise sound, objective, and consistent professional judgment, and to act independently and without bias.

62.    Because both the financial return expectations of investors and the price expectations of policy owners are based on life expectancy projections generated by underwriters, any pattern of understating life expectancy necessarily has a significant negative effect on individual settlement transactions. In particular, legitimate settlement

providers lose contracts to bids based on falsely understated life expectancy projections and investors overpay for policies.

63.    These false statements also affect the settlement market more broadly. The willingness of investors to commit capital to fund the purchase of life insurance policies from policy owners is predicated on the assumption that underwriter-generated assessments of life expectancy are legitimate and in accordance with accepted professional standards. Because the life settlement market is a relatively new phenomenon, any underwriter conduct that calls into question that assumption creates a significant risk that investors will flee the market, and that the access to the secondary market enjoyed by policy owners will be jeopardized in the long term.

## CROOKED DEALINGS OF the 21ST SERVICES DEFENDANT AND THE LIFETRADE DEFENDANTS

64.    During the period when Plaintiffs and the Class made their investments in the Lifetrade Entities (2006 through 2011), Lifetrade bought almost all of its life insurance policies from life settlement provider Portsmouth Settlement, which used 21st Services as its exclusive underwriter. On information and belief, Defendant Smith was at all relevant times during this period the indirect owner of Portsmouth Settlement and Defendant Marcum was its Chairman of the Board.[1]

---

[1] See the September 12, 2008, audit report for Portsmouth prepared by Aronson & Company submitted to the Washington State Department of Insurance, which discloses on page 8 that "During 2007 and 2006, the Company [Portsmouth] earned approximately 68% and 77%, respectively, of its revenue from one customer [Lifetrade], whose officer/majority investor [Smith] indirectly owns PSCI [Portsmouth]. See also Letter dated July 21, 2008, from Vince Wiegand, Chief Compliance Officer of Portsmouth, to the Texas Department of Insurance, enclosing a schedule listing key personnel of Portsmouth, including: "John Marcum, Chairman of Management Board. He oversees all of the company's operations as Chairman of the Board. The Vice-President, Chief Operating Officer, Chief Financial Officer and General Counsel report to the Chairman of the Board. (Please note that Portsmouth's CEO position is currently unoccupied. The departure of our CEO was reported to the Oklahoma Department of Insurance). Roy Smith, is the indirect 100% owner of Portsmouth Settlement Company I, LLC. He is not involved in the day-to-day transactions of the Company. John Marcum provides Mr. Smith updates regarding the performance of the company."

65.     As alleged more particularly in Exhibit B, a complaint filed against 21st Century in 2004 by a life settlement provider named Coventry (a subsidiary of insurer AIG), Defendant 21st Century was widely known among insiders in the life settlement industry as early as 2004 to have been accused of systematically and significantly overstating its LE evaluations in order to make it easier for unscrupulous life settlement providers like Portsmouth Settlement to outbid competitors in the very competitive market to acquire life policies from policy owners.

66.     21st Services' underwriting fees were paid on a per case basis, including not just its initial evaluations, but also periodic update evaluations during the life of the policy. Therefore, 21st Services made more money if its fraudulent underwriting practices caused its life settlement clients to win more competitive bids and buy more policies for 21st Services to evaluate on a continuing basis. As long as 21st Services' settlement provider clients such as Portsmouth Settlement were spending other people's money on the LE evaluations and were acting in the capacity of a broker paid on commission only, then the fraudulent evaluations worked equally well for both 21st Services and its client such as Portsmouth Settlement.

67.     The ultimate victims in this scheme were investors like Plaintiffs who had no idea that life insurance policies in which they were investing through the Lifetrade Entities were significantly overvalued and would not generate the expected cash flows required to service debt and provide a reasonable return on investment.  As Coventry stated in its complaint, "when underwriters consistently and significantly understate life expectancy projections, investors suffer enormous financial losses." Exhibit B, ¶ 6.

68.     Coventry accurately predicted that investors in pools underwritten using 21st Service's information would suffer large losses, see Exhibit B ¶ 9, and spoke of "investors, who

are duped by 21st Services's life expectancy projections into pouring money into settlement investments that are virtually guaranteed to lose significant sums." *Id.* Coventry also stated that "21st Services's falsely understated life expectancy projections systematically and significantly harm investors, potentially robbing them of their entire investment, and further put at risk the entire settlement market and the benefits it creates for policyowners." *Id*, at ¶ 40.

69.     Coventry also observed that "If a settlement is based on a false life expectancy, not only do investors suffer considerable losses because they paid too much for the policy, but they are also at risk of losing their entire investment . . . These losses are not realized until after the policyowner outlives the fraudulent life expectancy and, therefore, investors are generally unable to identify the fraud until a considerable time after the initial investment." *Id.*

70.     On information and belief, Plaintiffs allege that Defendant Smith, as the founder and primary investment manager of the Lifetrade Entities and the sole indirect stockholder of Portsmouth, knew about the fraudulent LE evaluations provided by Portsmouth Settlement and 21st Services as early as 2004, if not earlier, yet initiated and continued Lifetrade's business with 21st Services and Portsmouth Settlement because Smith, his affiliates and co-conspirators pocketed at least $133,770,813 in self-dealing fees, commissions and other compensation in connection with the Portsmouth Settlement transactions.[2]

71.     Plaintiffs also allege on information and belief that Smith was, at all relevant times, the controlling shareholder of Portsmouth Settlement as he appropriated the

---

[2] This figure is based upon figures reported at page 20 of Exhibit D-2 (the April 25, 2012 notice of shareholder's meeting) and in *Portsmouth Settlement Company I, LLC v. Aviva USA Corporation*, 957 N.Y.S.2d 638, 2010 N.Y. Slip Op. 51395(U) (2010). It appears that Smith, Marcum and their affiliated entities skimmed off approximately 25% of the $370,037,565 that Lifetrade spent on acquisition of life policies or $92 million in the form of undisclosed fees, commissions and overhead charges. They also received the $41,261,422 in investment manager compensation reported at page 20 of Exhibit D-2, plus Marcum likely received some portion of the $46,221,916 in "Broker Commissions" paid for distribution of the fund's securities to investors. Combined, their take from the fund was at least $133,770,813.

Portsmouth trade name and subsequently used it for affiliated businesses, including Portsmouth Financial Group of Fayetteville, Georgia, and Portsmouth Securities Limited, his current operation in the tax haven of Labuan, Malaysia.

72.   One example of the outrageous fees, commissions and "overhead" charged by Smith and Portsmouth Settlement to Lifetrade is revealed in the reported decision in *Portsmouth Settlement* Company *I, LLC v. Aviva USA Corporation*, 957 N.Y.S.2d 638, 2010 N.Y. Slip Op. 51395(U) (2010).   It is reported there that Portsmouth Settlement was paid fees and commissions of $74,201.75 and "overhead recovery" of $30,000 on a life settlement transaction of $770,000.   2010 N.Y. Slip Op. at 8.   In addition, Lifetrade's management company operated by Smith was paid $90,000 in fees not disclosed in the prospectus provided to investors. *Id.*   These undisclosed fees and commissions total $194,201.75 and comprise 25.22% of the already over-priced amount that Lifetrade paid for the policy in question, thereby further reducing the odds that investors in Lifetrade would ever see a positive return on their investments.

## S&P'S UNJUSTIFIABLE ENDORSEMENT
## OF THE LIFETRADE SCAM

73.   The Lifetrade fund was launched on January 1, 2004 and by August 31, 2006, some two and a half years later, had been only moderately successful in raising capital, with total assets of $234 million.   S&P entered the picture on June 27, 2007, providing Lifetrade an investment grade ratings report on the fund that could be and were used by Lifetrade to make private placements of its securities to a select group of investors in Argentina, Japan and Korea.   Some six months later, on December 31, 2007, the assets of the fund had doubled to $427 million from their level of $234 million on August 31, 2006. *See* 2007 audited Financial Statements attached as Exhibit C-1. By December 31, 2010, assets of the

fund had doubled again to $823 million, *see* 2010 audited Financial Statements attached as Exhibit C-2, reflecting the confidence that Plaintiffs and members of the Class placed in Lifetrade because of S&P's ratings. S&P's ratings were a tremendous marketing tool for Lifetrade's promoters, and indeed, Plaintiffs and members of the class relied upon S&P's ratings in deciding to initially invest in Lifetrade or to continue with their investments rather than exercise their rights of redemption.

74.    Copies of some of S&P's monthly ratings are attached as Exhibit D. The rating sheets generally stated that "the 'Af' credit rating reflects the strong credit quality of the Portfolio's eligible investments and counterparties." They also stated that "The rating indicates that the fund's portfolio holdings and counterparties provide strong protection from losses due to credit defaults."

75.    The ratings sheets further reported statistics for the fund's portfolio of policies, a pie chart showing the distribution of life expectancies for the portfolio (information that apparently came from 21st Services) and a line chart for historical net asset values of the fund ("NAVs") per share  (information again apparently derived from policy valuation reports prepared by 21st Services) that could be compared to U.S. stock and bond indexes to demonstrate to potential investors that the fund was steadily growing in value and outperforming benchmark indexes.

76.    The key ingredient missing from these rating reports was any critical analysis whatsoever of: (1) the 21st Services evaluation reports on which the performance and valuation data hinged, (2) the track record and trustworthiness of Lifetrade or its management or (3) the data and methodology utilized by Lifetrade to establish its monthly NAV and "performance" charts.

