UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LUIS RAMIRO AVILES, et al.,<br><br>　　　　　　　　Plaintiffs,<br><br>　　　-v-<br><br>S&P GLOBAL, INC., et al.,<br>　　　　　　　　Defendants. | 17-CV-2987 (JPO) |
| FERNANDO RAUL BENEDETTO, et al.,<br><br>　　　　　　　　Plaintiffs,<br><br>　　　-v-<br><br>ATC REALTY FIFTEEN, INC., et al.,<br>　　　　　　　　Defendants. | 17-CV-6087 (JPO) |
| HORACIO NESTOR ACEBEDO, et al.,<br>　　　　　　　　Plaintiffs,<br><br>　　　-v-<br><br>ATC REALTY FIFTEEN, INC., et al.,<br>　　　　　　　　Defendants. | 17-CV-7034 (JPO) |
| FREDERICO ALVAREZ, et al.,<br>　　　　　　　　Plaintiffs,<br><br>　　　-v-<br><br>ATC REALTY FIFTEEN, INC., et al.,<br>　　　　　　　　Defendants. | 18-CV-128 (JPO) |
| HECTOR JORGE ARECO, et al.,<br>　　　　　　　　Plaintiffs,<br><br>　　　-v-<br><br>ATC REALTY FIFTEEN, INC., et al.,<br>　　　　　　　　Defendants. | 18-CV-2416 (JPO)<br><br>OPINION AND ORDER |

J. PAUL OETKEN, District Judge:

In these five related cases, one of which is a putative derivative and class action, a collective total of over 500 offshore investors ("Plaintiffs") who acquired shares in the Lifetrade Fund, B.V. ("Lifetrade") and two related funds (collectively, the "Lifetrade Funds") seek relief for the evaporation of their investments. According to Plaintiffs, Defendant Roy G. Smith, Lifetrade's founder and chief executive officer ("CEO"); Defendant John Marcum, Lifetrade's chief marketing officer; and Defendant S&P Global, Inc. ("S&P"), a ratings agency, successfully courted investment in the Lifetrade Funds notwithstanding the fact that Lifetrade was secretly funneling investor cash into other Smith- and Marcum-linked enterprises such as Defendant Portsmouth Settlement Company I, LLC ("Portsmouth"). When this loose spending left Lifetrade cash-strapped, Plaintiffs allege, Lifetrade entered into a credit deal with a predecessor to Defendant Wells Fargo Bank, N.A. ("Wells Fargo"), which ultimately ended in the transfer of all of Lifetrade's assets to a Wells Fargo subsidiary for far less than they were worth—and without Plaintiffs seeing a dime.

Understandably miffed, Plaintiffs filed these suits against nineteen defendants—including Smith, Marcum, Portsmouth, S&P, and several Wells Fargo entities—alleging misrepresentation, fraudulent conveyance, violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968, and other assorted malfeasance. Portsmouth, Smith, Marcum, S&P, and the Wells Fargo entities now move to dismiss all claims against them. (Dkt. Nos. 86, 88, 91.[1]) For the reasons that follow, the motions are granted in part and denied in part.

---

[1] All docket citations refer to the docket in *Aviles v. S&P Global, Inc.*, No. 17 Civ. 2987, unless otherwise noted.

# I.       Background

Because the operative complaints in these related cases are largely identical, the Court draws its factual recitation from the Second Amended Complaint in *Aviles v. S&P Global, Inc.*, No. 17 Civ. 2987 (Dkt. No. 77 ("Compl."))—along with any documents attached to or incorporated by reference into that complaint, *see DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010)—and does not refer to the other four cases except as necessary.  For present purposes, the Court assumes the truth of Plaintiffs' allegations.  *See id.* at 110–11.

## A.       Factual Background

These cases center on the loss of millions of dollars Plaintiffs invested between 2006 and 2011 in three formally distinct funds alleged to have been "operated as a single enterprise" with Defendants Roy G. Smith and John Marcum at the helm.  (Compl. ¶ 39; *see also* Compl. ¶¶ 2 & n.2, 33–34.)  The Court first describes the Lifetrade Funds and their efforts to court investment.  The Court next explains the alleged undisclosed factors that made investment in the Lifetrade Funds a losing proposition.  Finally, the Court turns to the events that led to the transfer of Lifetrade's assets to Defendant ATC Realty Fifteen, Inc. ("ATC Realty"), a Wells Fargo subsidiary, and Lifetrade's subsequent efforts to conceal what had taken place.

### 1.       The Lifetrade Funds

The Lifetrade Funds built their business model around a type of transaction known as the "life settlement."  *See generally* Eli Martin Lazarus, *Viatical and Life Settlement Securitization: Risks and Proposed Regulation*, 29 Yale L. & Pol'y Rev. 253 (2010).  Ordinarily, a life insurance policyholder pays premiums to an insurer in exchange for the insurer's promise to pay specified proceeds to a designated beneficiary after the policyholder's death.  Sometimes, though, a policyholder's changing circumstances conspire to make immediate cash in hand more attractive than the promise of a postmortem payout to a chosen beneficiary.  (Compl. ¶ 41.)  Such

scenarios have created a market for the "life settlement," a transaction in which a third party known as a "settlement provider" makes a lump-sum payment to a policyholder, *i.e.*, the "life insured"; takes responsibility thereafter for paying the policy premiums; and, in return, receives the policy proceeds upon the life insured's death. (Compl. ¶¶ 41–43.) If the value of the proceeds exceeds the amount the settlement provider has paid the life insured, plus the amount the settlement provider has paid in premiums and other administrative and overhead costs, then the settlement provider will turn a profit. (Compl. ¶ 43.)

Defendant Lifetrade, the so-called "master fund" here, was a Netherlands Antilles mutual fund that invested exclusively in life insurance policies initially issued to United States citizens but later taken up by third-party settlement providers. (Compl. ¶¶ 38, 40.) The other two Lifetrade Funds, LTrade Plus Ltd. and LTrade Fixed Capital (BVI) Ltd. (together, the "Feeder Funds"), were British Virgin Islands funds that invested exclusively in securities issued by Lifetrade. (Compl. ¶¶ 38–39.) Investment in any of the Lifetrade Funds was by application only and was limited to "a select group" of non–United States investors recruited through investment advisors based in Argentina, Japan, and Korea. (Compl. ¶ 38; *see also* Compl. ¶ 39.)

### 2. The Lifetrade Funds Court Investment with S&P's Help

In the first few years after its 2004 launch, Lifetrade was only "moderately successful" in raising capital. (Compl. ¶ 75.) Thus, in 2006, in an effort to boost investment, Defendant Smith, Lifetrade's founder and CEO, retained Defendant S&P, the self-professed "world's leading provider of credit ratings" (Compl. ¶ 77), to provide Lifetrade with investment ratings in exchange for fees that ranged from $2,500 to $100,000 (Compl. ¶¶ 36, 72, 75, 96).[2]

---

[2] The complaint alleges that S&P "entered the picture" in 2007 (Compl. ¶ 75), but the 2007 date is a typographical error (*see* Dkt. No. 104 at 6 n.3).

S&P obliged. From June 2006 to April 2011, S&P published monthly investor-facing statements out of its New York office that stamped Lifetrade with an investment-grade rating of "Af" (Compl. ¶¶ 72, 76), thereby indicating that the fund's "portfolio holdings provide[d] strong protection against losses from credit defaults" (Dkt. No. 77-8 at 4). Plaintiffs allege that these statements, which included charts and graphs painting a rosy picture of Lifetrade's past and future performance, "w[ere] intended to, and did, promote [Lifetrade] as a desirable investment, with limited risk." (Compl. ¶ 73.) And Lifetrade, in turn, was keen to foster that impression. On August 31, 2006, just months after the ratings had begun, Lifetrade represented to investors that S&P's ratings demonstrated Lifetrade's "certified quality" (Dkt. No. 77-23 at 5; *see also* Compl. ¶ 80), and that they had been derived from "an audit of all aspects of [Lifetrade's] operations and . . . management, including physical visits and interviews," followed by "qualitative and quantitative analysis" (Dkt. No. 77-23 at 5; *see also* Compl. ¶ 74).

Thus, Plaintiffs maintain, the S&P ratings were "a tremendous marketing tool" for the Lifetrade Funds. (Compl. ¶ 82.) From August 31, 2006, just after S&P began to rate Lifetrade, to December 31, 2007, Lifetrade's assets doubled in value—and by December 31, 2010, they had doubled in value again, allegedly reflecting investors' confidence in S&P's ratings. (Compl. ¶ 81.) Thanks in part to S&P, then, the Lifetrade Funds ultimately managed to pull in a grand total of $685,835,000 from investors during its lifetime. (Compl. ¶¶ 95, 97.)

### 3. The Undisclosed Bugs in the System

Investors' confidence in the Lifetrade Funds was allegedly misplaced in light of at least three undisclosed considerations. First, the credentials of Lifetrade's leadership were less than sterling. Second, Lifetrade was overpaying for the life insurance policies it purchased. And third, conflicts of interest motivated Lifetrade to put investor money to dubious use.

### a. Smith's Tarnished Past

From the outset, Plaintiffs allege, investment in Lifetrade was a risky proposition given the spotty track record of the man at the top, Defendant Smith.

On paper, it appeared as though Lifetrade's management rested in capable hands. For example, Lifetrade's June 14, 2006 prospectus reported that Smith had worked as the CEO of a Malaysian investment bank until 2005, at which point the position "was relinquished . . . to allow him to focus full time on developing [Lifetrade]." (Compl. ¶ 100.) The prospectus also emphasized Smith's prior experience with "found[ing] his own fund management group and personally develop[ing] and operat[ing] a currency-trading program" that managed over $400 million. (Compl. ¶ 101.)

Plaintiffs allege, though, that the prospectus omitted salient aspects of Smith's biography. For example, the prospectus did not mention that Smith had once been temporarily barred from acting as a company director in the United Kingdom, his country of citizenship, due to his earlier, unlawful decision to direct a company while in a state of undischarged bankruptcy.[3] (Compl. ¶¶ 33, 101.) And the prospectus noted neither that Smith had supposedly received his position at the Malaysian bank only because Lifetrade agreed to pay the bank around $20,000 per month to serve as its investment manager, nor that Smith was allegedly terminated only after the bank determined that the arrangement posed an unacceptable liability risk. (Compl. ¶ 100.)

### b. Lifetrade's Overvalued Investments

---

[3] This bar was lifted after Smith, among other things, represented to a United Kingdom court that he had no further intention to serve as director of a United Kingdom company. (Compl. ¶ 33 n.6.) Smith allegedly did not tell that court, however, that he was at that very time acting as the director of several non–United Kingdom companies tied to Lifetrade. (*Id.*)

A leader with a spotted past alone, of course, does not necessarily mean that a company will do wrong by its investors. Here, though, the complaint goes on to allege that Smith's poor judgment seeped into Lifetrade's business decisions—and, specifically, that Smith knowingly led Lifetrade to overpay for the life insurance policies in which it invested. (*See* Compl. ¶¶ 55–56.)

Ultimately, the value of any given life settlement depends on both the amount of policy proceeds at issue—a number typically fixed by the underlying insurance policy—and the life expectancy of the life insured. (Compl. ¶ 44.) According to the complaint, the insured's life expectancy is "[t]he single most important factor" in pricing a life settlement (Compl. ¶ 46), because, put bluntly, the sooner the insured dies, the sooner the settlement provider reaps the policy proceeds—and the less it pays in premiums before doing so (Compl. ¶ 45). As a result, settlement providers typically retain underwriters to provide life expectancy projections, hopefully based on "sound, objective, and consistent professional judgment." (Compl. ¶ 47.)

Here, Lifetrade is alleged to have invested almost exclusively in life settlements arranged by a single Georgia-based provider, Defendant Portsmouth. (Compl. ¶¶ 29, 50.) Portsmouth's exclusive underwriter through August 2012, ITM Twentyfirst, LLC ("21st Services") (Compl. ¶¶ 50, 54), in turn, was allegedly "widely known among insiders in the life settlement industry as early as 2004 to have been accused" in an earlier, unrelated lawsuit "of systematically and significantly understating its [life expectancy] evaluations" (Compl. ¶ 51; *see also* Dkt. No. 77-5). For example, whereas 21st Services' model predicted that the policies Lifetrade bought from Portsmouth would pull in a total of almost $77 million in 2011, a model used by AVS, a competing underwriter, predicted returns of only around $42 million. (Compl. ¶¶ 59(a), 60.) Indeed, the complaint alleges, on a policy-by-policy basis, 21st Services' life expectancy

predictions were shorter than AVS's in every known instance, "a consistent, wide-ranging and material discrepanc[y]" that "could not have been the product of chance."  (Compl. ¶ 61.)

Because of this pattern of understatement, the complaint alleges, entities like Lifetrade that invested in life insurance policies that had been appraised by 21st Services stood at risk of major losses.  (Compl. ¶¶ 52–53.)  Although "it may be of small significance if a *particular* insured dies on a *particular* date," the complaint maintains, "life settlement funds, by their nature and design, rely upon the pooling of many insurance policies as a way of mitigating risk and assuring the relative stability of the fund," with the consequence that systematically inaccurate life expectancies distort a fund's expectations of profitability.  (Compl. ¶ 63; *see also* Compl. ¶ 48.)

Far from suspecting that Lifetrade was putting their money at risk, though, Plaintiffs maintain that they were led to believe that all was well.  S&P repeatedly gave Lifetrade positive investment ratings without suggesting that the life expectancy estimates upon which those ratings relied were too optimistic.  (Compl. ¶¶ 83–84.)  And S&P's monthly statements—as well as the Lifetrade Funds' own annual statements—contained performance charts depicting Lifetrade's historical net asset value ("NAV") price per share in favorable comparison to the returns investors could expect from other investment opportunities.  (Compl. ¶¶ 83, 86, 106.)

But these glowing reports, Plaintiffs maintain, left much unsaid.  For one thing, the NAV figures promoted by S&P and the Lifetrade Funds had allegedly been generated using a valuation method that Smith himself had devised and that relied on assumptions described by one former Lifetrade actuary as "'absurd,' 'ridiculously bad' and 'not reasonable by any actuarial standard.'"  (Compl. ¶ 85; *see also* Compl. ¶ 87.)  For another thing, S&P itself allegedly had reason to doubt the figures it was parroting.  In an October 13, 2009 report made available only to paying

subscribers, S&P opined that investment in life settlement transactions carried numerous risks, including unsound actuarial assumptions, shaky life expectancy projections, and the potential for fraud. (Compl. ¶ 90; *see also* Compl. ¶ 92; Dkt. No. 77-4.) Despite these privately voiced concerns, however—none of which S&P shared with Lifetrade's investors—S&P would continue to rate Lifetrade favorably until it "silently ceas[ed]" its ratings in April 2011 "without explaining why." (Compl. ¶ 94; *see also* Compl. ¶¶ 90–91.)

As a consequence, the complaint alleges, when the Lifetrade Funds told investors in May 2012 that Lifetrade's portfolio of life insurance policies was then valued at over $450 million, Plaintiffs would have had no reason to suspect that a third party's independent valuation had set the figure at a far more modest $302 million. (Compl. ¶ 56.)

### c.      Smith and Marcum's Self-Dealing

It was not mere ineptitude that led Lifetrade to invest almost exclusively in Portsmouth's overvalued insurance policies. Rather, the complaint alleges, this poor business decision arose out of Smith and Marcum's desire for self-enrichment. As it happened, Smith held indirect ownership over Portsmouth during the period in which he was acting as Lifetrade's primary investment manager. (Compl. ¶¶ 50, 56.) And Marcum was acting as the Chairman of Portsmouth's Board while simultaneously heading up Lifetrade's investor communications. (Compl. ¶¶ 34, 50.) Plaintiffs, though, were not told of these facts at the time they opted to invest in the Lifetrade Funds. (Compl. ¶ 50.)

Thus, despite allegedly knowing as early as 2004 that Portsmouth was overvaluing its life insurance policies, Smith kept up the relationship between Lifetrade and Portsmouth. (Compl. ¶ 56.) In the process, Smith, personally and through his various companies, pocketed somewhere around 25% of the sums Lifetrade paid Portsmouth for the purchase of life settlements. (Compl.

¶ 56 & n.8.)  For example, in connection with one transaction involving an insurance policy valued—indeed, likely *over*valued—by 21st Services at $770,000, Lifetrade paid Portsmouth fees, commissions, and overhead charges that totaled a cool $104,201.75.  (Compl. ¶ 57.)  What is worse, Plaintiffs go on, this self-dealing did not stop with Portsmouth; in connection with that same transaction, Lifetrade allegedly forked out an additional $90,000 in fees to another of Smith's enterprises—an enterprise that conveniently happened to serve as Lifetrade's investment manager from 2008 to 2010 and managing director from 2008 to 2017.  (Compl. ¶¶ 25, 57.)

Meanwhile, the Lifetrade Funds' investors had no knowledge of these self-dealing arrangements.  For example, Lifetrade's 2006 prospectus never divulged that Lifetrade would be incurring fees of 20–25% when purchasing life insurance policies from Portsmouth.  (Compl. ¶ 103.)  And although the prospectus mentioned some annual fees, it never disclosed certain additional currency-hedging fees that were being paid to a Smith-controlled company in connection with Lifetrade's Japanese assets.  (Compl. ¶¶ 30, 35, 102.)  Finally, while telling investors that Lifetrade would pay no undisclosed "commission or other payment . . . in respect of application for Shares," the prospectus failed to mention that the Lifetrade Funds were in fact paying out a 10% commission on all sums invested.  (Compl. ¶ 104; *see also* Compl. ¶ 30.)

All told, between the inflated amounts Lifetrade was paying to Portsmouth for insurance policies and the sums it was otherwise coughing up in "undisclosed fees, commissions and overhead charges," Smith and his entities are alleged to have appropriated at least $133 million, and perhaps as much as $239 million, when all was said and done.  (Compl. ¶ 56 n.8.)

### 4.    The Lifetrade Funds Meet Their Downfall

With investors' cash being squandered on overvalued assets and hidden fees, it was only a matter of time until the Lifetrade Funds ran into money trouble.  As was the case with so many creative investment ventures, the 2007–2008 financial crisis marked the beginning of the end.

Outwardly, all was made to seem well. As the national economy fell into turmoil, Smith reassured investors that Lifetrade was "robust and strong enough to weather the storm" (Compl. ¶ 107; Dkt. No. 77-6 at 7) and that Lifetrade "continue[d] to be a stable performer" (Compl. ¶ 109 (emphasis omitted)) as a result of its ability to "cherry pick . . . the best [life insurance] policies at the best price" (Compl. ¶ 110 (omission in original)). The reality, though, was less sanguine. Because the individuals insured under the life insurance policies that Lifetrade had acquired from Portsmouth were inconveniently outliving 21st Services' predictions, Lifetrade was not drawing in cash at the rate investors might have hoped. (*See* Compl. ¶ 111.) And because Lifetrade was siphoning what liquid funds it *did* have into the pockets of Smith and his entities, Lifetrade needed to find another source of liquidity so that it could continue to satisfy investors' requests to redeem their shares for cash as those requests arose. (*See id.*)

Enter Wells Fargo. On June 25, 2008, Wells Fargo and Lifetrade entered into a loan and security agreement (the "Loan Agreement") that, as amended, assured Lifetrade a $500 million credit line, secured by Lifetrade's assets—*i.e.*, its portfolio of life insurance policies—with all advances to be repaid to Wells Fargo by June 15, 2012.[4] (Compl. ¶ 114.) Although this credit line was reduced to $225 million in 2009 and again to $200 million in 2011 (Compl. ¶ 115), the arrangement provided Lifetrade with the ready cash it needed to stay afloat for a time.

---

[4] It was Wells Fargo's predecessor, Wachovia Bank, N.A., and not Wells Fargo itself that entered into the Loan Agreement, with Wells Fargo only later assuming the rights and obligations under the agreement after its October 12, 2008 merger with Wachovia. (Compl. ¶¶ 114–15.) And at some point during a 2011 reorganization, a Delaware trust called LT Opportunity Trust took over for Lifetrade as the borrower under the Loan Agreement, with Lifetrade and another Smith-controlled entity, the Irish company Lifetrade Life Settlements Limited, serving as guarantors. (Compl. ¶¶ 27, 117–18.) So as not to further populate an already overstuffed cast of characters, the Court generally follows the parties in treating Wells Fargo and Lifetrade as the parties to the Loan Agreement while acknowledging that the reality is knottier.

Despite affording a temporary reprieve, though, the Loan Agreement did nothing to shore up Lifetrade's underlying weaknesses. As the June 15, 2012 repayment date neared, Lifetrade needed to pull together the roughly $205 million it owed to Wells Fargo. (*See* Compl. ¶ 143.) But although Lifetrade told its investors that the value of its insurance policy portfolio around this time was roughly $450 million—and although Wells Fargo's own valuation put the portfolio's value at around $302 million (Compl. ¶ 56)—the value of the portfolio could not be immediately translated into cash that could be used to pay off the loan (*see* Compl. ¶ 131 & n.21). As a result, in March 2012, Lifetrade informed investors that it was suspending redemptions in light of the need to renegotiate the credit arrangement. (Compl. ¶ 127; Dkt. No. 77-9.)

Following the suspension of redemptions, Lifetrade called a May 17, 2012 shareholder meeting in the Dutch Antilles for purposes of voting on what to do about the expiring credit line. (Compl. ¶¶ 128–29; Dkt. No. 77-10.) Voters were given a choice of three options: surrendering Lifetrade's insurance policies to Wells Fargo to satisfy the debt, seeking a one-year extension of the credit line on unfavorable terms, or negotiating a long-term refinancing plan. (Compl. ¶ 128.) Smith and Marcum promoted the surrender option, falsely suggesting that investors could be personally liable to Wells Fargo if Lifetrade's debt ultimately went unsatisfied. (Compl. ¶ 128 & n.19.) Voters at the meeting, though, rejected Smith and Marcum's preferred surrender option in favor of pursuing long-term refinancing. (Compl. ¶ 129; Dkt. No. 77-11.)

But Wells Fargo had other plans. According to the complaint, Wells Fargo, despite claiming that it was "looking to exit the life settlement market" (Compl. ¶ 120), had long been hoping to capitalize on Lifetrade's liquidity woes, seize the life insurance policies Lifetrade had put up as collateral, and start its own life settlement business. (Compl. ¶¶ 116, 121 & n.15, 123.)

Wells Fargo, in other words, believed that Lifetrade's portfolio was worth more than the amount that Lifetrade owed under the Loan Agreement and that an opportunity to take over the portfolio would present itself once Lifetrade inevitably proved unable to pay off its debt. (Compl. ¶¶ 124–25.) As evidence of this scheme, Plaintiffs note that in 2010 Wells Fargo ignored a New York investment bank's offer to buy all of its life settlement loans, including those that had been extended to Lifetrade, in exchange for the full value owed under the loans. (Compl. ¶¶ 122–23.)

Wells Fargo's plan worked brilliantly. After Lifetrade proved unable to secure funding from other lenders prior to the June 15, 2012 maturity date of its loans, Wells Fargo announced its intention to foreclose on Lifetrade's assets. (Compl. ¶¶ 131–32.) But rather than foreclosing under the Loan Agreement, which would have entitled Lifetrade to collect most of the difference between the value of its portfolio and the value of its unpaid debt, Wells Fargo exploited Smith and Marcum's fear that they could be personally liable for Lifetrade's debt under Curaçao law in order to negotiate a new, August 14, 2012 agreement (the "Settlement Agreement"), pursuant to which Lifetrade agreed to transfer its entire portfolio to ATC Realty, a Wells Fargo subsidiary.[5] (Compl. ¶¶ 19, 133–34, 140.) Under the Settlement Agreement, Lifetrade's investors were to have no "further interest or claim in and to the Foreclosed Assets or to the proceeds and profits that may be derived therefrom" (Dkt. No. 77-2 at 35; *see also* Compl. ¶ 136), and with those magic words, Plaintiffs' investments in the Lifetrade Funds were fully wiped out (Compl. ¶ 134).

### 5. The Aftermath

At the time Lifetrade entered into the Settlement Agreement, Smith and Marcum gave investors no notice of the deal. (Compl. ¶ 139.) And the Settlement Agreement itself contained

---

[5] Here too, the parties to the Settlement Agreement included not only Wells Fargo and Lifetrade (in a guarantor capacity) but also various related entities. (*See* Dkt. No. 77-2 at 54–61.) As before, the Court finds it unnecessary to disaggregate these entities for present purposes.

a confidentiality provision that barred Lifetrade from making "any statements to investors in the Lifetrade [Funds], or any other Persons, whether privately or publicly, relating to the settlement contemplated by th[e] Agreement," beyond "the mere fact . . . that the settlement and foreclosure occurred." (Dkt. No. 77-2 at 48; *see also* Compl. ¶ 153.)

Consistent with the terms of the Settlement Agreement, Lifetrade did notify its investors that the settlement had occurred, updating its website with a link to a notice that one of its related entities had filed to inform the Irish Stock Exchange that "a consensual foreclosure process ha[d] been agreed in respect of the various rights and obligations arising under" the Loan Agreement. (Compl. ¶ 159; *see also* Compl. ¶ 160.) But, referring to a provision in the Settlement Agreement that granted Lifetrade a three-and-a-half-month window in which it could reacquire the portfolio upon repayment of the outstanding debt (Compl. ¶ 138),[6] Lifetrade's website represented that its directors hoped to "remove Wells Fargo from the position of collateral owner" and were "still working to achieve a satisfactory outcome for investors" (Compl. ¶ 160 (emphases omitted)).

Even after that refinancing window closed on November 30, 2012, though, Lifetrade's management continued to suggest that all was not lost. (*See* Compl. ¶¶ 160, 162.) For example, in letters dated February 20, 2013, and August 9, 2013, Smith told shareholders that refinancing efforts remained underway. (Dkt. No. 77-12; *see also* Compl. ¶ 162.) And on January 7, 2014, Smith wrote that he "expected that a final version" of a refinancing option "w[ould] be circulated for final approval . . . and signed by all parties by January 30th, 2014." (Dkt. No. 77-30 at 2; *see also* Compl. ¶ 165.) Meanwhile, Marcum was also telling investors that "efforts were being

---

[6] Plaintiffs allege that this provision was a sham because "all parties knew . . . that refinancing could not be accomplished in so short a time frame." (Compl. ¶ 138.)

made to set up a new credit facility" with a French bank, and he managed to draw in fresh outlays of roughly $15 million from Lifetrade investors to finance those supposed efforts. (Compl. ¶ 167.) All the while, Lifetrade sent its investors no annual reports. (Compl. ¶ 172.)