77.     In fact, Defendant Roy Smith had the administrator of the fund create the monthly NAVs using a "straight-line" method of adjusting the life expectancy of insured persons based upon the actuarially unsound premise that each insured had one less month of his life expectancy to live at the expiration of each month, thereby increasing the NAV of the fund in a straight-line progression. An actuary formerly employed by both Wells Fargo and Lifetrade, describes this straight-line valuation method as "absurd," "ridiculously bad" and "not reasonable by any actuarial standard."

78.     Unlike the benchmark stock and bond prices quoted in the S&P reports, the NAVs for the fund were a creature of Defendant Smith's imagination and were not based upon market prices established through actual sales in any marketplace, whether public or over-the-counter. Yet, S&P failed to disclose this critical fact in making its comparison of Lifetrade's "performance" to the benchmarks for stocks and bonds.

79.     Obviously, S&P conducted no due diligence investigation whatsoever before commencing its ratings in June 2006; otherwise, it would have learned from industry insiders about the serious fraud allegations that had been made by Coventry about 21st Services in 2004 (Exhibit B) and the actuarially absurd method concocted by Defendant Smith, and blessed by S&P, to value the fund.

80.     Moreover, as described above, S&P issued a confidential research report on October 13, 2009 attached hereto as Exhibit A, stating the blatant falsehood that it "has not to date rated a life settlement transaction." In fact, it had issued high "Af" ratings in multiple prior years without addressing five concerns set forth in its report and then only after publishing criteria for rating securitizations of the life settlement asset class, something it has yet to do. S&P's October 13, 2009 Report further stated that it could not rate a life settlement transaction.

81.     Reasons given by Standard & Poor's for its aversion to rating life settlement transactions included (1) a lack of statistical credibility for the actuarial assumptions underlying life settlement transactions based upon a pool of less than 1,000 lives (the Lifetrade fund had only approximately 236 to 500 lives insured during the period it was rated by S&P); (2) uncertainty about the potential of life settlement transactions to violate insurable interest laws, which vary from state to state; (3) concerns about the accuracy of independent medical reviews used to underwrite mortality calculations; (4) concerns about the lack of track records for most life settlement originators and the alignment of their interest with that of investors, i.e. the potential for fraud; and (5) concerns about the timing of cash flows from life settlement transactions.

82.     All of these were very real concerns that should have prevented S & P from rating the Fund between June 27, 2006 and April, 2011 and which should have been communicated to investors together with the ratings that were issued, and certainly should have been disclosed to investors, at the very latest, once S&P issued its subscriber-only research report on October 13, 2009. Instead, S&P continued to issue "Af," investment-grade ratings for Lifetrade monthly through at least April, 2011, failing to mention its research conclusions and thereafter silently ceasing its ratings without explaining why.

83.     Motivated by its own business concerns, and without regard for the truth of its representations or the harm that might be suffered by Plaintiffs and other investors, S&P issued glowing ratings reports for Lifetrade investments. S&P's ratings were largely responsible for the success of the Lifetrade Entities in raising some $685,835,000 from offshore investors. S&P issued these ratings in violation of its own policies and conclusions set forth in the confidential research report attached as Exhibit A.

## WELLS FARGO'S CONFLICT-RIDDLED ACTIONS
## AS LENDER, TRUSTEE AND CUSTODIAN

84.    On June 25, 2008, Lifetrade entered into a loan and security agreement ("Loan Agreement") for a $500 million credit facility with Wells Fargo Bank's predecessor Wachovia Bank, N.A., secured by Lifetrade's life insurance policies and bank accounts.  Under the Loan Agreement (section 2.6(a)), all outstanding advances were to be paid in full on or by the facility termination date of June 25, 2011, which was subsequently extended to June 15, 2012.

85.    Wachovia Bank failed during the 2008 financial crisis and was merged into Wells Fargo effective October 12, 2008.  Thereafter, Wells Fargo reduced the credit facility amount to $225 million on June 28, 2009 and to $200 million on June 30, 2011.

86.    Although Plaintiffs had no knowledge of these matters at the time, upon information and belief, Wells Fargo reduced the amount available on the credit line because the bank did not trust the LE evaluations provided by 21st Services and decided it did not want to be a life settlement lender.  At some point, the date of which is unknown to Plaintiffs, Wells Fargo retained the life settlement underwriter Milliman, Inc. to provide LE evaluations the bank felt it could trust. Lifetrade also, at the urging of Wells Fargo and other potential lenders, in approximately January, 2011, retained a new firm known as American Viatical Services ("AVS"), which had recently been acquired by Defendant Smith, to begin the lengthy process of re-evaluating the LE of Lifetrade's portfolio, a process that reportedly required some 16 months to accomplish because updated medical information was required for all of the life insureds.

87.    On March 25, 2011, Lifetrade was completely restructured in a complicated transaction that was supposedly done to avoid U.S. withholding taxes on life insurance proceeds. As part of the restructuring, Lifetrade exchanged its portfolio of life insurance policies for notes issued by a new Irish company, Lifetrade Life Settlements Ltd. ("LT Ireland"), owned by an

Irish charitable trust, and for preferred shares issued by a new Delaware corporation known as LT Investment, Inc., the common stock of which was owned by Defendant Smith.

88.     As part of this transaction, two Wells Fargo affiliates, Defendants Wells Fargo Utah and Wells Fargo Delaware, obtained legal title to the Lifetrade insurance policies as trustees of a Delaware trust known as LT Opportunity Trust, which became the sole borrower under the line of credit.  Lifetrade, and LT Ireland are believed to have signed as guarantors. Wells Fargo Bank was named custodian of the policies pursuant to the terms of a custodian agreement and was also given the roles of verification agent and escrow agent for the Lifetrade Entities.  Another Wells Fargo affiliate, Wells Fargo Securities, was appointed as administrative agent.

89.     In all, Wells Fargo and its affiliates held the fiduciary or contractual roles of trustee, custodian, verification agent and escrow agent on behalf of Lifetrade and its affiliates, but at the same time held the conflicting roles of secured lender and counterparty on Lifetrade's interest-rate hedges. What is more, Wells Fargo was on both sides of the key transaction: Wells Fargo affiliates were both the borrowers (Wells Fargo Utah and Wells Fargo Delaware as trustees of the LT Opportunity Trust) and the secured lender (Wells Fargo Bank).

90.     On or about March 8th and 15th, 2012 some investors were notified by Lifetrade that fund valuations and redemptions were being *suspended* for Lifetrade because, *inter alia*, the fund was a guarantor on a credit facility being re-negotiated that, if unsuccessful, would represent over 40% of the net asset value of the fund.  See Exhibit D-1.  At this time, the outstanding debt on the Wells Fargo credit line was $178 million, plus $15 million owed for a negative mark on the interest rate hedge.  Applying simple algebra, this would indicate that the

assets of the fund were valued at $482,500,000, meaning that the stockholders of Lifetrade had substantial equity in their shares.

91.     On or about April 25, 2012, some investors received notice from Lifetrade of a special shareholders meeting to be held on the island of Curacao in the Dutch Antilles on May 17, 2012 to consider options for dealing with the fund's expiring line of credit with Wells Fargo. See Exhibit D-2. Investors were presented with three options: (Option A) a surrender of the fund's life insurance policies to Wells Fargo in payment of the debt; (Option B) a short-term extension of the line of credit for one year on difficult terms; or (Option C) a long-term refinancing plan. Lifetrade and its insiders pushed the surrender option as the "preferred route," emphasizing that with that action "the only recourse is to the life insurance policies" and that "[i]f Wells Fargo is unable to recoup 100% of its obligations, the Fund and /or investors will not be required to fund the difference."

92.     Most of the Plaintiffs did not attend the shareholders' meeting or even receive notice of it, but now understand that those who did voted for Option C, i.e., for the fund to seek a long-term financing solution, and rejected Option A, i.e., the idea of a surrender of Lifetrade's life insurance policies to Wells Fargo. A copy of the minutes of the meeting provided to one investor is attached as Exhibit D-3. However, most of the Plaintiffs were never notified of the outcome of the meeting nor provided a copy of the minutes thereof, apparently because an attachment to the minutes contains a strong criticism of Lifetrade's management by a disgruntled investor who had been tricked into making a substantial investment in the fund in late 2011 without disclosure of the fund's deepening liquidity crisis.

93.     As the termination date of the Loan Agreement approached, the Wells Fargo Lending entities knew that Lifetrade lacked the finances to pay the existing debt, as Wells Fargo

was in active negotiations with Lifetrade to provide short or long term additional financing –
options Lifetrade was pursuing in lieu of allowing Wells Fargo to foreclose on the life insurance
policies, which it held only in its capacity as custodian.

94.    On or about June 15, 2012, Wells Fargo ceased negotiations and announced its
intention to satisfy the current outstanding debt – roughly  $205 million – by delivering to itself
the existing portfolio of life insurance policies with a face value of approximately $906 million,
over four times the debt.

95.    Had Wells Fargo simply proceeded with the foreclosure in accordance with the
Loan Agreement, following sale or maturity of the policies, it would have been required, in the
normal course, to return to Lifetrade any excess sums remaining after payment of the outstanding
debt, inclusive of interests, costs and fees.  Upon information and belief, as of June 2012 these
excess sums totaled approximately $700,000,000 in expected death benefits.

96.    Instead, motivated by greed and the desire to enhance its coffers at the Plaintiffs'
expense, the Wells Fargo Lending Entities embarked upon a coercive and unconscionable series
of negotiations with Roy Smith, which culminated on August 14, 2012 in a Settlement
Agreement that gave the Wells Fargo Defendants sole ownership of the entire portfolio of life
insurance policies, rendered the Lifetrade Entities insolvent and stripped from Plaintiffs any
prospect for recoupment of any portion of their investments. In so doing, Wells Fargo conspired
with and aided and abetted the Lifetrade Entities' breaches of fiduciary duty to Plaintiffs.   The
Settlement Agreement specifically precluded the Lifetrade Defendants from making "any
statements to investors in the Lifetrade Parties, or any other Persons, whether privately or
publicly, relating to the settlement contemplated by this Agreement."   The agreement further

provided that the Lifetrade Defendants would conceal from investors any information "relating to the state of mind, motivation, actions or inactions by the Lender Parties."