It was not until November 21, 2016, that investors began to learn the truth. (Compl. ¶ 170.) On that day, several investors received undated letters from Lifetrade that indicated, among other things, that "[t]he Lifetrade Fund holds no assets" (Dkt. No. 77-14 at 3) and that investors had suffered "a total loss of the capital contributed to date" (Dkt. No. 77-14 at 4). With the cat now out of the bag, the director of one of Lifetrade's related entities circulated to investors a February 22, 2017 notice that, at long last, contained annual reports for the years 2012 through 2016. (Compl. ¶ 172.) These newly disclosed reports, much to investors' dismay, indicated that Lifetrade had suffered a $472 million loss in 2012 and that its investors' equity had thereafter disappeared completely as early as 2013. (*Id.*)

Soon after those disclosures, this litigation began.

## B.    Procedural Background

On April 24, 2017, a group of more than fifty individuals and entities that had invested in the Lifetrade Funds filed an initial complaint in a suit captioned *Aviles v. S&P Global, Inc.*, No. 17 Civ. 2987. (Dkt. No. 5.) Four plaintiffs sought relief on their own behalves, on behalf of a putative class consisting of all offshore persons with unredeemed investments in the Lifetrade Funds, and derivatively on behalf of the Lifetrade Funds. (Dkt. No. 5 at 2.) The remaining plaintiffs asserted individual claims on their own behalves. (*Id.*) In the following months, additional class members joined the *Aviles* action to assert their individual claims (*see* Dkt. No. 77 ¶ 18), and still more class members filed their individual claims in a total of four additional actions: *Benedetto v. ATC Realty Fifteen, Inc.*, No. 17 Civ. 6087, which was filed on August 11, 2017; *Acebedo v. ATC Realty Fifteen, Inc.*, No. 17 Civ. 7034, which was filed on September 15,

2017; *Alvarez v. ATC Realty Fifteen, Inc.*, No. 18 Civ. 128, which was filed on January 8, 2018; and *Areco v. ATC Realty Fifteen, Inc.*, No. 18 Civ. 2416, which was filed on March 19, 2018. Today, the number of plaintiffs seeking to press their individual claims across the five actions exceeds 500. (*See Aviles*, No. 17 Civ. 2987, Dkt. No. 77-1 (listing the plaintiffs in the three first-filed actions); *Alvarez*, No. 18 Civ. 128, Dkt. No. 39-33; *Areco*, No. 18 Civ. 2416, Dkt. No. 8-1.)

As noted, the operative complaints in the five actions are identical in virtually all material respects.[7] These complaints name as defendants (1) ATC Realty, Wells Fargo, and two related entities—Wells Fargo Bank Northwest, N.A. ("Wells Fargo Utah"), and Wells Fargo Delaware Trust Company ("Wells Fargo Delaware")—that had been holding title to Lifetrade's policy portfolio as co-trustees at the time Lifetrade entered into the Settlement Agreement (the "Wells Fargo Defendants") (Compl. ¶¶ 19–22); (2) Lifetrade, Portsmouth, Smith, Marcum, and nine additional Lifetrade- or Portsmouth-linked companies[8] (the "Lifetrade Defendants") (Compl. ¶¶ 23–35); and (3) S&P[9] (Compl. ¶ 36).

---

[7] The operative complaints are the Second Amended Complaint in the *Aviles* action (No. 17 Civ. 2987, Dkt. No. 77), the First Amended Complaint in the *Benedetto* action (No. 17 Civ. 6087, Dkt. No. 48), the First Amended Complaint in the *Acebedo* action (No. 17 Civ. 7034, Dkt. No. 46), the First Amended Complaint in the *Alvarez* action (No. 18 Civ. 128, Dkt. No. 39) and the Corrected Complaint in the *Areco* action (No. 18 Civ. 2416, Dkt. No. 8).

[8] In addition to Lifetrade, Portsmouth, Smith, and Marcum, the complaint names Lifetrade Management Company, LLC; Lifetrade Management Company, N.V.; Lifetrade Asset Management, N.V.; Lifetrade Life Settlements Limited; LT Investments, Inc.; Portsmouth Securities Limited; LTrade Plus Ltd.; LTrade Fixed Capital (BVI) Ltd.; and TMF Curacao N.V. as defendants. (Compl. ¶¶ 24–28, 30–32, 35.)

[9] Plaintiffs also initially sought to proceed against 21st Services (Compl. ¶ 37), but they have since stipulated to 21st Services' dismissal from each of these actions (*see Aviles*, No. 17 Civ. 2987, Dkt. No. 99; *Benedetto*, No. 17 Civ. 6087, Dkt. No. 71; *Acebedo*, No. 17 Civ. 7034, Dkt. No. 69; *Alvarez*, No. 18 Civ. 128, Dkt. No. 46; *Areco*, No. 18 Civ. 2416, Dkt. No. 34).

The *Aviles*, *Acebedo*, *Alvarez*, and *Areco* complaints each assert twenty-one presently live causes of action: constructively fraudulent (Count One) and fraudulent (Count Two) conveyance, as to the Wells Fargo and Lifetrade Defendants; knowing, reckless, or negligent misrepresentation, as to Wells Fargo (Counts Four and Five), the Lifetrade Defendants (Counts Nine and Ten), and S&P (Counts Sixteen, Seventeen, and Eighteen); fraudulent breach of fiduciary duty or aiding and abetting such a breach, as to the Wells Fargo Defendants (Counts Six and Thirteen) and Smith and Marcum (Count Eleven); unconscionability (Count Three), breach of contract (Count Seven), and unjust enrichment (Count Eight), as to the Wells Fargo Defendants; violations of Curaçao law, as to the Lifetrade Defendants (Count Twelve); RICO violations and conspiracy to violate RICO, as to Smith, Marcum, and the Wells Fargo Defendants (Counts Fourteen and Fifteen); conspiracy to commit fraud, as to the Lifetrade Defendants (Count Twenty); and negligence and consumer-protection violations under Argentine law, as to all defendants (Counts Twenty-Two and Twenty-Three).[10] The *Benedetto* complaint supplements these twenty-one causes of action with an additional claim under Japanese law, brought by all Japanese plaintiffs against all defendants (Count Twenty-Four).

Facing this formidable bevy of claims, Smith, Marcum, and Portsmouth (the "Lifetrade Movants"), the Wells Fargo Defendants, and S&P have now moved to dismiss them all.[11]

---

[10] Counts Nineteen and Twenty-One assert claims against 21st Services only. Because 21st Services is no longer party to these cases, *see supra* note 9, these counts are dismissed.

[11] In the case of the *Alvarez* action, the filing of these motions to dismiss preceded the filing of the operative complaint (*see* No. 18 Civ. 128, Dkt. Nos. 29, 31, 34, 39), but the moving defendants have made clear that they intend to rely on their preexisting motion-to-dismiss papers in seeking dismissal of that complaint (*see* No. 18 Civ. 128, Dkt. No. 44).

## II.     Legal Standard

The instant motions to dismiss argue that the operative complaints, or portions thereof, must be dismissed, variously, for lack of subject-matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1), lack of personal jurisdiction pursuant to Rule 12(b)(2), and failure to state a cognizable legal claim pursuant to Rule 12(b)(6).

### A.     Rule 12(b)(1)

Where, as here, a motion to dismiss for lack of subject-matter jurisdiction pursuant to Rule 12(b)(1) is grounded in an argument that a plaintiff lacks standing to sue, it is the plaintiff's burden to demonstrate that it "had the requisite stake in the [case's] outcome when the suit was filed." *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016) (quoting *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008)). Should the defendant proffer evidence beyond the complaint in support of its Rule 12(b)(1) motion, "the plaintiff[] will need to come forward with evidence of [its] own to controvert that presented by the defendant 'if the affidavits submitted on a 12(b)(1) motion . . . reveal the existence of factual problems' in the assertion of jurisdiction." *Id.* at 57 (omission in original) (quoting *Exchange Nat'l Bank of Chi. v. Touche Ross & Co.*, 544 F.2d 1126, 1131 (2d Cir. 1976)). And "[i]f the extrinsic evidence presented by the defendant is [both] material and controverted," then the issue of standing presents a factual question that must ultimately be resolved in the form of factual findings. *Id.*

### B.     Rule 12(b)(2)

On a motion to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2), "the plaintiff bears the burden of establishing that the court has jurisdiction over the defendant." *Grand River Enters. Six Nations, Ltd. v. Pryor*, 425 F.3d 158, 165 (2d Cir. 2005) (quoting *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 784 (2d Cir. 1999)). Where, as here, there has been no "full-blown evidentiary hearing on the motion, the plaintiff need make

only a prima facie showing of jurisdiction." *Id.* (quoting *Bank Brussels*, 171 F.3d at 784). At

this "preliminary stage," a *prima facie* showing sufficient to defeat a Rule 12(b)(2) motion "may

be established solely by allegations" pleaded in good faith. *Dorchester Fin. Sec., Inc. v. Banco*

*BRJ, S.A.*, 722 F.3d 81, 85 (2d Cir. 2013) (per curiam) (quoting *Ball v. Metallurgie*

*Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990)). The allegations, though, must be

more than "conclusory statement[s]"; rather, they must state specific "facts supporting th[e]

conclusion" that jurisdiction is proper. *Jazini v. Nissan Motor Co.*, 148 F.3d 181, 184 (2d Cir.

1998).

### C.    Rule 12(b)(6)

Under Rule 12(b)(6), a party may move to dismiss a claim for failure to state a cause of

action "upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a Rule 12(b)(6)

motion, a plaintiff's complaint "must provide 'enough facts to state a claim to relief that is

plausible on its face'" when the complaint's factual allegations are taken as true and all

reasonable inferences are drawn in plaintiff's favor. *Mayor & City Council of Baltimore v.*

*Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S.

544, 570 (2007)). Under this standard, the complaint need only provide "enough fact to raise a

reasonable *expectation* that discovery will reveal evidence of illegal [conduct]." *Id.* (alteration in

original) (quoting *Twombly*, 550 U.S. at 556).

When the complaint alleges fraud, however, Rule 9(b) imposes the added requirement

that the complaint "state with particularity the circumstances constituting fraud." Fed. R. Civ. P.

9(b). Under this standard, a complaint alleging fraud must typically "(1) specify the statements

that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the

statements were made, and (4) explain why the statements were fraudulent." *United States ex*

*rel. Chorches v. Am. Med. Response, Inc.*, 865 F.3d 71, 81 (2d Cir. 2017) (quoting *United States*

*ex rel. Ladas v. Exelis, Inc.*, 824 F.3d 16, 25 (2d Cir. 2016)).  But although this standard

"demands specificity, . . . it does not elevate the standard of certainty that a pleading must attain

beyond the ordinary level of plausibility" required of civil complaints.  *Id.* at 88.

## III.  Discussion

The Court appropriately begins its review of the many issues presented by the instant

motions by addressing the jurisdictional issues that have been raised under Rules 12(b)(1) and

12(b)(2).  Thereafter, the Court turns to the merits of the Rule 12(b)(6) motions.

### A.  Rule 12(b)(1)

To start with, the Wells Fargo Defendants contend that one of the plaintiffs, the Japanese

company Plaza Asset Management ("Plaza"), lacks standing to bring its claims.  (Dkt. No. 89 at

38–39.)  Plaza is not alleged to have invested in any of the Lifetrade Funds but instead is alleged

only to be the "assignee of all rights, claims and causes of action" of investor Nomura Trust and

Banking Co., Ltd. ("Nomura").  (*Benedetto*, No. 17 Civ. 6087, Dkt. No. 48 ¶ 18(d).)  While it

would seem that, as assignee, Plaza could invoke Nomura's claims here, the Wells Fargo

Defendants maintain that Japanese law allows an assignee to assert a claim against a defendant

"*only* if the assignor has given notice to the defendant or the defendant . . . has acknowledged the

assignment."  (Dkt. No. 90-26 ¶ 17.)  Because Plaza has not alleged such notice or

acknowledgment, the Wells Fargo Defendants contend, it has not shown that it has standing to

raise the claims that Nomura has allegedly assigned it.  (Dkt. No. 89 at 38–39.)  And even had

Plaza properly alleged an assignment, the Wells Fargo Defendants further argue, Plaza has failed

to adequately allege that the instant claims fall within the assignment's scope.  (Dkt. No. 110 at

20.)

The Court is unpersuaded.  Plaintiffs have represented that the notice of assignment

required under Japanese law "can be sent at any time after the assignment" (Dkt. No. 103-1 ¶ 7),

including in the midst of a pending lawsuit (Dkt. No. 103-1 ¶ 8). Given that Defendants here are now on notice of the purported assignment, Plaintiffs have, at a minimum, established a dispute as to the validity of the assignment under Japanese law.

Nor is the Court convinced by the Wells Fargo Defendants' attempt to rely on *Cortlandt Street Recovery Corp. v. Deutsche Bank AG, London Branch*, No. 12 Civ. 9351, 2013 WL 3762882 (S.D.N.Y. July 18, 2013), to suggest that the complaint is insufficiently specific about the scope of the assignment. (Dkt. No. 110 at 20.) *Cortlandt Street* addressed a situation in which a plaintiff had entirely failed to allege "*what* [had been] assigned," *Cortlandt Street*, 2013 WL 3762882, at *2, whereas the complaint here unambiguously alleges that Nomura assigned Plaza "all [its] rights, claims and causes of action" (*Benedetto*, No. 17 Civ. 6087, Dkt. No. 48 ¶ 18(d)), which clearly encompasses the causes of action asserted here. Given that the Wells Fargo Defendants have presented no evidence controverting Plaintiffs' allegation, the Court must accept it as true at this early stage of the litigation. *See Carter*, 822 F.3d at 56–57.

The Court, then, concludes that Plaintiffs have made a sufficient showing of Plaza's standing at the pleading stage to withstand the Wells Fargo Defendants' 12(b)(1) motion.

## B.  Rule 12(b)(2)

Next, the Lifetrade Movants—Smith, Marcum, and Portsmouth—argue that this Court lacks personal jurisdiction over them with respect to the bulk of Plaintiffs' claims. (Dkt. No. 95 at 16–24.) Although they concede that this Court has jurisdiction to adjudicate Plaintiffs' RICO claims against Smith and Marcum, *see* 18 U.S.C. § 1965(b), (d) (authorizing nationwide service of process for RICO claims), they argue that all other claims against them must be dismissed on jurisdictional grounds, *see Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 83 (2d Cir. 2018) ("A plaintiff 'must establish the court's jurisdiction with respect to each claim asserted[.]'" (quoting *Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 24 (2d Cir. 2004))). (*Id.*)

Alternatively, they argue that even if jurisdiction is proper, the Court should stay or dismiss Plaintiffs' claims against Smith and Marcum in light of a related action that is currently pending in Curaçao. (Dkt. No. 95 at 39–40.)

Plaintiffs respond that jurisdiction is proper for two reasons. First, they argue that the Lifetrade Movants have consented to submit to this Court's jurisdiction by virtue of forum-selection clauses in the Loan and Settlement Agreements. (Dkt. No. 106 at 12–19.) Alternately, Plaintiffs argue, New York's long-arm statute, N.Y. C.P.L.R. § 302, authorizes this Court to exercise personal jurisdiction over the Lifetrade Movants here because those defendants "transact[] . . . business within [New York]," *id.* § 302(a)(1). (Dkt. No. 106 at 19–24.) Finally, Plaintiffs argue that the Curaçao lawsuit provides no basis for dismissal or a stay. (Dkt. No. 106 at 37–40.)

### 1.     Consent to Jurisdiction

This Court may exercise jurisdiction over the Lifetrade Movants to the extent that they have consented to allow the Court to do so. *See Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 625 (2d Cir. 2016). And, relevant here, "[p]arties can consent to personal jurisdiction through forum-selection clauses in contracts." *Days Inn Worldwide, Inc. v. Hazard Mgmt. Grp., Inc.*, No. 10 Civ. 7545, 2012 WL 5519356, at *3 (S.D.N.Y. Nov. 13, 2012).

In arguing that the Lifetrade Movants have consented to jurisdiction here, Plaintiffs point out that the parties to the Loan Agreement "agree[d] to the exclusive jurisdiction of any state or federal court located within the state of New York" (Dkt. No. 107-1 at 85 (formatting omitted)) and that the parties to the Settlement Agreement "agree[d] to the exclusive jurisdiction of any state or federal court located within the City of New York" (Dkt. No. 90-4 at 43 (formatting omitted)). Although none of the Lifetrade Movants were themselves party to these contracts, Plaintiffs point out that each movant was closely affiliated with a Lifetrade party and that each

movant signed the Loan Agreement, an amendment to the Loan Agreement, or the Settlement Agreement in a representative capacity on such a party's behalf.  (Dkt. No. 106 at 14–17.)

While the Second Circuit has not yet weighed in on the question, *see Magi XXI, Inc. v. Stato della Città del Vaticano*, 714 F.3d 714, 723 n.10 (2d Cir. 2013), courts in this Circuit have held that parties to a contract that includes a forum-selection clause may invoke that clause to establish personal jurisdiction over a defendant that is not party to the contract but that is closely aligned with a party, *see, e.g.*, *LaRoss Partners, LLC v. Contact 911 Inc.*, 874 F. Supp. 2d 147, 159–61 (E.D.N.Y. 2012); *Recurrent Capital Bridge Fund I, LLC v. ISR Sys. & Sensors Corp.*, 875 F. Supp. 2d 297, 310–11 (S.D.N.Y. 2012); *Firefly Equities, LLC v. Ultimate Combustion Co.*, 736 F. Supp. 2d 797, 799–801 (S.D.N.Y. 2010); *Metro-Goldwyn-Mayer Studios Inc. v. Canal+ Distrib. S.A.S.*, No. 07 Civ. 2918, 2010 WL 537583, at *4–5 (S.D.N.Y. Feb. 9, 2010); *Nanopierce Techs., Inc. v. Southridge Capital Mgmt. LLC*, No. 02 Civ. 0767, 2003 WL 22882137, at *5–6 (S.D.N.Y. Dec. 4, 2003).  Plaintiffs urge the Court to adopt that practice here.

The Court, however, need not decide whether to follow the courts that have concluded that a party to a contract may enforce a forum-selection clause against a non-party that is closely related to a party.  *But cf. Arcadia Biosciences, Inc. v. Vilmorin & Cie*, 356 F. Supp. 3d 379, 395 (S.D.N.Y. 2019) (noting that the "constitutional requirements" that govern personal jurisdiction "caution against a liberal application of forum selection clauses to non-signatory defendants").  Nor need the Court decide whether the Lifetrade Movants would be bound by the forum-selection clauses at issue here even if such a rule were to apply.  After all, whatever the extent to which *Wells Fargo* could enforce the clauses against Lifetrade-aligned entities such as the Lifetrade Movants, Plaintiffs—who are party to neither the Loan nor the Settlement Agreement—have not demonstrated that *they* may invoke the clauses.

To be sure, "a non-signatory to a contract containing a forum selection clause may enforce the forum selection clause against a signatory when the non-signatory is 'closely related' to another signatory." *Magi XXI*, 714 F.3d at 723 (quoting *Holland Am. Line Inc. v. Wärtsilä N. Am., Inc.*, 485 F.3d 450, 456 (9th Cir. 2007)). But even if the Court assumes, as Plaintiffs urge, that the Lifetrade Movants should be treated as stand-ins for Lifetrade and that Plaintiffs, too, are closely related to Lifetrade, the complaint has not alleged that Plaintiffs are closely related to "*another* signatory," *id.* (emphasis added), *i.e.*, to the Wells Fargo parties.

This distinction matters. Enforcement of a forum-selection clause by a non-signatory is limited to circumstances in which "the non-signatory's enforcement of the forum selection clause is 'foreseeable' to the signatory against whom the non-signatory wishes to enforce the forum selection clause." *Id.* In consenting to resolve its disputes with Wells Fargo in New York's courts, Lifetrade may have foreseen that it could be called to answer to non-signatory Wells Fargo entities in those same courts. But Lifetrade could hardly have foreseen being haled into court in New York by *its own investors* on the basis of its agreement with *Wells Fargo*.

The forum-selection clauses upon which Plaintiffs rely, then, offer no basis for this Court to take personal jurisdiction over the Lifetrade Movants in connection with Plaintiffs' claims.

### 2. In-State Transaction of Business

Absent consent, this Court may exercise jurisdiction over the Lifetrade Movants only to the extent that "a court of general jurisdiction" in New York could do the same. Fed. R. Civ. P. 4(k)(1)(A). A New York court's ability to take jurisdiction over non-domiciliaries like the Lifetrade Movants, in turn, is limited by two sources of law. Specifically, any such exercise of jurisdiction must (1) fall within the scope of New York's long-arm statute and (2) comport with the U.S. Constitution's Due Process Clause. *See Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163–64 (2d Cir. 2010). Here, Plaintiffs contend that the Lifetrade Movants have

"transact[ed] . . . business within the state," N.Y. C.P.L.R. § 302(a)(1), and so are subject to this Court's jurisdiction under New York's long-arm statute (Dkt. No. 106 at 19–24). To assess this argument, the Court performs a "two-step analysis," *Chloé*, 616 F.3d at 163, first asking whether "the long-arm statute permits personal jurisdiction" and then "analyz[ing] whether personal jurisdiction comports with the Due Process Clause of the United States Constitution," *id.* at 164.

### a. Long-Arm Statute

Under the long-arm statute, New York courts may take jurisdiction over non-domiciliary defendants in connection with claims that "aris[e] from" the defendants' transaction of business within the state. N.Y. C.P.L.R. § 302(a)(1). The "'overriding criterion' in determining whether an entity 'transacts any business' in New York within the meaning of the statute is whether the entity 'purposefully avails itself of the privilege of conducting activities within New York.'" *Rosenblatt v. Coutts & Co. AG*, 750 F. App'x 7, 9–10 (2d Cir. 2018) (summary order) (quoting *Paterno v. Laser Spine Inst.*, 24 N.Y.3d 370, 377 (2014)). And "New York courts have held that a claim 'aris[es] from' a particular transaction when there is 'some articulable nexus between the business transacted and the cause of action sued upon,'" *Solé Resort, S.A. de C.V. v. Allure Resorts Mgmt., LLC*, 450 F.3d 100, 103 (2d Cir. 2006) (alteration in original) (quoting *McGowan v. Smith*, 52 N.Y.2d 268, 272 (1981)), or when there is "a substantial relationship between the transaction and the claim asserted," *id.* (quoting *Kreutter v. McFadden Oil Corp.*, 71 N.Y.2d 460, 467 (1988)).

Applying these principles, the Court considers whether it has a basis for exercising personal jurisdiction over the Lifetrade Movants in connection with the claims asserted here.

### i. Smith

Smith avers that he owns no property, business, or assets in New York (Dkt. No. 92 ¶ 4), and Plaintiffs never argue that Smith personally transacted any relevant business in New York. Instead, Plaintiffs argue that Lifetrade's own New York contacts may be imputed to Smith on an agency or alter ego theory and that Lifetrade, for its part, conducted business through New York banks. (Compl. ¶ 14; Dkt. No. 106 at 19–21.) For example, Lifetrade relied on a New York bank to verify the insurance policies it hoped to buy (Compl. ¶ 14(4); Dkt. No. 107-8) and to hold the policies in escrow after purchase (Compl. ¶ 14(5); Dkt. Nos. 107-10, 107-11). And Lifetrade used New York banks to channel investors' funds into its own offshore bank account and then to channel funds from that bank account into the offshore bank accounts of other Lifetrade and Portsmouth entities, sometimes in the form of purportedly improper commissions and fees. (Compl. ¶ 14(9); Dkt. Nos. 107-13 through 107-20; *see also* Dkt. No. 107 ¶ 22.)

Smith does not dispute that Lifetrade's reliance on New York banks to manage its assets and transfer investor funds constitutes the in-state transaction of business. Nor, likely, could he. As the New York Court of Appeals has confirmed, "the use of a New York correspondent bank account, standing alone, may be considered a 'transaction of business' under the long-arm statute if the defendant's use of the correspondent account was purposeful." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 168 (2d Cir. 2013) (quoting *Licci v. Lebanese Canadian Bank, SAL*, 20 N.Y.3d 327, 338 (2012)). And Plaintiffs have clearly alleged that Lifetrade's use of New York–based banking services was "frequen[t] and deliberate." *Id.*

Nonetheless, Smith argues, Plaintiff's efforts to rely on Lifetrade's banking activity to support this Court's jurisdiction over him in connection with the instant claims must fail for two reasons. First, he contends, Plaintiffs have not alleged sufficient facts to permit the plausible inference that Lifetrade's New York contacts can be imputed to him on an agency or alter-ego

theory.  (Dkt. No. 95 at 19–21; Dkt. No. 111 at 6–7.)  Second, he goes on, Plaintiffs' claims do not "aris[e] from," N.Y. C.P.L.R. § 302(a)(1), those New York contacts.  (Dkt. No. 111 at 7–8.)

The Court disagrees.  As for the first point, under New York law, if a corporation has sufficient in-state contacts to fall subject to personal jurisdiction, then a corporate officer who has "played a part in the [corporate] activities that gave rise to the action" is likewise subject to jurisdiction, to the extent that due process permits, due to the agency relationship between the corporation and the officer.  *Arch Specialty Ins. Co. v. Entm't Specialty Ins. Servs., Inc.*, No. 04 Civ. 1852, 2005 WL 696897, at *4 (S.D.N.Y. Mar. 24, 2005); *see also Kreutter*, 71 N.Y.2d at 466–72.  To be sure, "a general allegation that an officer controls a corporation is not sufficient to establish personal jurisdiction" on an agency theory.  *Pilates, Inc. v. Current Concepts, Inc.*, No. 96 Civ. 0043, 1996 WL 599654, at *3 (S.D.N.Y. Oct. 18, 1996).  Rather, to establish an agency relationship under the long-arm statute, "New York law requires a Plaintiff to 'convince the court that [the corporation] engaged in purposeful activities in this State in relation to [Plaintiff's] transaction for the benefit of and with the knowledge and consent of the [individual defendant] and that [the individual defendant] exercised some control over [the corporation] in the matter.'"  *Arma v. Buyseasons, Inc.*, 591 F. Supp. 2d 637, 647 (S.D.N.Y. 2008) (alterations in original) (quoting *Kreutter*, 71 N.Y.2d at 467).