97.    Thereafter, with investors completely in the dark as to these developments, LT Ireland notified the Irish stock exchange on August 16, 2012, that Wells Fargo as "Administrative Agent" under a Loan and Security Agreement dated March 28, 2011, had served on LT Ireland "(in its capacity as a guarantor under the Loan and Security Agreement) a notice of public sale dated 8 August 2012 (the 'Foreclosure Notice') arising from the occurrence of certain termination events pursuant to the Loan and Security Agreement."

98.    LT Ireland's announcement further stated that "Subsequent to the service of the Foreclosure Notice, [LT Ireland] and the Administrative Agent, as well as relevant other parties, entered into a settlement agreement (the 'Settlement Agreement') on 14 August 2012, pursuant to which a consensual foreclosure process has been agreed in respect of the various rights and obligations arising under, among others, the Loan and Security Agreement and certain other relationships and arrangements of [LT Ireland]."

99.    In an undated letter sent to its investors about the same time, Lifetrade called attention to the LT Ireland announcement and explained that "The situation is that the foreclosure issued by Wells Fargo is in accordance with the Irish structure's legal requirements. On August 14, 2012 a settlement agreement was reached which ensures that the Fund has four months [sic] to implement a replacement line to remove Wells Fargo from the position of collateral owner. As per the agreement the option termination date will be November 30, 2012. The directors are still working to achieve a satisfactory outcome for investors and will update the website with developments as they happen."

100.    Thereafter, Plaintiffs were reassured on two occasions in 2013 that refinancing solutions for the Wells Fargo situation were being sought and, on one of these occasions, that their "continued patience" was requested. *See* Exhibits E attached.  On October 1, 2014, it was reported in a life settlements industry publication that Smith said the fund was "close to obtaining a new credit facility." See Exhibit E-1 attached.   During 2014, 2015 and 2016, Plaintiffs were told by representatives of Lifetrade that efforts were being made to set up a new credit facility with the French bank BNP Paribas.  Several Plaintiffs contributed new funds of approximately $15 million to a fund organized on the island of Bermuda that was to loan cash to the Lifetrade Fund in order to meet requirements of the French bank.

101.    It was not until approximately November 21, 2016, that Lifetrade's management sent e-mails indicating *for the first time* that the bank was legally the owner of the life insurance policies that formerly belonged to Lifetrade; that the Lifetrade fund held no assets; and that the investors had suffered a "total loss."  See attached Exhibit F.

102.    Although it was concealed from Plaintiffs at the time, upon information and belief, Wells Fargo and its affiliates, acting as the Plaintiffs' fiduciaries in their capacities as trustees and custodians of the life insurance policies, surrendered those policies to itself pursuant to the terms of the Settlement Agreement of August 14, 2012, reserving to the Lifetrade Entities only a three and a half month option to reacquire the policies upon repayment of the debt.

103.    That Smith, Marcum and their affiliates would consent to this arrangement without notice to the shareholders, or any attempt to reorganize Lifetrade in bankruptcy, knowing that Lifetrade had significant equity in Well Fargo's collateral and knowing also that the shareholders of Lifetrade had opposed any surrender of the policies at the shareholder's

meeting on May 17, 2012, bespeaks a complete disregard for Plaintiffs and members of the class to whom Smith, Marcum and their corporate affiliates owed a fiduciary duty.

104.    Their conduct is believed to have been motivated by their potential liability for the Wells Fargo debt under Curacao law.[3]  Based upon figures reported at page 20 of Exhibit D-2 (the April 25, 2012 notice of shareholder's meeting) and in *Portsmouth Settlement* Company *I, LLC v. Aviva USA Corporation*, 957 N.Y.S.2d 638, 2010 N.Y. Slip Op. 51395(U) (2010), it appears that Smith, Marcum and their affiliated entities skimmed off 25% of the $370,037,565 that Lifetrade spent on acquisition of life policies or $92 million in the form of undisclosed fees, commissions and overhead charges. They also undoubtedly received the $41,261,422 in investment manager compensation reported in Exhibit D-2, plus perhaps some portion of the $46,221,916 in "Broker Commissions" paid to investment advisers for distribution of the fund's securities to investors. In short, they had considerable fortunes to lose if pursued for personal liability on the Wells Fargo debt.

105.    Whatever the motive for their breach of fiduciary duty, it is a matter within the exclusive knowledge of Smith, Marcum and the Wells Fargo Defendants.  These defendants, in fact, conspired to conceal their motives from Plaintiffs. An express term of the August 14, 2012 contract inexplicably reads: "At no time shall the Lifetrade Parties make any statements to any persons relating to the state of mind, motivations, actions or inactions by the Lender parties." Ex. __ at 42.

---

[3] Book 2, Article 16(1) of the Curacao Civil Code states "If, in the case of the involuntary liquidation of a legal person, there is question of a manifestly improper management which is likely to have been an important cause of the involuntary liquidation, *each director shall be jointly and severally liable* towards the insolvent estate for any shortfall, consisting of the amount of the liabilities insofar as these cannot be discharged on liquidation from the remaining assets." Article 16(9) further states that "For the purpose of this article, *a person who*, at any time during the period referred to in paragraph 8 [the three-year period preceding the involuntary liquidation or suspension of payments, which precedes it] *has determined or co-determined the policy of the legal person as if he were a director* or who manifestly acted without due care as an incorporator *shall be equated to a director*." (Emphasis added).

106.     In their April 25, 2012, communication with Lifetrade investors proposing a surrender of the collateral in extinguishment of the debt, Lifetrade's management misled investors by emphasizing that "With this option, Wells Fargo will be in control of the selling process. However, the only recourse is to the life insurance policies. If Wells Fargo is unable to recoup 100% of its obligations, the Fund *and/or investors* will not be required to fund the difference."   (Emphasis added).    In reality, Wells Fargo never had any recourse to the shareholders of Lifetrade because they enjoyed limited liability as a result of the corporate form; the real concern here appears to have been Wells Fargo's potential recourse to Smith, Marcum and/or their affiliated entities as guarantors of the debt or directors/control persons liable under Curacao law for the debts of an insolvent legal entity.

107.     Because the face value of the policies was $905,759,403 and the amount of the debt was only $204,696,178, it was a fraudulent breach of the Wells Fargo Defendants' fiduciary and contractual duties as trustees and custodian to take all the life insurance policies for the banks' own benefit, excluding the Lifetrade Entities and their stockholders from any benefit of the cash flows certain to be realized as the policies matured through the deaths of the life insureds.

108.     Because Roy Smith and/or his affiliated entities had self-dealing motives for surrender of the life insurance policies to Wells Fargo, it was likewise a fraudulent breach of fiduciary duty for Smith and his affiliated entities to sign off on the Settlement Agreement transferring the life insurance policies to Wells Fargo.

## DERIVATIVE ACTION ALLEGATIONS

109.     Plaintiffs Hugo Leonardo Carlini, Rafael Mendoza de la Torre, Martin Miranda and Carlos Alberto Wehbi prosecute some of the claims in this action as a derivative action on behalf of the Lifetrade entities and their stockholders.

110.     Demand upon the management of the Lifetrade entities would be futile because (1) the managers and directors of the Lifetrade entities participated in the wrongful actions described herein and cannot be expected to take any action on behalf of the entities and their shareholders against the Defendants with whom they conspired; (2) the Lifetrade entities are now insolvent and have no funds with which to take any action on behalf of the entities and their shareholders; and (3) the Lifetrade entities have ceased doing business and no longer hold meetings of their managers and directors.

### CLASS ACTION ALLEGATIONS

### Plaintiff Class — All Offshore Investors in the Lifetrade Entities

111.     Pursuant to Fed. Rule Civ. Proc. 23, Plaintiffs Hugo Leonardo Carlini, Rafael Mendoza de la Torre, Martin Miranda and Carlos Alberto Wehbi bring this action on behalf of the following class:

> All offshore investors in the Lifetrade Entities whose investments have not been redeemed.

112.     Excluded from the Class are (1) the Court and members of the immediate family of the Court, and (2)  Defendants and the parents, subsidiaries, affiliates, officers, directors, employees and co-conspirators of Defendants.

113.     The proposed class satisfies the requirements of Rule 23(a) -- numerosity, commonality, typicality and adequacy – and the requirements of each of the three subdivisions of Rule 23(b).

### Rule 23(a)

114.    *Numerosity.* The members of the class are so numerous as to render joinder impracticable.   Plaintiffs do not know the precise number of class members. However, investments in the Lifetrade entities were $685,835,000 in total and included investors from both Latin America, Asia, and elsewhere. The Plaintiffs, scores of foreign investors, are only a portion of the total number, which is believed to be in the hundreds if not thousands.

115.    Commonality.  There *are* numerous questions of law and fact common to all class members.

116.    *Typicality.* The claims of the named plaintiffs and the absent class members are all tangible, have a *common* origin, and have a common basis.  The claims all originate from the same course of wrongful conduct. Defendants acted with regard to all class members in the same or substantially similar way, and all class members have passive investments in the Lifetrade Entities that were calculated and maintained in the same or similar way.   If prosecuted individually, the claims of each class member would necessarily rely upon the same material facts, rely upon the same theories, and seek the same relief.   As a result, the typicality requirement is satisfied.