Plaintiffs' allegations here meet this test with respect to Smith.  In particular, Lifetrade is alleged to have engaged in all its New York activities "under the direction and control of Smith" (Compl. ¶ 14), Lifetrade's founder, CEO, and sole voting shareholder (Compl. ¶¶ 23, 33).[12]  And while this allegation alone might be too conclusory to make out a *prima facie* showing of

_____

[12] These allegations belie Smith's claim that Plaintiffs failed to allude to an agency theory of personal jurisdiction in their complaint.  (*See* Dkt. No. 111 at 8 n.1.)

jurisdiction, the complaint as a whole paints Smith as intimately involved in Lifetrade's day-to-day operations, whether by "initiat[ing] and continu[ing]" Lifetrade's business with Portsmouth (Compl. ¶ 56), establishing the method of NAV calculation used in S&P's monthly reports (Compl. ¶¶ 85, 87), or, critically here, directing outflows of investor capital into his own and his companies' pockets (*e.g.*, Compl. ¶ 140). Given that New York banks formed a critical conduit for these outflows (*see* Dkt. No. 107 ¶ 22), it is at least plausible to infer that Smith "exercised some control" over Lifetrade in establishing these New York connections, *Arma*, 591 F. Supp. 2d at 647 (quoting *Kreutter*, 71 N.Y.2d at 467).[13]

Smith's second argument—that Plaintiffs' claims do not arise from Lifetrade's New York contacts—fares little better. New York's long-arm statute requires only some "relatedness between the [in-state] transaction and the legal claim[,] such that the latter is not completely unmoored from the former." *D & R Glob. Selections, S.L. v. Bodega Olegario Falcon Pineiro*, 29 N.Y.3d 292, 299 (2017) (quoting *Licci*, 20 N.Y.3d at 339). This "relatively permissive" standard is satisfied "where at least one element [of a plaintiff's claim] arises from the [defendant's] New York contacts." *Id.* (quoting *Licci*, 20 N.Y.3d at 339, 341). Personal jurisdiction under the long-arm statute, in other words, is appropriate where a plaintiff's claims are "in some way arguably connected" to the in-state transaction of business. *Licci*, 20 N.Y.3d at 340.

Here, Lifetrade allegedly used New York's banking channels to acquire investor cash (Dkt. No. 107 ¶¶ 16–21) and to route those funds to Smith and his entities under the guise of

---

[13] In light of this conclusion, the Court need not consider whether Plaintiffs have plausibly alleged that Lifetrade was Smith's alter ego. *See NYKCool A.B. v. Pac. Int'l Servs., Inc.*, 66 F. Supp. 3d 385, 393 (S.D.N.Y. 2014) ("[J]urisdiction based on an alter ego theory applies in a far narrower set of circumstances than jurisdiction based on an agency theory.").

commissions and fees (Dkt. No. 107 ¶¶ 22–23).  These New York channels, in other words, formed an integral part of the architecture of the self-enrichment scheme that left Lifetrade with insufficient liquidity to save its investors' money by paying off its debts rather than surrendering its assets.  Plaintiffs' claims, then, are hardly "completely unmoored" from Lifetrade's New York activities.  *D & R Glob. Selections*, 29 N.Y.3d at 299 (quoting *Licci*, 20 N.Y.3d at 339); *see also Licci*, 20 N.Y.3d at 340–41 (holding that New York courts could exercise personal jurisdiction over a Lebanese bank in connection with claims arising out of a rocket attack committed in Israel by a Lebanese terrorist group because the bank had routed wire transfers to the group through a New York bank).

At this early stage in the litigation, then, the Court concludes that Plaintiffs' allegations suffice to make out a *prima facie* showing that this Court may exercise personal jurisdiction over Smith under New York's long-arm statute on an agency theory.

### ii.    Marcum

Plaintiffs make out an even stronger *prima facie* showing of this Court's jurisdiction over Marcum under the long-arm statute.  Marcum is alleged to have visited New York on several occasions in connection with the Lifetrade Funds.  (Compl. ¶ 14.)  On two of the visits, Marcum allegedly met with an investor's representatives to give them false reassurances about Lifetrade's supposed refinancing efforts following the execution of the Settlement Agreement, and on at least one of these visits, Marcum allegedly met with an investment advisor to court investment in the Lifetrade Funds.  (*Id.*)  On several further occasions, Marcum allegedly attended meetings at the New York offices of Wells Fargo's predecessor to negotiate the Loan Agreement.  (*Id.*)

These meetings—in which Marcum was "physically present in New York" and during some of which Marcum purposefully cultivated "a continuing relationship" with Wells Fargo's

New York–based predecessor—clearly constitute the transaction of business within the meaning of New York's long-arm statute. *D & R Glob. Selections*, 29 N.Y.3d at 298 (second quoting *Fischbarg v. Doucet*, 9 N.Y.3d 375, 381 (2007)). And Marcum's alleged in-state efforts to secure investment, negotiate the Loan Agreement, and mislead investors as to the Settlement Agreement's import clearly bear "some articulable nexus" to Plaintiffs' claims, *Solé Resort*, 450 F.3d at 103 (quoting *McGowan*, 52 N.Y.2d at 272), even if, as Marcum maintains, none of these efforts put him face-to-face with any of the named plaintiffs in this suit (Dkt. No. 93 ¶ 7).

The Court therefore concludes that Plaintiffs have made out a sufficient *prima facie* showing at the pleading stage that Marcum's in-state transaction of business subjects him to personal jurisdiction in this action under New York's long-arm statute.[14]

### iii. Portsmouth

Portsmouth, however, is another story. Although Portsmouth is alleged to have engaged in "extensive life settlement business in the State of New York" and to have filed a lawsuit in New York (Compl. ¶ 29), the complaint fails to allege that any of Portsmouth's New York activities bear a direct relationship with the specific events that have given rise to the instant suit. Significantly, Plaintiffs have neither alleged (*see* Compl. ¶ 14) nor produced evidence (*see* Dkt. No. 107 ¶¶ 22–23) that Portsmouth (as distinct from Portsmouth Securities Limited, a Malaysian company (Compl. ¶ 30)) was involved in the banking activity that supports jurisdiction over Smith. Thus, even if Portsmouth can be said to transact business in New York as a general

---

[14] Because Marcum's own alleged in-state activities are sufficient to make out a *prima facie* showing of jurisdiction under the long-arm statute, the Court need not address Plaintiffs' suggestion that Lifetrade's New York contacts may be imputed to Marcum on an agency or alter ego theory (Dkt. No. 106 at 20) or that Smith's New York contacts may be imputed to Marcum on a co-conspirator theory (Dkt. No. 106 at 23–24).

matter, Plaintiffs have not carried their burden of making out a *prima facie* showing that the particular claims they assert here "aris[e] from" that business.  N.Y. C.P.L.R. § 302(a)(1).

Plaintiffs nonetheless suggest that this Court may take personal jurisdiction over Portsmouth because Portsmouth was allegedly "controlled by Defendant Smith" and allegedly "acted in concert with and conspired with the other Lifetrade Defendants."  (Dkt. No. 106 at 24.) According to Plaintiffs, these allegations are sufficient to establish this Court's jurisdiction over Portsmouth on an alter ego or agency theory.  (*Id.*)

As for the alter ego theory, the complaint lacks the "specific averment of facts that, if credited," could create a plausible inference that Portsmouth and the other Lifetrade Defendants "operate[d] as a single economic unit."  *S. New Eng. Tele. Co. v. Glob. NAPs Inc.*, 624 F.3d 123, 138 (2d Cir. 2010).  While Plaintiffs allege that Smith, as Portsmouth's indirect owner, received self-dealing fees as a result of Portsmouth's business with Lifetrade (*see, e.g.*, Compl. ¶ 57), the complaint nowhere suggests that Portsmouth, even if mismanaged, was "undercapitalized or otherwise used as [Smith's] 'shell' compan[y]" rather than being operated as a "legitimate profit-seeking entit[y]," *Am. Lecithin Co. v. Rebmann*, No. 12 Civ. 929, 2017 WL 4402535, at *9 (S.D.N.Y. Sept. 30, 2017); *see also Alterseekers, Inc. v. BrandForce SF, LLC*, No. 12 Civ. 5392, 2015 WL 5719759, at *6 (E.D.N.Y. Sept. 29, 2015) (requiring that a plaintiff asserting personal jurisdiction on an alter ego theory "establish . . . that one entity was a shell for the other, *i.e.*, that one entity was subject to the complete domination of the other" (quoting *Bank of Am. v. Apollo Enter. Solutions, LLC*, No. 10 Civ. 5707, 2010 WL 4323273, at *4 (S.D.N.Y. Nov. 1, 2010))).

As for the agency theory, Plaintiffs have not alleged that Portsmouth, as distinct from Smith, exercised control over Lifetrade's New York contacts.  In an effort to get around this defect, Plaintiffs point to their allegation that Portsmouth was Smith's alter ego (Compl. ¶ 29)

and urge this Court to employ transitive reasoning: because Lifetrade's in-state contacts can be imputed to Smith on an agency theory, and because Smith's contacts can be imputed to Portsmouth on an alter ego theory, the argument runs, Lifetrade's contacts can be imputed to Portsmouth (Dkt. No. 106 at 24). This proposed syllogism, though, fails at the second step. Just as the complaint fails to plausibly allege that Portsmouth was Lifetrade's alter ego, it also—for essentially the same reasons—fails to plausibly allege that Portsmouth was Smith's alter ego.

Because Plaintiffs have failed to make out a *prima facie* showing that New York's long-arm statute provides authority for this Court to exercise personal jurisdiction over Portsmouth here, Portsmouth's motion to dismiss all claims against it pursuant to Rule 12(b)(2) is granted.

### b. Due Process

Although the Court has concluded that Plaintiffs have made out a *prima facie* showing that New York's long-arm statute authorizes it to take jurisdiction over Smith and Marcum for purposes of this suit, any exercise of personal jurisdiction must also comport with due process. *See Chloé*, 616 F.3d at 164. The exercise of claim-specific personal jurisdiction—as opposed to general, all-purpose jurisdiction—over an out-of-state defendant satisfies due process if: (1) the defendant has "purposefully availed itself of the privilege of conducting activities within the forum State"; (2) the claim at issue "arise[s] out of or relate[s] to the defendant's forum conduct"; and (3) the exercise of jurisdiction is "reasonable under the circumstances." *U.S. Bank Nat'l Ass'n v. Bank of Am. N.A.*, 916 F.3d 143, 150 (2d Cir. 2019) (quoting *Bristol-Myers Squibb Co. v. Superior Court of Cal.*, 137 S. Ct. 1773, 1785–86 (2017)).[15]

---

[15] Plaintiffs do not argue that Smith and Marcum are subject to general jurisdiction in New York.

Where, as here, a court takes jurisdiction over a defendant under New York's long-arm statute on the basis of the defendant's in-state transaction of business, the requirements of due process are typically satisfied. *See HSH Nordbank AG N.Y. Branch v. Street*, No. 11 Civ. 9405, 2012 WL 2921875, at *4 n.3 (S.D.N.Y. July 18, 2012) ("[T]he personal jurisdiction analysis under [N.Y. C.P.L.R.] § 302(a)(1) and the Due Process Clause is in most instances essentially coterminous . . . ."). And Smith and Marcum make no argument that the Court's constitutional analysis here should differ from its statutory analysis. Indeed, the only distinct point Smith and Marcum raise in connection with the Due Process Clause is that much of the conduct at issue occurred outside the United States, suggesting, perhaps, that an exercise of personal jurisdiction here would be unreasonable. (Dkt. No. 95 at 24.) But the extraterritorial aspects of Plaintiffs' claims would not bar, for example, Marcum's home state of Connecticut from taking personal jurisdiction over him (*see* Dkt. No. 93 ¶ 2), so there is no reason that they would bar New York from doing the same in a case, like this one, where personal jurisdiction is otherwise proper.

For the same reasons that Plaintiffs have made out a sufficient *prima facie* showing of this Court's ability to exercise jurisdiction over Smith and Marcum here under New York's long-arm statute, then, Plaintiffs have adequately alleged that this exercise comports with due process.

### 3. Motion to Dismiss or Stay in Light of a Prior Pending Action

Smith and Marcum finally contend that even if, as this Court has concluded, personal jurisdiction over them is proper here, the claims against them should nonetheless be dismissed or stayed in light of a lawsuit currently pending against them in Curaçao. (Dkt. No. 95 at 39–40.)

In determining whether to exercise its "inherent power to dismiss or stay an action based on the pendency of a related proceeding in a foreign jurisdiction," this Court takes a holistic view of the circumstances, considering factors such as "(1) similarity of the parties and issues,

(2) interests of judicial economy, (3) the order in which the actions were filed, (4) adequacy of the alternative forum, and (5) general considerations of fairness and prejudice to the parties." *Thornton Tomasetti, Inc. v. Anguillan Dev. Corp.*, No. 14 Civ. 7040, 2015 WL 7078656, at *3 (S.D.N.Y. Nov. 13, 2015) (first quoting *Ole Media Mgmt., L.P. v. EMI Apr. Music, Inc.*, No. 12 Civ. 7249, 2013 WL 2531277, at *2 (S.D.N.Y. June 10, 2013)). Mindful of its "virtually unflagging obligation . . . to exercise the jurisdiction given" it, however, *id.* (alteration in original) (quoting *Royal & Sun All. Ins. Co. of Can. v. Century Int'l Arms, Inc.*, 466 F.3d 88, 92 (2d Cir. 2006)), the Court's task "is not to articulate a justification *for* the exercise of jurisdiction, but rather to determine whether exceptional circumstances exist that justify the surrender of that jurisdiction," *id.* (quoting *Royal & Sun*, 466 F.3d at 93).

Smith and Marcum have not carried their burden of demonstrating the sort of exceptional circumstances that might warrant dismissal or a stay. Indeed, Smith and Marcum have done little more than represent that there *is* a lawsuit against them in Curaçao and that this lawsuit was filed by a Lifetrade investor. (*See* Dkt. No. 92 ¶¶ 7–9; Dkt. No. 93 ¶¶ 8–9.) Although the Curaçao lawsuit does involve issues that are similar to those raised in the instant suit (*see* Dkt. No. 94-2 ¶¶ 15–21), Smith and Marcum have provided no information about the current status of the Curaçao suit, no indication that any of the more than 500 plaintiffs here would be able to assert their own rights as part of that suit, and no information about what remedies would be available even if Plaintiffs *were* able to participate. If the mere existence of a fraud suit brought by a single plaintiff somewhere in the world were enough to bar a different set of plaintiffs from pursuing a lawsuit in the United States on the basis of the same fraud, those accused of transnational fraud would virtually never face suit here. That is not the law.

The Court concludes, then, that Smith and Marcum have failed to demonstrate that the pending Curaçao action warrants a stay or dismissal of the claims asserted against them here.

## C.     Rule 12(b)(6)

Having dealt with the jurisdictional preliminaries, the Court now turns to the question of whether Plaintiffs' complaint states a viable cause of action against S&P, the Lifetrade Movants, or the Wells Fargo Defendants.  Plaintiffs' claims fall into four categories: (1) claims under the federal RICO statute; (2) claims under New York's fraudulent conveyance statute; (3) New York common-law claims; and (4) foreign-law claims.  The Court addresses each category in turn.

### 1.     RICO Claims (Counts Fourteen and Fifteen)

In their sole federal claims, Plaintiffs charge Smith, Marcum, and the Wells Fargo Defendants (the "RICO Defendants") with violating RICO (Count Fourteen) and conspiring to violate RICO (Count Fifteen).  (Compl. ¶¶ 264–89.)  RICO prohibits "any person employed by or associated with any enterprise engaged in . . . interstate or foreign commerce" from "conduct[ing] or participat[ing], directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity," 18 U.S.C. § 1962(c), or from conspiring to do so, *id.* § 1962(d).  Under RICO, an actionable "pattern of racketeering activity" must at a minimum be made up of two or more predicate racketeering acts—defined to include certain acts of mail and wire fraud—committed within a ten-year span.  *See id.* §§ 1961(1), (5).

Here, Plaintiffs contend, the RICO Defendants allegedly carried out the transfer of Lifetrade's assets to ATC Realty through "multiple related acts of mail fraud and wire fraud." (Compl. ¶ 271.)  These acts, Plaintiffs maintain, include emails and phone calls in which the terms of the Settlement Agreement were negotiated and finalized (Compl. ¶ 268), mailings and electronic transmissions through which the agreement was executed (Compl. ¶ 271), and various investor communications from Smith and Marcum that were allegedly aimed at concealing that

Lifetrade's assets had been irretrievably surrendered (Compl. ¶¶ 272–73). Thus, Plaintiffs conclude, the RICO Defendants conspired to conduct—and in fact did conduct—their business together as an enterprise through a pattern of racketeering activity. (Compl. ¶¶ 279, 284.)

The RICO Defendants respond that Plaintiffs' RICO claims are fatally flawed for multiple reasons. First, they argue that RICO does not provide Plaintiffs a cause of action to seek redress for their injuries because those injuries occurred abroad. (Dkt. No. 89 at 10; Dkt. No. 95 at 12–14.) Next, they argue that Plaintiffs have failed to plausibly allege a course of conduct that violated RICO. (Dkt. No. 89 at 11–15; Dkt. No. 95 at 14–16.) Finally, they argue that any RICO claims are time-barred. (Dkt. No. 89 at 15–16; Dkt. No. 95 at 9–12.)

The Court need only address the first two of these arguments.

### a. Domestic Injury

A plaintiff's power to bring a civil RICO claim derives from 18 U.S.C. § 1964(c), which creates a private right of action for "[a]ny person injured in his business or property by reason of a violation" of RICO's substantive provisions. 18 U.S.C. § 1964(c). As the Supreme Court has made clear, though, this remedial provision "requires a civil RICO plaintiff to allege and prove a *domestic* injury to business or property and does not allow recovery for foreign injuries." *RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090, 2111 (2016) (emphasis added).

While the Supreme Court has not yet provided a framework for resolving "disputes [that] arise as to whether a particular alleged injury is 'foreign' or 'domestic,'" *id.*, the Second Circuit has offered some guidance. As a starting point, "when a foreign plaintiff maintains tangible property in the United States, the misappropriation of that property constitutes a domestic injury." *Bascuñán v. Elsaca*, 874 F.3d 806, 814 (2d Cir. 2017). So, for example, the Second Circuit has held that the theft of funds from a United States bank account causes a domestic

injury, *id.* at 820, as does the theft of bearer shares stored in the United States, if the shares have been "*physically* stolen" and have not just suffered "a drop in the[ir] economic value," *id.* at 824.

Where it is *intangible* property that forms the basis for a civil RICO claim, in contrast, courts have typically "focus[ed] on where the plaintiff felt the effects of the injury-inducing predicate acts." *Humphrey v. GlaxoSmithKline PLC*, 905 F.3d 694, 704 (3d Cir. 2018); *see also Armada (Sing.) PTE Ltd. v. Amcol Int'l Corp.*, 885 F.3d 1090, 1094 (7th Cir. 2018) ("It is well understood that a party experiences or sustains injuries to its intangible property at its residence . . . ."); *Elsevier Inc. v. Pierre Grossmann, IBIS Corp.*, No. 12 Civ. 5121, 2017 WL 5135992, at *4 (S.D.N.Y. Nov. 2, 2017) (noting that "courts in this District have adopted a 'locus-of-effects approach,' which 'focus[es] on where the plaintiff felt the effects of the injury'" (alteration in original) (quoting *Dandong Old N.-E. Agric. & Animal Husbandry Co. v. Hu*, No. 15 Civ. 10015, 2017 WL 3328239, at *11 (S.D.N.Y. Aug. 3, 2017))). Thus, the Second Circuit has held, where a shareholder's "ownership interest in a company" suffers a drop in value, the "clear locational nexus" is "the shareholder's place of residence." *Bascuñán*, 874 F.3d at 823.

Here, Plaintiffs have alleged "diminished value" of their investments in the Lifetrade Funds, *Bascuñán*, 874 F.3d at 823, and not "the misappropriation of specifically identifiable [tangible] property," *id.* at 810. Accordingly, Plaintiffs' individual injuries occurred in the countries "where [they] felt the effects" of the RICO Defendants' alleged actions. *Humphrey*, 905 F.3d at 704. And the United States is not among those countries. Plaintiffs are all non–United States investors who suffered economic injury when the shares they held in three non–United States funds lost their value. Plaintiffs have identified no authority that would support the counterintuitive proposition that such circumstances give rise to an injury in the United States.

Plaintiffs respond that they *have* alleged an injury to tangible property located in the United States because the life insurance policies alleged to have been fraudulently transferred to ATC Realty were located in Minnesota at the time of the transfer. (Compl. ¶ 134 n.22; Dkt. No. 102 at 37–38.) This argument, however, overlooks that these insurance policies, which belonged to *Lifetrade* prior to the transfer, did not constitute *Plaintiffs'* "business or property." 18 U.S.C. § 1964(c). The injury that *Plaintiffs* suffered was a diminution of the value of their shares in the Lifetrade Funds—an injury to intangible property that, as discussed above, occurred abroad.

RICO therefore provides Plaintiffs no cause of action to seek relief for the extraterritorial loss of their individual investments in the Lifetrade Funds. By that same reasoning, though, RICO *might* provide Plaintiffs a cause of action insofar as they seek to proceed derivatively on Lifetrade's behalf. After all, *Lifetrade* may well have suffered a domestic "injur[y] in [its] business or property" when its life insurance policy portfolio—located in Minnesota—was allegedly transferred to ATC Realty for a fraction of its value. 18 U.S.C. § 1964(c). Ultimately, however, the Court need not conclusively determine whether Lifetrade itself is plausibly alleged to have suffered a domestic injury because, as explained below, Plaintiffs have not plausibly alleged that any such injury occurred "by reason of" a substantive RICO violation. *Id.*

### b.    RICO Violation

To properly allege a substantive RICO violation, Plaintiffs must allege "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *DeFalco v. Bernas*, 244 F.3d 286, 306 (2d Cir. 2001) (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985)). Here, the RICO Defendants argue that Plaintiffs have failed to adequately allege (1) that the

RICO Defendants worked together as an enterprise[16] (Dkt. No. 89 at 11–12); (2) that the alleged enterprise committed any predicate acts of racketeering (Dkt. No. 95 at 14–15); or (3) that the alleged predicate acts formed a pattern (Dkt. No. 89 at 12–14; Dkt. No. 95 at 15–16). The Court need only address the last of these arguments.

While a pattern of racketeering activity under RICO must involve at least two predicate racketeering acts within a ten-year span, *see* 18 U.S.C. § 1961(5), "two acts alone will not always suffice to form a pattern," *DeFalco*, 244 F.3d at 306. Rather, a RICO plaintiff must show that the acts, beyond being minimally numerous, "are 'related, and that they amount to or pose a threat of continued criminal activity.'" *Id.* at 320 (quoting *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989)). To establish such continuity, the plaintiff may show either "a 'closed-ended' pattern—a series of related predicate acts extending over a substantial period of time—or . . . an 'open-ended' pattern of racketeering activity that poses a threat of continuing criminal conduct beyond the period during which the predicate acts were performed." *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 183 (2d Cir. 2008) (citing *H.J. Inc.*, 492 U.S. at 241).

As noted, the predicate acts alleged by Plaintiffs consist of supposed incidents of wire or mail fraud connected to the negotiation and execution of the Settlement Agreement and to subsequent efforts to prevent investors from learning of the agreement.[17] (Compl. ¶¶ 268, 271–

---

[16] The Wells Fargo Defendants additionally argue that, to the extent Plaintiffs have alleged the existence of an enterprise, Plaintiffs have not plausibly alleged that the Wells Fargo Defendants participated in that enterprise. (Dkt. No. 89 at 14–15.)

[17] Plaintiffs also allege that Wells Fargo has "committed similar frauds" against investors in other life-settlement pools. (Compl. ¶ 274; *see also* Compl. ¶ 275.) To the extent that Plaintiffs intend to rely on these allegations as evidence of a pattern, they have not alleged with the requisite particularity any predicate acts of mail or wire fraud associated with those earlier alleged frauds. *See First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 178 (2d Cir. 2004) ("[A]ll allegations of fraudulent predicate [RICO] acts[] are subject to the heightened

73.)  In assessing these allegations, the Court is mindful of the Second Circuit's view that,

"[g]iven the routine use of mail and wire communications in business operations, . . . 'RICO

claims premised on mail or wire fraud must be particularly scrutinized because of the relative

ease with which a plaintiff may mold a RICO pattern from allegations that, upon closer scrutiny,

do not support it.'"  *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 489 (2d Cir. 2014)

(quoting *Efron v. Embassy Suites (P.R.), Inc.*, 223 F.3d 12, 20 (1st Cir. 2000)).  Here, even

assuming that each of the communications the RICO Defendants made in connection with the

Settlement Agreement represented a discrete predicate act of mail or wire fraud, Plaintiffs have

failed to adequately allege that those various acts added up to a pattern capable of supporting

RICO liability.

 As for open-ended continuity, Plaintiffs have alleged that the RICO Defendants engaged

in a fraudulent scheme of inherently finite scope: namely, the transfer of Lifetrade's assets to

ATC Realty.  Once that transfer took place, "the scheme essentially came to its conclusion,"

*First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 181 (2d Cir. 2004), such that

there was little ongoing "threat of continuing criminal activity," *id.* at 180 (quoting *Cofacrèdit,*

*S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 242 (2d Cir. 1999)).  And although

Plaintiffs allege that the RICO Defendants continued to commit predicate acts even after that

transfer in an effort to cover up their fraud, "no predicate acts [are alleged to] have occurred," *id.*

---

pleading requirements of Federal Rule of Civil Procedure 9(b).").  Nor are those earlier supposed
frauds, which are not alleged to have involved Smith and Marcum, attributable to the same RICO
enterprise—*i.e.*, Smith, Marcum, and the Wells Fargo Defendants (*see* Compl. ¶ 266)—that
Plaintiffs identify as the source of their present claims.  *See United States v. Indelicato*, 865 F.2d
1370, 1384 (2d Cir. 1989) (en banc) ("[N]o RICO violation can be shown unless there is proof of
the . . . relationship between the racketeering acts and the RICO enterprise.").

at 181, since Plaintiffs learned of the alleged fraud in November 2016 (*see* Compl. ¶¶ 10, 273), "which suggests that the scheme has wound to a close," *First Capital*, 385 F.3d at 181.

Plaintiffs' RICO claims fare no better under the rubric of closed-ended continuity. To be sure, the alleged predicate acts, which occurred over a four-year period starting with the Settlement Agreement's 2012 execution and ending with the alleged fraud's 2016 discovery, "extend[ed] over a . . . period of time" longer than the two-year span the Second Circuit has deemed sufficiently "substantial" to establish closed-end continuity. *Id.* (quoting *GICC Capital Corp. v. Tech. Fin. Grp., Inc.*, 67 F.3d 463, 466 (2d Cir. 1995)). But although "two years may be the *minimum* duration necessary to find closed-ended continuity, the mere fact that predicate acts span two years is insufficient, without more, to support a finding of a closed-ended pattern." *Id.* Instead, the Court must take holistic account of the alleged pattern, considering "factors such as the number and variety of predicate acts, the number of both participants and victims, and the presence of separate schemes." *Id.* (quoting *DeFalco*, 244 F.3d at 321).