117.    *Adequacy of Representation.* The named plaintiffs are willing and able to serve as class *representatives* and to undertake the resulting duties and obligations; they will fairly and adequately protect the class members; they have no interests adverse to other class members; and they have retained counsel with substantial experience and success in the prosecution of class actions and complex litigation who are able to represent the interests of the entire class.

### Rule 23(b)(1)

118.    Certification of a Plaintiff class is appropriate under Rule 23(b)(1) because the prosecution of separate actions creates the risk of inconsistent and varying adjudications which

would establish incompatible standards of conduct for Defendants or because adjudications with respect to individual class members would as a practical matter be dispositive of the interests of others not currently before the court.

## Rule 23(b)(2)

119.    Defendants are acting and have acted in a manner generally applicable to the class, thereby making appropriate final injunctive and declaratory relief for the class as a whole.

## Rule 23(b)(3)

120.    The questions of law and fact common to all class members predominate over any questions affecting only individual members.

121.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy in that among other things:

a)    Given the extensive common questions of law and fact, there are enormous economies to the courts and the parties in litigating the common issues on a class-wide basis, instead of an individual basis;

b)    The expense and burden of individual litigation in an overseas jurisdiction make it difficult for most of the individual class members to redress the wrongs done to them, such that few individual class members have any interest in controlling the prosecution of separate actions;

c)    A class action is required for optimal deterrence and to limit the court-awarded reasonable expenses incurred by class members in pursuing their claims; and,

d)    There are no unusual management difficulties posed by this action.  No superior alternative exists for the fair and efficient group-wide adjudication of this controversy.

**Rule 23(c)(4)**

122.    Plaintiffs may seek partial certification under Rule 23(c)(4) in that questions of law and fact common to the class exist as to all class members.  Such a partial certification would be an alternative to certification under Rule 23(b)(1), (b)(2), and (b)(3).

123.    Successful prosecution of this matter as a class action is the only way that the rights of the class members will ever be vindicated.

## ALLEGATIONS CONCERNING TIMELINESS

124.    Until very recently, Plaintiffs' investments in the Lifetrade Entities were carried on the account statements many of the Plaintiffs received from their banks or brokerage firms at the last official net asset value provided by the Lifetrade Entities prior to a suspension of valuations that occurred in 2012.

125.    Plaintiffs were advised on or about March 8th and 15th, 2012 that fund valuations and redemptions were being suspended due to various issues affecting the fund's liquidity, including an expiring line of credit, but were told also that the firm's debts were only 40% of its assets, meaning the assets of the fund were valued at $482 million.

126.    On August 14, 2012, Lifetrade entered into the Settlement Agreement with Wells Fargo and agreed to transfer all of its life policies to Wells Fargo's designee, TMC Realty Fifteen, Inc.  Under the terms of that agreement, Lifetrade agreed that it would "not make any statements to investors in the Lifetrade Parties, or any other Persons, whether privately or publicly, relating to the settlement contemplated by this Agreement. The Borrower may communicate to such investors the mere fact that settlement discussions are being conducted and may disclose that the settlement and the foreclosure occurred."

127.    Moreover, these Defendants conspired to conceal any information "relating to the state of mind, motivation, actions or inactions by the Lender Parties." Ex. A-1 at 42.

128.    Therefore, Wells Fargo and Lifetrade conspired and agreed to keep the Plaintiffs and other members of the class in the dark about the nature and terms of the Settlement Agreement.  In so doing, the Lifetrade Defendants improperly bargained away their fiduciary duty to disclose to investors that a voluntary transfer occurred.

129.    On August 16, 2012, the LT Ireland provided notice to the Irish Stock Exchange that "The Issuer hereby gives notice that the Administrative Agent served on the Issuer (in its capacity as a guarantor under the Loan and Security Agreement) a notice of public sale dated 8 August 2012 (the "Foreclosure Notice") arising from the occurrence of certain termination events pursuant to the Loan and Security Agreement.  Subsequent to the service of the Foreclosure Notice, the Issuer and the Administrative Agent, as well as relevant other parties, entered into a settlement agreement (the "Settlement Agreement") on 14 August 2012, pursuant to which a consensual foreclosure process has been agreed in respect of the various rights and obligations arising under, among others, the Loan and Security Agreement and certain other relationships and arrangements of the Issuer."

130.    About the same time, Lifetrade posted a notice on its website providing a link to the notice to the Irish Stock Exchange and stating that "The situation is that the foreclosure issued by Wells Fargo is in accordance with the Irish structure's legal requirements. On August 14, 2012 a settlement agreement was reached which ensures that the Fund has four months to implement a replacement line to remove Wells Fargo from the *position of collateral owner*. As per the agreement the option termination date will be November 30, 2012. The directors are still working to achieve a satisfactory outcome for investors and will update the website with developments as they happen." (Emphasis added.)

131.    From the reports posted after the Settlement Agreement, Plaintiffs had no way of knowing that Lifetrade had voluntarily transferred Lifetrade's life policy portfolio to Wells Fargo. Rather, it appeared that Wells Fargo had either foreclosed upon the policies or still held them as collateral.

132.    On more than one occasion after the Settlement Agreement, Plaintiffs and members of the class were told by the Lifetrade Defendants that refinancing solutions for the Wells Fargo debt were being sought and, on one of these occasions, that their "continued patience" was requested. *See* Exhibit E attached. On October 1, 2014, Smith stated in a news media interview that the fund was "close to refinancing the debt." See Exhibit E-1.

133.    During 2014, 2015 and 2016, Plaintiffs were told by their brokers, who were in communication with Marcum and other representatives of Lifetrade, that efforts were being made to set up a new credit facility with the French bank BNP Paribas. Several Plaintiffs and class members contributed new funds of approximately $15 million to a fund organized on the island of Bermuda (the "PPF Bond Deal") that was to loan cash to the Lifetrade Fund in order to meet requirements of the French bank. From all information received by Plaintiffs and members of the class, it appeared it appeared to them that Wells Fargo was still working with Lifetrade and facilitating a refinancing transaction.

134.    It was not until approximately November 21, 2016, that some of the Plaintiffs received e-mails from their brokers with attached undated letters from Lifetrade's management indicating that the fund had entered into a "contractual settlement agreement" with Wells Fargo (the date of which was not revealed); *that the bank was legally the owner of all of the life insurance policies* that formerly belonged to Lifetrade (with no information about how or when

this occurred); that the Lifetrade fund held no assets; and that the investors had suffered a "*total loss*." *See* attached Exhibit F (Emphasis added).

135. One of the letters stated also "It is for this reason that most banks and platforms that guard this fund have decided to assign a zero value to the NAV and assume the loss which enable the banks to remove this fund from their portfolios." *Id.*

136. Shortly thereafter, on or about February 22, 2017 many of the Plaintiffs received a notice of annual meeting for Lifetrade from HB Management N.V., one of the directors of Lifetrade Management Company N.V., a copy of which is attached as Exhibit G. The February 22, 2017 notice included "drafts" of annual reports for Lifetrade for the years 2012 through 2016, which Plaintiffs had never previously seen, suggesting for the first time that Lifetrade suffered a loss of $472,210,869.14 in 2012; that it had shareholders' equity of only $50,168.01 at year end 2012; and that its shareholder equity disappeared completely in 2013 due to continuing losses.

137. These reports in November 2016 and February 2017 alerted Plaintiffs to their loss for the first time, caused them to suspect for the first time that they were victims of a fraud in which the Defendants acted with scienter and caused then to retain counsel to investigate.

138. Plaintiffs learned that Defendant S&P acted with scienter only when they paid $600 on January 24, 2017 to obtain access to S&P's confidential research report attached as Exhibit A. Plaintiffs learned of the scienter of 21st Services and the Lifetrade Defendants only when counsel uncovered the accusations of the Coventry suit attached as Exhibit B and the facts set forth in *Portsmouth Settlement Company I, LLC v. Aviva USA Corporation*, 957 N.Y.S.2d 638, 2010 N.Y. Slip Op. 51395(U) (2010).

139.     Prior to retaining counsel, Plaintiffs did not have sufficient knowledge or information about the fraud to prepare and file a complaint meeting the pleading standards of Fed. Rule Civ. Proc. 9(b), *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950, 173 L. Ed. 2d 868 (2009) and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557, 127 S. Ct. 1955, 1966, 167 L. Ed. 2d 929 (2007), including the requirement that they plead scienter with particularity.

## COUNT I

## FRAUD - KNOWING MISREPRESENTATION BY S&P

140.     **Incorporation By Reference.** Plaintiffs re-allege paragraphs 1 through 139, inclusive, of this Complaint.

141.     **Misrepresentation.**   By its words and conduct, knowing that investors in Lifetrade would rely thereon, Defendant S&P represented to Plaintiffs that the securities of Lifetrade were safe, investment-grade securities that had steadily increased in value since their initial offering, exceeding the performance of benchmark indexes for U.S. stocks and bonds.  In truth and in fact, the securities of Lifetrade were exceedingly risky, their value being based almost entirely upon false LE evaluations prepared by 21st Services, which had already been accused of fraud in a lawsuit and reports widely circulated in the life settlements industry before S&P rated Lifetrade's securities.  Defendant S&P itself knew that life settlement transactions were too risky to rate.

142.     **Knowledge of Falsity.**   At the time it made the misrepresentations about the safety and value of Lifetrade's securities, Defendant S&P knew that they were false as shown by its confidential research report stating that life settlement transactions were too risky for it to rate.

143.    **Scienter.** Defendant S&P knew that investors in Lifetrade would rely upon its representations, and intended that they do so.