The predicate acts alleged here involve the execution of the Settlement Agreement and several subsequent statements made by the agreement's participants to a finite, if numerous, set of investors in order to minimize the agreement's import. (*See* Compl. ¶¶ 267–78.) In other words, the supposed "pattern" here represents the efforts of a single group of actors to execute a one-time scheme against a single set of victims through a single means. Despite the four-year duration of these efforts, the Court concludes that Plaintiffs' attempt to characterize them as a pattern of racketeering activity "artificially fragment[s] a singular act into multiple acts simply to invoke RICO." *Schlaifer Nance & Co. v. Estate of Warhol*, 119 F.3d 91, 98 (2d Cir. 1997); *see also Crawford*, 758 F.3d at 489 (urging scrutiny of alleged patterns based on predicate acts of mail and wire fraud). Plaintiffs have thus failed to plead the closed-ended continuity required to

establish a pattern where open-ended continuity is lacking. *See Gross v. Waywell*, 628 F. Supp. 2d 475, 494 (S.D.N.Y. 2009) ("[C]ourts in this Circuit have held repeatedly that allegations of RICO violations involving solely mail and wire fraud or little other variety in the predicate acts, a limited number of participants or victims, [and] a discrete scheme with a narrow purpose or a single property . . . are generally insufficient to demonstrate closed-ended continuity . . . .").

Because Plaintiffs have failed to plausibly allege that the RICO Defendants engaged in a pattern of racketeering activity capable of supporting civil RICO liability, they have failed to plead a substantive RICO violation (Count Fourteen). And because a RICO conspiracy requires an "inten[tion] to further an endeavor which, if completed, would satisfy all of the elements" of a RICO violation, *First Capital*, 385 F.3d at 178 (quoting *Baisch v. Gallina*, 346 F.3d 366, 376 (2d Cir. 2003)), they have likewise failed to plead a RICO conspiracy (Count Fifteen). Accordingly, all of Plaintiffs' RICO claims—including their derivative claims—are dismissed.[18]

### 2.      Fraudulent Conveyance (Counts One and Two)

The Court turns next to New York's fraudulent-conveyance statute, N.Y. Debt. & Cred. Law §§ 270–281. Pointing to the transfer of Lifetrade's assets, Plaintiffs charge the Wells Fargo Defendants and Lifetrade Movants with constructively fraudulent (Count One) and fraudulent (Count Two) conveyance under this statute, *see id.* §§ 274, 276. (Compl. ¶¶ 177–89.) But while the Lifetrade Movants and Wells Fargo Defendants argue that Plaintiffs have not stated a claim under the statute (Dkt. No. 89 at 20–21; Dkt. No. 95 at 38–39), the Wells Fargo Defendants make the threshold argument that the statute has no application here in the first place because the substantive law of Delaware, not New York, governs these claims (Dkt. No. 89 at 16–19).

---

[18] In light of this conclusion, the Court need not decide whether, as the RICO Defendants maintain (Dkt. No. 89 at 15–16; Dkt. No. 95 at 9–12), Plaintiffs' RICO claims are time-barred.

Plaintiffs offer two reasons why, in their view, New York law controls. First, they argue that the Settlement Agreement contains a choice-of-law provision that calls for the application of New York law to their fraudulent-conveyance claims. (Dkt. No. 102 at 10–12.) Second, they argue that the applicable conflict-of-laws principles should lead this Court to apply New York's substantive law over Delaware's. (Dkt. No. 102 at 12–15.) The Court considers both arguments.

### a.    Contractual Choice-of-Law Provision

Plaintiffs first argue that New York law applies to their fraudulent-conveyance claims because the Settlement Agreement and other documents that effectuated the challenged transfer contain choice-of-law provisions that call for New York law to govern. (Dkt. No. 102 at 10–12.)

As a federal court sitting in New York, this Court looks to New York's choice-of-law principles to determine "which state's substantive law should govern." *Wall v. CSX Transp., Inc.*, 471 F.3d 410, 415 (2d Cir. 2006). As relevant here, New York typically honors contractual choice-of-law provisions. *Terwilliger v. Terwilliger*, 206 F.3d 240, 245 (2d Cir. 2000). Because no party disputes the validity of the contractual provisions upon which Plaintiffs rely, the Court asks only whether, under New York law, Plaintiffs' claims fall within the provisions' scope. *See Fin. One Pub. Co. v. Lehman Bros. Special Fin., Inc.*, 414 F.3d 325, 332–33 (2d Cir. 2005).

New York law provides that "tort claims are outside the scope of contractual choice-of-law provisions that specify what law governs construction of the terms of the contract," and New York courts have shown "reluctance to read choice-of-law clauses broadly." *Id.* at 335. But where the "express language" of a choice-of-law provision is "'sufficiently broad' as to encompass the entire relationship between the contracting parties," New York law will "apply [that provision] to claims for tort arising incident to the contract." *Krock v. Lipsay*, 97 F.3d 640, 645 (2d Cir. 1996) (quoting *Turtur v. Rothschild Registry Int'l, Inc.*, 26 F.3d 304,

310 (2d Cir. 1994)). As a general rule of thumb, "provisions applying to disputes 'arising out of' or 'relating to' a contract are capacious enough to reach related tort claims, while provisions stating that a contract will be 'governed by' or 'construed in accordance with' the law of a state are not." *Chigirinskiy v. Panchenkova*, No. 14 Civ. 4410, 2015 WL 1454646, at *6 (S.D.N.Y. Mar. 31, 2015) (quoting *Refco Grp. Ltd., LLC v. Cantor Fitzgerald, L.P.*, No. 13 Civ. 1654, 2014 WL 2610608, at *40 (S.D.N.Y. June 10, 2014)).

Here, the Settlement Agreement's choice-of-law provision reads in relevant part: "This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York." (Dkt. No. 90-4 at 43 (formatting omitted).) This provision, then, fits to a tee the sort of contractual language that courts applying New York law have held insufficient to cover tort claims, such as Plaintiffs' fraudulent-conveyance claims, that arise in connection with the contract. *See Chigirinskiy*, 2015 WL 1454646, at *6; *Drenis v. Haligiannis*, 452 F. Supp. 2d 418, 426 (S.D.N.Y. 2006) (holding that a fraudulent-conveyance claim arising in connection with transactions made under the terms of a contract was not governed by a contract term dictating that the contract "shall be governed by, and construed in accordance with," Delaware law).

Undaunted, Plaintiffs point to a provision in a foreclosure notice executed in connection with the Settlement Agreement. (Dkt. No. 102 at 10.) This provision states that Wells Fargo accepted Lifetrade's assets "in satisfaction of [Lifetrade's] Indebtedness pursuant to . . . applicable New York law" (Dkt. No. 90-5 at 3) and that Lifetrade waived certain rights "under . . . applicable New York law" (Dkt. No. 90-5 at 4). In Plaintiffs' eyes, this language indicates that "Wells Fargo intended for New York law to define whether [the challenged transfer] was a valid 'strict foreclosure' or . . . an improper fraudulent conveyance." (Dkt. No. 102 at 10.)

Plaintiffs reach too far. Essentially, they identify contract language designed to *foreclose* certain claims under New York law and draw from that language the negative inference that the parties to the contract intended to open the door to precisely those claims. In other words, while it is clear from the foreclosure notice's language that the parties foresaw that New York law might be invoked in connection with the Settlement Agreement, nothing suggests a contractual agreement that such an invocation would be valid. Given New York courts' "reluctance to read choice-of-law clauses broadly," *Fin. One Pub. Co.*, 414 F.3d at 335, this Court will not infer such an agreement in the absence of "express language," *Krock*, 97 F.3d at 645.

Plaintiffs have thus failed to demonstrate that the choice-of-law provisions contained in the Settlement Agreement and related documents apply to their fraudulent-conveyance claims.

### b. Conflict of Laws

Absent a contractual choice-of-law provision covering Plaintiffs' fraudulent-conveyance claims, this Court looks to New York's ordinary conflict-of-laws principles. *See Wall*, 471 F.3d at 415. Typically, New York courts apply New York's substantive law to cases filed in New York. *See id.* at 422–23. But where a party has identified a conflict between New York's tort law and the tort laws of another relevant jurisdiction, a New York court will apply "[t]he law of the jurisdiction having the greate[r] interest in the litigation." *GlobalNet Financial.com, Inc. v. Frank Crystal & Co.*, 449 F.3d 377, 383 (2d Cir. 2006) (first alteration in original) (quoting *Schultz v. Boy Scouts of Am., Inc.*, 65 N.Y.2d 189, 197 (1985)); *see also Fallman v. Hotel Insider Ltd.*, No. 14 Civ. 10140, 2016 WL 316378, at *4 (S.D.N.Y. Jan. 15, 2016) (noting that "[t]he party claiming that foreign law applies" carries the burden of showing a conflict).

The "first step in any case presenting a potential choice of law issue is to determine whether there is an actual conflict between the laws of the jurisdictions involved." *GlobalNet*,

449 F.3d at 382 (quoting *In re Allstate Ins. Co.*, 81 N.Y.2d 219, 223 (1993)).  Here, the Wells

Fargo Defendants argue that there is a material conflict between New York's and Delaware's

fraudulent-conveyance laws.  In particular, they argue that Delaware law contains a statute of

repose that "extinguishe[s]" a fraudulent-conveyance claim if it is not brought "within [four]

years after the transfer was made . . . or, if later, within [one] year after the transfer . . . was or

could reasonably have been discovered," Del. Code Ann. tit. 6, § 1309(1), whereas New York

law imposes a more lenient six-year statute of limitations, *see Bobash, Inc. v. Festinger*, 868

N.Y.S.2d 747, 749 (App. Div. 2d Dep't 2008).[19]  (Dkt. No. 89 at 19.)  And, they continue, this

distinction is clearly material to Plaintiffs' claims because the earliest of the five instant lawsuits

was filed on April 24, 2017—within six years of the challenged transfer, which occurred and was

publicly announced in 2012 (*see* Compl. ¶ 159), but not within four.

Plaintiffs fail to respond to these points.  They never argue, for example, that the Wells

Fargo Defendants have failed to carry their burden of demonstrating a genuine conflict.  Nor do

they make any argument that their fraudulent-conveyance claims would be timely even if

Delaware's substantive law were to apply.  The Court therefore concludes that, for purposes of

this litigation, the Wells Fargo Defendants have adequately shown that "there is indeed a conflict

between New York and Delaware fraudulent conveyance law," *Drenis*, 452 F. Supp. 2d at 427,

that Delaware's four-year timeline represents a statute of repose that New York courts would

apply in cases governed by Delaware law, *see Tanges v. Heidelberg N. Am., Inc.*, 93 N.Y.2d 48,

---

[19] In the case of claims alleging constructively fraudulent conveyance, Delaware law
provides an even tighter timeline, extinguishing such claims after four years regardless of when
they might reasonably have been discovered.  *See* Del. Code Ann. tit. 6, § 1309(2).

56 (1999) (characterizing statutes of repose as "substantive law" for conflict-of-laws purposes), and that this statute of repose would be fatal to Plaintiffs' fraudulence-conveyance claims.[20]

Apparently accepting that New York and Delaware law are in material conflict, Plaintiffs argue only that New York's conflict-of-law principles favor applying New York law, rather than Delaware law, here (Dkt. No. 102 at 12–15) because New York has "the greate[r] interest in the litigation," *GlobalNet*, 449 F.3d at 384 (quoting *Schultz*, 65 N.Y.2d at 197).

To determine which jurisdiction has the greater interest in a tort claim, New York courts assess whether the claim at issue arises under a "conduct-regulating rule[]" or a "loss-allocation rule[]." *In re Thelen LLP*, 736 F.3d 213, 220 (2d Cir. 2013). Because the parties here agree that Plaintiffs' fraudulent-conveyance claims are conduct regulating (Dkt. No. 89 at 17; Dkt. No. 102 at 12), this Court looks to "the law of the jurisdiction where the tort occurred," *In re Thelen*, 736 F.3d at 220 (quoting *Cooney v. Osgood Mach., Inc.*, 81 N.Y.2d 66, 72 (1993)).

Here, the challenged Settlement Agreement represents a multinational transaction with no one obvious locus. But the Wells Fargo Defendants maintain that "[a] close reading of the complaint demonstrates that Delaware has the greatest connection to the transfer" because it is the home state of at least three of the various participants in the Settlement Agreement. (Dkt. No. 89 at 18.) Plaintiffs, for their part, while disparaging the strength of Delaware's connection to the underlying tort (Dkt. No. 102 at 14), never propose that some other jurisdiction—such as

---

[20] Given these conclusions, the Court need not decide whether, as the Wells Fargo Defendants claim, the Settlement Agreement is incapable of supporting a fraudulent-conveyance claim under Delaware law because it represents a strict foreclosure within the meaning of the Uniform Commercial Code. (Dkt. No. 89 at 18–19.) Nor need the Court consider the Lifetrade Movants' argument that Delaware law bars Plaintiffs from asserting a fraudulent-conveyance claim against them because they were not parties to the transfer at issue. (Dkt. No. 95 at 38–39.)

Georgia, for example, where Smith signed the Settlement Agreement (Dkt. No. 92 ¶ 6), or the foreign jurisdictions in which Plaintiffs suffered their injuries—bears a greater connection.

Were the Court tasked with deciding which of all the various jurisdictions involved in this alleged fraud laid the greatest claim to seeing its substantive law applied, the Court might well settle on some jurisdiction other than Delaware. For example, despite the Wells Fargo Defendants' suggestion that New York's "interest" analysis focuses principally on the location of an alleged fraud's perpetrator (Dkt. No. 110 at 6), the Second Circuit has recognized that "for claims based on fraud, the locus of the tort is generally deemed to be the place where the injury was inflicted," *In re Thelen*, 736 F.3d at 220; *cf. Eclaire Advisor Ltd. ex rel. Daewoo Int'l (Am.) Corp. Creditor Tr. v. Daewoo Eng'g & Constr. Co.*, 375 F. Supp. 2d 257, 268 (S.D.N.Y. 2005) ("New York has an 'especially strong' interest in applying its law when one of its domiciliaries alleges that it has been defrauded." (quoting *Advanced Portfolio Techs., Inc. v. Advanced Portfolio Techs. Ltd.*, No. 94 Civ. 5620, 1999 WL 64283, at *6 (S.D.N.Y. Feb. 8, 1999))).

In this case, though, the Court's question is not whether the victims' jurisdiction or the perpetrators' jurisdiction has the greater interest in seeing its law applied. Rather, the Court's comparison is between Delaware—a jurisdiction that is home to three of the alleged perpetrators (*see* Compl. ¶¶ 22, 24, 28, 182, 188)—and New York, a jurisdiction that is home to none of the alleged perpetrators and none of the victims and in which none of the tortious conduct is alleged to have taken place. Under these circumstances, it is clear that Delaware, rather than New York, has "the greater interest in having its substantive law govern" here. *In re Hellas Telecomms. (Lux.) II SCA*, 535 B.R. 543, 575 (Bankr. S.D.N.Y. 2015); *see also Atsco Ltd. v. Swanson*, 816 N.Y.S.2d 31, 32–33 (App. Div. 1st Dep't 2006) (applying Malaysian law to the allegedly

fraudulent "transfer of assets by a Malaysian citizen out of Malaysia," where the victims seeking the application of New York law were domiciled in Japan and the Cayman Islands).

Plaintiffs beg to differ. Citing *Taberna Preferred Funding II, Ltd. v. Advance Realty Group LLC*, No. 2013 Civ. 652884, 2014 WL 4974959 (N.Y. Sup. Ct. Oct. 3, 2014), they contend that where "there is no single, identifiable location of the wrongful conduct," the Court must look to the reasonable expectations of the parties (Dkt. No. 102 at 13). And under this "reasonable expectations" rule, Plaintiffs go on, the choice-of-law provision in the Settlement Agreement clearly betrays the parties' expectation that New York law would govern here. (*Id.*)

*Taberna*, though, does not support Plaintiffs' position. In *Taberna*, a New York trial court applied New York law to a fraudulent-conveyance claim because no other jurisdiction had an "overwhelming" interest in the dispute and because the defendants could "reasonably expect to be held accountable" under New York law. *Id.* at *10. But although *Taberna*'s rationale for applying New York law is somewhat opaque, the allegedly fraudulent instrument in that case had at least been "negotiated, in part, in New York State, where [one of the defendants] maintain[ed] its offices." *Id.* at *4. And, indeed, the opinion explicitly *rejected* the argument that a choice-of-law provision in the transfer instrument should inform its analysis. *See id.* at *9 n.6. Whatever *Taberna* stands for, then, it hardly suggests that a court faced with several jurisdictions that hold a potential stake in a controversy must reject them all in favor of a jurisdiction whose sole connection is a choice-of-law provision that has already been deemed inapplicable.

In sum, while Delaware's interest in having its law applied to Plaintiffs' fraudulent-conveyance claims may not be "overwhelming," *id.* at *10, its interest exceeds New York's own. New York's choice-of-law principles therefore direct this Court to apply

Delaware's law of fraudulent conveyance to the extent that it conflicts with New York's.[21]  And in light of the Wells Fargo Defendants' unrebutted showing that such a conflict exists and that Counts One and Two fail to state a claim under Delaware law, those counts are dismissed.

### 3.    Common-Law Claims

Plaintiffs assert a barrage of common-law claims—including claims of fraud, breach of contract, and negligent misrepresentation—against all three sets of defendants.  With respect to these claims, no party identifies a conflict between New York law and the law of any other relevant jurisdiction, so New York's substantive law applies.  *See Wall*, 471 F.3d at 422–23.

The Court addresses the common-law claims against each set of defendants in turn.

### a.    S&P

Plaintiffs raise three common-law claims against S&P.  Two of these claims charge S&P with fraud based on (1) knowingly making misrepresentations and (2) making false statements without sufficient knowledge of their truth or falsity.  (Compl. ¶¶ 290–301.)  The remaining claim charges S&P with negligent misrepresentation.  (Compl. ¶¶ 302–307.)  The Court first addresses the fraud claims before turning to the negligent misrepresentation claim.

### i.    Fraud (Counts Sixteen and Seventeen)

Plaintiffs assert two counts of fraud against S&P, alleging that S&P's 2006–2011 credit ratings and accompanying monthly reports attested to Lifetrade's strong past performance and future prospects even though S&P knew that (Count Sixteen) or failed to investigate whether (Count Seventeen) investment in Lifetrade was in fact highly risky.  (Compl. ¶¶ 290–301.)  S&P

---

[21] Because the Court concludes that New York's fraudulent-conveyance statute does not govern Plaintiffs' claims, it need not consider whether Plaintiffs have stated a viable cause of action under that statute.

moves to dismiss these claims, arguing, first, that they are time-barred (Dkt. No. 87 at 3–10) and, second, that the complaint fails to plausibly allege fraud (Dkt. No. 87 at 10–21).

### *a.* *Timeliness*

In assessing the timeliness of Plaintiffs' fraud claims, the parties agree that the proper starting point is New York's "borrowing statute" (Dkt. No. 87 at 3; Dkt. No. 104 at 15), which provides as relevant that "[a]n action based upon a cause of action accruing without the state cannot be commenced after the expiration of the time limited by the laws of either the state or the place without the state where the cause of action accrued," N.Y. C.P.L.R. § 202. In other words, Plaintiffs' claims are timely only if they are "timely under the limitation periods of both New York and the jurisdiction where the cause of action accrued." *Portfolio Recovery Assocs., LLC v. King*, 14 N.Y.3d 410, 416 (2010) (quoting *Glob. Fin. Corp. v. Triarc Corp.*, 93 N.Y.2d 525, 528 (1999)). Because S&P makes no argument that Plaintiffs' claims are untimely under the laws of the jurisdictions in which they accrued (Dkt. No. 87 at 4), the Court need consider only whether Plaintiffs have plausibly alleged facts that would render their claims timely under New York law.

New York law provides that a fraud action must be commenced within "the greater of six years from the date the cause of action accrued or two years from the time the plaintiff . . . discovered the fraud, or could with reasonable diligence have discovered it." N.Y. C.P.L.R. § 213(8). Because the first of the complaints in these five actions was filed on April 24, 2017, Plaintiffs' fraud claims against S&P are untimely if they both (1) accrued prior to April 24, 2011 and (2) could reasonably have been discovered prior to April 24, 2015.[22] The parties dispute

---

[22] The Court bases these dates on the filing date of the *Aviles* action, which was the first-filed of these five related cases, because *Aviles* seeks to proceed as a class action and because each plaintiff in the four later-filed actions is alleged to be a class member. Should class

both when Plaintiffs' claims accrued (Dkt. No. 87 at 5; Dkt. No. 104 at 17–20) and when they could reasonably have been discovered (Dkt. No. 87 at 6–10; Dkt. No. 104 at 17–20).

## I.    *Accrual*

Under New York law, a claim that a ratings agency "fraudulently misrepresented the creditworthiness" of certain investments "by assigning them artificially high ratings" typically accrues at the time of investment, *Varga v. McGraw Hill Fin., Inc.*, 48 N.Y.S.3d 24, 25–26 (App. Div. 1st Dep't 2017), because investment represents the "complet[ion] [of] the act that the alleged fraud[] . . . induced," *Prichard v. 164 Ludlow Corp.*, 854 N.Y.S.2d 53, 54 (App. Div. 1st Dep't 2008); *see also Hopkinson v. Estate of Siegal*, No. 10 Civ. 1743, 2011 WL 1458633, at *5 (S.D.N.Y. Apr. 11, 2011) (describing the accrual date of a plaintiff's fraud claim as the date she invested in two tax shelter partnerships that failed to generate promised revenues and tax deductions).  Here, S&P argues, because it is alleged to have ceased rating Lifetrade in April 2011 (Compl. ¶ 72), the *latest* an investor could have invested in reliance on its ratings was April 2011, more than six years prior to the filing of the instant actions (Dkt. No. 87 at 5).

S&P's argument, however, contains an artful elision.  Even though S&P's reports about Lifetrade ceased in April 2011, a fraud claim accrues—as S&P itself recognizes (*id.*)—when a plaintiff takes detrimental action in reliance on a fraudulent statement, and not at the time the statement is made, *see Varga*, 48 N.Y.S.3d at 26.[23]  Of course, the length of time that passes

_____

certification ultimately be denied, of course, the timeliness of any given plaintiff's claim would have to be assessed with respect to the date on which his or her individual claim was filed.

[23] The Court acknowledges that at least one other court in this District has taken the view that a fraud claim under New York law accrues "at the time the defendant makes a knowingly false statement of fact with the intent to induce reliance on that statement." *Kwan v. Schlein*, 441 F. Supp. 2d 491, 503 (S.D.N.Y. 2006).  But because "justifiable reliance" is a necessary element of a fraud claim, *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 291 (2d Cir. 2006) (quoting *Kaufman v. Cohen*, 760 N.Y.S.2d 157, 165 (App Div. 1st Dep't 2003)), a claim can hardly accrue before

between an allegedly fraudulent statement and a plaintiff's act of supposed reliance may be

probative of the reasonableness of that reliance or of whether the plaintiff's action was, as a

factual matter, actually taken in reliance on the statement.  But those issues go to the merits of a

fraud claim and not to its timeliness.  Given that, as S&P admits (Dkt. No. 87 at 5), numerous

plaintiffs invested in the Lifetrade Funds within six years of the first-filed of the instant suits—

*i.e.*, after April 24, 2011 (*see, e.g.*, Dkt. No. 77-1)—those plaintiffs' fraud claims are timely.

Of course, Plaintiffs urge the Court to go further.  In their view, *every* plaintiff's fraud

claims fall within the six-year statutory window, regardless of investment date.  According to

Plaintiffs, because "a tort cause of action cannot accrue until an injury is sustained," *Kronos, Inc.*

*v. AVX Corp.*, 81 N.Y.2d 90, 94 (1993), their claims against S&P did not accrue until their

investments caused them economic loss—*i.e.*, until, at the earliest, Lifetrade transferred its assets

to ATC Realty in 2012 and thereby rendered Plaintiffs' shares worthless (Dkt. No. 104 at 17–

20).  Indeed, Plaintiffs further argue, because "a fraud action cannot be maintained where the

damages attributable to the fraud are speculative or undeterminable," *Abernathy-Thomas Eng'g*

*Co. v. Pall Corp.*, 103 F. Supp. 2d 582, 599 (E.D.N.Y. 2000), their claims might not even have

accrued until 2016, when it finally became clear that refinancing efforts had failed (Dkt. No. 104

at 18).

Plaintiffs, though, misapply these principles of New York law.  After all, Plaintiffs

suffered ascertainable injury due to S&P's alleged fraud as soon as they invested in "securities

[that] were worth less than their price at the time of purchase," *Varga*, 48 N.Y.S.3d at 26, even if

further damages lay in wait down the line.  Put another way, a driver who is misled into buying a

---

such reliance has occurred.  Indeed, S&P itself does not suggest otherwise.  (*See* Dkt. No. 87 at
5.)

jalopy at a hotrod price need not wait until she is stranded by the side of the road to seek relief. To be sure, Plaintiffs point out that Lifetrade "appeared to be doing well" in its early years. (Dkt. No. 104 at 19.) But while that initial success might be relevant to the question of when Plaintiffs should have discovered that they had been fleeced, it does not change the fact that Plaintiffs' own theory of fraud is that S&P tricked them into investing in funds that were "too risky to rate" (Compl. ¶ 99)—an injury that was complete as soon as the money changed hands.

Thus, although those plaintiffs who invested in the Lifetrade Funds on or after April 24, 2011, have timely filed their fraud claims, the same cannot necessarily be said for those plaintiffs who invested earlier.

## II.  *Discovery*

That those plaintiffs who invested in the Lifetrade Funds prior to April 24, 2011, failed to bring suit within six years of the accrual of their fraud claims, however, does not by itself render those claims untimely. Rather, those claims remain viable if they were brought within "two years from the time [Plaintiffs] . . . discovered the fraud, or could with reasonable diligence have discovered it," N.Y. C.P.L.R. § 213(8), or, in other words, if Plaintiffs would have been unable to discover S&P's alleged fraud through reasonable diligence prior to April 24, 2015.

Determining when discovery was reasonably possible turns on when Plaintiffs "w[ere] 'possessed of knowledge of facts from which [the fraud] could be reasonably inferred.'" *Sargiss v. Magarelli*, 12 N.Y.3d 527, 532 (2009) (last alteration in original) (quoting *Erbe v. Lincoln Rochester Tr. Co.*, 3 N.Y.2d 321, 326 (1957)). Specifically, "[a] duty of inquiry arises when the facts would suggest fraud to a person of ordinary intelligence." *United Teamster Fund v. MagnaCare Admin. Servs., LLC*, 39 F. Supp. 3d 461, 477 (S.D.N.Y. Aug. 14, 2014). And once a set of triggering facts has put a plaintiff on inquiry notice, "knowledge of a fraud" is imputed to

the plaintiff unless she undertakes some "investigative efforts" in response.[24]  *Cohen v. S.A.C.*

*Trading Corp.*, 711 F.3d 353, 361 (2d Cir. 2013).