144.    **Reasonable Reliance by Investors in Lifetrade.** The Plaintiffs were unaware of the falsity of S&P's representations. Plaintiffs reasonably relied upon the false representations of S&P. Had Plaintiffs known that S&P had issued a confidential report stating that life settlement transactions are too risky to rate, Plaintiffs would not have invested in the securities.

145.    **Proximate Cause, Damages, and Prayer for Relief.** As a proximate cause of the knowing misrepresentation of Defendant S&P, the Plaintiffs have been damaged in an amount to be established at trial, and seek to recover the damages of the Class which are at least $5 million and the damages of at least one individual Plaintiff exceed $75,000.

### COUNT II

### FRAUD - FALSE STATEMENTS BY S&P
### WITHOUT SUFFICIENT KNOWLEDGE OF TRUTH OR FALSITY

146.    **Incorporation by Reference.** Plaintiffs re-allege paragraphs 1 through 145, inclusive, of this Complaint.

147.    **False Statement.** By its words and conduct, knowing that investors in Lifetrade would rely thereon, Defendant S&P represented to Plaintiffs that the securities of Lifetrade were safe, investment-grade securities that had steadily increased in value since their initial offering, exceeding the performance of benchmark indexes for U.S. stocks and bonds. In truth and in fact, the securities of Lifetrade were exceedingly risky, their value being based almost entirely upon false LE evaluations prepared by 21st Services, which had already been accused of fraud in a lawsuit and reports widely circulated in the life settlements industry before S&P rated Lifetrade's securities. These misrepresentations were never withdrawn or corrected, and continue to this day.

148.   **Absence of Knowledge of Truth or Falsity.** At the time S&P made its initial false statements about the safety and performance of Lifetrade's securities on June 27, 2006, if S&P did not yet know that the securities were too risky to rate, it nevertheless acted without a sufficient investigation to permit it to know whether its statements were true or false. That is, Defendant S&P had no idea of the safety or value of Lifetrade's securities, and had not made sufficient inquiry to know one way or the other, yet made the representations anyway.

149.   **Scienter.** Defendant S&P knew that investors in Lifetrade would rely upon its representations, and intended that they do so.

150.   **Reasonable Reliance by Investors in Lifetrade.** The Plaintiffs were unaware of the falsity of S&P's statements. Plaintiffs reasonably relied upon the false statements of S&P. Had Plaintiffs known that S&P, in reality, had no idea about the safety or value of Lifetrade's securities, Plaintiffs would not have invested in the securities.

151.   **Proximate Cause, Damages, and Prayer for Relief.**  As a proximate cause of the false statements, the Plaintiffs have been damaged in an amount to be established at trial, and seek to recover the damages of the Class, which are at least $5 million and the damages of at least one individual Plaintiff exceed $75,000.

## COUNT III

## NEGLIGENT MISREPRESENTATION BY S&P

152.   **Incorporation by Reference.** Plaintiffs re-allege paragraphs 1 through 151, inclusive, of this Complaint.

153.   **Representations by Defendant.** By its words and conduct, knowing that investors in Lifetrade would rely thereon, Defendant S&P represented to Plaintiffs that the securities of Lifetrade were safe, investment-grade securities that had steadily increased in value

since their initial offering, exceeding the performance of benchmark indexes for U.S. stocks and bonds.

154.   **Falsity of Representation.** In truth and in fact, the securities of Lifetrade were exceedingly risky, their value being based almost entirely upon false LE evaluations prepared by 21st Services, which had already been accused of fraud in a lawsuit and reports widely circulated in the life settlements industry before S&P rated Lifetrade's securities. These misrepresentations were never withdrawn or corrected, and continue to this day.

155.   **Special Relationship.** Plaintiffs had a "special relationship" with S&P, in that S&P (1) intended their ratings would be used to evaluate the Lifetrade investment; (2) intended that Plaintiffs – members of a select group of qualified investors – would rely on their ratings to evaluate the investment; and (3) prepared their ratings with the end and aim of inducing investors such as the Plaintiffs to invest.

156.   **Reliance by Known Party or Parties in Furtherance of Purpose.** The Plaintiffs reasonably relied upon the false statements of S&P.  Had Plaintiffs known that S&P, in reality, had no idea about the safety or value of Lifetrade's securities or in fact knew the securities were too risky to rate, Plaintiffs would not have invested in the securities.

157.   **Proximate Cause, Damages and Prayer for Relief.** As a proximate cause of the false statements, the Plaintiffs have been damaged in an amount to be established at trial, and seek to recover the damages of the Class which are at least $5 million and the damages of at least one individual Plaintiff exceed $75,000.

## COUNT IV

## CONSTRUCTIVELY FRAUDULENT CONVEYANCE TO ATC REALTY FIFTEEN, INC. AND WELLS FARGO BANK

158.    **Incorporation by Reference.** Plaintiffs re-allege paragraphs 1 through 157, inclusive, of this Complaint.

159.    **Transfer.** The life insurance policies of Lifetrade were transferred to ATC Realty Fifteen for the benefit of Wells Fargo Bank on or about August 15, 2012 under the terms of the Settlement Agreement dated August 14, 2012 attached as Exhibit A-**1**.

160.    **Absence of Fair Consideration.** The antecedent debt of approximately $204,696,178 owed to Wells Fargo was not a fair consideration for the transfer because the life insurance polices had a face value of $905,759,403 in death benefits and a present value of approximately $451,459,040.

161.    **Insolvency.** The Lifetrade Entities were insolvent or were rendered insolvent by the transfer.

162.    **Standing, Prayer for Relief.** Plaintiffs have standing to bring this claim and seek to rescind the transfer pursuant to the New York Fraudulent Conveyance Act, N.Y. CLS Dr & Cr. § 273-a because they have unliquidated claims against the Lifetrade Defendants.


## COUNT V

### FRAUDULENT CONVEYANCE TO ATC REALTY FIFTEEN, INC. AND WELLS FARGO BANK WITH INTENT TO HINDER, DELAY OR DEFRAUD CREDITORS

163.    **Incorporation by Reference.** Plaintiffs re-allege paragraphs 1 through 162, inclusive, of this Complaint.

164.    **Transfer.** The life insurance policies of Lifetrade were transferred to ATC Realty Fifteen for the benefit of Wells Fargo Bank on or about August 15, 2012 under the terms of the Settlement Agreement dated August 14, 2012 attached as Exhibit A-1.

165.     **Intent.**  The transfer was made with actual intent to hinder, delay, or defraud present or future creditors of the Lifetrade Entities.

166.     **Standing and Prayer for Relief.**  Plaintiffs have standing to bring this claim and seek to rescind the transfer and recover statutory attorney's fees pursuant to the New York Fraudulent Conveyance Act, N.Y. CLS Dr & Cr. § 276 because they have unliquidated claims against the Lifetrade Defendants.

**COUNT VI**

**UNCONSCIONABILTY OF THE WELLS FARGO LOAN AND SETTLEMENT AGREEMENTS**

167.     **Incorporation by Reference.**  Plaintiffs re-allege paragraphs 1 through 166, inclusive, of this Complaint.

168.     **Contracts at Issue.**  Plaintiff challenge herein certain provisions of the following agreements entered into between Wells Fargo and Lifetrade:  First Amendment to Loan and Security Agreement dated June 26, 2009, Second Amendment to Loan and Security Agreement dated January 29, 2010, Third Amendment to Loan and Security Agreement dated June 25, 2010, Fourth Amendment to Loan and Security Agreement dated August 30, 2010, Fifth Amendment to Loan and Security Agreement dated September 23, 2010, the Omnibus Amendment dated March 28, 2011, at which date Lifetrade Ireland acceded as a Guarantor, the Sixth Amendment to Loan and Security Agreement dated June 29, 2011, the Second Omnibus Amendment dated August 4, 2011, the Seventh Amendment to Loan and Security Agreement dated September 1, 2011, the Eighth Amendment to Loan and Security Agreement dated September 30, 2011, the Ninth Amendment to Loan and Security Agreement dated November 15, 2011, the Tenth Amendment to Loan and Security Agreement dated November 29, 2011, the Eleventh Amendment to Loan and Security Agreement dated December 15, 2011, the Twelfth

Amendment to Loan and Security Agreement dated January 13, 2012, and Limited Waiver and Thirteenth Amendment to Loan and Security Agreement, dated as of March 9, 2012, Fourteenth Amendment to Loan and Security Agreement, dated as of March 15, 2012, and the Settlement Agreement dated August 14, 2012 (hereinafter the "Loan & Settlement Agreements").

169.    **Procedural Unconscionability.** Key Provisions of the Loan and Settlement Agreements are procedurally unconscionable as to Plaintiffs and the class members because they were entered into entered into without notice to or an opportunity for investors of Lifetrade to have any input into the contract terms. Plaintiffs and members of the class received inadequate representation in the negotiation of the contracts, especially the Settlement Agreement, because of the Lifetrade Defendants wished to avoid personal liability for the Wells Fargo debt and were operating with a conflict of interest.

170.    Lifetrade itself was placed in the position of negotiating loan renewal terms with Wells Fargo under duress of the 2007-2009 financial crisis and the absence of alternative lenders in the marketplace. Wells Fargo took advantage of Lifetrade's weakness to exact oppressive interest rates and other conditions that almost guaranteed Lifetrade's default if it was unable to obtain alternative financing.

171.    **Substantive Unconscionability.** The initial Lifetrade loan agreement with Wachovia on June 25, 2008, had a credit facility of $500 million at an interest rate of 3-month Libor plus 2.4%. After Wells Fargo acquired the assets of Wachovia, it cut the credit facility to $200 million and jacked up the interest rate to 3-month Libor plus 4% on June 25, 2009, 3-month Libor plus 5% on September 23, 2010, and 3-month Libor pus 9% on April 1, 2011, all at a time of historically low interest rates.