On a motion to dismiss, it is "often inappropriate" to determine precisely when a plaintiff

was first on inquiry notice, *LC Capital Partners, LP v. Frontier Ins. Grp., Inc.*, 318 F.3d 148,

156 (2d Cir. 2003) (quoting *Marks v. CDW Comput. Ctrs., Inc.*, 122 F.3d 363, 367 (7th Cir.

1997)), but a court may do so if "the facts on the face of the complaint and related documents"

are sufficient to establish a "duty of inquiry" as a matter of law, *id.*  And although resolving the

issue of inquiry notice at the pleading stage is said to be reserved for "extreme circumstances,"

*In re Sumitomo Copper Litig.*, 120 F. Supp. 2d 328, 347 (S.D.N.Y. 2000) (quoting *In re

Prudential Sec. Inc. Ltd. P'ships Litig.*, 930 F. Supp. 68, 76 (S.D.N.Y. 1996)), the Second Circuit

has done exactly that in "a vast number of cases," *LC Capital Partners*, 318 F.3d at 156 (quoting

*Dodds v. Cigna Sec., Inc.*, 12 F.3d 346, 352 n.3 (2d Cir. 1993)).

Turning to the case at hand, Plaintiffs could easily have discovered the basis for their

fraud claims against S&P had they investigated prior to April 24, 2015.  All that separated them

from the 2009 report that revealed S&P's alleged duplicity was a $600 paywall fee.  (Compl.

¶ 174.)  Indeed, Plaintiffs found the report just months after realizing, allegedly for the first time,

in November 2016 that the value of their investments had "irreversibly and entirely diminished."

---

[24] Plaintiffs correctly note that in *Merck & Co. v. Reynolds*, 559 U.S. 633 (2010), the Supreme Court held in the context of the federal securities laws that "the 'discovery' of facts that put a plaintiff on 'inquiry notice' does not automatically begin the running of the limitations period," *id.* at 653.  (Dkt. No. 104 at 14.)  But that point is irrelevant, as *Merck* dealt with the discovery rule laid out in 28 U.S.C. § 1658(b)(1), *see Merck*, 559 U.S. at 653, a specific federal statute that is not at issue here, *see Ayers v. Piaker & Lyons, P.C.*, 748 F. App'x 368, 370 (2d Cir. 2018) (summary order) (rejecting the view that the standards applicable to 28 U.S.C. § 1658(b)(1) apply to state-law discovery rules, including New York's); *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 150 (2d Cir. 2012) (concluding that *Merck* "does not apply outside the realm of the statute that it interpreted").

(Compl. ¶ 171; *see also* Compl. ¶ 174.)  An investigation, too, would have revealed that—as S&P has represented without rebuttal—some financial news outlets, including the *Financial Times*, made contemporaneous reference to the 2009 report (Dkt. No. 87 at 6–7) and that S&P had ceased rating Lifetrade in 2011 (Compl. ¶ 94), a decision that Lifetrade's own management publicly admitted in 2014 stemmed from "concern[] about the asset class" (Dkt. No. 77-13 at 3).

The critical question, then, is whether the facts of which Plaintiffs were or should have been aware by April 24, 2015, were sufficient as a matter of law to put Plaintiffs on notice of the need to undertake the investigation that would have revealed this evidence.  They were.  As early as 2012, Lifetrade suspended redemptions (Compl. ¶ 127), stopped sending annual reports to investors (Compl. ¶ 172), and updated its website with a link to a notice that Wells Fargo had effected foreclosure (Compl. ¶ 160).  Armed with this information, at least one investor was moved to file a fraud suit in Curaçao in December 2012, alleging in part that Smith and Marcum had undersold Lifetrade's fiscal woes.  (Dkt. No. 94-2 ¶ 16.)  Plaintiffs too, then, might have been more curious as to whether Lifetrade in fact represented the safe, stable investment that S&P had supposedly marketed—just as they were years later, in 2016, when they realized that Lifetrade was not just in distress but entirely sunk.  Of course, Plaintiffs allege that they had been warned at the time of investment that "they should not expect 'for their investment to be liquid' and that [Lifetrade] '[was] not suitable for persons who require[d] regular income from their investments.'"  (Compl. ¶ 150 (quoting Dkt. No. 77-26 at 2, 9).)  But even if reasonable investors might have believed that Lifetrade's variable liquidity would sometimes cause it to suspend redemptions in the ordinary course of business, it strains credulity to believe that reasonable investors would have been similarly nonplussed by a liquidity shortage so severe that it led Lifetrade to fall into default and foreclosure.

Nor does it change the analysis that Smith and Marcum allegedly took pains to downplay the suspicious developments of 2012, periodically promising investors that refinancing efforts were underway and that Lifetrade might be able to reclaim its assets. (Compl. ¶¶ 162, 165–67.) After all, "reassuring statements will prevent the emergence of a duty to inquire or dissipate such a duty only if an investor of ordinary intelligence would reasonably rely on the statements to allay the investor's concern." *LC Capital Partners*, 318 F.3d at 155. And by April 24, 2015, Plaintiffs had been hearing Smith and Marcum's reassuring words for over two years without any indication that Lifetrade had actually locked down any new funding source or had come any nearer to reclaiming the assets upon which Wells Fargo had long ago foreclosed. Indeed, these very reassurances acknowledged that the foreclosure posed a "challenge[]" and that Lifetrade's leadership was "hard at work trying to find the best possible solution." (Dkt. No. 77-12 at 2.) This admission that all was not well reinforces the Court's conclusion that Plaintiffs had cause prior to April 24, 2015, to ask whether Lifetrade had been a good investment from the outset.

Ultimately, this is not a case in which Plaintiffs had no reason beyond publicly available press reports and court filings to inquire into S&P's ratings. *See Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 426–36 (2d Cir. 2008). Nor is this a case in which investors put money into a fund they knew to be "particularly risky" and so had no reason to question their ensuing losses. *CSAM Capital, Inc. v. Lauder*, 885 N.Y.S.2d 473, 475 (App. Div. 1st Dep't 2009). Rather, this is a case in which Plaintiffs claim they were misled into believing that they were making a safe investment but then failed to make any inquiry once clear signs emerged of the very risks they allege had not been disclosed. The 2012 foreclosure, in other words, "relate[d] . . . directly to the . . . omissions the Plaintiffs later allege[d] in their action against [S&P]" and so, taken in combination with the other circumstances alleged, was sufficient to put Plaintiffs on

inquiry notice prior to April 24, 2015, as to the integrity of S&P's ratings. *Staehr*, 547 F.3d at 427 (quoting *Newman v. Warnaco Grp., Inc.*, 335 F.3d 187, 193 (2d Cir. 2003)).

The Court therefore dismisses Counts Sixteen and Seventeen as untimely with respect to all plaintiffs who invested in the Lifetrade Funds prior to April 24, 2011.

### b.      Merits

The Court next turns to S&P's argument that even those fraud claims that were timely filed must be dismissed for failure to state a cognizable legal claim. (Dkt. No. 87 at 10–21.)

To state a fraud claim under New York law, a plaintiff must allege "a misrepresentation or a material omission of fact which was false and known to be false by [the] defendant, made for the purpose of inducing the other party to rely upon it, justifiable reliance of the other party on the misrepresentation or material omission, and injury." *Pasternack v. Lab. Corp. of Am. Holdings*, 27 N.Y.3d 817, 827 (2016) (alteration in original) (quoting *Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 178 (2011)). Here, S&P argues that Plaintiffs have failed to plausibly allege that it made any actionable misrepresentations (Dkt. No. 87 at 10–15), that it acted with fraudulent intent (Dkt. No. 87 at 16–17), that Plaintiffs reasonably relied on any supposed misrepresentations (Dkt. No. 87 at 17–20), or that these misrepresentations caused Plaintiffs' injuries (Dkt. No. 87 at 20–21). The Court addresses each argument in turn.

### I.      Actionable Misrepresentations

To start, S&P contends that it cannot be liable for fraud because it is not plausibly alleged to have made any misrepresentations or material omissions in the first place. (Dkt. No. 87 at 10–15.) Plaintiffs, though, maintain that S&P's monthly reports were misleading both on their face and in light of S&P's failure to mention the concerns about life settlements that it disclosed in its non-public 2009 research report. (Dkt. No. 104 at 25–29.)

The Court first addresses the credit ratings themselves. While "courts in this circuit—and around the country—have consistently held that credit ratings are statements of opinion," such ratings may be actionable if "the holder of the opinion reflected in the rating did not believe the opinion at the time that it was made." *Tolin v. Standard & Poor's Fin. Servs., LLC*, 950 F. Supp. 2d 714, 722 (S.D.N.Y. 2013); *see also Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*, 888 F. Supp. 2d 431, 455–56 (S.D.N.Y. 2012) (characterizing credit ratings as "fact-based opinions," *id.* at 455 (emphasis omitted), that may be actionable if they "*both* misstate[] the opinions or beliefs held by the [speaker] *and* [are] false or misleading with respect to the underlying subject matter they address," *id.* at 456).

Here, S&P argues that Plaintiffs have not alleged facts from which it is plausible to infer that it disbelieved the positive ratings it awarded Lifetrade. While acknowledging that the 2009 report doubts the safety of investing in bonds composed of "pool[ed] and repackag[ed] cash flows from a pool of life insurance policies" (Dkt. No. 77-4 at 2), S&P maintains that its rating of Lifetrade took no view on whether the fund represented a good investment, but rather spoke only to "the strong credit quality of the [fund's] eligible investments and counterparties" (Dkt. No. 77-8 at 3) or, put another way, to "the likelihood that the insurance companies that issued the life insurance policies" Lifetrade purchased "would pay the policy benefits when they became due" (Dkt. No. 87 at 13). In other words, in S&P's view, the 2009 report simply "does not speak to the same subject as S&P's fund credit rating" and so offers no indication that S&P had doubts about its credit rating at the time it was issued. (Dkt. No. 109 at 12.)

Plaintiffs offer no real rebuttal. They do not, for example, offer an alternative reading of S&P's "Af" rating that would suggest that it was intended to assess Lifetrade's overall integrity, as opposed to the reliability of the insurers that issued the policies Lifetrade held as assets. (*See*

Dkt. No. 77-8 at 4 (describing the ratings as "assessments of the overall credit quality of a fund's portfolio" and noting that they are "not recommendations to purchase, sell, or hold a security").) Nor have Plaintiffs alleged that S&P doubted—or had reason to doubt—that these insurers could indeed be trusted to pay out policy proceeds as needed. Certainly, Plaintiffs allege that *Lifetrade* represented that S&P's ratings were suggestive of Lifetrade's overall investment quality (*see* Compl. ¶¶ 74, 80), but Plaintiffs offer no basis for imputing these alleged misrepresentations to S&P. *See Eurycleia Partners, LP v. Seward & Kissel, LLP*, 849 N.Y.S.2d 510, 512–13 (App. Div. 1st Dep't 2007) ("[I]n the absence of a fiduciary relationship with plaintiffs, [a defendant] [is] not required to correct a misstatement that it did not make."). Plaintiffs, therefore, have failed to plausibly allege that the "Af" ratings themselves were false or misleading.

This conclusion, though, does not end the ballgame. S&P's ratings did not appear in a vacuum but, rather, were embedded in monthly reports alongside other information. And Plaintiffs allege that this other information—life expectancy projections provided by 21st Services and NAV figures concocted by Lifetrade—was deeply flawed. (*See* Compl. ¶¶ 61, 85.) Unlike the "Af" rating itself, moreover, the life expectancy figures—which suggested the rate at which Lifetrade would be able to accumulate cash holdings—and the figures related to the value of Lifetrade's assets spoke to the fund's overall financial health and not to the narrow question of whether the insurers backing the policies Lifetrade held could be trusted to pay proceeds.

Critically, S&P never disputes that Plaintiffs have plausibly alleged that the NAV and life expectancy figures were misleading. Instead, S&P merely points out that "there is no allegation that S&P either knew or believed that any factual information in the reports was inaccurate." (Dkt. No. 87 at 14.) But that argument speaks to whether Plaintiffs have plausibly alleged that S&P acted with the requisite mental state—an issue to which the Court turns below, *see infra*

Section III.C.3.a.i.b.II—and not to whether the information S&P chose to convey was in fact false or misleading. While an expression of *opinion* is considered to be true if the speaker believes the expression, *see Tolin*, 950 F. Supp. 2d at 722, S&P never disputes that the NAV and life expectancy figures it published in the reports that accompanied its ratings were fact-based representations.[25] S&P's mental state is thus irrelevant to the truth or falsity of those figures.

So, while Plaintiffs have failed to adequately allege that S&P's credit ratings constituted actionable misrepresentations in and of themselves, Plaintiffs have made out a plausible case at the pleading stage that the monthly reports within which those ratings were embedded contained false data that sent the misleading impression that investment in Lifetrade was a sound prospect.

## II.    *Scienter*

S&P next argues that Plaintiffs have failed to allege facts that give rise to an inference that it acted with scienter, the requisite mental state. (Dkt. No. 87 at 16–17.)

Under New York law, a misrepresentation can typically form the basis for a fraud claim only if it was "known to be false" by the speaker. *Mandarin Trading Ltd.*, 16 N.Y.3d at 178 (quoting *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 421 (1996)). But Plaintiffs have not alleged that S&P knew the NAV and life expectancy figures it published were false. Although the complaint alleges that "insiders in the life settlement industry" knew "as early as 2004" that 21st Services "ha[d] been accused of systematically and significantly understanding its [life expectancy] evaluations" (Compl. ¶ 51), it never alleges that S&P was among those insiders. Nor does it allege that the unnamed insiders had any particular reason to know that the

---

[25] The Lifetrade Movants, for their part, do argue that the life expectancy figures cannot constitute actionable misrepresentations for purposes of a fraud claim. (Dkt. No. 95 at 31–32.) But for the reasons explained in Section III.C.3.b.i.b, *infra*, the Court rejects that argument.

accusations against 21st Services had merit. The Court therefore concludes that Count Sixteen—which charges S&P with *knowing* misrepresentation—must be dismissed.

Plaintiffs, though, have also alleged that S&P issued its monthly reports with reckless disregard as to whether the information within was true or false. (Compl. ¶¶ 296–301.) Courts have occasionally suggested that such recklessness satisfies the scienter element of a fraud claim under New York law, and S&P never argues that the law is otherwise. *See Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 177 (2d Cir. 2015) (describing scienter under New York law as requiring "conscious misbehavior or recklessness" (quoting *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 291 (2d Cir. 2006))); *Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 104 (2d Cir. 2001) (noting that a misrepresentation "either known by [the] defendant to be untrue or recklessly made" can support a fraud claim under New York law); *Alio v. Saponaro*, 520 N.Y.S.2d 245, 245 (App. Div. 3d Dep't 1987) (similar).

The Court therefore turns to the question of whether Plaintiffs have adequately alleged that S&P acted recklessly in issuing its monthly statements. In making this assessment, the Court recognizes that Plaintiffs' complaint is subject to the heightened pleading standards of Rule 9(b). And courts in this Circuit have regularly held that Rule 9(b) requires a complaint raising a common-law fraud claim to allege facts that create not just a plausible inference, but a "*strong* inference," of scienter. *380544 Can., Inc. v. Aspen Tech., Inc.*, 633 F. Supp. 2d 15, 29 (S.D.N.Y. 2009) (emphasis added); *see also Stephenson v. PricewaterhouseCoopers, LLP*, 768 F. Supp. 2d 562, 571 n.1 (S.D.N.Y. 2011). *But see Chorches*, 865 F.3d at 88 (denying that Rule 9(b) "elevate[s] the standard of certainty that a pleading must attain beyond the ordinary level of plausibility" required of civil complaints). The parties, too, agree that Rule 9(b) imposes this requirement (*see* Dkt. No. 87 at 16; Dkt. No. 104 at 29), so the Court asks whether the

complaint here raises a strong inference that S&P acted with recklessness, which in this context means "conscious recklessness—*i.e.*, a state of mind approximating actual intent, and not merely a heightened form of negligence," *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009) (emphases omitted) (quoting *Novak v. Kasaks*, 216 F.3d 300, 312 (2d Cir. 2000)); *see also Charles Schwab & Co. v. Retrophin, Inc.*, No. 14 Civ. 4294, 2015 WL 5729498, at *9 (S.D.N.Y. Sept. 30, 2015) (applying this standard to a common-law fraud claim).[26]

The principal basis Plaintiffs offer for inferring that S&P acted recklessly in failing to scrutinize the life expectancy and NAV figures it published in its monthly reports is that S&P raised concerns about life settlements in a non-public October 2009 report. Of course, this report cannot create a strong inference that any S&P reports issued *prior* to October 2009 evidenced reckless disregard of risks that were "either known to [S&P] or so obvious that [S&P] must have been aware of [them]." *S. Cherry St.*, 573 F.3d at 109 (emphasis omitted) (quoting *In re Carter-Wallace, Inc. Sec. Litig.*, 220 F.3d 36, 39 (2d Cir. 2000)); *see In re PXRE Grp., Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 536 (S.D.N.Y. 2009) (noting that scienter can be inferred where defendants were aware of specific contrary information "*at the same time* they made their misleading statements" (quoting *In re Marsh & Mclennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 484 (S.D.N.Y. 2006))). Nor does the complaint allege any other facts from which it is

---

[26] A complaint may also satisfy the scienter requirement by alleging facts that "show that the defendant had both the 'motive and opportunity' to commit the alleged fraud." *Charles Schwab*, 2015 WL 5729498, at *9 (quoting *Lerner*, 459 F.3d at 290). Because the Court ultimately concludes that Plaintiffs have adequately alleged S&P's recklessness, it need not decide whether S&P's wish to maintain a fee-generating relationship with Lifetrade gave S&P a legally sufficient motive for painting Lifetrade in a falsely favorable light. *Compare, e.g.*, *Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*, 651 F. Supp. 2d 155, 179 (S.D.N.Y. 2009) (finding a ratings agency's fee arrangement to be a sufficient basis for inferring scienter), *with, e.g.*, *Prickett v. N.Y. Life Ins. Co.*, 896 F. Supp. 2d 236, 246 (S.D.N.Y. 2012) ("[A] general profit motive, such as the motive to earn fees, is not a sufficient motive to commit fraud.").

possible to draw such an inference.[27]  Thus, Plaintiffs have failed to plausibly allege scienter with respect to any statements S&P made prior to the report's October 13, 2009 publication.

Statements that S&P made after October 13, 2009, though, are another story.  S&P's October 2009 report identified exactly those risks that made investment in Lifetrade a dubious proposition.  For example, the report cautioned that the incentives of underwriters like 21st Services were "not necessarily in alignment with investors' interests" and that the potential for "underwriting errors" could "have dramatic effects on cash flows."  (Dkt. No. 77-4 at 3.)  And, the report went on, "life settlement originators" like Portsmouth "ha[d] either limited or no track record" and faced an incentive "to focus more on their [own] growth than on potential underwriting problems."  (*Id.*)  That S&P doubted the integrity of settlement providers and their underwriters as early as October 2009 raises a strong inference that S&P ignored known risks when it decided to publish the life expectancy figures it received from 21st Services and the NAV figures it received from Lifetrade without subjecting those figures to scrutiny.

S&P makes two attempts to underplay the significance of the 2009 report.

First, S&P argues that the 2009 report addressed *securitizations—i.e.*, life settlements packaged together in bonds—and not the sort of *mutual funds* in which Plaintiffs invested.  (Dkt. No. 87 at 16–17.)  This distinction, however, is scarcely relevant, because the specific risks identified in the 2009 report apply just as readily to life settlements pooled in funds as they do to life settlements pooled in bonds.  Indeed, the very sort of "underwriting errors" that the 2009 report contemplated (Dkt. No. 77-4 at 3) were among the alleged reasons that the life expectancy and NAV figures published in S&P's monthly ratings reports were misleading.

---

[27] To the extent Plaintiffs argue that a strong inference of S&P's pre-2009 recklessness can be drawn from the complaint's allegations that 21st Services had been accused of distorting its life expectancy projections as early as 2004, the Court disagrees for the reasons already given.

Second, S&P argues that Plaintiffs have failed to raise a strong inference that the S&P employees who issued the ratings reports were aware of the 2009 report or the risks it identified. (Dkt. No. 109 at 14–15.) Thus, S&P contends, Plaintiffs have failed to adequately allege "that someone whose intent could be imputed to [S&P] acted with the requisite scienter." *Silvercreek Mgmt. v. Citigroup, Inc.*, 248 F. Supp. 3d 428, 439 (S.D.N.Y. 2017) (quoting *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008)). But the 2009 report clearly "was available" to the S&P employees responsible for rating Lifetrade "at the same time" they issued their ratings reports. *In re Ambac Fin. Grp., Inc. Sec. Litig.*, 693 F. Supp. 2d 241, 267 (S.D.N.Y. 2010) (quoting *In re Marsh & Mclennan*, 501 F. Supp. 2d at 484). And while Plaintiffs have not identified the specific, New York–based employees alleged to have had ultimate approval authority over S&P's monthly reports about Lifetrade (*see* Compl. ¶ 76), one can easily infer that those individuals were or should have been aware of a report coming out of the same office (Compl. ¶ 90) and addressing a closely related topic.

Ultimately, then, the Court concludes that Plaintiffs have adequately alleged that S&P acted recklessly in publishing purportedly false NAV and life expectancy figures following the release of the October 13, 2009 report that might have called those figures into doubt.

### III.    Reliance

Turning to the next element of Plaintiffs' fraud claims, S&P contends that Plaintiffs have failed to allege that they reasonably relied on its alleged misstatements. (Dkt. No. 87 at 17–20.)

New York law requires that a plaintiff alleging fraud establish "actual reliance" on a specific misrepresentation or omission. *Int'l Fund Mgmt. S.A. v. Citigroup Inc.*, 822 F. Supp. 2d 368, 387 (S.D.N.Y. 2011). To be sure, in fraud cases arising under the *federal* securities laws, "reliance on . . . omitted information may be presumed where such information is material,"

*Black v. Finantra Capital, Inc.*, 418 F.3d 203, 209 (2d Cir. 2005), but contrary to Plaintiffs' suggestion (*see* Dkt. No. 104 at 32 & n.28), courts have "repeatedly refused to import this presumption into New York common law," *Int'l Fund Mgmt.*, 822 F. Supp. 2d at 387. Thus, Plaintiffs must plausibly allege that S&P's "misrepresentation[s] or omission[s] [were] a 'substantial factor in inducing [them] to act the way that [they] did.'" *Ge Dandong v. Pinnacle Performance Ltd.*, No. 10 Civ. 8086, 2013 WL 5658790, at *9 (S.D.N.Y. Oct. 17, 2013) (quoting *Curiale v. Peat, Marwick, Mitchell & Co.*, 630 N.Y.S.2d 996, 1002 (App. Div. 1st Dep't 1995)).

In an effort to do so, Plaintiffs have alleged that they "would not have invested in Lifetrade or continued their investment had they known . . . that S&P believed life settlements were too risky to rate." (Compl. ¶ 99.) In other words, Plaintiffs have alleged two "specific action[s] or inaction[s]," *In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*, 995 F. Supp. 2d 291, 313 (S.D.N.Y. 2014), induced by S&P's reports: (1) purchasing shares in the Lifetrade Funds and (2) choosing not to redeem shares they had already purchased.

S&P challenges both theories of reliance. As for Plaintiffs' claim that the S&P reports induced them to retain shares they otherwise would have redeemed—*i.e.*, Plaintiffs' "holder" claim—S&P argues that New York law does not recognize this theory of reliance. (Dkt. No. 87 at 19.) And as for Plaintiffs' claim that the reports induced them to buy shares they otherwise would not have bought, S&P argues that Plaintiffs have not plausibly alleged that they actually relied on the reports or that any such reliance was reasonable. (Dkt. No. 87 at 18–20.)

The Court begins with Plaintiffs' holder claims. New York courts have generally held that such claims are "not actionable," *Varga*, 48 N.Y.S.3d at 26, because calculating damages would require a court to assess "the value that might have been realized" had an investor sold off its holdings "in a hypothetical market exchange that never took place," *Starr Found. v. Am. Int'l*

*Grp., Inc.*, 901 N.Y.S.2d 246, 252 (App. Div. 1st Dep't 2010). Some courts, however, have observed that this rationale for rejecting holder claims does not apply where, as here, an investor allegedly suffered "the loss of an entire investment" after being induced to retain shares that were ultimately drained of all their value. *Beach v. Citigroup Alternative Invs. LLC*, No. 12 Civ. 7717, 2014 WL 904650, at *17 (Mar. 7, 2014); *see also Matana v. Merkin*, 957 F. Supp. 2d 473, 490–91 (S.D.N.Y. 2013) (acknowledging that the viability of a holder claim under such circumstances remains an open question under New York law); *Universal Inv. Advisory SA v. Bakrie Telecom PTE, Ltd.*, No. 14 Civ. 652890, 2016 WL 1590934, at *9 (N.Y. Sup. Ct. Apr. 18, 2016) ("[C]ourts have been split on whether New York law bars all holder claims or whether holder claims which merely allege hypothetical lost profits are not viable."), *aff'd as modified*, 62 N.Y.S.3d 1 (App. Div. 1st Dep't 2017).

The Court need not resolve this difficult and contested point of New York law, however. After all, even those authorities that recognize a narrow category of potentially viable holder claims would require an investor to plead reliance "with particularity." *Starr Found.*, 901 N.Y.S.2d at 259 (Moskowitz, J., dissenting); *see also Matana*, 957 F. Supp. 2d at 491 (rejecting a holder claim on the ground that the investor had "failed to plead such a claim with the particularity required by Rule 9(b)"). Here, Plaintiffs allege that they learned about S&P's reports from their investment advisors when making the initial decision to invest (Compl. ¶ 98), but the complaint contains no allegations as to how or whether S&P's reports continued to reach Plaintiffs after they had already invested. To the extent that Plaintiffs allege reliance on reports they viewed at the time of investment, their holder claims are indistinguishable from their claims that they *invested* in reliance on S&P's reports. And to the extent that Plaintiffs purport to have relied on communications they received thereafter, the complaint says nothing about the

circumstances of those communications—a silence that is particularly striking in light of the fact that S&P stopped issuing reports in April 2011 (Compl. ¶ 94), nearly a year before Lifetrade locked Plaintiffs into their investments by suspending redemptions (Compl. ¶ 127).[28]  *Cf. Beach*, 2014 WL 904650, at *15–18 (concluding that investors had stated a viable holder claim where the investors had allegedly declined to exercise their redemption rights during a discrete 90-day window in reliance on an allegedly misleading letter sent just days before the window opened).