172.    Wells Fargo's purpose in increasing the interest rate to such extreme levels was to either force Lifetrade to refinance the debt elsewhere (something that was impossible under market conditions) or to force Lifetrade into default so that Wells Fargo could take over its life settlement portfolio and realize all profits for itself.

173.    The Settlement Agreement of August 14, 2012 was the culmination of this oppressive process and is substantively unconscionable because it is was completely one-sided, containing clauses that purport to waive all rights of derivative plaintiffs and bankruptcy trustees and impose an outrageous interest rate or yield of 16% per annum that was required to be paid by Lifetrade or its investors should they be able to refinance the Wells Fargo debt with another lender. The huge yield that Wells Fargo expected and imposed guaranteed that, with the passage of time, Lifetrade and its investors would be progressively less able to refinance the debt.

174.    Accordingly, the interest rates imposed under the Loan and Settlement Agreements were unconscionable and should be reduced by the Court to a reasonable floating rate such as the prime lending rate for purposes of calculating amounts due to Wells Fargo if and when the Settlement Agreement is voided under pursuant to the New York Fraudulent Conveyance Act, N.Y. CLS Dr & Cr, Art. 10.

175.    **Proximate Cause, Damages, and Prayer for Relief.** As a consequence of the foregoing, Plaintiffs have been damaged in an amount to be determined at trial, but the seek to recover in full the damages of the Class, which are at least $5 million and the damages of at least one individual Plaintiff exceed $75,000.

### COUNT VII

### FRAUDULENT BREACH OF FIDUCIARY DUTY BY THE WELLS FARGO DEFENDANTS

176.     **Incorporation by Reference.** Plaintiffs re-allege paragraphs 1 through 175, inclusive, of this Complaint.

177.     **Special Relationship of Confidence & Trust.** By virtue of (1) Wells Fargo Bank's role as Custodian, Verification Agent, and Escrow Agent for the Lifetrade fund, (2) the roles of its affiliates Wells Fargo Utah and Wells Fargo Delaware as trustees of the LT Opportunity Trust which held title to Lifetrade's life insurance policies, and (3) the roles of Wells Fargo Utah and Wells Fargo Delaware as trustees of the LT Opportunity Trust, which was the borrower on loans secured by Lifetrade's life insurance policies, Wells Fargo Bank and its affiliates Wells Fargo Utah and Wells Fargo Delaware had a special relationship of confidence and trust with Lifetrade and its shareholders which gave rise to fiduciary duties.

178.     **Breach of Fiduciary Duty.** By (1) surrendering the Lifetrade life insurance policies to themselves in satisfaction of a debt owed to and by themselves, (2) ignoring self-dealing conflicts of interest on their own part and that of Lifetrade's management, (3) ignoring a special vote of the shareholders of Lifetrade opposing that action, and (4) failing to provide notice of that action to the shareholders of Lifetrade, Wells Fargo Bank, Wells Fargo Utah and Wells Fargo Delaware fraudulently breached the fiduciary duties owed to Lifetrade and its shareholders.

179.     **Proximate Cause, Damages, and Prayer for Relief.** As a proximate cause of the breach, the Plaintiffs have been damaged in an amount to be established at trial, and seek to recover the damages of the Class which are at least $5 million and the damages of at least one individual Plaintiff exceed $75,000.

**COUNT VIII**

**BREACH OF CONTRACT BY THE WELLS FARGO DEFENDANTS**

180. **Incorporation by Reference.** Plaintiffs re-allege paragraphs 1 through 179, inclusive, of this Complaint.

181. **Contractual Relationships.** Wells Fargo Bank entered into various agreements with Lifetrade by which it assumed the roles of Custodian, Verification Agent, and Escrow Agent for the Lifetrade fund.  Wells Fargo Utah and Wells Fargo Delaware also entered into various agreements with Lifetrade by which they assumed the role of trustees and agreed to both borrow money on behalf of Lifetrade and its affiliates and to hold title to all life insurance policies belonging to Lifetrade and its affiliates.

182. **Breach of Contractual Duties.**  By (1) surrendering the Lifetrade life insurance policies to themselves in satisfaction of a debt owed by and to themselves, (2) ignoring self-dealing conflicts of interest on their own part and that of Lifetrade's management, (3) ignoring a special vote of the shareholders of Lifetrade opposing that action, and (4) failing to provide notice of that action to the shareholders of Lifetrade, Wells Fargo Bank, Wells Fargo Utah and Wells Fargo Delaware breached their contractual duties owed to Lifetrade and its shareholders.

183. **Proximate Cause, Damages, and Prayer for Relief.**  As a proximate cause of the breach, the Plaintiffs have been damaged in an amount to be established at trial, and seek to recover but the damages of the Class which are at least $5 million and the damages of at least one individual Plaintiff exceed $75,000.

## COUNT IX

### UNJUST ENRICHMENT OF WELLS FARGO BANK

184. **Incorporation by Reference.** Plaintiffs re-allege paragraphs 1 through 183, inclusive, of this Complaint. They plead additionally and in the alternative, that:

185.   **Defendant was Enriched.** Defendant Wells Fargo Bank is being enriched by collecting the death benefits on some $906 million in life insurance to satisfy a debt of only $205 million that was owed by Lifetrade.

186.   **At the Plaintiffs' Expense.** Wells Fargo Bank's enrichment is at the expense of the shareholders of Lifetrade, who invested some $593 million, net of redemptions, in Lifetrade and have been deprived of the entirety of their investments.

187.   **Against Equity & Good Conscience.** It is against equity and good conscience for Wells Fargo to be permitted to retain the portion of the life insurance policy death benefits that are in excess of the $205 million debt owed to Wells Fargo, plus its reasonable costs and interest.

188.   **Proximate Cause, Damages, and Prayer for Relief.** As a proximate cause of Wells Fargo's conduct, the Plaintiffs have been damaged in an amount to be established at trial, and seek to recover but the damages of the Class which are at least $5 million and the damages of at least one individual Plaintiff exceed $75,000.

## COUNT X

## FRAUD - KNOWING MISREPRESENTATION BY 21ST CENTURY

189.   **Incorporation by Reference.** Plaintiffs re-allege paragraphs 1 through 188, inclusive, of this Complaint.

190.   **Misrepresentation.** By its words and conduct, knowing that Lifetrade and its investors would rely thereon, Defendant 21st Services made false representations about the life expectancy of life insureds who engaged in life settlement transactions with Portsmouth Settlement that were to be assigned to Lifetrade.

191.   **Knowledge of Falsity.**   At the time it made the misrepresentations, Defendant 21st Services knew that they were false and grossly understated the life expectancies of the insured persons.

192.   **Scienter.** Defendant S&P knew that Lifetrade and its investors would rely upon its representations, and intended that they do so.

193.   **Reasonable Reliance by Lifetrade and its Investors.** Lifetrade and its investors were unaware of the falsity of 21st Services representations. Plaintiffs reasonably relied upon the false representations of 21st Services.  Had Plaintiffs known that 21st Services was providing fraudulent life expectancy evaluations, Plaintiffs would not have invested in the securities.

194.   **Proximate Cause, Damages, and Prayer for Relief.** As a proximate cause of the knowing misrepresentations of Defendant 21st Services, the Plaintiffs have been damaged in an amount to be established at trial, and seek to recover the damages of the Class which are at least $5 million and the damages of at least one individual Plaintiff exceed $75,000.

### COUNT XI

### CONSPIRACY TO COMMIT FRAUD
### BY 21ST SERVICES AND THE LIFETRADE DEFENDANTS

195.   **Incorporation by Reference.** Plaintiffs re-allege paragraphs 1 through 194, inclusive, of this Complaint.

196.   **Conspiracy to Defraud.** As alleged in detail above, Defendant 21st Services and its co-conspirators, Portsmouth Settlement and Smith, knowingly and/or recklessly, agreed and/or confederated by common design and conspired by common design to make materially false and misleading statements and engage in a fraudulent scheme for the purpose of inducing Plaintiffs to invest in Lifetrade.

197.   **Reasonable Reliance by Lifetrade and its Investors.** Lifetrade and its investors were unaware of the falsity of 21st Services representations made by agreement with Portsmouth Settlement and Smith. Plaintiffs reasonably relied upon the false representations. Had Plaintiffs known that Defendants were providing fraudulent life expectancy evaluations, Plaintiffs would not have invested in the securities.

198.   **Proximate Cause, Damages, and Prayer for Relief.** As a proximate cause of the knowing misrepresentations of Defendants 21st Services, Portsmouth Settlement and Smith, the Plaintiffs have been damaged in an amount to be established at trial, and seek to recover the damages of the Class which are at least $5 million and the damages of at least one individual Plaintiff exceed $75,000.

### COUNT XII

### NEGLIGENT MISREPRESENTATION BY 21ST SERVICES

199.   **Incorporation by Reference.** Plaintiffs re-allege paragraphs 1 through 198, inclusive, of this Complaint.

200.   **Representations by Defendant.** By its words and conduct, knowing that investors in Lifetrade would rely thereon, Defendant 21st Services made representations about the life expectancy of life insureds who engaged in life settlement transactions with Portsmouth Settlement that were to be assigned to Lifetrade.

201.   **Falsity of Representations.** The representations were false because they did not comport with professional standards and under-estimated the life expectancy of the life insureds.

202.   **Special Relationship.** Lifetrade had a "special relationship" with 21st Services, in that 21st Services (1) intended their life expectancy evaluations would be used to value life policies that Portsmouth Settlement purchased on behalf of Lifetrade; (2) intended that

Portsmouth Settlement and Lifetrade would rely on their life expectancy evaluations to value the life insurance policies; and (3) prepared their life expectancy evaluations with the end and aim of permitting Portsmouth Settlement and Lifetrade to outbid other bidders for the policies.