Having concluded that Plaintiffs have failed to allege holder claims with the requisite particularity, the Court turns to Plaintiffs' claim that they relied on S&P's allegedly misleading reports when deciding to invest in the Lifetrade Funds in the first place.  In connection with this claim, S&P argues that certain groups of plaintiffs have failed to plausibly allege actual reliance and that all plaintiffs have failed to plausibly allege that their reliance was reasonable.[29]

As for actual reliance, S&P argues that any plaintiff who invested in the Lifetrade Funds before S&P began rating Lifetrade in June 2006 or after S&P stopped rating Lifetrade in April 2011 could not have actually relied on S&P's reports.  (Dkt. No. 87 at 18.)  The Court agrees that those plaintiffs who invested prior to June 2006—to the extent that their claims are not already time-barred, *see supra* Section III.C.3.a.i.a—have failed to plausibly allege actual reliance.  But the Court sees no basis for concluding at the pleading stage that those plaintiffs who invested *after* S&P stopped issuing ratings are barred from attempting to prove reliance on S&P's earlier

---

[28] Plaintiffs themselves admit that the complaint never "allege[s] that each Plaintiff received every monthly report S&P issued, nor even that ratings concerning offshore investments were publicly accessible."  (Dkt. No. 104 at 23.)  And indeed, Plaintiffs go so far as to acknowledge that the complaint is agnostic on whether or not it even ever "came to the attention of individual investors" that S&P at some point discontinued its ratings of Lifetrade.  (*Id.*)

[29] S&P argues in addition that Plaintiffs' allegations of reliance are too conclusory to satisfy Rule 9(b)'s requirement that fraud be pleaded with particularity.  (Dkt. No. 87 at 17–18.)  The Court rejects this argument for the reasons given in Section III.C.3.b.i.a, *infra*.

statements, especially given that S&P is not alleged to have issued subsequent corrections or credit downgrades that might have rendered reliance on its earlier pronouncements unreasonable as a matter of law. *See Robinson v. Deutsche Bank Tr. Co. Ams.*, 572 F. Supp. 2d 319, 322 (S.D.N.Y. 2008) ("[W]hether or not reliance on alleged misrepresentations is reasonable in the context of a particular case is intensely fact-specific and generally considered inappropriate for determination on a motion to dismiss." (quoting *Stamelman v. Fleishman-Hillard, Inc.*, No. 02 Civ. 8318, 2003 WL 21782645, at *7 (S.D.N.Y. July 31, 2003))).[30]

As for the reasonableness of any reliance, S&P makes two arguments. First, S&P argues that Plaintiffs, as "sophisticated investors," should have noticed the flaws in S&P's reports themselves. (Dkt. No. 87 at 19.) "It is well established that where sophisticated businessmen engaged in major transactions enjoy access to critical information but fail to take advantage of that access, New York courts are particularly disinclined to entertain claims of justifiable reliance." *Terra Secs. Asa Konkursbo v. Citigroup, Inc.*, 740 F. Supp. 2d 441, 448 (S.D.N.Y. 2010) (quoting *Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1541 (2d Cir. 1997)). But beyond alleging that Lifetrade put its investors through an unelaborated "application process" (Compl. ¶ 38), the complaint says nothing about Plaintiffs' sophistication. Moreover, S&P's lone basis for arguing that Plaintiffs might have doubted S&P's reports is that 21st

---

[30] It is not entirely clear to the Court that Plaintiffs have alleged that they themselves, as opposed to their investment advisors, ever actually viewed S&P's reports. (*See* Compl. ¶ 98.) To the extent that any given plaintiff was never directly exposed to S&P's alleged misstatements, the Court has some question as to whether that plaintiff can establish reliance. *See Pasternack*, 27 N.Y.3d at 828–29 (declining to "extend the reliance element of fraud to include a claim based on the reliance of a third party, rather than the plaintiff," *id.* at 829, but acknowledging that a plaintiff can allege fraud to the extent that a third party "acted as a conduit to relay the false statement to plaintiff, who then [personally] relied on the misrepresentation," *id.* at 828). But because S&P does not argue for dismissal on this basis, the Court declines to consider it at present.

Services had been accused in 2004 of distorting its life expectancy figures. (Dkt. No. 87 at 19–20.) The Court has already explained why those earlier accusations were insufficient to require S&P to question the integrity of 21st Services' predictions. *See supra* Section III.C.3.a.i.b.II. For the same reasons, the Court likewise has no basis for concluding that those accusations were sufficient to put Plaintiffs on notice of the alleged flaws in 21st Services' figures.

Second, S&P argues that because it did not rate either of the Feeder Funds, investors in those funds could not have reasonably relied on its ratings of Lifetrade. (Dkt. No. 87 at 18.) But Plaintiffs have alleged that the Feeder Funds invested exclusively in Lifetrade. (Compl. ¶¶ 31–32.) It therefore stands to reason that any false statements that could have led a reasonable investor to believe that direct investment in Lifetrade was a winning proposition could likewise have produced reasonable reliance in the Feeder Funds' investors.

The Court therefore concludes that Plaintiffs have plausibly alleged the reliance required to state a viable fraud claim.

## IV. Loss Causation

Finally, S&P argues that Plaintiffs have failed to plausibly allege that its credit reports caused their economic injury. (Dkt. No. 87 at 20–21.) Under New York law, a fraud claim requires a "nexus between [a defendant's] alleged misrepresentations and plaintiff's losses." *Laub v. Faessel*, 745 N.Y.S.2d 534, 537 (App. Div. 1st Dep't 2002). Even if an investor pleads that it "would not have invested *but for* [a given] misrepresentation," it cannot recover on a fraud claim if it "lost [its] money for *wholly unrelated reasons* (say, the market crashing)." *Loreley Fin. (Jersey) No. 4 Ltd. v. UBS Ltd.*, 978 N.Y.S.2d 615, 620 (Sup. Ct. 2013). Here, S&P argues, Plaintiffs' injury was allegedly caused by the transfer of Lifetrade's assets to ATC Realty—an act "unrelated to the credit quality of Lifetrade's underlying assets." (Dkt. No. 87 at 21.)

S&P's argument relies on a narrow interpretation of Plaintiffs' fraud claim that this Court has already rejected. Put simply, S&P points out that the "Af" credit ratings it awarded Lifetrade assessed the credit quality of the insurers that issued the life insurance policies Lifetrade held as assets and argues that Plaintiffs have not alleged that their injury was attributable to the failure of those insurers. But while S&P is correct that Plaintiffs cannot claim any injury based on the "Af" credit ratings themselves, *see supra* Section III.C.3.a.i.b.I, Plaintiffs have also plausibly alleged that the NAV and life expectancy figures in S&P's monthly reports gave a misleading impression of Lifetrade's liquidity and profitability, *see id.* Given that S&P itself acknowledges that Lifetrade's "liquidity crisis" prompted Plaintiffs' losses (Dkt. No. 87 at 21 (emphasis omitted)), these allegations are sufficient to "support the inference that [Plaintiffs] 'would have been spared all or an ascertainable portion of [their] loss'" had S&P's allegedly false depiction of Lifetrade's fiscal health not induced Plaintiffs to make their investments, *Loreley Fin.*, 797 F.3d at 189 (quoting *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 175 (2d Cir. 2005)).

***

To summarize: Count Sixteen is dismissed in full, and Count Seventeen is likewise dismissed, except with respect to those plaintiffs who invested in the Lifetrade Funds on or after April 24, 2011, in reliance on the life expectancy and NAV figures contained in S&P reports that were published on or after October 13, 2009.

### ii. Negligent Misrepresentation (Count Eighteen)

Plaintiffs next charge S&P with negligent misrepresentation in connection with its monthly credit-rating reports. (Compl. ¶¶ 302–07.) Because these claims, which are "closely aligned with [P]laintiffs' intentional fraud claims," are subject to a six-year statute of limitations,

*Maverick Fund, L.D.C. v. Comverse Tech., Inc.*, 801 F. Supp. 2d 41, 62–63 (E.D.N.Y. 2011), the Court dismisses the Count Eighteen claims of all plaintiffs who invested prior to April 24, 2011.

Turning to the merits, S&P argues that Plaintiffs' negligent-misrepresentation claims fail irrespective of whether Plaintiffs have plausibly alleged fraud. (Dkt. No. 87 at 21–22.) To state a claim of negligent misrepresentation under New York law, a plaintiff must allege that "(1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment." *Hydro Inv'rs, Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 20 (2d Cir. 2000). Here, S&P argues, Plaintiffs have failed to plausibly allege that they had the requisite "special relationship," *id.*, with S&P.

New York law has long defined the special relationship necessary to support a negligent-misrepresentation claim as "either privity of contract between the plaintiff and the defendant or a relationship 'so close as to approach that of privity.'" *Sykes v. RFD Third Ave. 1 Assocs., LLC*, 15 N.Y.3d 370, 372 (2010) (quoting *Ultramares Corp. v. Touche*, 255 N.Y. 170, 182–83 (1931)). To establish such a relationship, a plaintiff must show among other things that she was a "known party" in whom the defendant's alleged misstatement was intended to induce reliance. *Id.* at 373 (quoting *Credit All. Corp. v. Arthur Andersen & Co.*, 65 N.Y.2d 536, 551 (1985)).

Plaintiffs maintain that they have plausibly alleged the required relationship because they, as "members of a select group of offshore investors," were alleged to have been the target audience for S&P's reports. (Compl. ¶ 305; *see also* Dkt. No. 104 at 38–40.) Under New York

law, though, this is not enough. That a defendant "knew in general that prospective [commercial participants] would rely on" its statements is insufficient to establish a special relationship. *Sykes*, 15 N.Y.3d at 373; *see also Westpac Banking Corp. v. Deschamps*, 66 N.Y.2d 16, 19 (1985) (dismissing negligent misrepresentation claim where plaintiff had claimed only that "it was one of a class of 'potential [recipients of defendant's false statement],' to which class as a whole [defendant] owed a duty"). In keeping with this principle, the Second Circuit has held, as especially relevant here, that no special relationship exists between a ratings agency and an investor that loses money after investing in securities that the agency has rated favorably, absent "allegations of any direct contact between [the plaintiff] and the Rating Agenc[y]." *Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 114–15 (2d Cir. 2012).

Because the complaint contains no allegations that S&P's reports were addressed to any plaintiff specifically known to S&P, it fails to state a claim for negligent misrepresentation against S&P under New York law. Count Eighteen is therefore dismissed.

### b. The Lifetrade Movants

The Court turns next to the four common-law claims that Plaintiffs have asserted against the Lifetrade Movants. In two fraud counts, Plaintiffs allege that the Lifetrade Movants made knowing misrepresentations to induce investment in the Lifetrade Funds (Compl. ¶¶ 224–30) and, similarly, conspired with 21st Services to do the same (Compl. ¶¶ 314–17). The remaining two counts charge the Lifetrade Movants with negligent misrepresentation (Compl. ¶¶ 231–37) and fraudulent breach of fiduciary duty (Compl. ¶¶ 238–41). The Court addresses the fraud, negligent misrepresentation, and fiduciary breach claims in that order.

### i.    Fraud (Counts Nine and Twenty)

Plaintiffs assert two counts of fraud against the Lifetrade Defendants.  One count alleges that the Lifetrade Defendants induced Plaintiffs' investments by misrepresenting, among other things, Smith's history, the value of Lifetrade's assets, and the consequences of the Settlement Agreement.  (Compl. ¶¶ 224–30.)  The other count, similarly, alleges that the Lifetrade Defendants conspired with 21st Services to induce investment by presenting false life expectancy projections to potential investors.  (Compl. ¶¶ 314–17.)

From the outset, the Court is able to narrow the scope of these claims in two ways.

First, the Court agrees with the Lifetrade Movants that it need consider only those alleged misrepresentations that predate the March 2012 suspension of redemptions.  (Dkt. No. 95 at 34–35.)  Under New York law, a plaintiff "cannot sustain a cause of action for fraud if defendant's misrepresentation did not form the basis of reliance."  *Sec. Inv'r Prot. Corp. v. BDO Seidman, L.L.P.*, 95 N.Y.2d 702, 709 (2001).  But after redemptions were suspended, Plaintiffs were locked in to their investments regardless of anything the Lifetrade Movants said or failed to say.  And while Plaintiffs identify their choice not to file suit earlier as the detrimental action that was induced by the Lifetrade Movants' post–March 2012 misrepresentations (Dkt. No. 106 at 34), that argument gives the game away:  if the Lifetrade Movants' post-suspension statements operated to prevent Plaintiffs from asserting fraud claims they would have asserted but for those statements, the statements themselves can hardly be said to form a basis for the claims.[31]

---

[31] Here too, Plaintiffs argue that New York law does not always require actual reliance (Dkt. No. 106 at 34), claiming that reliance may be presumed where the basis for a fraud claim is the alleged omission of facts that "a reasonable investor might have considered . . . important," *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153–54 (1972).  As the Court has noted, though, *see supra* Section III.C.3.a.i.b.III, this presumption applies to claims under the federal securities laws and is not typically recognized in cases applying New York common law. *See Sec. Inv'r Prot. Corp. v. BDO Seidman, LLP*, 222 F.3d 63, 73 (2d Cir. 2000).  In any event,

Second, as the Lifetrade Movants argue (Dkt. No. 95 at 32–34), many plaintiffs' claims are untimely.  As explained above, *see supra* Section II.C.3.a.i.a, the claims of those plaintiffs who invested prior to April 24, 2011—outside the relevant statute of limitations—are time-barred.[32]  Fighting this conclusion, Plaintiffs make two arguments for why, in their view, their fraud claims against the Lifetrade Movants should be considered timely.  (Dkt. No. 106 at 33–34.)

Plaintiffs first invoke the "continuing violation" doctrine, which "is usually employed where there is a series of continuing wrongs and [which] serves to toll the running of a period of limitations to the date of the commission of the last wrongful act."  *Henry v. Bank of Am.*, 48 N.Y.S.3d 67, 70 (App. Div. 1st Dep't 2017) (quoting *Selkirk v. State*, 671 N.Y.S.2d 824, 825 (App. Div. 3d Dep't 1998)).  Under this rule, Plaintiffs claim, their claims accrued only after the Lifetrade Movants' allegedly fraudulent conduct ceased in 2016.  (Dkt. No. 106 at 29.)  But "where a plaintiff asserts a single breach—with damages increasing as the breach continued—the continuing wrong theory does not apply," *Henry*, 48 N.Y.S.3d at 70, and, as the Court has already explained, *see supra* Section III.C.3.a.i.a.I, each plaintiff's fraud claim was complete at the time of investment, *see Cupersmith v. Piaker & Lyons P.C.*, No. 14 Civ. 1303, 2016 WL 5394712, at *11 (N.D.N.Y. Sept. 27, 2016) ("New York courts have repeatedly refused to apply

---

to the extent that New York courts may have suggested openness to such a presumption in certain narrow circumstances, *see Ackerman v. Price Waterhouse*, 683 N.Y.S.2d 179, 191–94 (App. Div. 1st Dep't 1998), there is no reason why the presumption would apply where, as here, out-of-pocket reliance is a logical impossibility.

[32] Contrary to the Lifetrade Movants' contentions, though, this result does not bar the Court's consideration of allegedly false *statements* made prior to April 24, 2011.  (Dkt. No. 95 at 34.)  As the Court has explained, an investor that put money into the Lifetrade Funds after that date might have relied on statements made prior to that date when deciding to do so—and the reasonableness of any such reliance is a question of fact that requires a more developed record.

the continuing violation doctrine to common law fraud-based claims which, like Plaintiffs' claims, accrue at the time of purchase.").

Plaintiffs next argue (Dkt. No. 106 at 30) that the Lifetrade Movants are equitably estopped from invoking the statute of limitations because the Lifetrade Movants' alleged misrepresentations about the status of refinancing efforts following the execution of the Settlement Agreement caused Plaintiffs to delay filing suit. *See Shondel J. v. Mark D.*, 7 N.Y.3d 320, 326 (2006) (explaining that equitable estoppel protects a party who, "while justifiably relying on the opposing party's actions, has been misled into a detrimental change of position"). But even if the Lifetrade Movants' post-settlement reassurances might have prevented Plaintiffs from challenging the settlement itself, Plaintiffs offer no reason why those reassurances should have led them to refrain from investigating and challenging the allegedly fraudulent acts that led to the liquidity shortfall that triggered the suspension of redemptions and ensuing Settlement Agreement in the first place. And, as the Court has just explained, those pre-suspension acts are the only alleged acts that could plausibly have produced the reliance necessary for Plaintiffs' fraud claims. Accordingly, the claims of those plaintiffs that invested prior to April 24, 2011, are time-barred.

With the scope of Plaintiffs' claims thus narrowed, the Lifetrade Movants make three arguments as to why those claims should be slimmed further or dismissed altogether. First, they argue that Plaintiffs have failed to satisfy Rule 9(b)'s particularity requirement. (Dkt. No. 95 at 27–31). Second, they argue that Plaintiffs have failed to allege an actionable misrepresentation insofar as their claims rely on S&P's ratings and 21st Services' life expectancy figures. (Dkt. No. 95 at 31–32.) And third, they argue that Plaintiffs have failed to adequately plead that their financial injury was caused by any of the misrepresentations alleged. (Dkt. No. 95 at 35–36.)

Each of these arguments is considered in turn.

### a.     Rule 9(b)

As noted, Rule 9(b) requires that a complaint alleging fraud "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Chorches*, 865 F.3d at 81 (quoting *Ladas*, 824 F.3d at 25). The Lifetrade Movants argue that the complaint here fails to comply with Rule 9(b) because it "do[es] not identify any specific statements that were fraudulent" and does not identify which of the Lifetrade Defendants was responsible for each statement. (Dkt. No. 95 at 28.) Moreover, the Lifetrade Movants continue, the complaint does not specify which plaintiffs viewed which statements, when those plaintiffs did so, or what detrimental action those plaintiffs took in reliance. (Dkt. No. 95 at 29–31.)

Although the complaint is hardly a model, the Court concludes that Plaintiffs have put the Lifetrade Movants on notice of the substance of their fraud claims with the required specificity. To start with, the complaint does identify specific statements alleged to have been false or misleading. These statements include Lifetrade prospectuses that omitted mention of Smith's checkered past or certain self-dealing fee arrangements (Compl. ¶¶ 100–04); financial statements that displayed 21st Services' flawed life expectancy projections and Lifetrade's flawed NAV figures (Compl. ¶¶ 85, 105–06); and Investment Consultant Reports aimed at falsely convincing investors of Lifetrade's financial stability between 2008 and 2011 (Compl. ¶¶ 107–11).[33]

---

[33] In addition, Plaintiffs identify allegedly false statements that Smith and Marcum made in the lead-up to the Settlement Agreement in an effort to convince investors to support the surrender of Lifetrade's assets. (Compl. ¶ 128 & n.19.) And Plaintiffs also identify several false statements that Smith and Marcum allegedly made after the execution of the Settlement Agreement in the hopes of dissuading investors from comprehending the extent of their losses. (Compl. ¶¶ 14, 165–66.) Because these statements were made after the March 2012 suspension

And while Plaintiffs do not in every instance ascribe a particular speaker to each of these statements, the Lifetrade Movants are wrong to suggest that Rule 9(b) necessarily requires that Plaintiffs do so. (*See* Dkt. No. 111 at 13–14.) Rather, if an alleged misrepresentation appears in "official materials produced in connection with the sale of securities," Rule 9(b) does not require a plaintiff to "disaggregate" a set of allegedly responsible defendants as long as "the complaint gives grounds for attributing the statements to the group." *Loreley Fin.*, 797 F.3d at 173; *see also In re Parmalat Sec. Litig.*, 377 F. Supp. 2d 390, 401 (S.D.N.Y. 2005) ("It is not necessary . . . that [a] plaintiff connect a particular insider or affiliate to an allegedly deceptive corporate statement."). Given Plaintiffs' allegations that Smith, as Lifetrade's founder and CEO (Compl. ¶ 100), involved himself in the day-to-day operations of the Lifetrade Funds, *see supra* Section III.B.2.a.i, and that Marcum served as the "chief marketing officer . . . in charge of [the Lifetrade Funds'] investor communications" (Compl. ¶ 34), Plaintiffs have provided a plausible basis for inferring Smith and Marcum's involvement in the official investor-facing corporate communications that form the basis for Plaintiffs' fraud claims—*i.e.*, Lifetrade's prospectuses, annual financial reports, and Investment Consultant Reports.[34]

Finally, the Lifetrade Movants fault Plaintiffs for failing to link specific communications to specific investment decisions. Although "[t]he Second Circuit has not yet determined whether

---

of redemptions, though, they cannot form the basis for a fraud claim for the reasons already given.

[34] Because the Court has concluded that the allegedly fraudulent communications issued to investors in connection with the Settlement Agreement are not actionable as a result of Plaintiffs' failure to plausibly allege detrimental reliance, *see supra* Section III.C.3.b.i, the Court need not consider whether Plaintiffs' failure to attribute each of these less formal communications to a specific defendant would otherwise bar Plaintiffs from relying on them as a basis for their common-law fraud claims. And because the Court has dismissed all claims against Portsmouth, *see supra* Section III.B.2.a.iii, it need not consider whether Plaintiffs have offered a plausible basis for inferring Portsmouth's role in the challenged communications.

Rule 9(b)'s heightened pleading requirement applies to allegations of reliance in connection with a common law fraud claim," *DoubleLine Capital LP v. Odebrecht Fin., Ltd.*, 323 F. Supp. 3d 393, 463 n.16 (S.D.N.Y. 2018), courts in this District have held that a plaintiff asserting such a claim "must allege with particularity that it actually relied upon the [defendant's] supposed misstatements," *In re Bear Stearns*, 995 F. Supp. 2d at 312. Courts applying this rule typically require a plaintiff to allege that she "personally read specific actionable misstatements . . . , and then purchased or sold securities in reliance on those misstatements." *In re Marsh & Mclennan*, 501 F. Supp. 2d at 493; *see also id.* at 495 (applying this standard to common-law fraud claims).

Here, though, Plaintiffs *have* alleged that they or their investment advisors "read and reviewed" the allegedly fraudulent materials and that they relied on those materials in choosing to invest in the Lifetrade Funds.[35] (Compl. ¶ 112.) Thus, Plaintiffs have "identif[ied] specific transactions"—Plaintiffs' initial investment in the Lifetrade Funds—as well as "specific reports and statements . . . on which [P]laintiffs claim to have relied" in entering into those transactions. *Fir Tree Capital Opportunity Master Fund, L.P. v. Am. Realty Capital Props., Inc.*, No. 17 Civ. 4975, 2017 WL 10808809, at *5 (S.D.N.Y. Dec. 14, 2017).

The Lifetrade Movants would require more. Specifically, they would require that each of the more than 500 named plaintiffs pinpoint which subset of the closed universe of actionable misrepresentations identified in the complaint prompted its investment decision. But the Court declines to adopt this requirement. Even if the differing circumstances of Plaintiffs' reliance may have implications at the class certification stage, *see Pa. Pub. Sch. Emps. Ret. Sys. v.*

---

[35] As above, *see supra* note 30, the Court has not been asked to decide whether Plaintiffs' fraud claims fail to the extent that Plaintiffs themselves—as opposed to their investment advisors—are not alleged to have received the allegedly fraudulent communications. The Court therefore takes no view on the matter at present.

*Morgan Stanley & Co.*, 772 F.3d 111, 120 (2d Cir. 2014), the complaint has apprised the Lifetrade Movants of what statements they allegedly made, why those statements are alleged to have been fraudulent, and what investment activities those statements allegedly induced.

Indeed, a requirement that each plaintiff specifically allege the precise circumstances of her individual reliance would essentially bar common-law fraud claims from ever proceeding on a class-wide basis. After all, a class-action complaint cannot allege exactly when and how each unnamed class member received an alleged misleading statement, nor can it detail the precise subsequent steps that each plaintiff took upon receipt. But neither New York's courts nor federal courts in this Circuit have adopted a categorical bar on class treatment of common-law fraud claims. *See, e.g.*, *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 224 (2d Cir. 2008) (declining to adopt a "blanket rule that 'a fraud class action cannot be certified when individual reliance will be an issue'" (quoting *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 745 (5th Cir. 1996))), *abrogated on other grounds by Bridge v. Phx. Bond & Indem. Co.*, 553 U.S. 639 (2008); *Ferrari v. Nat'l Football League*, 61 N.Y.S.3d 421, 424 (App. Div. 4th Dep't 2017); *Ackerman v. Price Waterhouse*, 683 N.Y.S.2d 179, 192 (App. Div. 1st Dep't 1998) ("[R]eliance issues are no bar to class certification where identical representations are made in writing to a large group.").

Although the question is close, the Court concludes that Plaintiffs have satisfied Rule 9(b)'s particularity requirement by alleging that an identified group of investors took specific action (*i.e.*, investment) on the basis of an identified set of alleged misstatements.

### b.      *Actionable Misstatements*

The Lifetrade Movants next argue that, to the extent Plaintiffs' fraud claims rest on the Lifetrade Movants' publication of S&P's credit ratings or 21st Services' life expectancy figures, Plaintiffs have failed to plausibly allege any actionable misstatements. (Dkt. No. 95 at 31–32.)

As for the S&P ratings, the Court rejects the Lifetrade Movants' argument that the ratings are, as opinions (*see* Dkt. No. 95 at 32), *per se* incapable of supporting a fraud claim, *see Tolin*, 950 F. Supp. 2d at 722 (noting that credit ratings may be actionable if the speaker "did not believe" them at the time they were communicated).  But, as the Court has explained, Plaintiffs have not plausibly alleged that S&P's ratings here were in fact misleading.  *See supra* Section III.C.3.a.i.b.I.  Thus, while the Lifetrade Movants' *characterizations* of S&P's ratings (*see, e.g.* Compl. ¶ 74) might be actionable if found to be misleading, the Lifetrade Movants' mere repetition of the ratings themselves cannot form a basis for liability in this case.

As for the life expectancy figures, the Lifetrade Movants offer two reasons why they are not actionable.  First, the Lifetrade Movants point out that the figures are "prediction[s] of a future event" and so, supposedly, cannot be misleading.  (Dkt. No. 95 at 31.)  But predictions are not insulated from liability.  Rather, "where one party . . . ha[s] superior knowledge, the expression of an opinion [regarding future events] implies that the declarant knows facts which support that opinion and that he knows nothing which contradicts the statement."  *Probulk Carriers Ltd. v. Peraco Chartering USA LLC*, No. 11 Civ. 5686, 2012 WL 3095319, at *10 (S.D.N.Y. July 20, 2012) (quoting *Kimmell v. Schaefer*, 637 N.Y.S.2d 147, 149 (App. Div. 1st Dep't 1996)).  Here, the complaint alleges that life expectancy underwriters are trusted to employ "sound actuarial principles and reasonably anticipated mortality and morbidity experience" (Compl. ¶ 47), but that 21st Services instead "knowingly issued falsely short life expectancy evaluations" in connection with the policies at issue here (Compl. ¶ 69).  If Plaintiffs can indeed show that 21st Services' predictions were unmoored from the analytical standards that industry participants expect from underwriters, then those predictions may be considered misleading.