203. **Reliance by Known Party or Parties in Furtherance of Purpose.** Portsmouth Settlement and Lifetrade reasonably relied upon the false statements of 21st Services. Had Lifetrade known that 21st Services was understating the life expectancies, it would not have purchased the life settlements in question.

204. **Proximate Cause, Damages, and Prayer for Relief.** As a proximate cause of the false statements, Lifetrade and its investors have been damaged in an amount to be established at trial, and seek to recover the damages of the Class which are at least $5 million and the damages of at least one individual Plaintiff exceed $75,000.

### COUNT XIII

### FRAUD - KNOWING MISREPRESENTATIONS AND CONCEALMENT OF MATERIAL FACTS BY THE LIFETRADE DEFENDANTS

205. **Incorporation by Reference.** Plaintiffs re-allege paragraphs 1 through 204, inclusive, of this Complaint.

206. **Misrepresentations.** By their words and conduct, knowing that investors in Lifetrade would rely thereon, the Lifetrade Defendants made false representations about (1) the life expectancy of life insureds, (2) the value of life insurance policies purchased by Lifetrade and (3) the safety of investments in Lifetrade.

207. **Concealment.** Having a duty of disclosure due to the vague and misleading nature of disclosures made to Lifetrade investors, the Lifetrade Defendants also failed to disclose (1) the amount of the fees, commissions and other compensation paid to them, (2) the true reason that Wells Fargo Bank reduced the amount of Lifetrade's credit line and declined to renew its

credit facility, (3) the true reason they viewed a surrender of Lifetrade's policies as a preferred route for dealing with the Wells Fargo debt, and (4) the true status of Lifetrade's life insurance policies after they were surrendered.

208.   **Scienter.**   At the time they made the misrepresentations and nondisclosures, the Lifetrade Defendants knew that their statements were false and that their nondisclosures would mislead investors in Lifetrade.

209.   **Knowledge of Reliance.**   The Lifetrade Defendants knew that Plaintiffs and members of the class would rely upon their false representations and concealment, and intended that they do so.

210.   **Reasonable Reliance by Lifetrade and its Investors.** Plaintiffs and members of the class were unaware of the falsity of the Lifetrade Defendants' misrepresentations or the misleading nature of matters they concealed. Plaintiffs and members of the class reasonably relied upon the false representations and are deemed to have relied upon the nondisclosure of material facts. Had Plaintiffs and members of the class known the matters misrepresented or concealed by the Lifetrade Defendants, they would not have invested in Lifetrade and/or would have taken other action to protect their interests after making an investment.

211.   **Proximate Cause, Damages, and Prayer for Relief.** As a proximate cause of the knowing misrepresentations and concealment by the Lifetrade Defendants, the Plaintiffs and members of the class have been damaged in an amount to be established at trial, and seek to recover the damages of the Class which are at least $5 million and the damages of at least one individual Plaintiff exceed $75,000.

## COUNT XIV

## FRAUDULENT BREACH OF FIDUCIARY DUTY BY SMITH AND MARCUM

212.     **Incorporation by Reference**. Plaintiffs re-allege paragraphs 1 through 211, inclusive, of this Complaint.

213.     **Special Relationship of Confidence & Trust**. By virtue of Smith's positions as the founder and principal investment officer of Lifetrade and Marcum's position as the chief marketing officer and spokesman for the Lifetrade Entities, Smith and Marcum had a special relationship of confidence and trust with the Lifetrade Entities and their shareholders which gave rise to fiduciary duties. These duties include but are not limited to: (1) the duty to protect investors and refrain from self-dealing; (2) the duty to act in the investors' best interests to preserve their rights as shareholders and to maximize their potential assets; and (3) the duty to keep investors fully apprised of the condition of their settlements.

214.     **Fraudulent Breach of Fiduciary Duty**.   By (1) engaging in self-dealing transactions by which they and their controlled entities, including Portsmouth Settlement, Portsmouth Securities and Lifetrade Management, were allowed to make undisclosed fees and commissions of as much as 25% of the amount Lifetrade paid for life settlements, (2) surrendering Lifetrade's policies to Wells Fargo Bank to avoid potential liability for themselves and their controlled entities, (3) ignoring the wishes of Lifetrade's shareholders expressed in a special shareholders' vote  (4) failing to provide clear notice of the surrender of Lifetrade's policies to its shareholders, and (5) entering into the August 14, 2012 Settlement Agreement with the Wells Fargo Defendants, which, *inter alia,* stripped Plaintiffs of the entirety of their investments, fraudulently concealed from Plaintiffs the true facts concerning their losses, and otherwise put their individual interests above those of the investors,   Smith and Marcum breached their fiduciary duties owed to Lifetrade and its investors.

215.     **Proximate Cause, Damages, and Prayer for Relief.**  As a proximate cause of the breach, the Plaintiffs and members of the class have been damaged in an amount to be established at trial, and seek to recover the damages of the Class which are at least $5 million and the damages of at least one individual Plaintiff exceed $75,000.

**COUNT XV**

**WELLS FARGO'S AIDING AND ABETTING BREACHES OF FIDUCIARY DUTY BY SMITH AND MARCUM**

216.     **Incorporation by Reference.** Plaintiffs re-allege paragraphs 1 through 215, inclusive, of this Complaint.

217.     **Knowledge and Scienter:** At all relevant times, Wells Fargo knew that Smith and Marcum, as the controlling persons of the Lifetrade Defendants and  the persons negotiating on behalf of all Lifetrade Defendants, faced personal liability for the debts of Lifetrade, and were deeply concerned about their potential exposure and the prospects that they might lose the substantial sums they had already fraudulently skimmed from the Lifetrade Entities.

218.     Wells Fargo also knew that  Smith and Marcum, as the controlling persons of the Lifetrade Defendants, owed fiduciary duties to Lifetrade investors, including Plaintiffs, that required them, inter alia, to act in the investors' best interests to preserve their rights as shareholders, to maximize their potential assets, to keep them fully apprised of the condition of their investments, and to refrain from self-dealing.

219.     **Inducement and Participation in Breach of Fiduciary Duties:** Notwithstanding this knowledge, Wells Fargo induced and/or participated in the breach of Smith and Marcum's fiduciary duties to Plaintiffs by playing to their personal vulnerabilities and orchestrating a

Settlement Agreement with them that both stripped Plaintiffs of all rights to their investments and fraudulently concealed from them the fact that they had suffered any loss.

220.     Thus, in the Settlement Agreement, the Wells Fargo Defendants insisted "as a material inducement to the Lender to enter into this Agreement" that Smith and Marcum agree to a provision "on behalf of [Lifetrade] and its Derivative/Successor Persons" relieving Wells Fargo of "any fiduciary duty of any kind or nature whatsoever to any Lifetrade Party." Settlement Agreement, Exhibit A-1, Section 5.9.

221.     Wells Fargo further insisted that Smith and Marcum, as the controlling persons of the Lifetrade Defendants, agree "on behalf of itself and its Derivative/Successor Persons" to waive "any defenses of any kind or nature whatsoever to the validity, effectiveness or enforceability" of the Settlement Agreement and accompanying documents. Settlement Agreement, Exhibit A-1, Section 12.3.

222.     Wells Fargo further demanded that Smith and Marcum approve the "Unconditional and Absolute Transfer" of the entirety of the insurance policies that Wells Fargo had held as collateral only: ". . . . The Lifetrade Parties and their Derivative/Successor Persons will not have any further interest or claim in and to the Foreclosed Assets or the proceeds and profits that may be derived therefrom." Settlement Agreement, Exhibit A-1, Section 9.1. Although nominally the Settlement Agreement gave the Lifetrade Defendants a short window in which to re-purchase the portfolio by November 12, 2012, that provision was entirely illusory, as it was obvious to both Wells Fargo that three and a half months was an impossibly brief period in which to obtain financing elsewhere.

223.   Wells Fargo also induced Smith and Marcum, to agree to an excessive and unbargained-for Lender Yield of 16%. Settlement Agreement, Exhibit A-1, Section xvi, at p. 10.

224.   By promoting the foregoing contractual provisions which heavily benefited Wells Fargo, Smith and Marcum to the detriment of investors, including Plaintiffs, Wells Fargo induced and participated in Smith and Marcum's breach of their fiduciary duty to protect investors and refrain from self-dealing, thereby aiding and abetting that breach.

225.   In frank recognition of the unconscionable size of the 16% Lender Yield, under the circumstances, Wells Fargo expressly insisted that Smith, Marcum and Lifetrade conceal the Lender Yield from investors, including Plaintiffs. Settlement Agreement, Exhibit A-1, Section 13.13(c). By insisting that the Lender Yield be kept secret from investors, Wells Fargo directly participated in and induced Smith and Marcum's breach of their fiduciary duty to be open and truthful with Plaintiffs about their investments, thereby aiding and abetting that breach.

226.   Further promoting Smith and Marcum's breach of fiduciary obligations to Plaintiffs, Wells Fargo insisted and that "the Lifetrade Parties shall not make any statements to investors . . . whether privately or publicly, relating to the settlement contemplated by this Agreement" other than certain minimal factual statements. Settlement Agreement, Exhibit A-1, Section 13.13(c). Plaintiffs were kept in the dark for years about the failure of their investments precisely because Wells Fargo colluded with Smith & Marcum to keep this information from them.