Second, the Lifetrade Movants point out that Plaintiffs have not alleged that any one life expectancy prediction in fact proved to be inaccurate. (Dkt. No. 95 at 31.) But this argument is a *non sequitur*. The question here is whether Plaintiffs' claim that 21st Services "issued falsely short life expectancy evaluations" as a matter of course (Compl. ¶ 69) is plausible. Alleging that those evaluations failed to predict the life expectancies of specific individuals is of course one way to establish plausibility, but so too is alleging, as Plaintiffs have, that the evaluations both underestimated the revenue Lifetrade ended up collecting on the policies and unfailingly undershot the projections of a competing underwriter. (Compl. ¶¶ 60–61.) The Court has little trouble concluding that Plaintiffs have plausibly alleged that the graphic depictions Lifetrade sent investors to illustrate the spread of life expectancies across its portfolio holdings (*see, e.g.*, Compl. ¶ 66; Dkt. No. 77-6 at 5) were misleading.[36]

Thus, while the Court agrees with the Lifetrade Movants that Plaintiffs have not plausibly alleged that S&P's "Af" ratings were misleading, the Court arrives at the opposite conclusion with respect to the life expectancy projections the Lifetrade Movants elected to publish.

### c. Causation

Finally, the Lifetrade Movants argue that Plaintiffs have inadequately alleged that their losses were causally tied to the alleged misrepresentations. (Dkt. No. 95 at 35–36.) Under New

---

[36] The Lifetrade Movants also argue that reliance on these life expectancy graphics would not have been reasonable because Lifetrade's financial statements warned that the underlying life insurance policies "might not mature within the expected time period[,] exposing [Lifetrade] to additional risk." (Dkt. No. 77-6 at 23; *see also* Dkt. No. 95 at 32.) The Lifetrade Movants, however, offer no authority for the idea that this single disclaimer made it unreasonable as a matter of law for Plaintiffs to expect that the life expectancy figures Lifetrade chose to publish would at least be methodologically sound. *Cf., e.g.*, *Basis Yield Alpha Fund (Master) v. Goldman Sachs Grp., Inc.*, 980 N.Y.S.2d 21, 31 (App. Div. 1st Dep't 2014) (finding certain "disclaimers and disclosures" insufficient to "preclude, as a matter of law, [a] plaintiff's claim of justifiable reliance on [the defendant's] misrepresentations and omissions").

York law, a fraud plaintiff "must show both that defendant's misrepresentation induced [her] to engage in the transaction in question (transaction causation) and that the misrepresentation directly caused the loss about which [she] complains (loss causation)." *Levy v. Young Adult Inst., Inc.*, 103 F. Supp. 3d 426, 445 (S.D.N.Y. 2015) (quoting *Laub*, 745 N.Y.S.2d at 536). The Lifetrade Movants argue that Plaintiffs have not plausibly alleged either type of causation here.

As for transaction causation, the Lifetrade Movants point out that Plaintiffs have alleged that they understood Lifetrade's "Af" rating to mean that "S&P endorsed Lifetrade as a solid and safe investment," and that the rating, so understood, was "[a] material consideration in deciding to invest their money in Lifetrade." (Compl. ¶ 98; *see also* Dkt. No. 95 at 36.) But because the rating did not in fact represent an overall assessment of the wisdom of investing in Lifetrade, *see supra* Section III.C.3.a.i.b.I, the Lifetrade Movants argue that Plaintiffs' own misunderstanding caused them to invest (Dkt. No. 95 at 36). But an event "can have multiple 'but-for' causes, each one of which may be sufficient to support liability." *Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 n.5 (2d Cir. 2013). Even if Plaintiffs might have been spared investment in the Lifetrade Funds had they better understood S&P's rating, so too might they have been spared had the Lifetrade Movants been forthright about the conflicts of interest, self-dealing fees, and life expectancy distortions that, Plaintiffs allege, were all hidden from investors.

As for loss causation, the Lifetrade Movants argue that Plaintiffs' injuries "resulted from a liquidity event and the Wells Fargo Settlement" (Dkt. No. 95 at 35), and not from misleading statements the Lifetrade Movants made when courting Plaintiffs' investment. But far from being "*wholly unrelated*" to the self-dealing transactions the Lifetrade Movants are alleged to have hidden, and the distorted life expectancy and NAV figures the Lifetrade Movants are alleged to

have promoted, *Loreley Fin.*, 978 N.Y.S.2d at 620, the liquidity crisis that culminated in Plaintiffs' losses is plausibly alleged to have arisen out of those very factors.

Plaintiffs have therefore plausibly alleged transaction and loss causation.

*** 

To summarize, the Court grants the Lifetrade Movants' motion to dismiss Counts Nine and Twenty for failure to state a claim, but only with respect to those plaintiffs who invested in the Lifetrade Funds prior to April 24, 2011, and with respect to any alleged misrepresentations made after March 2012. In all other respects, the motion is denied.

### ii. Negligent Misrepresentation (Count Ten)

In addition to their fraud claims, Plaintiffs raise a claim of negligent misrepresentation against the Lifetrade Movants. (Compl. ¶¶ 231–37.) The Lifetrade Movants seek dismissal of this claim, but their arguments in support of dismissal are identical to the arguments they have made in connection with Plaintiffs' fraud claims. (*See* Dkt. No. 95 at 27–36.) Accordingly, Count Ten meets the same fate as Counts Nine and Twenty: it is dismissed, except with respect to those plaintiffs who invested in the Lifetrade Funds on or after April 24, 2011, and with respect to any alleged misrepresentations made after March 2012.

### iii. Breach of Fiduciary Duty (Count Eleven)

Plaintiffs' final common-law claim against the Lifetrade Movants is a claim of fraudulent breach of fiduciary duty, asserted against Smith and Marcum only. (Compl. ¶¶ 238–41.) According to Plaintiffs, Smith and Marcum committed a fiduciary breach by engaging in undisclosed self-dealing transactions, promoting 21st Services' flawed life expectancy figures, overstating the value of Lifetrade's assets, and transferring Lifetrade's portfolio to ATC Realty via the Settlement Agreement without notice and against investors' wishes. (Compl. ¶ 240.)

Smith and Marcum seek dismissal of this claim on the sole ground that it is time-barred. (Dkt. No. 95 at 25–27.)  In making this argument, they point out that "[b]reach of fiduciary duty claims that seek money damages only are subject to a three-year statute of limitations" under New York law, *Murphy v. Morlitz*, 751 F. App'x 28, 30 (2d Cir. 2018) (summary order), and that Plaintiffs failed to bring suit within three years of the last alleged breach—*i.e.*, the August 14, 2012 Settlement Agreement (Dkt. No. 95 at 27).  Plaintiffs, though, respond that a plaintiff may bring a claim of "fraud-based" fiduciary breach "within [six] years from the date of the fraudulent act or [two] years from the date the party discovered the fraud or could, with due diligence, have discovered it."  *Murphy*, 751 F. App'x at 30 (quoting *Kaufman v. Cohen*, 760 N.Y.S.2d 157, 167 (App. Div. 1st Dep't 2003)).  Under this rule, Plaintiffs maintain, their claims are indisputably timely.  (Dkt. No. 106 at 27–28.)  Furthermore, they argue, their claims would be timely even under a three-year statute of limitations.  (Dkt. No. 106 at 25–26.)

As an initial matter, no party has addressed the fact that where, as here, a shareholder asserts a fiduciary breach claim derivatively on behalf of a company, New York law typically applies a six-year limitations period regardless of whether the claim sounds in fraud.  *See Levy*, 103 F. Supp. 3d at 434–35 (citing N.Y. C.P.L.R. § 213(7)); *In re Gen. Vision Servs., Inc.*, 423 B.R. 790, 793 (S.D.N.Y. 2010); *Skorr v. Skorr Steel Co.*, No. 02 Civ. 8300, 2005 WL 1803075, at *2 (N.Y. Sup. Ct. July 25, 2005) ("A shareholder derivative action, regardless of the theory underlying the claim, is governed by [a] six year statute of limitations . . . .").  Smith and Marcum have therefore failed to establish that it is "clear from the face of the complaint" that Plaintiffs' derivative claims are untimely as a matter of law to the extent that they accrued on or after April 24, 2011.  *Hidalgo v. Johnson & Johnson Consumer Cos.*, 148 F. Supp. 3d 285, 294 (S.D.N.Y. 2015) (quoting *Staehr*, 547 F.3d at 425).

The derivative claim based on the August 14, 2012 Settlement Agreement clearly accrued within this window.  And the derivative claim based on Smith and Marcum's alleged ongoing duplicity throughout the course of the Lifetrade Funds' existence may plausibly be understood to challenge a "continuous course of wrongful conduct," *Cupersmith*, 2016 WL 5394712, at *11 n.8 (quoting *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11 MDL 2262, 2015 WL 6243526, at *135 (S.D.N.Y. Oct. 20, 2015)), such that the claim did not accrue until, at the earliest, Lifetrade lost its assets in 2012.[37]  *See, e.g.*, *Amberger v. Legacy Capital Corp.*, No. 17 Civ. 532, 2017 WL 4863093, at *8 (S.D.N.Y. Oct. 16, 2017) (applying the continuing-violation doctrine to a fiduciary breach claim where the alleged fiduciary, "over an extended period of time, engaged in a pattern of ongoing, wrongful acts"); *Palmeri v. Willkie Farr & Gallagher LLP*, 69 N.Y.S.3d 267, 271–72 (App. Div. 1st Dep't 2017) (applying the continuing-violation doctrine to a fiduciary breach claim).  The Court accordingly declines to dismiss Plaintiffs' derivative fiduciary breach claims at this stage.

The Court next considers Plaintiffs' individual claims.  Here too, the parties may have overlooked a critical issue.  Under New York law, "allegations of mismanagement or diversion of assets by officers or directors to their own enrichment, without more, plead a wrong to the corporation only, for which a shareholder may sue derivatively but not individually."  *Abrams v. Donati*, 66 N.Y.2d 951, 953 (1985); *see also Cortes v. 3A N. Park Ave Rest Corp.*, 998 N.Y.S.2d 797, 817 (Sup. Ct. 2014) (reaffirming this principle).  But Smith and Marcum do not invoke this

---

[37] As the Court explained above, *see supra* Section III.C.3.b.i, the same cannot be said for Plaintiffs' fraud claims, which target a series of discrete, independent investment events rather than a continuing wrong.  *Cf. In re Comverse Tech., Inc. Sec. Litig.*, 543 F. Supp. 2d 134, 155 (E.D.N.Y. 2008) ("The weight of authority in this circuit is skeptical of the application of the continuing violations doctrine in securities fraud cases.").

principle, and the Court declines to dismiss Plaintiffs' individual claims at this juncture on a rationale that Plaintiffs have not yet been given any opportunity to challenge.

Assuming for now, then, that Plaintiffs may assert individual claims of fiduciary breach against Smith and Marcum, the Court considers whether those claims were filed in a timely manner. From the outset, the parties dispute whether the claims are subject to the typical three-year limitations period or the fraud-specific six-year limitations period. Resolution of this question "turns on whether the fraud claim is 'essential' to the breach of fiduciary duty claim, or whether the fraud claim is 'incidental' to the fiduciary duty claim." *Matana*, 957 F. Supp. 2d at 492 (citations omitted). Specifically, where the allegedly fraudulent aspects of a fiduciary breach involve no action and impart no injury above and beyond what is entailed by the breach itself, those aspects are considered incidental, such that the three-year limitations period applies to the breach claim. *See id.* (citing *Corcoran v. N.Y. Power Auth.*, 202 F.3d 530, 545 (2d Cir. 1999)).

To assess whether fraud has been pleaded as an essential aspect of Plaintiffs' fiduciary breach claims, in other words, the Court looks to "the viability of [P]laintiffs' fraud cause of action." *Kaufman*, 760 N.Y.S.2d at 165. As for Plaintiffs' allegations that the Lifetrade Movants induced investment by concealing self-dealing arrangements or by circulating life expectancy and NAV figures known to be false, the Court has already concluded that Plaintiffs have plausibly alleged fraud. *See supra* Section III.C.3.b.i. Plaintiffs' individual fiduciary breach claims based on these allegations, then, are timely insofar as they accrued on or after April 24, 2011.[38] *See N.Y. State Workers' Compensation Bd. v. Consol. Risk Servs., Inc.*, 4

---

[38] Because the parties have not briefed the question of whether Plaintiffs may bring fiduciary breach claims in their individual capacity *at all*—let alone whether those claims, if

N.Y.S.3d 680, 685 (App. Div. 3d Dep't 2015) (concluding that a six-year limitations period applied to a fiduciary breach claim that was "grounded in . . allegations" that the defendants, in a scheme to pocket additional commissions, concealed "issues associated with underwriting deficiencies" and "fraudulently conceal[ed] or misrepresent[ed] the financial condition" of trusts being administered on the plaintiffs' behalf).

As for the transfer of Lifetrade's assets, though, Plaintiffs have not plausibly alleged that fraud forms an "essential" aspect of the claim. *Matana*, 957 F. Supp. 2d at 492. As already noted, *see supra* Section III.C.3.b.i, redemptions had been suspended by the time of the transfer, and no statements or omissions on Smith and Marcum's part could have induced any reliance. Certainly, Plaintiffs allege that Smith and Marcum made after-the-fact efforts to conceal that the transfer had occurred. (*See* Compl. ¶¶ 162, 165–67.) But these efforts were "merely 'the means of accomplishing the breach,'" *Matana*, 957 F. Supp. 2d at 492 (quoting *Powers Mercantile Corp. v. Feinberg*, 490 N.Y.S.2d 190, 193 (App. Div. 1st Dep't 1985)), and caused no injury "distinct" from those caused by the breach itself, *id.* (quoting *Corcoran*, 202 F.3d at 545).

Having concluded that a three-year limitations period applies to Plaintiffs' individual fiduciary breach claims to the extent that they are based on the Settlement Agreement, the Court next asks whether these claims are nonetheless timely.

First, Plaintiffs argue that these claims were timely when filed in 2017 because they did not accrue until 2016. (Dkt. No. 106 at 25–26.) In Plaintiffs' view, no fiduciary breach claim based on the transfer was available prior to 2016 because Plaintiffs had until then been engaged in "efforts to avoid or mitigate any loss that might have resulted" from the transfer. (Dkt. No.

---

viable, are subject to the same accrual analysis as Plaintiffs' derivative claims—the Court takes no view at present on when these claims accrued.

106 at 26.) Due to these efforts, Plaintiffs maintain, their damages—a necessary element of their claim, *see Murphy*, 751 F. App'x at 30—would have been speculative had they filed suit earlier.

This argument is frivolous. Plaintiffs' own complaint characterizes the August 14, 2012 Settlement Agreement as the event that "rendered the Lifetrade [Funds] insolvent and stripped from Plaintiffs any prospect for recoupment of any portion of their investments." (Compl. ¶ 134.) While Plaintiffs maintain that their subsequent efforts might have softened the financial blow, the failure of those efforts "was not the first event by which Plaintiffs could have, by their own theory of the case, alleged damages" arising out of the transfer. *Bd. of Trs. ex rel. Gen. Ret. Sys. of Detroit v. BNY Mellon, N.A.*, No. 11 Civ. 6345, 2012 WL 3930112, at *8 (S.D.N.Y. Sept. 10, 2012). Plaintiffs' fiduciary breach claims based on the transfer therefore accrued no later than August 14, 2012, and so were not brought within three years. *See Malmsteen v. Berdon, LLP*, 369 F. App'x 248, 249 (2d Cir. 2010) (summary order) (recognizing that a claim for breach of fiduciary duty under New York law typically "accrues at the time of the breach").

Second, Plaintiffs argue that Smith and Marcum are equitably estopped from invoking the statute of limitations in connection with the transfer.[39] (Dkt. No. 106 at 30.) As a general rule, equitable estoppel bars a defendant from asserting a statute-of-limitations defense where the defendant has affirmatively engaged in "fraud, misrepresentations, or deception" that is "specifically directed at preventing the plaintiff from bringing suit." *Twersky v. Yeshiva Univ.*, 993 F. Supp. 2d 429, 442 (S.D.N.Y. 2014); *see also Ross v. Louise Wise Servs., Inc.*, 8 N.Y.3d 478, 491 (2007) (explaining that the doctrine applies when a defendant makes "later fraudulent

---

[39] The Court has already explained why equitable estoppel does not apply to fraud claims based on Smith and Marcum's actions prior to the March 2012 suspension of redemptions. *See supra* Section III.C.3.b.i. To the extent that Plaintiffs intend to use those same actions as the basis for a *fiduciary breach* claim that would otherwise be untimely—*i.e.*, one that accrued prior to April 24, 2011, *see supra*—equitable estoppel is unavailable for the same reasons.

misrepresentation[s] . . . for the purpose of concealing [a] former tort"). Here, Plaintiffs point out, Smith and Marcum are alleged to have repeatedly—and falsely—reassured Plaintiffs that the Settlement Agreement was not the terminal act that, in reality, it turned out to be.

The issue is close. On the one hand, Smith and Marcum allegedly told Plaintiffs after the execution of the Settlement Agreement that any "efforts to seek legal recourse would destroy" ongoing refinancing efforts—efforts that were not, in fact, occurring. (Compl. ¶ 273.) And the Court is aware that equitable estoppel is typically treated as "a question of fact, which should be fully developed and determined upon the trial of the action." *Dist. Attorney of N.Y. Cty. v. Republic of the Phil.*, No. 14 Civ. 890, 2016 WL 9022580, at *5 (S.D.N.Y. Jan. 20, 2016) (quoting *St. John's Univ. v. Bolton*, 757 F. Supp. 2d 144, 187 (E.D.N.Y. 2010)). On the other hand, equitable estoppel is an "extraordinary remedy," *Twersky*, 579 F. App'x at 10 (quoting *Clark v. Ravikumar*, 935 N.Y.S.2d 633, 635 (App. Div. 2d Dep't 2011)), appropriate "only under exceptional circumstances," *id.* (quoting *Gross v. N.Y.C. Health & Hosps. Corp.*, 505 N.Y.S.2d 678, 679 (App. Div. 2d Dep't 1986)). And, Smith and Marcum's smooth talk notwithstanding, Plaintiffs were not without warning signs that the transfer was more than temporary.

In the end, though, the Court concludes that Smith and Marcum have failed to show that Plaintiffs cannot plausibly invoke estoppel. Smith and Marcum never dispute that the complaint adequately alleges that they bore a fiduciary duty to Lifetrade's investors. And, as the Second Circuit has recognized, "[a] beneficiary should be entitled to rely upon a fiduciary[] . . . without the necessity of interrupting a continuous relationship of trust and confidence by instituting suit." *Golden Pac. Bancorp v. Fed. Deposit Ins. Corp.*, 273 F.3d 509, 519 (2d Cir. 2001). In light of this consideration, New York regularly tolls "the limitations period for claims arising out of a fiduciary relationship . . . 'until the fiduciary has openly repudiated his or her obligation or the

relationship has been otherwise terminated.'" *Id.* at 518 (quoting *Westchester Religious Inst. v. Kamerman*, 691 N.Y.S.2d 502, 503 (App. Div. 1st Dep't 1999)); *see also Clarendon Nat'l Ins. Co. v. Culley*, No. 11 Civ. 2629, 2012 WL 1453975, at *4 (S.D.N.Y. Apr. 25, 2012) ("Equitable tolling is commonly applied in the context of breach of fiduciary duty claims."). Given Smith and Marcum's "repeated[] assur[ances]" that they were continuing to work "in [Plaintiffs'] best interests" following the Settlement Agreement, *In re Dissolution of Therm, Inc.*, 18 N.Y.S.3d 739, 740–41 (App. Div. 3d Dep't 2015), the complaint plausibly establishes that Plaintiffs were entitled to rely on those assurances and to forbear challenging the agreement in court until the breakdown of the fiduciary relationship had become "clear and . . . known to [them]" in 2016, *Willensky v. Lederman*, No. 13 Civ. 7026, 2015 WL 327843, at *10 (S.D.N.Y. Jan. 23, 2015) (quoting *Evangelista v. Mattone*, 844 N.Y.S.2d 74, 75 (App. Div. 2d Dep't 2007)).

In sum, the Court concludes that Smith and Marcum have failed to show that Plaintiffs' fiduciary duty claims are untimely as a matter of law. Dismissal of Count Eleven is thus unwarranted at present.

### c. The Wells Fargo Defendants

Finally, Plaintiffs assert seven common-law claims against the Wells Fargo Defendants. Two of these claims—one for fraud and one for negligent misrepresentation—are brought both directly and derivatively. As for the remaining five claims—namely, unconscionability of the Settlement Agreement, breach of fiduciary duty, breach of contract, unjust enrichment, and aiding and abetting Smith and Marcum's fiduciary breach—the Wells Fargo Defendants argue that Plaintiffs may proceed in a derivative capacity only. (Dkt. No. 89 at 22–23.) Because Plaintiffs have made no effort to rebut this argument (Dkt. No. 102 at 20 n.24), the Court treats

these five claims as purely derivative.  The Court deals first with Plaintiffs' fraud and

negligent-misrepresentation claims before turning to the purely derivative claims.

### i. Fraud and Negligent Misrepresentation (Counts Four and Five)

Plaintiffs first assert claims of fraud and negligent misrepresentation against Wells Fargo

alone.  (Compl. ¶¶ 199–210.)  In challenging these claims, Wells Fargo argues that Plaintiffs

have failed to plausibly allege, with the specificity required by Rule 9(b), that (1) Wells Fargo

made misleading statements or omissions (Dkt. No. 89 at 31–32); (2) Wells Fargo had a duty to

disclose the information it allegedly concealed (Dkt. No. 89 at 33); (3) Plaintiffs reasonably

relied on any alleged misrepresentations (Dkt. No. 89 at 33–34); or (4) Wells Fargo acted with

scienter (Dkt. No. 89 at 34–35).  The Court addresses only the second of these arguments.

As a starting point, Plaintiffs have not identified any affirmative misrepresentations that

Wells Fargo is alleged to have made.[40]  Rather, Plaintiffs' fraud and negligent-misrepresentation

claims are based on the theory that Wells Fargo "conceal[ed] its plan to . . . seize collateral to

operate its own life settlement business" and "conceal[ed] from investors that the value of

[Lifetrade's] insurance portfolio at the time of [its] alleged 'foreclosure' was $100 million in

excess of [Lifetrade's] debt."  (Dkt. No. 102 at 23.)  Such omissions may serve as the basis for

Plaintiffs' claims, but only if Wells Fargo had a "duty to disclose" the matters that were

allegedly withheld.  *Mandarin Trading Ltd.*, 16 N.Y.3d at 179; *see also Gomez-Jimenez v. N.Y.*

---

[40] Plaintiffs do claim that a senior Wells Fargo director's 2011 statement that "Wells
Fargo was [at that time] looking to exit the life settlement market" (Compl. ¶ 120) was "'a 'partial
or ambiguous statement,'" *Century Pac., Inc. v. Hilton Hotels Corp.*, 528 F. Supp. 2d 206, 232
(S.D.N.Y. 2007) (quoting *Creative Waste Mgmt., Inc. v. Capitol Envtl. Servs., Inc.*, 429 F. Supp.
2d 582, 609 (S.D.N.Y. 2006)).  (*See* Dkt. No. 102 at 24 n.31.)  But Plaintiffs never allege that
they were aware of this statement when it was made, let alone that they made investment
decisions in reliance upon it, and so it bears no particular relevance to their fraud claims.

*Law Sch.*, 956 N.Y.S.2d 54, 60 (App. Div. 1st Dep't 2012) (noting that a fraud or negligent-misrepresentation claim may be based on an omission only if there is "a duty of full and complete disclosure").

New York law recognizes three situations in which "a party to a business transaction" has a duty of disclosure:

> first, where the party has made a partial or ambiguous statement, on the theory that once a party has undertaken to mention a relevant fact to the other party it cannot give only half of the truth; second, when the parties stand in a fiduciary or confidential relationship with each other; and third, where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge.

*Creative Waste Mgmt., Inc. v. Capitol Envtl. Servs., Inc.*, 429 F. Supp. 2d 582, 609 (S.D.N.Y. 2006) (quoting *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993)). Plaintiffs identify no "partial or ambiguous statement[s]" Wells Fargo made to Lifetrade or its investors and no "superior knowledge" that Wells Fargo enjoyed. *Id.* Instead, Plaintiffs argue only that Wells Fargo had a "confidential relationship," *id.*, with Lifetrade (Dkt. No. 102 at 26–28).

The Court is not persuaded. Typically, "parties engaged in an arm's-length business transaction" such as the Loan or Settlement Agreement have no confidential relationship under New York law. *Dembeck v. 220 Cent. Park S., LLC*, 823 N.Y.S.2d 45, 47 (App. Div. 1st Dep't 2006). Plaintiffs, though, hope to get around this rule by pointing out that Wells Fargo at various points served as escrow agent for transactions between Lifetrade and the third-party settlement providers from which Lifetrade bought life insurance policies. (Dkt. No. 102 at 27; *see also* Dkt. Nos. 90-11, 90-12.) But while an escrow agent has fiduciary obligations "*as escrowee*," *Cash v. Titan Fin. Servs., Inc.*, 873 N.Y.S.2d 642, 646 (App. Div. 2d Dep't 2009) (emphasis added) (quoting *Takayama v. Schaefer*, 669 N.Y.S.2d 656, 659 (App. Div. 2d Dep't 1998)), Plaintiffs cite no support for the proposition that those obligations extend past the specific transactions

covered by the escrow agreement, *cf., e.g.*, *T.T.S.G., Inc. v. Kubic*, 639 N.Y.S.2d 825, 826 (App. Div. 1st Dep't 1996) (noting that an escrow agent breaches its fiduciary duties if it "pay[s] escrow funds to others . . . rather than meeting [its] obligation" *under the escrow agreement*).