227.   Wells Fargo's actions in furtherance of Smith and Marcum's breaches of fiduciary duty were knowing and intentional.  For this reason, Wells Fargo sought to conceal from investors, including Plaintiffs, any information relating to its own motivations in entering

into the Settlement Agreement. Wells Fargo insisted upon provisions in the Settlement Agreement that expressly prevented Lifetrade from revealing "any statement to any Persons relating to the state of mind, motivation, actions or inactions by the Lender Parties [Wells Fargo]." Settlement Agreement, Exhibit A-1, Section 13.13(c)

228.    By reason of the foregoing, Wells Fargo is liable to Plaintiffs for aiding and abetting in the breaches of fiduciary duty by Smith and Marcum.

229.    **Proximate Cause, Damages, and Prayer for Relief.** As a direct consequence of Wells Fargo's foregoing misconduct,Smith and Marcum breached their fiduciary duties to Plaintiffs. As a proximate cause of the breach, the Plaintiffs and members of the class have been damaged in an amount to be established at trial, and seek to recover the damages of the Class which are at least $5 million and the damages of at least one individual Plaintiff exceed $75,000.

## COUNT XVI

## CIVIL RICO

230.    **Incorporation by Reference.** The allegations of paragraphs 1 through 229 are incorporated herein by reference.

231.    **Violations of RICO.** This Count is against Defendants Smith, Marcum and the Wells Fargo Defendants (the "RICO Defendants").

232.    Lifetrade is an enterprise engaged in and whose activities affect interstate commerce. The RICO Defendants are employed by or associated with the enterprise.

233.   The RICO Defendants agreed to and did conduct and participate in the conduct of the enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Plaintiffs.

234.   Specifically, each of the RICO Defendants entered into a conspiracy to defraud and did in fact defraud Plaintiffs and members of the Class, who are each Lifetrade investors, using the mails and wires to do so.  Specifically, as detailed above, the RICO Defendants entered into a settlement agreement dated August 12, 2012 whereby the life insurance policies were surrendered to Wells Fargo's subsidiary ATC Realty Fifteen, Inc.  Smith, Marcum and the Wells Fargo entities (as trustees and custodians of the life insurance policies) knew at that time that Lifetrade shareholders had opposed surrender of the policies at the May 17, 2012 shareholders meeting. Smith, Marcum and the Wells Fargo entities also knew that Smith and Marcum were personally responsible for the debt, and that their willingness to have Lifetrade surrender the policies was an act of self-dealing designed to protect themselves rather than to benefit Plaintiffs, to whom they owed fiduciary duties.

235.   For this reason, the August 12, 2012 settlement agreement transferring policy ownership hid the fact of the transfer, through an express provision that "the Lifetrade Parties shall not make any statements to investors in the Lifetrade Parties, or any other Persons, whether privately or publicly, relating to the settlement contemplated by this Agreement."  The settlement further contemplated that Wells Fargo's true motivations be shielded from the investors, providing that Lifetrade shall not make "any statements" relating to the "state of mind, motivation, actions or inactions" by the Wells Fargo entities.

236.   The settlement contained a further provision that the agreement would be terminated if any Lifetrade Party sought legal redress relating to the settlement agreement or the foreclosed assets.   This provision essentially reinstated the Wells Fargo entities' right to pursue their rights against Smith and Marcum in the event that any investor sought to enforce their rights.   Thus, the RICO Defendants intended to and did in fact carry out the transfer of the life insurance policies in secret, using the Lifetrade borrowing entity to do so.   This was done with the sole purpose of defrauding the investor Plaintiffs, while protecting Smith, Marcum and/or their affiliated entities, who were personally responsible for the loan and who benefitted greatly from the transfer of the policies in satisfaction of the debt.

237.   Pursuant to and in furtherance of their fraudulent scheme, Defendants committed multiple related acts of mail fraud and wire fraud.   Specifically, the mails and wires were utilized to execute the August 14, 2012 settlement agreement itself.   The agreement itself expressly contemplates execution in counterpart, which in fact took place as evidenced by the face of the execution pages.   Upon information and belief, each of the signatory parties utilized the mails and wires to transmit their execution copies of the agreement.   Upon information and belief, the mails and wires were further utilized in the negotiations leading up to finalization of the settlement agreement.

238.   Following execution of the settlement agreement, Lifetrade (the RICO enterprise) continued to be utilized to further the scheme to defraud.   Specifically, as noted above, in October 2014, RICO Defendant Smith further misled Plaintiffs by stating publicly that Lifetrade was "close to obtaining a new credit facility."   Exhibit E-1.   This statement was reported in a life settlements industry publication, which Smith knew and expected would be distributed via the

mails and wires, and which the Wells Fargo entities (as owners of significant life settlement assets) were aware.

239.   The RICO Defendants continued to defraud investors, through Lifetrade, during 2014, 2015, and 2016.  Smith and Marcum, through Lifetrade, used the mails and wires to fraudulently represent to investors that a new credit facility was being explored (even though Wells Fargo's subsidiary ATC Realty Fifteen, Inc. already had ownership of the life insurance policies), and that efforts to seek legal recourse would destroy such efforts.  Only in November 2016, some four years after the RICO Defendants first conspired to and did in fact transfer ownership of the life insurance assets to the Wells Fargo entities, did Smith and Marcum, through Lifetrade, notify some Plaintiffs indicating that the bank was the legal owner of the policies, that the fund had no assets, and that the Plaintiff investors had suffered a total loss. During this period, and continuing to the present day, the Wells Fargo Defendants have benefitted from the ownership of the assets to the detriment of Plaintiffs.  Wells Fargo continues to collect policy payouts as insureds expire, and continues to enjoy a handsome windfall at the expense of the Plaintiffs they defrauded through Lifetrade.

240.   On information and belief, Wells Fargo committed similar frauds in 2010 and 2011 against investors in life settlement pools securitized by Medley Capital, Berlin Atlantic Capital and Q Capital, all of which had credit lines similar to Lifetrade's that were originated by Wachovia Securities and acquired by Wells Fargo through its acquisition of Wachovia.

241.   The Settlement Agreement entered into by Wells Fargo with Berlin Atlantic Capital is dated March 16, 2011 and is substantially similar to the Settlement Agreement Wells Fargo entered into on August 14, 2012, with Lifetrade.  Plaintiffs do not have a copies of the

Medley Capital and Q Capital settlement Aagreement, but believe and therefore allege that they were substantially similar to the agreements with Berlin Atlantic Capital and Lifetrade.

242.    Despite telling Medley Capital, Berlin Atlantic Capital, Q Capital and Lifetrade that Wells Fargo did not want to be in the life settlement business and using this as a reason for reducing the borrowers credit lines, jacking up their interest rates to default-type rates and refusing to renew their credit facilities, Wells Fargo has in fact gotten into the life settlement business by acquiring the policy portfolios of all three companies, holding the policies to maturity and collecting the life insurance proceeds.  In essence, Wells Fargo has substituted itself for the stockholders of all three borrowers as the investor in their policy portfolios.

243.    On information and belief, Wells Fargo tricked and coerced each of its life settlement borrowers into turning over their policy portfolios to Wells Fargo or its designee so that Wells Fargo could profit from holding those policy portfolios to maturity rather than continue in Wachovia's role as a lender only.

244.    The acts set forth above constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

245.    The RICO Defendants have directly and indirectly conducted and participated in the conduct of the enterprise's affairs through the pattern of racketeering and activity described above, in violation of 18 U.S.C. § 1962(c).

246.    **Proximate Cause, Damages, and Prayer for Relief.** As a direct and proximate result of the RICO Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiffs have been injured in their business and property in that Lifetrade surrendered 100% of its life settlement portfolio, to which they had not assented.

{00033897}                                    71

247.    As a direct and proximate result of the foregoing, the Plaintiffs and members of the class have been damaged in an amount to be established at trial, and seek to recover the damages of the Class which are at least $5 million and the damages of at least one individual Plaintiff exceed $75,000.  Plaintiffs further seek to recover attorneys' fees and treble damages.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs pray for the following relief:

a)    An award of compensatory damages in amounts to be determined at trial resulting from Defendants' wrongful conduct and breach of their legal, contractual and fiduciary duties;

b)    An order rescinding the fraudulent conveyance to the Wells Fargo Defendants pursuant to the New York Fraudulent Conveyance Act, N.Y. CLS Dr & Cr, Art. 10;

c)    Pre-judgment and post-judgment interest to the extent allowed by law;

d)    An award of the cost of prosecuting this action, including reasonable attorneys' fees, expert fees and costs reasonably incurred to the extent allowed by law;

e)    Punitive damages;

f)    Treble damages under RICO;

g)    Statutory attorney's fees pursuant to RICO and the New York Fraudulent Conveyance Act, N.Y. CLS Dr & Cr, Art. 10;

h)    Such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial on all claims alleged herein so triable.

Dated:  August 1, 2017

Respectfully submitted,


**PHILLIPS & PAOLICELLI, LLP**

By: _____

William Mack (WM-7786)
WMack@p2law.com

Steven Phillips (SP-9658)
SPhillips@p2law.com

Diane Paolicelli (DP-3067)
dpaolicelli@p2law.com

747 Third Avenue
New York, N.Y. 10017
Telephone: (212) 388-5100

**WATERS & KRAUS, LLP**
Wm. Paul Lawrence, II
 (Admitted *Pro Hac Vice*)
plawrence@waterskraus.com
Washington D.C. Metro Office
37163 Mountville Rd.
Middleburg, VA 20117
Telephone: (540) 687-6999
Fax: (540) 687-5457


Charles Siegel
(Admitted *Pro Hac Vice*)
csiegel@waterskraus.com
3219 McKinney Ave.
Dallas, TX 75204
Telephone: (214) 357-6244
Fax: (214) 357-7252