That point is dispositive. While Wells Fargo likely owed Lifetrade a duty of disclosure with regard to, for example, the status of the funds Wells Fargo held in escrow on Lifetrade's behalf, Wells Fargo's agreement to take on a fiduciary role in connection with certain of Lifetrade's transactions hardly bound Wells Fargo to a duty of full transparency in every unrelated future matter that might arise. *See, e.g.*, *Faktor v. Yahoo! Inc.*, No. 12 Civ. 5220, 2013 WL 1641180, *3 (S.D.N.Y. Apr. 16, 2013) (noting that establishing a disclosure duty on the basis of a confidential relationship requires a "demonstrat[ion] that the defendant was 'under a duty to act for or to give advice for the benefit of another upon matters *within the scope* of the relations'" (emphasis added) (quoting *Flickinger v. Harold C. Brown & Co.*, 947 F.2d 595, 599 (2d Cir. 1991))). Here, there is no allegation that Wells Fargo fell short in any way with respect to its duties under the various escrow agreements it held with Lifetrade. Rather, Wells Fargo is alleged only to have withheld from Lifetrade its motives for entering into an entirely separate agreement—the Settlement Agreement—that arose out of Wells Fargo's role as lender. Even if secret motives, without more, can form the basis for a fraud claim, Plaintiffs have not plausibly alleged that Wells Fargo was under any duty to disclose its motives here.

Counts Four and Five are therefore dismissed.

### ii.     Purely Derivative Claims

The remainder of Plaintiffs' common-law claims against the Wells Fargo Defendants are asserted in a derivative capacity only. The Wells Fargo Defendants argue that these claims must

all be dismissed from the outset for two threshold reasons.  The Court addresses those arguments before turning to the merits of the claims themselves.

### a.  Threshold Arguments

The Wells Fargo Defendants make two arguments in favor of the wholesale dismissal of Plaintiffs' derivative common-law claims.  First, they argue that Plaintiffs are bound by a release of claims in the Settlement Agreement.  (Dkt. No. 89 at 23–24.)  Second, they argue that because Lifetrade itself was just as culpable as they are alleged to have been, the *in pari delicto* doctrine bars Lifetrade from seeking relief through Plaintiffs now.  (Dkt. No. 89 at 24–25.)

### I.  Release of Claims

The Wells Fargo Defendants first argue that Plaintiffs are barred from asserting any derivative common-law claims against them because the Lifetrade Funds agreed as part of the Settlement Agreement to release the Wells Fargo Defendants from "any and all Claims [they had] or may have with respect to any action (or omission)" related to the agreement, the transfer, or Lifetrade's transferred portfolio.  (Dkt. No. 77-2 at 22; *see also* Dkt. No. 89 at 23–24.)

Under New York law, "[i]t is well established that a valid release constitutes a complete bar to an action on a claim which is the subject of the release."  *Glob. Minerals & Metals Corp. v. Holme*, 824 N.Y.S.2d 210, 214 (App. Div. 1st Dep't 2006).  Plaintiffs make no argument that their derivative claims fall outside the scope of the release.  Rather, they contend that the release is not valid.  (Dkt. No. 102 at 20–21.)  In support of this contention, they note that "a release may be set aside on the traditional bases of fraudulent inducement, fraudulent concealment, misrepresentation, mutual mistake or duress."  *Glob. Minerals*, 824 N.Y.S.2d at 214.

Here, the Court has concluded that Plaintiffs have not stated a viable fraud claim in connection with the Settlement Agreement.  *See supra* Sections III.C.2, III.C.3.b.i, III.C.3.c.i.

But that conclusion does not end the matter. The Court has determined that Plaintiffs *have* plausibly alleged that Smith and Marcum's conduct around the Settlement Agreement constituted a fiduciary breach. *See supra* Section III.C.3.b.iii. And, as the Court will explain, *see infra* Section III.C.3.c.ii.b.V, the Wells Fargo Defendants are plausibly alleged to have aided and abetted that breach. So, the question remains: May a corporation's release of claims against a third party be rescinded, in the absence of fraud, where the release arises out of a fiduciary breach that was committed by the corporate officers and knowingly facilitated by the third party?

The parties have cited no New York law on this question, and the Court has found no authority that directly controls. But the Court takes the view that New York courts would likely answer in the affirmative. After all, "where a fiduciary relationship exists between" parties to a contract, "there must be clear proof of the integrity and fairness of a transaction between them, 'or any instrument thus obtained will be set aside or held as invalid,'" *Ajettix Inc. v. Raub*, 804 N.Y.S.2d 580, 588 (Sup. Ct. 2005) (quoting *Gordon v. Bialystoker Ctr. & Bikur Cholim, Inc.*, 45 N.Y.2d 692, 698 (1978)), even in the face of a release of claims, *see id.* at 589. Here, of course, the Settlement Agreement was a contract between a beneficiary (Lifetrade) and a third party (Wells Fargo), and not a contract between a fiduciary (Smith or Marcum) and a beneficiary (Lifetrade). But New York courts will sometimes set aside a third-party transaction executed by a fiduciary in breach of its obligations. *See, e.g.*, *In re Agrest*, 719 N.Y.S.2d 261, 262 (App. Div. 2d Dep't 2001) (voiding a fiduciary's "gratuitous conveyance" of a beneficiary's property to a third party on grounds of fiduciary breach); *cf. Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 250 (2000) (citing the "common law of trusts" for the proposition that "when a trustee in breach of his fiduciary duty to the beneficiaries transfers trust property to a third person, the third person takes the property subject to the trust, unless he has purchased the

property . . . without notice of the fiduciary's breach of duty").  And considerations of equity militate against allowing an unscrupulous fiduciary to double down on a breach by taking the additional step of validly insulating its third-party co-conspirator from any liability for the breach.  In the absence of any authority suggesting that New York law permits such a gambit, the Court declines to hold at this time that it does.

The Court concludes that the Settlement Agreement's release of claims does not bar Plaintiffs' derivative common-law claims against the Wells Fargo Defendants to the extent that the release arose from a fiduciary breach that the Wells Fargo Defendants knowingly abetted.

## II.        *In Pari Delicto*

The Wells Fargo Defendants next argue that the *in pari delicto* doctrine bars Plaintiffs' derivative claims.  (Dkt. No. 89 at 24–25.)  Under that doctrine, "courts will not intercede to resolve a dispute between two wrongdoers."  *Kirschner v. KPMG LLP*, 15 N.Y.3d 446, 464 (2010).  And because traditional agency principles impute a corporate agent's acts to the corporation "even where the agent acts less than admirably, exhibits poor business judgment, or commits fraud," *id.* at 465, *in pari delicto* typically bars shareholders of a company that has committed wrongdoing from bringing a derivative suit against any third-party outsiders that assisted the company in carrying out the wrongful acts, *see id.* at 475–77.

As Plaintiffs point out, though, the doctrine has a relevant exception.  (Dkt. No. 102 at 22.)  Under the "adverse interest exception," a corporate agent's actions are not imputed to the corporation where the agent has "*totally abandoned* his principal's interests and [has] act[ed] *entirely* for his own or another's purposes."  *Kirschner*, 15 N.Y.3d at 466 (second quoting *Center v. Hampton Affiliates, Inc.*, 66 N.Y.2d 782, 785 (1985)).  While this exception is not available where the agent has committed "[a] fraud that by its nature will benefit the corporation"—even if

motivated by a "desire for personal gain"—it may be invoked "in the narrow circumstance where the corporation is actually the victim of a scheme undertaken by the agent to benefit himself or a third party personally, which is therefore entirely opposed . . . to the corporation's own interests." *Id.* at 467. Where this exception does apply, the corporation's agents, rather than the corporation itself, are considered to be the wrongdoers, and the corporation is free to pursue a derivative action against third-party wrongdoers through its shareholders.

The complaint establishes that this exception could plausibly apply here. Although the Wells Fargo Defendants argue that Lifetrade benefitted from the Settlement Agreement "by having its debt extinguished" (Dkt. No. 110 at 12), the complaint—construed in the light most favorable to Plaintiffs—alleges that Lifetrade could have achieved the same result by holding the Wells Fargo Defendants to the foreclosure procedures already set out in the Loan Agreement. (Compl. ¶ 133.) And, Plaintiffs further allege, had Smith and Marcum taken that path, hundreds of millions of dollars would have flowed back into Lifetrade's coffers. (*Id.*) Instead, motivated by personal concerns, Smith and Marcum elected to negotiate a *new* agreement—the Settlement Agreement—that allegedly "rendered the Lifetrade [Funds] insolvent" and produced no commensurate benefit for the company. (Compl. ¶ 134; *see also* Compl. ¶¶ 139–40.)

While the Wells Fargo Defendants may ultimately be able to produce evidence that the decision to supplant the Loan Agreement with the Settlement Agreement did in fact confer some benefit on the Lifetrade Funds, the Court is obliged at this stage in the litigation to accept all of Plaintiffs' allegations as true and to construe them in the light most favorable to Plaintiffs. As a consequence, dismissal on grounds of *in pari delicto* is not presently warranted.

### b.     Merits

Unable to conclude at the pleading stage that Plaintiffs are barred from asserting their

derivative common-law claims—namely, unconscionability, breach of fiduciary duty, breach of

contract, unjust enrichment, and aiding and abetting fiduciary breach—against the Wells Fargo

Defendants, the Court considers the viability of each of these claims.

### I.     Unconscionability (Count Three)

Plaintiffs' first purely derivative claim seeks rescission of the Settlement Agreement on

the ground that it is unconscionable.  (Compl. ¶¶ 190–98.)  New York courts recognize that a

plaintiff may assert unconscionability as a stand-alone cause of action for the rescission of a

contract.  *See K9 Bytes, Inc. v. Arch Capital Funding, LLC*, 57 N.Y.S.3d 625, 630 (Sup. Ct.

2017).  To secure such a remedy, a plaintiff must demonstrate that "the contract was both

procedurally and substantively unconscionable when made."  *Gendot Assocs., Inc. v. Kaufold*,

866 N.Y.S.2d 361, 363 (App. Div. 2d Dep't 2008) (quoting *Gillman v. Chase Manhattan Bank,

N.A.*, 73 N.Y.2d 1, 10 (1988)).  Here, the Wells Fargo Defendants argue only that Plaintiffs have

inadequately pleaded procedural unconscionability.

The hallmark of procedural unconscionability is a bargaining situation characterized by

"an 'absence of meaningful choice on the part of one of the parties.'"  *Mayagüez S.A. v.

Citigroup, Inc.*, No. 16 Civ. 6788, 2018 WL 1587597, at *12 (S.D.N.Y. Mar. 28, 2018) (quoting

*Gillman*, 73 N.Y.2d at 10).  Assessing whether a plaintiff has established such a situation

requires "an examination of the contract formation process and the alleged lack of meaningful

choice."  *Id.* (quoting *Gillman*, 73 N.Y.2d at 10–11).

As explored further below, *see infra* Section III.C.3.c.ii.b.V, the gravamen of Plaintiffs'

complaint here is that Smith and Marcum abandoned the interests of Lifetrade entirely and that

the Wells Fargo Defendants knowingly seized on this lapse by convincing Smith and Marcum to agree to a deal that served their personal interests—and the Wells Fargo Defendants'—but not the interests of the company to which Smith and Marcum owed a fiduciary duty. To the extent that Smith and Marcum were no longer acting on its behalf, then, Lifetrade lacked any "meaningful choice," *Mayagüez S.A.*, 2018 WL 1587597, at *12, over the terms of the Settlement Agreement, and the Wells Fargo Defendants are alleged to have deliberately exploited that vulnerability. The Court is therefore unprepared at this stage in the litigation to conclude that Plaintiffs will be unable as a matter of law to demonstrate that the Settlement Agreement was the product of a procedurally unconscionable negotiating process.

The Court denies the Wells Fargo Defendants' motion to dismiss Count Three.

## II. *Breach of Fiduciary Duty (Count Six)*

Plaintiffs next claim that the Wells Fargo Defendants breached fiduciary duties created by certain contractual agreements that Lifetrade had entered into with various Wells Fargo entities. (Compl. ¶¶ 211–14.) The Wells Fargo Defendants seek to dismiss this claim on the grounds that it is duplicative of Plaintiffs' contract claim, that it is time-barred, and that Plaintiffs have adequately alleged neither the existence of any fiduciary duty nor a breach of any such duty. (Dkt. No. 89 at 26–30.) The Court need only consider the first of these arguments.

Typically, "[w]here the plaintiff and defendant are parties to a contract, and the plaintiff seeks to hold the defendant liable in tort, the plaintiff must prove that the defendant breached a duty 'independent' of its duties under the contract," or else the plaintiff is limited to proceeding under the contract. *Carvel Corp. v. Noonan*, 350 F.3d 6, 16 (2d Cir. 2003); *see also Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162, 193 (S.D.N.Y. 2011) ("Under New York law, 'a cause of action for breach of fiduciary duty that is merely duplicative

of a breach of contract claim cannot stand.'" (quoting *Grund v. Del. Charter Guar. & Tr. Co.*, 788 F. Supp. 2d 226, 249–50 (S.D.N.Y. 2011))).  Here, Plaintiffs as much as concede that the Wells Fargo Defendants' alleged fiduciary relationship with Lifetrade "emerged from the myriad contractual relationships at work."  (Dkt. No. 102 at 33.)

In Plaintiffs' eyes, though, the whole is somehow greater than the sum of its parts.  In entering into multiple distinct contracts with Lifetrade, the argument runs, the Wells Fargo Defendants took on an elevated duty of loyalty that transcended the specific contractual duties established by the individual contracts.  Plaintiffs, though, have cited no authority for the proposition that an all-purpose fiduciary relationship arises where two corporate entities do frequent commercial business with one another.  *See Solutia Inc. v. FMC Corp.*, 456 F. Supp. 2d 429, 456 (S.D.N.Y. 2006) ("Absent 'extraordinary circumstances,' New York law does not recognize the existence of a fiduciary duty between sophisticated commercial entities contracting at arm's length." (quoting *In re Mid-Island Hosp., Inc.*, 276 F.3d 123, 130 (2d Cir. 2002))).

Plaintiffs, in other words, have not plausibly alleged that the Wells Fargo Defendants owed a fiduciary duty to Lifetrade separate and apart from any contractual duties they owed Lifetrade.  As a consequence, Count Six is dismissed as duplicative.

### III.    *Breach of Contract (Count Seven)*

Suitably enough, Plaintiffs next charge the Wells Fargo Defendants with breach of contract.  (Compl. ¶¶ 215–18.)  The complaint, however, is silent on which contractual terms which defendant is alleged to have breached, and how.  Instead, it refers vaguely to "various agreements" between Lifetrade and the Wells Fargo Defendants (Compl. ¶ 216) and alleges that, in negotiating and executing the Settlement Agreement, the Wells Fargo Defendants breached unspecified "contractual duties owed to Lifetrade and its shareholders" (Compl. ¶ 217).

Plaintiffs' briefing provides little elaboration. There, Plaintiffs point to a contractual trust agreement among Lifetrade, Wells Fargo Utah, and Wells Fargo Delaware that tasks the Wells Fargo signatories with a duty to avoid "gross negligence, bad faith or willful misconduct." (Dkt. No. 90-13 at 15; *see also* Dkt. No. 102 at 35.) Plaintiffs also argue that this trust agreement, and certain other contracts between Lifetrade and various Wells Fargo entities contained an implied covenant of good faith and fair dealing pursuant to New York law. (Dkt. No. 102 at 35–36.)

Absent in all of this, however, is any indication of what specific contractual duties were violated, and how. *See Fink v. Time Warner Cable*, 810 F. Supp. 2d 633, 644–45 (S.D.N.Y. 2011) ("[A] breach of contract claim will be dismissed where a plaintiff fails to allege 'the essential terms of the parties' purported contract, including the specific provisions of the contract upon which liability is predicated.'" (quoting *Martinez v. Vakko Holding A.S.*, No. 07 Civ. 3413, 2008 WL 2876529, at *2 (S.D.N.Y. July 23, 2006))); *Kraus v. Visa Int'l Serv. Ass'n*, 756 N.Y.S.2d 853, 853 (App. Div. 1st Dep't 2003) (concluding that contract claims are "properly dismissed" where the complaint "fail[s] to allege the breach of any particular contractual provision"). Of course, even absent a breach of "express contractual obligations," a plaintiff may bring a claim for violation of the implied covenant of good faith and fair dealing that New York law reads into every contract. *Dominick & Dominick LLC v. Deutsche Oel & Gas AG*, No. 14 Civ. 6445, 2016 WL 11259075, at *7 (S.D.N.Y. Aug. 15, 2016) (quoting *Elmhurst Dairy, Inc. v. Bartlett Dairy, Inc.*, 949 N.Y.S.2d 115, 118 (App. Div. 2d Dep't 2012)). But such a claim is available only if the defendant has taken action that "ha[s] the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Id.* (quoting *Fishoff v. Coty Inc.*, 634 F.3d 647, 653 (2d Cir. 2011)). And just as Plaintiffs have not identified a specific contractual

provision that the Wells Fargo Defendants have violated, they have not identified a specific contractual benefit that the Wells Fargo Defendants' alleged bad faith denied them.

Accordingly, Count Seven is dismissed for failure to state a claim.

## IV. Unjust Enrichment (Count Eight)

Next, Plaintiffs assert a claim of unjust enrichment against the Wells Fargo Defendants, on the grounds that they accepted assets worth over $900 million in satisfaction of Lifetrade's $205 million debt and that this self-enrichment ultimately came at Lifetrade's expense. (Compl. ¶¶ 219–23.) New York law recognizes a claim of unjust enrichment where "the defendant has obtained a benefit which in 'equity and good conscience' should be paid to the plaintiff." *Corsello v. Verizon N.Y., Inc.*, 18 N.Y.3d 777, 790 (2012) (quoting *Mandarin Trading Ltd.*, 16 N.Y.3d at 182). But although many cases could "[i]n a broad sense" be slotted into this rubric, "unjust enrichment is not a catchall cause of action to be used when others fail" and is "not available where it simply duplicates or replaces, a conventional contract or tort claim." *Id.*

The Court agrees with the Wells Fargo Defendants that Plaintiffs' unjust-enrichment claims must be dismissed as duplicative. (*See* Dkt. No. 89 at 38.) These claims, after all, almost exactly mirror Plaintiffs' fraudulent conveyance claim (*compare* Compl. ¶¶ 179, 183, *with* Compl. ¶¶ 220, 223) and breach-of-contract claim (*compare* Compl. ¶¶ 217–18, *with* Compl. ¶¶ 220, 223). Although courts will sometimes decline to dismiss an unjust-enrichment claim that is apparently duplicative of a contract claim if the parties dispute the existence of a contract, *see Willman v. Zelman & Assocs., LLC*, No. 11 Civ. 1216, 2012 WL 811512, at *5 (S.D.N.Y. Mar. 12, 2012), the Wells Fargo Defendants have conceded the existence of the contracts upon which Plaintiffs ground their claims here (Dkt. No. 110 at 19–20), and Plaintiffs have identified no scenario in which they might succeed on their unjust-enrichment claims but not on their others.

Count Eight, then, is dismissed as duplicative.

## V. *Aiding and Abetting (Count Thirteen)*

Finally, Plaintiffs claim that the Wells Fargo Defendants aided and abetted Smith and Marcum's fiduciary breach by conspiring with Smith and Marcum to execute the Settlement Agreement and conceal its terms from investors.  (Compl. ¶¶ 247–63.)

To state a claim for aiding and abetting a breach of fiduciary duty under New York law, a plaintiff must allege "(1) a breach by a fiduciary of obligations to another, (2) that the defendant knowingly induced or participated in the breach, and (3) that [the] plaintiff suffered damage as a result of the breach." *Lerner*, 459 F.3d at 294 (quoting *Kaufman*, 760 N.Y.S.2d at 169).  The Court has already concluded that Plaintiffs' fiduciary breach claim against Smith and Marcum survives the Lifetrade Movants' motion to dismiss, *see supra* Section III.C.3.b.iii, and the Wells Fargo Defendants make no independent argument that the complaint fails to state a fiduciary breach claim against Smith and Marcum (Dkt. No. 89 at 35).  Furthermore, the Wells Fargo Defendants do not dispute that Plaintiffs are alleged to have suffered damages as a result of that breach.  The Court, then, asks only whether the complaint adequately alleges that the Wells Fargo Defendants knowingly participated in the breach.

New York courts have explained that the participation element of an aiding and abetting claim requires that "the alleged aider and abettor rendered substantial assistance to the fiduciary in the course of effecting the alleged breach of duty." *Sanford/Kissena Owners Corp. v. Daral Props., LLC*, 923 N.Y.S.2d 692, 695 (App. Div. 2d Dep't 2011).  And substantial assistance, in turn, "occurs when a defendant affirmatively assists, helps conceal or fails to act when required to do so, thereby enabling the breach to occur." *Id.* (quoting *Monaghan v. Ford Motor Co.*, 897 N.Y.S.2d 482, 485 (App. Div. 2d Dep't 2010)).  The Wells Fargo Defendants maintain that the

complaint falls short under this standard in two respects. First, they argue that the complaint does not adequately plead that they had knowledge of the alleged breach. (Dkt. No. 89 at 36.) Second, they argue that the complaint does not allege facts from which it is plausible to infer that they substantially assisted the breach. (*Id.*) The Court, however, disagrees on both points.

As for knowledge, Plaintiffs have plausibly alleged that the Wells Fargo Defendants knew that Smith and Marcum had abandoned their fiduciary roles. In particular, the complaint alleges that, under the Loan Agreement, Lifetrade was entitled to a foreclosure that would have required the Wells Fargo Defendants "to return to Lifetrade any excess sums remaining after payment of the outstanding debt." (Compl. ¶ 133.) But instead of demanding such a foreclosure, Smith and Marcum—whom the Wells Fargo Defendants knew to be "deeply concerned about their potential [legal] exposure" (Compl. ¶ 248)—acceded to Wells Fargo's alleged demands that they enter into a new agreement that represented a much worse deal for Lifetrade (*see* Compl. ¶¶ 254–55, 257). And, to top it all off, the Wells Fargo Defendants specifically required that Smith and Marcum agree to conceal certain aspects of the Settlement Agreement from investors. (Compl. ¶¶ 258–59.) These allegations are sufficient to raise a plausible inference that the Wells Fargo Defendants well knew that Smith and Marcum were doing wrong by Lifetrade's investors and yet decided to steam ahead with the Settlement Agreement nonetheless.

As for substantial assistance, the Wells Fargo Defendants argue only that their exercise of a contractual foreclosure right cannot, as a matter of law, constitute substantial assistance of a fiduciary breach. (Dkt. No. 89 at 36.) To be sure, the "mere demand for the repayment of a bona fide debt does not constitute a corrupt inducement to establish aiding and abetting liability." *Barnet v. Drawbridge Special Opportunities Fund LP*, No. 14 Civ. 1376, 2014 WL 4393320, at *18 (S.D.N.Y. Sept. 5, 2014). But, again, the Wells Fargo Defendants are alleged to have done

more than make a demand for repayment. According to the complaint—which the Court must for present purposes take to be true—had the Wells Fargo Defendants simply wanted to collect what they were owed, they could have invoked the foreclosure procedures in the preexisting Loan Agreement. Instead, though, they are alleged to have exploited Smith and Marcum's personal concerns in order to wring yet more out of Lifetrade. While the evidence might in the end show this narrative to be fanciful, of course, the Court must assume its truth for now.

The Court denies the Wells Fargo Defendants' motion to dismiss Count Thirteen.

### D. Foreign-Law Claims (Counts Twelve, Twenty-Two, Twenty-Three, and Twenty-Four)

Plaintiffs' final set of claims consists of four counts arising under foreign law. One count charges the Lifetrade Defendants with violations of Curaçao law (Compl. ¶¶ 242–46), one count charges all defendants except Wells Fargo with violations of Argentina's consumer-protection statute (Compl. ¶¶ 324–26; Dkt. No. 102 at 24 n.30), one count charges all defendants with violations of Argentina's tort law (Compl. ¶¶ 327–30), and one count—brought on behalf of the Japanese plaintiffs only—charges all defendants with violations of Japanese law (*Benedetto*, No. 17 Civ. 6087, Dkt. No. 48 ¶¶ 331–34).

For the most part, the moving defendants' arguments in favor of dismissing these foreign-law claims are identical to their arguments in favor of dismissing Plaintiffs' common-law claims. (*See* Dkt. No. 89 at 31 n.14; Dkt. No. 95 at 36–38; Dkt. No. 109 at 19 n.12; Dkt. No. 110 at 15–16.) And Plaintiffs themselves identify no meaningful distinctions between New York law and the laws of the various jurisdictions they invoke. (*See* Dkt. No. 102 at 24 n.30.) Rather, Plaintiffs explain that "[t]he foreign law counts simply provide notice of additional laws, in addition to those of New York, under which Plaintiffs believe they would be entitled to relief

based upon the facts alleged in the body of the complaint if the Court's choice-of-law analysis determines that the laws of those jurisdictions are applicable."  (Dkt. No. 106 at 35–36.)

The Court reiterates that New York's substantive law applies to this action in the absence of a conflict between New York law and the law of another relevant jurisdiction.  *See Wall*, 471 F.3d at 422–23.  And the Court further reiterates that "[t]he party claiming that foreign law applies" carries the burden of showing a conflict.  *Fallman*, 2016 WL 316378, at *4.  Because none of the defendants' opening briefs argued for dismissal of Plaintiffs' foreign-law claims on the grounds that they are duplicative, the Court will allow these claims to remain in the case for now.  However, the claims will be dismissed prior to trial unless Plaintiffs demonstrate a relevant conflict of laws that would require the Court to engage in a choice-of-law analysis.

With that word of explanation, the motions to dismiss Counts Twelve, Twenty-Two, Twenty-Three, and Twenty-Four are denied.

## IV.  Conclusion

For the foregoing reasons, S&P, the Lifetrade Movants, and the Wells Fargo Defendants' motions to dismiss are GRANTED in part and DENIED in part.

All claims against Portsmouth are dismissed for lack of personal jurisdiction.  Counts One, Two, Four, Five, Six, Seven, Eight, Fourteen, Fifteen, Sixteen, Eighteen, Nineteen, and Twenty-One are dismissed in full.  Counts Nine, Ten, Seventeen, and Twenty are dismissed as to those Plaintiffs who invested in the Lifetrade Funds prior to April 24, 2011.  And Counts Three, Eleven, Twelve, Thirteen, Twenty-Two, Twenty-Three, and Twenty-Four survive in full.

Defendants shall file their answers to the remaining claims within 21 days of the date of this Opinion and Order.

The Clerk of Court is directed to close the following motions:

- Docket Numbers 86, 88, and 91 in *Aviles*, No. 17 Civ. 2987;

- Docket Numbers 58, 60, and 63 in *Benedetto*, No. 17 Civ. 6087;

- Docket Numbers 55, 57, and 60 in *Acebedo*, No. 17 Civ. 7034;

- Docket Numbers 29, 31, and 34 in *Alvarez*, No. 18 Civ. 128; and

- Docket Numbers 47, 49, and 54 in *Areco*, No. 18 Civ. 2416.

SO ORDERED.

Dated: March 28, 2019
     New York, New York

_____
J. PAUL OETKEN
United States District Judge