UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE LIFETRADE LITIGATION

17-CV-2987 (JPO)

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

Plaintiffs, a collection of foreign investors, brought this derivative action on behalf of the now-defunct Lifetrade investment fund against Defendant Wells Fargo, alleging that Wells Fargo aided and abetted Lifetrade's managers in breaching their fiduciary duties, and that Wells Fargo executed an unconscionable contract with Lifetrade. Before the Court are: Wells Fargo's motion for summary judgment on Plaintiffs' claims (ECF No. 1198); Plaintiffs' motion for summary judgment on their own claims (ECF No. 1208); third-party defendant John Marcum's motion for summary judgment on Wells Fargo's claims against him (ECF No. 1201); and Wells Fargo's motion for judgment on the pleadings and/or summary judgment on Marcum's counterclaims against Wells Fargo (ECF No. 1199). For the reasons that follow, Wells Fargo's motions for summary judgment are granted and the other motions are denied.

I.    **Background**

A.    **Factual Background**

The Court assumes familiarity with the history of this case and recounts only those facts relevant to this opinion. The facts recounted below are taken from the parties' Local Rule 56.1 statements and counterstatements. (*See* ECF No. 1217 ("WF SOF"); ECF No. 1245 ("Pl. Reply SOF"); ECF No 1220 ("Pl. SOF"); ECF No. 1243 ("WF Reply SOF"); ECF Nos. 1213, 1234,

1251, 1258, 1267, 1270.)  Where material facts are disputed, such disputes are noted.[1]  For a

more fulsome description of the life settlement industry, the role that the original Lifetrade funds

---

[1] Local Rule 56.1—"simple to understand and to apply—[is] designed to assist the Court by narrowing the scope of issues to be decided in a motion for summary judgment and by identifying the facts material and admissible to that decision-making process."  *Johnson v. City of New York*, No. 15-CV-6915, 2019 WL 294796, at *10 n.8 (S.D.N.Y. Jan. 23, 2019).  Here, however, the parties have collectively submitted 879 pages of unnecessary, redundant, and improper Rule 56.1 filings.  This briefing includes numerous examples of parties "improperly interject[ing] arguments and/or immaterial facts in response to factual assertions . . . supported by the record, without specifically controverting those assertions."  *Id.*

For example, in its initial 56.1 statement, Wells Fargo recounts two uncontroversial facts about the parties to the litigation—that Lifetrade Management Company LLC, "a Delaware incorporated [LLC], was the investment manager of [Lifetrade Fund B.V.]," and that it "subcontracted the role to Lifetrade Asset Management N.V. . . . a Curaçao [LLC]."  (ECF No. 1217 ("WF SOF") ¶ 8.)  Plaintiffs, in their 56.1 counterstatement admit the truth of these facts, but then add another paragraph asserting that Wells Fargo has "take[n] at face value the complex web of companies created by Smith to create the appearance of meaningful Lifetrade activities or presence in Curaçao."  (ECF No. 1245 ("Pl. Reply SOF") at 4.)  Similarly, Wells Fargo states "HBM Curaçao was a director of LAM Curaçao."  (WF SOF ¶ 9.)  Plaintiffs again admit this, but then also "dispute" it because it "does not reflect that Roy Smith and John Marcum were also directors of LAM Curaçao."  (Pl. Reply SOF at 5.)  This kind of argumentation is not appropriate for a Rule 56.1 statement.

Nor are Plaintiffs exclusively at fault.  Wells Fargo's reply statement—itself 317 pages long and not even a permissible Rule 56.1 filing in the first place—begins with an unauthorized argumentative brief.  (*See* ECF No. 1270.)  It then reproduces numerous times the same boilerplate language taking issue with the false disputes raised in Plaintiffs' 56.1 statement.  (*Id.*)  While Wells Fargo is legally correct that Plaintiffs raised immaterial disputes, its improper response only amplifies the problem.

The parties repeat the same pattern with respect to Plaintiffs' cross-motion for summary judgment, adding a further 232 pages of redundant briefing.  There, Wells Fargo does exactly what it accuses Plaintiffs of doing.  For example, Wells Fargo "dispute[s]" various statements on the grounds that they have "no bearing on . . . the issues underlying Plaintiffs' motion."  (*See, e.g.*, ECF No. 1243 ("WF Reply SOF") at 127.)  That is not a factual dispute appropriate to raise in a Rule 56.1 counterstatement.

As other courts in this district have already observed, "[s]uch flagrant disregard of the Court's Rules cannot stand."  *Johnson*, 2019 WL 294796, at *10 n.8 (collecting cases).  "[T]he net result of counsel's deficiencies has been to impose on the Court and its limited resources the burden of parsing the entirety of the voluminous record in the case to ensure that [their] client's claims receive thorough and just consideration."  *Id.*  "In the future, it simply will not do for counsel to say that genuine issues of material fact exist and then rely on the Court to go find

2

played in it, and the alleged fraud perpetrated on Plaintiffs by Roy Smith and John Marcum, *see generally Ramiro Aviles v. S & P Glob., Inc.*, 380 F. Supp. 3d 221 (S.D.N.Y. 2019).

Plaintiffs are former investors in a set of investment funds and management companies organized under the Lifetrade aegis and incorporated in Curaçao, Ireland, and Delaware. (*See* WF SOF ¶¶ 4-8; Pl. Reply SOF at 2-4.) The various Wells Fargo entities named in this suit—Wells Fargo Bank, N.A., Wells Fargo Utah, and ATC Realty Fifteen, Inc. (collectively "Wells Fargo")—are components of a "national banking association organized under the laws of the United States." (WF SOF ¶¶ 1-3.)

Here, Plaintiffs bring derivative claims on behalf of the vehicle in which they invested, Lifetrade Fund B.V. ("Lifetrade"). Lifetrade was involved in the "multinational life settlements business," in which third parties purchase life-insurance policies from insureds, pay the premiums on those policies, and then collect on policy proceeds when the insureds die. (*See* WF SOF ¶¶ 19-21; Pl. Reply SOF at 9-10.) "Life settlements are an illiquid . . . class of investments" that can carry high risks for investors. (WF SOF ¶ 22; Pl. Reply SOF at 10.) The parties agree that this is in part due to deficiencies in the tertiary market[2] for life settlements. (Pl. SOF ¶¶ 228-29; WF Reply SOF at 152-53.). Roy Smith and John Marcum were intimately involved the

---

them. Much more is expected from an experienced member of the bar of this Court and will henceforth be *strictly* required." *Id.*

[2] Plaintiffs draw, and Wells Fargo accepts, a terminological distinction between a "secondary" and "tertiary" market for life settlements. Lifetrade is alleged to have participated in the secondary market by purchasing policies from insureds. The tertiary market, as used by the parties, refers to an investor-investor market for the sale of "portfolios or blocks" of life settlements, of the kind held by Lifetrade and later by Wells Fargo. (ECF No. 1220 ("Pl. SOF") ¶¶ 228-29; ECF No. 1243 ("WF Reply SOF") at 152-53.) Plaintiffs argue that a tertiary market did not exist; Wells Fargo argues that the market existed, but that there were not publicly available trading prices and that Wells Fargo would have "taken a significant loss" had it sold Lifetrade's portfolio. (*Id.* at 152.)

management of Lifetrade, and Smith was Lifetrade's sole voting shareholder. (*See* Pl. SOF ¶ 21-22, 26-33; WF SOF ¶ 4-6; ECF No. 290 ("Compl.") ¶ 23.)

Wells Fargo became Lifetrade's lender when it acquired Wachovia Bank, N.A. ("Wachovia") following the 2008 financial crisis. (WF SOF ¶ 26.) In mid-2008, Lifetrade entered into a contract with Wachovia (the "Loan Agreement"), which provided *inter alia* a one-year credit facility with a termination date in mid-2009. (*Id.* ¶¶ 25, 28.) Between 2009 and 2012, Wells Fargo and Lifetrade negotiated the first of "at least fourteen" amendments to the Loan Agreement extending the termination date of the credit facility. (*Id.* ¶¶ 41-46.) Plaintiffs argue that Lifetrade was entitled to these renewals under the initial agreement, which it argues "was a three-year facility with 1-year renewals." (Pl. Reply SOF at 19.) The final amendment provided for a facility termination date of June 15, 2012. (WF SOF ¶ 47.)

Though the parties disagree about Wells Fargo's motivations for doing so, they do not dispute that "[a]t the time of the loan's initial maturity and first renewal in June 2009, Wells Fargo informed Lifetrade that it no longer wished to participate in the life settlements business and that Lifetrade should find alternative financing." (*Id.* ¶ 44; Pl Reply SOF at 20.) As a result, Lifetrade engaged an outside placement agent in order to pursue "a potential refinancing of the Wells Fargo loan with another capital provider." (WF SOF ¶ 48.) Although Lifetrade received considerable initial interest and executed at least two non-binding term sheets with potential funders, it was ultimately unable to complete a refinancing deal. (*Id.* ¶¶ 49-64; Pl. Reply SOF at 22-29.) As a result, on June 15, 2012, Lifetrade failed to satisfy its monthly payment obligation, triggering a termination event under the Loan Agreement. (WF SOF ¶¶ 72.)[3] Although Wells

---

[3] Plaintiffs do not dispute any of these facts. Their 56.1 statement denials instead blame Wells Fargo's "predatory" practices for the refinancing failure and subsequent default. (Pl. SOF at 31-32.) As a result, the relevant facts are deemed admitted.

Fargo may have contemplated seizing Lifetrade's portfolio prior to the default, it began formally negotiating a "consensual 'strict foreclosure' via settlement" (the "Settlement Agreement") with Lifetrade's leadership after June 15, 2012.  (WF SOF ¶ 74; Pl. Reply SOF at 32-33; ECF No. 1247-64 at 2-3.)  Wells Fargo "dual track[ed]" a public foreclosure process alongside negotiating the Settlement Agreement, and the parties finalized and signed the Settlement Agreement on August 14, 2012.  (WF SOF ¶¶ 77-78, 82-83; Pl. Reply SOF at 34-36.)

Plaintiffs' still-surviving claims concern the Settlement Agreement.[4]  Wells Fargo argues that the Agreement was in Lifetrade's interests, because Lifetrade's portfolio was underperforming expectations (WF SOF ¶¶ 66-70), market conditions were unfavorable (*id.* ¶¶ 55, 65), and a strict foreclosure preserved the possibility that Lifetrade could repurchase its portfolio at a later time if it were able to secure new financing (*id.* ¶ 102).  Plaintiffs, on Lifetrade's behalf, dispute this.  They allege that Lifetrade's portfolio was actually worth substantially more than its outstanding debt (*compare id.* ¶ 86 *with* Pl. SOF ¶ 103), that Wells Fargo sought to gain hundreds of millions of dollars in profit by holding the portfolio after the foreclosure (Pl. SOF ¶ 161), and that the Settlement Agreement included a number of terms that were harmful to Lifetrade and/or its investors (*id.* ¶¶ 177-84).  They also argue that Wells Fargo effectively coerced Lifetrade into executing the Agreement.  (*Id.* ¶¶ 170-76.)

### B.    Procedural Background

In 2017, Plaintiffs sued multiple parties including Smith, Marcum, Wells Fargo, S&P Global, Inc., and various Lifetrade entities.  *Ramiro Aviles*, 380 F.Supp.3d at 254.  In 2019, the

---

[4] Plaintiffs take the position that Wells Fargo engineered Lifetrade's failure in order to seize its portfolio at a bargain price.  (*See, e.g.*, Pl. Reply SOF at 68.)  As explained below, *infra* Section III.A, such conduct may shed light on Wells Fargo's motives for its conduct, but those motives are not at issue in this opinion.

Court dismissed some of Plaintiffs' claims, allowing others to proceed.  *Id.* at 308.  This included dismissing all but two claims against Wells Fargo—one for unconscionability of the Settlement Agreement, and the other for aiding and abetting alleged fiduciary breaches by Smith and Marcum.  *Id.*  In the intervening years, Plaintiffs' claims against all Defendants other than Smith—deceased and replaced by his estate—and Wells Fargo have been resolved.  *In re Lifetrade Litig.*, No. 17-CV-2987, 2023 WL 6785810, at *3 (S.D.N.Y. Oct. 13, 2023).  While Plaintiffs settled their claims against Marcum, he remains present in the action as a third-party defendant and counterclaimant against Wells Fargo.  *Id.* at 3 n.3.  Fact discovery, including depositions, was completed in August 2023.  *Id.*

Wells Fargo moved for summary judgment as to Plaintiffs' remaining claims on April 5, 2024 (ECF No. 1198), and filed a supporting memorandum of law (ECF No. 1216 ("WF Mem.")).  Plaintiffs opposed the motion on June 5, 2024 (ECF No. 1248 ("Pl. Opp.")), and Wells Fargo replied on July 19, 2024 (ECF No. 1269 ("WF Reply")).  Plaintiffs also moved for summary judgment on April 5, 2024 (ECF No. 1208), and filed a supporting memorandum of law on April 6, 2024 (ECF No. 1221 ("Pl. Mem.")).  Wells Fargo opposed the motion on June 4, 2024 (ECF No. 1244 ("WF Opp.")), and Plaintiffs replied on July 19, 2024 (ECF No. 1272 ("Pl. Reply")).  In connection with these motions, the parties filed a series of Rule 56.1 statements and counterstatements.  (WF SOF; Pl. SOF; WF Reply SOF; Pl. Reply SOF; ECF Nos. 1258, 1270.)[5]

Wells Fargo moved for judgment on the pleadings or summary judgment as to Marcum's counterclaims on April 5, 2024 (ECF No. 1199), and filed a supporting memorandum of law (ECF No. 1211 ("WF Marcum Mem.")).  Marcum opposed the motion on June 4, 2024 (ECF

---

[5] Plaintiffs and Wells Fargo also filed several motions attempting to exclude each other's expert witnesses and their reports (ECF Nos. 1200, 1207, 1238).  Because the Court does not rely on any of the disputed materials in rendering this opinion, the motions are denied as moot.

No. 1233 ("Marcum Opp.")), and Wells Fargo replied on (ECF No. 1268 ("WF Marcum

Reply")).  Marcum also moved for summary judgment on Wells Fargo's third-party claims on

April 5, 2024 (ECF No. 1201), and filed a supporting memorandum of law (ECF No. 1202

("Marcum Mem.")).[6]  Wells Fargo opposed the motion on June 4, 2024 (ECF No. 1241 ("WF

Marcum Opp.")), and Marcum replied on July 19, 2024 (ECF No. 1256 ("Marcum Reply")).  In

connection with the claims involving Marcum, the parties filed a series of Rule 56.1 statements

and counterstatements.  (ECF Nos. 1213, 1234, 1251, 1267.)

     The Court addresses all outstanding matters in this opinion.

## II.    Legal Standard

     Summary judgment is appropriate when "there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is

material if it "might affect the outcome of the suit under the governing law."  *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute is genuine if, considering the record as

a whole, a rational trier of fact could find in favor of the non-moving party.  *Ricci v. DeStefano*,

557 U.S. 557, 586 (2009).  The Court must "resolve all ambiguities and draw all permissible

inferences in favor of the [non-movant]."  *Friend v. Gasparino*, 61 F.4th 77, 84 (2d Cir. 2023)

(quotation marks omitted).

---

[6] Marcum attempted to file a motion for oral argument connected to his motion for summary judgment, but in fact filed only a signature page and certificate of service.  (ECF No. 1204.)  In any event, because oral argument is not necessary and would not promote judicial economy, the motion for oral argument is denied.

III.    **Discussion**

A.    **Aiding and Abetting**

The first of Plaintiffs' two remaining derivative claims is based on Wells Fargo's alleged complicity in Smith and Marcum's breach of their fiduciary duties to the company. (Pl. SOF ¶¶ 193-99.) Only breaches of Smith and Marcum's duties are relevant, because the Court has already held as a matter of law that Wells Fargo did not "owe[] a fiduciary duty to Lifetrade separate and apart from any contractual duties they owed Lifetrade." *Ramiro Aviles*, 380 F. Supp. 3d at 304.

New York courts have explained that aiding and abetting requires that "the alleged aider and abettor rendered substantial assistance to the fiduciary in the course of effecting the alleged breach of duty." *Sanford/Kissena Owners Corp. v. Daral Props., LLC*, 923 N.Y.S.2d 692, 695 (2d Dep't 2011). And substantial assistance, in turn, "occurs when a defendant affirmatively assists, helps conceal or fails to act when required to do so, thereby enabling the breach to occur." *Id*. (quoting *Monaghan v. Ford Motor Co.*, 897 N.Y.S.2d 482, 485 (2d Dep't 2010)). Because Wells Fargo was not "required to [act]" on behalf of Lifetrade beyond its contractual obligations, it must have "affirmatively assist[ed]" or "help[ed] conceal" Smith and Marcum's breaches. *Id.*

Plaintiffs offer two conflicting theories of how Wells Fargo aided and abetted Smith and Marcum. First, Plaintiffs argue that Wells Fargo "employ[ed] 'scare tactics'" (Pl. Reply at 11) in order to "coerce[] Lifetrade's Management" into signing the Settlement Agreement, which included "numerous" false statements and constituted an "unjustified abandonment of shareholders' rights and interests," and to "induce[] Lifetrade Management to deceive shareholders." (Pl. SOF ¶ 199.) Second, Wells Fargo allegedly "conspire[d]" with Smith and

Marcum (Pl. Opp. at 39; *see also* Pl. Reply at 11 n.11), facilitating their conflicts of interest and "self-dealing" (Pl. SOF. ¶ 194; *see also* Pl. Reply at 10).

At the outset, it is helpful to clarify the scope of claims that Plaintiffs may properly assert. First, Plaintiffs' claim is for *aiding and abetting* Smith and Marcum's breaches of *their* fiduciary duties. Wells Fargo can be liable only to the extent that it facilitated wrongdoing by Lifetrade's managers, not for alleged misconduct that Wells Fargo itself committed independently of those managers. For example, because Plaintiffs admit that Wells Fargo acted independently of and adversely to Lifetrade's managers at least until September 23, 2010 (Pl. SOF ¶ 136-37), Wells Fargo's allegedly "coercive and improper behavior" before that date is not relevant to Plaintiffs' aiding and abetting claim (*id.* ¶¶ 114-33 (capitalization altered); Pl. Opp. at 31 (discussing Wells Fargo's "predatory, loan-to-own behavior"); Pl. SOF ¶ 163 (describing Wells Fargo "thwart[ing]" Lifetrade's attempts to refinance).)[7] Similarly, Wells Fargo's conduct after the signing of the Settlement Agreement cannot support an aiding and abetting claim, because, by that time, Smith and Marcum had no control over the company anymore. (*Cf.* Pl. Opp. at 12 (alleging that Wells Fargo retained Lifetrade's old portfolio and earned high returns on it).)

Second, Plaintiffs assert a derivative claim on behalf of Lifetrade, not direct claims on their own behalf. *Ramiro Aviles*, 380 F. Supp. 3d at 298-99. This means that only allegations of harm to Lifetrade, as opposed to its individual shareholders, are relevant. *See In re Bank of Am. Corp. Sec., Derivative, & Emp. Ret. Income Sec. Act (ERISA) Litig.*, 757 F. Supp. 2d 260, 291

---

[7] The Court previously rejected Plaintiffs' direct claims against Wells Fargo based on this conduct, explaining that the bank made no explicit misrepresentations and had no "duty to disclose its motives" to Lifetrade's investors by virtue of being an escrow agent. *Ramiro Aviles*, 380 F. Supp. 3d at 300.

(S.D.N.Y. 2010) ("It is important to distinguish the injury to shareholders *qua* shareholders from any injury to the corporation. If a harm were suffered by the shareholders as shareholders, then the same harm would not be a harm inflicted on the corporation."); *Marx v. Akers*, 88 N.Y.2d 189, 193 (1996) ("The remedy sought is for wrong done to the corporation; the primary cause of action belongs to the corporation; recovery must enure to the benefit of the corporation." (quotation marks omitted)); *Scott v. Allen*, 36 N.Y.S.2d 411, 413 (2d Dep't. 1942) ("As he stands in the place of the corporation, he can enjoy no greater rights with respect to the prosecution of the cause of action than the corporation itself would have if it instituted the action."). And the "corporation does not owe fiduciary duties to its members or shareholders, because recognizing such a duty would lead to the confounding possibility that a shareholder of a corporation could bring a derivative action on behalf of the corporation against the corporation itself." *In re Stillwater Cap. Partners Inc. Litig.*, 851 F. Supp. 2d 556, 569 (S.D.N.Y. 2012) (cleaned up) (quoting *Hyman v. New York Stock Exch., Inc.*, 848 N.Y.S.2d 51, 53 (2007)). This means that Plaintiffs may not use their derivative aiding and abetting claim to recover for harm to their own pocketbooks stemming from their lack of information about the goings-on at Lifetrade. *Cf. Haberman v. Murchison*, 331 F. Supp. 180, 187 (S.D.N.Y. 1971), *aff'd*, 468 F.2d 1305 (2d Cir. 1972) (rejecting derivative liability where alleged injury was to only individual shareholders); *Kamerman v. Steinberg*, 123 F.R.D. 66, 69-70 (S.D.N.Y. 1988) ("Plaintiffs cannot bring the federal securities claims on [the company's] behalf unless the company *itself* was victimized through some misrepresentation by Defendants . . . . If Plaintiffs fail to make this showing, the derivative suit must be dismissed . . . .")

What is left are two relevant theories: that Wells Fargo induced (or colluded with) Smith and Marcum to sign such an unfavorable Settlement Agreement that signing it was a breach of

their fiduciary duties to Lifetrade; and that Wells Fargo induced Smith and Marcum to conceal the Settlement Agreement from shareholders. Neither theory survives summary judgment.

### 1. The Substance of the Settlement Agreement

Plaintiffs' allegations about the substance of the Settlement Agreement fail because, for two broad reasons, Plaintiffs cannot show that it was a breach of Smith and Marcum's fiduciary duties to the company. First, Plaintiffs have failed to raise a material question of fact as to whether the Settlement Agreement was unreasonable or contrary to Lifetrade's interests, much less that it was so unreasonable that merely signing it was a breach of Lifetrade's management's fiduciary duties. While the deal clearly did not end up enriching Lifetrade's shareholders, Lifetrade had no practical alternative, nor have Plaintiffs presented any evidence that could establish that the portfolio was worth more than Lifetrade's outstanding debt. Second, even if the deal was suboptimal, Smith and Marcum's discretionary decision to sign it is protected by New York's business judgment rule.

Regarding the first reason, Plaintiffs do not dispute that, prior to the Settlement Agreement, Lifetrade defaulted on its debt to Wells Fargo (WF SOF ¶ 72; Pl. Reply SOF at 31-32), and that Lifetrade repeatedly tried and failed to secure substitute financing from a different lender (WF SOF ¶¶ 49-64; Pl. Reply SOF at 22-29).[8] Nor do Plaintiffs dispute that Wells Fargo

---

[8] While Plaintiffs purport to "dispute" some of these statements in Wells Fargo's statements of fact, they do not actually contest any of the underlying facts or provide alternative accounts. Their 56.1 statement denials instead blame Wells Fargo's "predatory" practices for the refinancing failure and subsequent default. (Pl. SOF at 31-32.) As a result, the relevant facts are deemed admitted. In each instance, Plaintiffs dispute the "assertions Wells Fargo seeks to draw" from the stated facts and argue that the facts are "incomplete" because they do "not take into account . . . Wells Fargo's predatory role and coercive course of conduct in creating the situation" in the first place. (*E.g.*, Pl. Reply SOF at 52.) But, as explained above, Plaintiffs' remaining claims do not encompass Wells Fargo's course of conduct before the negotiations of the settlement agreement, and while such conduct may be relevant in demonstrating Wells Fargo's motives and intent, it does not bear on the likelihood that a foreclosure sale or

was within its contractual rights at that point to foreclose on Lifetrade's assets. (WF SOF ¶¶ 32-33; Pl. Reply SOF at 14-15.) Once Wells Fargo filed its notice of foreclosure, Lifetrade had only two options: "reach agreement on a settlement or file bankruptcy to protect its assets." (Pl. SOF at 34.) Plaintiffs do not dispute that the market value of its portfolio[9] at the time of default was significantly lower than the value of Lifetrade's outstanding debt, and that a public foreclosure sale would have yielded a substantial shortfall. (WF SOF ¶ 106; Pl. Reply SOF at 50.) Nor do Plaintiffs dispute that a bankruptcy filing would have resulted in the company's being "essentially dead" and would have offered no reasonable chance of Lifetrade continuing to operate. (WF SOF ¶¶ 107-08; Pl. Reply SOF at 51-52.)

The crux of Plaintiffs' theory, rather, is that Smith and Marcum should have rejected the Settlement Agreement and played a game of chicken by threatening to force Wells Fargo to proceed with foreclosure pursuant to New York's version of the Uniform Commercial Code ("UCC"). (*See* Pl. Opp. at 23-28.) Plaintiffs argue that this would have "required" Wells Fargo to retain Lifetrade's portfolio on its books indefinitely, "maximizing value by collecting death benefits and waiting for market conditions to improve before executing a profitable sale." (*Id.* at 25.) In fact, Plaintiffs' argument is even more extreme, as they argue that failure to pursue such a course of action was so unreasonable that it constituted a breach of Smith and Marcum's fiduciary duties. (*Id.* at 25-26.)

There are several problems with this theory. Plaintiffs themselves argue that there was not a functioning tertiary market for life settlements, and they provide no timeframe within

---

bankruptcy conducted in 2012 would have produced better results for Lifetrade than the Settlement Agreement.

[9] Plaintiffs distinguish between the market value of the portfolio and a deeper, true value, reflected in the valuation methodology codified in the Loan Agreement. (*See, e.g.*, Pl. SOF § XIV.)

which one was expected to develop.  (Pl. Reply SOF ¶ 526.)  Even under Defendants' view—
that prices were simply depressed—there was no clear timeframe within which prices would
recover.  (WF SOF ¶¶ 103-08.)  Under such circumstances, Plaintiffs cannot show that
commercial reasonableness required Wells Fargo to refrain from either a public sale or a strict
foreclosure.  "[A] secured party is under no obligation to delay a foreclosure sale to indulge the
debtor's 'hope that the market might recover in time,' when the secured party is faced with
'highly unsteady market conditions.'"  *In re Adobe Trucking, Inc*., No. 10-70353, 2011 WL
6258233, at *13 (Bankr. W.D. Tex. Dec. 15, 2011) (quoting *Bankers Tr. Co. v. J.V. Dowler &
Co*., 47 N.Y.2d 128, 136 (1979)), *aff'd*, 551 F. App'x 167 (5th Cir. 2014) (per curiam); *accord
CCO Condo Portfolio (AZ) Junior Mezzanine, LLC v. Feldman*, 717 F. Supp. 3d 331, 338
(S.D.N.Y. 2024) ("[A] secured creditor is under no obligation to delay the sale of
collateral . . . in the hope of obtaining a higher price . . . ." (quoting *SNCB Corp. Fin. Ltd. v.
Schuster*, 877 F. Supp. 820, 828 (S.D.N.Y. 1994)); *Atlas MF Mezzanine Borrower LLC v.
Macquarie Tex. Loan Holder LLC*, 158 N.Y.S.3d 19, 21 (1st Dep't 2021) ("The time between
default and auction—just under two months—was not insufficient as a matter of law."); *see also
Sumner v. Extebank*, 452 N.Y.S.2d 873, 875 (1st Dep't 1982) (approving of a near 90% loss and
finding "[t]he low price paid and the lack of bidders were not the result of a commercially
unreasonable sale, but were rather indicative of the lack of demand"), *aff'd as modified*, 58
N.Y.2d 1087 (1st Dep't 1983).

Plaintiffs do not cite any persuasive authority to the contrary.  For example, Plaintiffs cite
a number of cases—all involving other states' versions of the UCC—holding that creditor-
initiated delays in disposing of collateral were not *un*reasonable.  (*See* Pl. Opp. at 26 & n.12.)  Of
course, that is not the situation here.  Had Wells Fargo elected to pursue a foreclosure sale, but

delayed the sale in hopes that the market would recover, the UCC may have protected Wells Fargo's choice as a commercially reasonable one.  But Plaintiffs' cases do not establish that any state's UCC forces a creditor to delay a sale substantially when it otherwise would not.  If anything, Plaintiffs' cases prove the opposite, as they involve courts declining to second-guess the decisions of creditors disposing of collateral, even when those decisions led to lower sale prices.  *Cf. Layne v. Bank One, Ky.*, N.A., 395 F.3d 271, 281 (6th Cir. 2005) (cited by Plaintiffs).  Plaintiffs' sole citation supporting an obligation to delay a sale is inapposite.  (*Cf.* Pl. Opp. at 25-26.)  The White, Summers, and Hillman treatise on the UCC does say that selling "too quickly" can be commercially unreasonable, but only in contemplation of a situation where a sale occurs after mere days, rather than after "two or three weeks of advertising and notice."  4 White, Summers and Hillman, Uniform Commercial Code § 34.23 (6th ed.).  The same treatise also says that "a creditor who repossesses an automobile in the winter dares not await the spring season for a better market," because "[i]f the goods depreciate . . . the sale will be attacked for not being timely."  *Id.*

The Court was able to find only one federal case contemplating an interpretation of commercial reasonableness akin to the one Plaintiffs put forth here.  *See Aviation Fin. Grp., LLC v. Duc Hous. Partners, Inc.*, No. 08-CV-535, 2010 WL 1576841, at *10 (D. Idaho Apr. 20, 2010) (applying Idaho law).  However, that case is readily distinguishable—the sale took place over a matter of days, was conducted in an atypical manner (selling a private aircraft online), was for less than what the selling party had stipulated was the collateral's fair market value, and was for less than similar aircraft sold for around the same time.  *Id.* at *8-11.  In addition, the parties in *Aviation Financial Group* agreed that a functioning market for private aircraft existed; the sole

timing dispute was whether the marketing and diligence process was "rushed," resulting in a sale

to a less-than-reputable buyer. *Id.* at *9, 11. Here, none of those extenuating factors are present.

Reinforcing the reasonableness of the Settlement Agreement is the fact that the modern

UCC encourages strict foreclosures. *See* Official Comment to N.Y. U.C.C. § 9-620 (explaining

amendments that simplified the strict foreclosure process, "reflect[ing] the belief that strict

foreclosures should be encouraged and often will produce better results than a disposition for all

concerned"); *see also Harris v. Key Bank Nat'l. Ass'n.*, 193 F. Supp. 2d 707, 712 n.1

(W.D.N.Y.), *aff'd*, 51 F. App'x 346 (2d Cir. 2002) (summary order). Indeed, many of the

reasons to prefer such a consensual foreclosure—minimization of risk, avoidance of a costly

bankruptcy process, decrease in transaction costs—are present here. And certainly nothing in the

UCC compels a lender to refrain from a sale altogether simply because it would yield a net loss.

At bottom, Plaintiffs' theory is undermined by a contradiction. On the one hand,

Plaintiffs want to maintain that "the market for selling the portfolio or obtaining alternative

financing at any reasonable rate was non-existent" (ECF No. 1219-3 ¶ 47), "as evidenced by

Lifetrade management's inability to obtain alternative financing" (Pl. Mem. at 32). Put

differently, most companies other than Wells Fargo thought that the portfolio was an undesirable

asset and did not want to invest in it. On the other hand, Plaintiffs believe that Wells Fargo was

aware that "owning the Lifetrade Portfolio would be a profitable asset for the bank" (ECF No.

1219-3 ¶ 48), and therefore was obligated to hold it indefinitely, "keep paying premiums and let

the policies keep churning out money[,] . . . returning any remainder to [Lifetrade]." (Pl. Reply at

14.) Plaintiffs cannot have it both ways: if it was universally understood that the portfolio was

an undesirable dud, then Wells Fargo was not obligated by the commercial reasonableness

requirement to bear the risk of holding it. If it was not such a dud, then Lifetrade should have

been able to exercise its statutory right to request a public foreclosure sale—something that Plaintiffs repeatedly stress was practically impossible. What Plaintiffs really want is a chimera not found in the UCC—for Wells Fargo not to dispose of the collateral at all, but to retain it at their own expense and risk, forego other opportunities, and then pay Plaintiffs any surplus profits that might accrue. There is simply no basis in the law for requiring such a remedy.

Plaintiffs have also failed to raise a genuine dispute as to whether Lifetrade's portfolio was actually worth more than Lifetrade's unpaid debt. Plaintiffs' primary argument here is that Section 5.1 of the operative Loan Agreement contained a "Valuation Model" that appraised the portfolio in excess of the outstanding debt at the time of the Settlement Agreement.[10] (Pl. SOF § XIV; Pl. Mem. § IV.) But that valuation provision does not apply to foreclosure proceedings or any other disposition of the portfolio in the event of a default.[11] To the contrary, the operative

---

[10] Plaintiffs emphasize the fact that Wells Fargo actually kept the life settlements on its books after the Settlement Agreement, which Plaintiffs say proves that Wells Fargo had ulterior motives. To the contrary, Plaintiffs' own arguments show why this was Wells Fargo's only option: there was no functioning market on which Wells Fargo could have offloaded the portfolio. Further illustrating this point, Plaintiffs themselves cite a number of internal Wells Fargo communications stating that the bank desperately wanted to get rid of the portfolio, but was unable to find a buyer. (*See* Pl. Reply SOF at 166-67.) This makes sense; even if Lifetrade's portfolio eventually became profitable, Wells Fargo incurred opportunity costs by holding it, and Plaintiffs provide no evidence that the portfolio was more valuable than other assets Wells Fargo could have held instead. Whether the portfolio would eventually become profitable was also a matter of uncertainty and risk—while Plaintiffs are correct that "[t]he underlying 'insureds' all were going to die" (Pl. Reply at 14), insurance policies are not costless to maintain. Nor do Plaintiffs claim that Wells Fargo could have taken only the two most valuable policies in satisfaction of Lifetrade's debt without taking on the rest of the portfolio. (*Cf. id.*) Were insurance policies so sure to yield profits for their holders, then "no commercially reasonable actor" would sell them in the first place. (*Cf. id.*) Like any other financial asset, Lifetrade's portfolio offered its holder a balance of risk and reward. Under such conditions, Wells Fargo owed Lifetrade no duty risk losses in order to hypothetically preserve profits for its former debtor's shareholders. Wells Fargo's statements to banking regulators years later in 2016, once the portfolio had in fact become profitable, cannot disprove this. (*Cf.* Pl. Opp. at 13-14.)

[11] Although Wells Fargo does not address this, Annex C to the Loan Agreement states that Wells Fargo "reserve[d] the right to adjust [the Valuation Model] at any time to reflect such

amendment to the Loan Agreement states that the Valuation Model was "intended to be used solely in the *administration* of the Loan Agreement and the other Transaction Documents and *for no other purpose*."  (ECF No 1205-24 § 2(g) (emphasis added); *cf.* Pl. Mem. at 32 n. 17.)

Wells Fargo argues from this language that the model was solely meant to "check if the expected performance of the portfolio securing its loan met certain thresholds."  (WF Opp. at 36.)  As further evidence, it points to Section 9.2 of the Loan Agreement, which outlines procedures governing post-default remedies, many of which would be nonsensical if the Valuation Model were binding in such circumstances.  (ECF Nos. 1205-1 and 1205-2 ("Loan Agreement"), ECF No. 1205-14 ("Omnibus Amendment").)  For example, the Loan Agreement empowers Wells Fargo to utilize "all rights and remedies of a secured party upon default under Article 9 of the UCC," and explicitly authorizes bidding at a "public or private sale."  (Omnibus Amendment § 9.2(b)-(c).)[12]  Such sales plainly would not work if Wells Fargo were required to dispose of the portfolio at a predetermined contractual amount.  When interpreting contracts, "words should be given the meanings ordinarily ascribed to them and absurd results should be avoided."  *Newmont Mines Ltd. v. Hanover Ins. Co.*, 784 F.2d 127, 135 (2d Cir. 1986).  In addition, despite defining terms related to the Valuation Model (*see, e.g.*, ECF No. 1219-32

---

matters as the Administrative Agent deems relevant," which might encompass switching the Valuation Model to one based on market value.  (ECF No. 1219-32 at 35.)  In any event, the Court need not reach this issue due to the sufficiency of Wells Fargo's other arguments.

[12] Plaintiffs argue that "the Fifth Amendment to the Loan Agreement and all subsequent amendments to the Loan Agreement were procedurally and substantively unconscionable."  Pl. Mem. at 15.)  However, even the original Loan Agreement contained substantially similar language about the scope of remedies available in the event of a Lifetrade default.  (*See* Loan Agreement § 9.2(b)-(c) (authorizing "all other rights and remedies provided under the UCC of each applicable jurisdiction and other Applicable Law, which rights shall be cumulative," including a "public or private sale").)

("Annex C") at 25, 35), the Loan Agreement uses none of them when specifying remedies in the event of default (Loan Agreement § 9).[13]

Plaintiffs respond that "administration" encompasses foreclosure, since Section 9 of the Loan Agreement directs the "Administrative Agent"—Wells Fargo—to manage the disposition of collateral in the event of a default. (Pl. Reply at 16 n.17.) But this is a misreading of the contract. The mere fact that Wells Fargo was designated the "Administrative Agent" does not mean that everything Wells Fargo did under the contract was "administration." To the contrary, the contract expressly states that the Administrative Agent would be responsible for "administration, *modification*, *amendment* [and] *enforcement* of . . . [the] Agreement." (Loan Agreement § 11.1(d) ("Indemnification of the Administrative Agent") (emphasis added).) "Under New York law . . . 'the use of different terms in the same agreement implies that they are to be afforded different meanings.'" *Contant v. AMA Cap., LLC*, 66 F.4th 59, 67 (2d Cir. 2023) (quoting *Jin Ming Chen v. Ins. Co. of the State of Penn.*, 36 N.Y.3d 133, 140 (2020)) (cleaned up). Even if the foregoing list of responsibilities were exclusive, foreclosure in the event of default much more naturally fits into the category of "enforcement" than it does into the category of "administration."

Moreover, the Loan Agreement uses the specific term "administration" (or variants like "administrating") in only a few, narrow contexts: namely, the ongoing servicing of the policies in the portfolio (*see* Loan Agreement art. VI ("Administration and Servicing of Assets"

---

[13] For example, Annex C to the Agreement defines "Outstanding Asset Value" "[w]ith respect to any policy" as based on the "Valuation Model." (Annex C at 25.) But "Outstanding Asset Value" is never used in the Agreement in connection with termination, foreclosure, or the disposition of collateral, nor even used as a valuation method for the portfolio as a whole. (*Cf. id.* at 35 (defining the "Valuation Model" as "used by the Valuation Agent . . . to determine the Outstanding Asset Value of *each Asset*" (emphasis added)); *see also id.* at 4 (defining "Asset" as "Any Policy acquired by [Lifetrade]"), 26 (defining "Policy" as "[a]n entire insurance policy")).)

(capitalization altered)), and the management of Lifetrade's "reporting obligations" by the

Collateral Manager (*id.* art. VII).[14]  These functions fit well with the ordinary meaning of

"administer," which is "to manage."  *Sprinzen v. Sup. Ct. of State of N. J.*, 478 F. Supp. 722, 723

(S.D.N.Y. 1979) ("Plaintiffs contend that . . . we should adopt the general definition of

'administer' which is 'to manage.' . . . Looking at the plain, unambiguous meaning of 'where the

[ERISA] plan is administered', we find that plaintiffs' construction . . . is correct."); *see also*

*Bostic v. Ohio River Co. (Ohio Div.) Basic Pension Plan*, 517 F. Supp. 627, 631 (S.D.W. Va.

1981) (citing *Sprinzen* as embodying "the time-worn plain meaning rule"); *cf. CGS Indus., Inc. v.*

*Charter Oak Fire Ins. Co.*, 751 F. Supp. 2d 444, 450 (E.D.N.Y. 2010), *aff'd*, 720 F.3d 71 (2d

Cir. 2013) ("If a relevant term is not defined . . . it is to be afforded its ordinary meaning, which

may include its usage in federal law.")  In addition, neither the term "administer" nor any variant

is used in Section 9, nor anywhere else in the Loan Agreement to refer to foreclosure or the

disposition of capital.  The Court's reading is therefore buttressed by the familiar principle that

the inclusion of language in some places but not others in a contract strongly implies that the

omission was intentional.  *See Bank of New York Mellon Tr. Co. v. Morgan Stanley Mortg. Cap.,*

*Inc.*, 821 F.3d 297, 306 (2d Cir. 2016) ("The failure to couch the request-for-cure provision in

the explicit language of condition is particularly significant here because the sophisticated

drafters elsewhere employed precisely such language to establish undoubted conditions

precedent."); *see also Int'l Fid. Ins. Co. v. Cnty. of Rockland*, 98 F. Supp. 2d 400, 412 (S.D.N.Y.

2000) ("Sophisticated lawyers . . . must be presumed to know how to use parallel construction

---

[14] Plaintiffs argue that the Loan Agreement uses variants of the term "Valuation" throughout the contract and its annexes.  (Pl. Reply at 16 n. 17 (collecting citations).)  The Valuation Model surely was an important element of the contract.  Yet Plaintiffs point to no use of or reference to the model in the context of disposition of collateral.

and identical wording to impart identical meaning when they intend to do so, and how to use different words and construction to establish distinctions in meaning.").

Plaintiffs point to no other textual or practical basis for applying the contract's fixed valuation methodology to post-default remedies. Therefore, unlike in *Leonia Bank PLC v. Kouri*, 286 730 N.Y.S.2d 501, 501 (1st Dept. 2001), the parties here did not stipulate to the value of illiquid assets for purposes of foreclosure, and the Court cannot conclude that the true value of the portfolio, per the Valuation Model, was substantially greater than the value of the outstanding debt at the time of the Settlement Agreement.

Finally, Lifetrade received non-trivial benefits from the Settlement Agreement. The Agreement granted Lifetrade three extra months to secure third-party financing and repurchase its portfolio from Wells Fargo. (*See* Settlement Agreement § 5.1.) Plaintiffs argue that this option was "illusory . . . since the parties recognized that the prospects for refinancing during the brief period proposed were essentially non-existent." (Pl. Reply SOF ¶ 468.) But while Plaintiffs point to some testimony that reacquiring the portfolio was unlikely (ECF No. 1219-13 at 230, 362), it does not support the notion that a sale was entirely impossible. Because Lifetrade's other options were immediate bankruptcy or a public foreclosure sale without a functioning market, Smith and Marcum's choice to opt for a slim chance of repurchasing the portfolio was a reasonable one, even if it did not work out in the end.

The Settlement Agreement also provided certain protections for Lifetrade, most importantly a right to receive a substantial share—over half—of the net proceeds if Wells Fargo were to sell the portfolio to a third party. (Settlement Agreement § 11.1.) That right extended for a year following the execution of the Agreement. (*Id.* at 11 (definition of "End Date").) Plaintiffs claim that this right was purely "illusory." (Pl. SOF ¶ 180.) Although such a sale may

have been unlikely, Plaintiffs present no evidence that it was impossible, particularly because the net proceeds clause would still have applied if Wells Fargo split up the portfolio and sold it piecemeal to private buyers rather than on the open market.  (Settlement Agreement § 11.1.)

In sum, Plaintiffs have failed to raise a genuine dispute of material fact regarding whether the Settlement Agreement was a commercially unreasonable (or even suboptimal) choice for Lifetrade.  They therefore cannot demonstrate that Smith and Marcum breached their fiduciary duties by signing it.  *See Cambridge Cap. Real Est. Invs., LLC v. Archstone Enter. LP*, 28 N.Y.S.3d 33, 36 (2016) ("Plaintiff identifies no alternative transactions, let alone one that would have achieved more value for the Fund.  Fiduciaries are not required to abandon a transaction simply because a better deal might have become available in the future." (cleaned up)) (applying Delaware law).

Even if the Court were to conclude, despite all of this, that the Settlement Agreement was a bad deal for Lifetrade, Smith and Marcum's choice to sign it would still be protected as a reasonable exercise of business judgment.  *See Ull v. Royal Car Park LLC*, 116 N.Y.S.3d 251, 251 (1st Dep't 2020).  New York's business judgment rule "bars judicial inquiry into actions of corporate directors taken in good faith and in the exercise of honest judgment in the lawful and legitimate furtherance of corporate purposes."  *Wen v. N.Y.C. Reg'l Ctr., LLC*, 695 F. Supp. 3d 517, 545 (S.D.N.Y. 2023), *aff'd*, No. 23-7506, 2024 WL 4180521 (2d Cir. Sept. 13, 2024) (quoting *S.H. & Helen R. Scheuer Fam. Found., Inc., ex rel. Scheuer v. 61 Assocs.*, 582 N.Y.S.2d 662, 664 (1st Dep't 1992)).  "Although the doctrine originated in suits against corporate directors, it also protects the managers of LLCs."  *Id.* at 546.  The rule states that "where corporate officers or directors exercise unbiased judgment in determining that certain actions will promote the corporation's interests, courts will defer to those determinations if they were made

in good faith." *Id.* (quotation marks omitted).  The rule applies unless a decision involves "fraud, self-dealing, or bad faith," or "[w]hen a corporate director or officer has an interest in a decision." *Kleeberg v. Eber*, 665 F. Supp. 3d 543, 572 (S.D.N.Y. 2023) (quotation marks omitted).

Here, the Court has already held that the decision to sign the Settlement Agreement, while potentially a breach of fiduciary duty, was not fraudulent in nature. *Ramiro Aviles*, 380 F. Supp. 3d 296.  Bad faith, for these purposes is defined as "intent to harm" or "intentional dereliction of duty." *Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 240 (Del. 2009); *cf. Ficus Invs., Inc. v. Priv. Cap. Mgmt., LLC*, 872 N.Y.S.2d 93, 99 (1st Dep't 2009) (noting that Delaware courts' holdings "can be instructive" on issues of New York corporate law).  Smith and Marcum plainly had no intent to harm Lifetrade or disregard their duty to keep it solvent; to the contrary, Plaintiffs' most recent theory is that Smith and Marcum wanted to avoid a default or shutdown of the company in order to preserve their own salaries.  (Pl. Reply at 8 & n.8.)  While Smith and Marcum may not have cared first and foremost about maximizing the short-term payout to Lifetrade's other shareholders, Plaintiffs have not provided any evidence that they affirmatively wanted to harm Lifetrade or cause it to fail.  (*See, e.g.*, Pl. SOF ¶¶ 164-65 (describing Smith and Marcum's efforts to find third-party financing); WF SOF ¶¶ 48-65 (same).)

Because they cannot show fraud or bad faith, Plaintiffs' only answer to the business judgment rule is that Smith and Marcum were engaged in self-dealing, or were at least interested in the outcome of the Settlement Agreement.  (Pl. Reply at 8 & n.8.)  Plaintiffs contend that Smith and Marcum wanted to "obtain[] delay in facing suit" and to continue earning their salaries, giving them incentives that ran counter to Lifetrade's best interests.  Not only are these

theories implausible, but they are also insufficient to show interestedness even if true. *Cf. Wen*, 695 F. Supp. 3d at 547-48.

Regarding the risk of litigation, although Plaintiffs allege in a conclusory manner that "[r]e-acquiring LT's portfolio was an impossible goal, used as a pretext to placate investors and delay suit" (Pl. Rely at 10), the evidence cannot support their theory. Lifetrade's shareholders were indisputably aware of the vast majority of what Smith and Marcum were doing, and even voted against the approach embodied in the Settlement Agreement when given a chance. (Pl. Reply SOF ¶ 497.) Even if the Settlement Agreement's repurchase option gave Lifetrade's shareholders false hope, such hope could have lasted at most three months. (*See* Settlement Agreement at 17 (terminating the repurchase option at the end of November 2012).) Plaintiffs never explain or establish how such a short delay in facing the present litigation—which, recall, has now stretched out over the better part of a decade—would have materially benefitted Smith and Marcum, much less created a sufficient conflict of interest to negate the business judgment rule.

Plaintiffs' salary theory is also fundamentally inconsistent with their theory of harm to Lifetrade and its shareholders. Plaintiffs contend that Smith and Marcum violated their fiduciary duties by acquiescing to a strict foreclosure, thereby forgoing (allegedly) sizeable returns to Lifetrade's shareholders. But that ignores that Smith and Marcum also had financial interests in Lifetrade's portfolio.[15] Whether at Plaintiffs' expense or not, it is clear that Smith and Marcum profited when Lifetrade profited. Plaintiffs provide no plausible reason that the three months of

---

[15] *See* Compl. ¶¶ 23 (identifying Smith as Lifetrade's "sole voting stockholder"), 34 (identifying Marcum as "Smith's henchman and confident [*sic*] who, for loyalty and services rendered in carrying out Smith's fraudulent scheme, was rewarded with a 20% interest in LMC NV, LMC LLC, and LAM NV").

wages and fees that Smith and Marcum received would have been greater than the (alleged) profits that Lifetrade would have secured had they negotiated a better deal with Wells Fargo.

Plaintiffs have also produced no evidence that Smith or Marcum continued earning substantial fees under the Settlement Agreement.  (*Cf.* Pl. SOF ¶ 179, 192.)  For example, Plaintiffs allege that "[f]rom September 2010 until at least 2013 Smith continued to charge substantial fees for his services as a Director of the Funds." (*Id.* ¶ 192.)  In support, they cite two exhibits: Marcum's testimony (ECF No. 1219-2 ¶¶ 164-66, 169-70) and Lifetrade's 2009 Prospectus (ECF No. 1219-36 at 12.)  The Prospectus says nothing relevant, only outlining the general kinds of fees that would be earned by Lifetrade's management.  (ECF No. 1219-36 at 12.)  Plaintiffs' characterization of Marcum's testimony is even more misleading.  In it, Marcum denies knowing the exact fact for which Plaintiffs cite his testimony:  "I was not privy to Roy Smith's . . . fee incomes derived from Lifetrade." (ECF No. 1219-2 ¶ 170.)  The closest Marcum comes is saying that Smith "did not resign" and that Marcum's "livelihood was then dependent on [Smith's] continuing to employ [him]."  (*Id.* ¶¶ 165-66.)  Clearly this does not create a triable issue of fact over whether such servicing and transition fees were a sufficient conflict of interest to void the business judgment rule.

Moreover, numerous courts have already rejected the notion that a desire to preserve an investment manager's salary or fee earnings constitutes interestedness.  Plaintiffs essentially argue that Smith and Marcum were "interested" because they wanted to "maintain the outstanding loans for as long as possible so [they] could optimize the amount of . . . management fees [they] collected," while Lifetrade's non-managing members "wanted their capital to be carefully managed to optimize the possibility of a quick repayment."  *Wen*, 695 F. Supp. 3d at 546 (quotation marks omitted).  Such allegations, though, "are insufficient to show [that]

Defendant[s] [were] interested in the purported defaults such that [their] actions fall outside the business judgment rule." *Id.* at 546-47. "On Plaintiffs' theory, any decision by Defendant[s] to forego declaring a default [or dissolution] would trigger a violation of the duty of loyalty and would eliminate the protection accorded Defendant[s] by the business judgment rule because every such decision, by definition, would prolong the period of time during which Defendant[s] would continue to earn its management fee [or salary]." *Id.* at 547. Put simply, "[a] fiduciary does not become self-interested merely because she is paid by her principal. . . . Alleging that a fiduciary's decision was motivated by a desire to maintain her salary is, without more, insufficient to take that decision outside the protections of the business judgment rule." *Id.* at 548 (collecting cases rejecting similar arguments).

Accordingly, even if the Settlement Agreement was in some ways suboptimal, it was a valid exercise of Smith and Marcum's business judgment, and executing it was thus not a breach of their fiduciary duties.

### 2.    The Confidentiality Provision

The second possible basis for a breach of fiduciary duty by Smith and Marcum is the confidentiality provision in the Settlement Agreement. Although it is unclear whether Plaintiffs intend to claim this as an independent breach leading to aiding and abetting liability, for the sake of completeness, the Court considers it anyway.[16] The confidentiality provision states, in relevant part:

---

[16] While Plaintiffs mention the Settlement Agreement's confidentiality provision (Pl. Opp. at 19; Pl. Reply SOF at 42-43), they include only passing references to the fiduciary duty of candor and never define the term or apply it to the facts of this action. (*See* Pl. Mem. at 17.) In addition, the Court has already explained that "after-the-fact efforts to conceal that the transfer" of Lifetrade's assets had occurred "were merely the means of accomplishing the breach, and caused no injury distinct from those caused by the breach itself." *Ramiro Aviles*, 380 F.Supp.3d

(a) Each of the Lender Parties and the Lifetrade Parties shall maintain and shall cause each of its employees and officers to maintain the confidentiality of the Settlement Documents and all information with respect to other parties, except that each such party and its directors, officers and employees may . . . (ii) disclose such information as is required by Applicable Law

. . .

(b) Notwithstanding anything herein to the contrary, the foregoing shall not be construed to prohibit (i) disclosure of any and all information that is or becomes publicly known, (ii) disclosure of any and all information (A) if required to do so by any applicable statute, law, rule or regulation, (B) to any Governmental Authority having or claiming authority to regulate or oversee any respects of the Lender Parties' or the Lifetrade Parties' business or that of their Affiliates, (C) pursuant to any subpoena, civil investigative demand or similar demand or request of any court, regulatory authority, arbitrator or arbitration to which the Lender Parties, the Lifetrade Parties or an officer, director, employer, shareholder or affiliate of any of the foregoing is a party or (D) to any affiliate, independent or internal auditor, agent, employee or attorney of any Lender Party or any servicer or other service provider with respect to the Foreclosed Assets or Collateral; or (iii) any other disclosure authorized by the Lender.

. . .

(c) Without limiting the foregoing . . . the Lifetrade Parties shall not make any statements to investors in the Lifetrade Parties, or any other Persons, whether privately or publicly, relating to the settlement contemplated by this Agreement. The Borrower may communicate to such investors the mere fact that settlement discussions are being conducted and may disclose that the settlement and the foreclosure occurred, the terms of the Borrower Option and the Contingent Payment other than the Lender Yield. At no time shall the Lifetrade Parties make any statements to any Persons relating to the state of mind, motivation, actions or inactions by the Lender Parties.

(ECF No. 1219-1 ("Settlement Agreement") § 13.13(a)-(c).) According to Plaintiffs, the

provision "prohibit[ed] Lifetrade from revealing Wells Fargo's motivations, and . . . specifically

forbade Lifetrade from making disclosures to its shareholders respecting the settlement

negotiations." (Pl. Reply SOF at 42.) According to Wells Fargo, it "did not prohibit disclosures

required by applicable law." (WF SOF ¶ 96.) The parties do not dispute that Smith and Marcum

at least informed investors of the existence of the Settlement Agreement "through postings on

---

at 296-97 (cleaned up). While the Court made this observation in a different context and it is therefore not binding as law of the case, the underlying logic nonetheless applies.

Lifetrade's website and the Irish Stock Exchange in addition to shareholder letters distributed by Lifetrade and its broker network."  (WF SOF ¶¶ 172-83; Pl. Reply SOF at 80-86.)  But Smith and Marcum do appear at least to have complied with the confidentiality provision in withholding information about the "Lender Party Yield"[17] from investors.  (*See, e.g.*, ECF Nos. 1210-30 (sharing a draft of the Settlement Agreement with a representative of one institutional investor, Plaza Asset Management, but noting that it was "for internal use only" and that the recipient "can summarize to investors but can't mention interest rate"); 1205-76 & 1205-153 (notifying investors of the Settlement Agreement but not providing a draft or summarizing the Lender Party Yield term).)

"Under New York law, LLC members owe one another, as well as the LLC, various fiduciary duties.  Among these duties are the duty of care, duty of loyalty, and the duty of disclosure."  *Rennaker Co. Consulting, Inc. v. TLM Grp., LLC*, No. 16-CV-3787, 2017 WL 2240235, at *4 (S.D.N.Y. Mar. 29, 2017) (citation omitted).  Though "[c]ourts in other states have found that the duty to disclose is 'not an independent dut[y] but the application in a specific context of the board's fiduciary duties of care, good faith, and loyalty,'" *L&N Twins Place LLC*, No. 20-CV-1858, 2020 WL 7211235, at *4 n.7 (S.D.N.Y. Dec. 4, 2020) (quoting *Malpiede v. Townson*, 780 A.2d 1075, 1086 (Del. 2001), "New York law . . . imposes on managers of an LLC the duty 'to make full disclosure of all material facts,'" *id.*, at *4 (quoting *Bookhamer v. I. Karten-Bermaha Textiles Co., L.L.C.*, 859 N.Y.S.2d 172, 173 (1st Dep't 2008)).  Such a disclosure obligation arises between LLC members when they transact with one another, such as

---

[17] The Lender Party Yield was the option premium—the amount above the value of the policy claims and the costs incurred maintaining the policies—that Lifetrade would need to pay to reacquire its portfolio after the strict foreclosure.  (*See* Settlement Agreement §§ 1.2 ("Lender Party Yield"; "Required Payment Amount"), 5.1 ("Option to Repurchase").)

when one member buys out the share of another. *See, e.g.*, *Salm v. Feldstein*, 799 N.Y.S.2d 104, 105-06 (2d Dep't 2005) (describing the disclosure obligations of an LLC's managing members to its non-managing members); *DirecTV Latin Am., LLC v. Park 610, LLC*, 691 F. Supp. 2d 405, 438-39 (S.D.N.Y. 2010) (similar).  At least some courts have also extended the duty to certain "day-to-day contractual or financial matters," *L&N Twins Place*, 2020 WL 7211235 at *5, even in the absence of "self-dealing" by the managing member, *id.* at *2; *see also*, *Rennaker*, 2017 WL 2240235, at *5 (denying a motion to dismiss a claim that "Defendants breached their fiduciary duties by depriving [Plaintiff] of information concerning the ongoing affairs of TLM, TLM MCL, and/or the assigned contracts.").  However, for information to require disclosure, it must be "material," and the non-disclosure must have caused damages.  *In re L&N Twins Place*, 2020 WL 7211235, at *4.  Neither is true here.

Regarding materiality, "omitted information is material if there is a substantial likelihood that a reasonable shareholder would have considered it important; that is, if he or she would have viewed it as having significantly altered the total mix of available facts."  *2 Fifth Ave. Tenants Ass'n v. Abrams*, 583 N.Y.S.2d 466, 467 (1st Dep't 1992) (quoting *State of New York v. Rachmani Corp.*, 71 N.Y.2d 718, 726, (1988)); *see also Cohen v. Calloway*, 667 N.Y.S.2d 249 (1st Dep't 1998) (same).  Put differently, "New York law defines materiality 'to mean that, counterfactually, the plaintiff would have acted differently but for the alleged misrepresentation or omission.'"  *Fed. Deposit Ins. Corp. v. Murex LLC*, 500 F. Supp. 3d 76, 111 (S.D.N.Y. 2020) (quoting *City Trading Fund v. Nye*, 72 N.Y.S.3d 371, 378 (N.Y. Sup. Ct. 2018)).  However, notice of the Settlement Agreement was public and Lifetrade's largest shareholder had access to both draft and execution versions of the actual agreement.  (WF SOF ¶¶ 173-74.)  Only two things were withheld: information "relating to the state of mind, motivation, actions or inactions"

by Wells Fargo, and the 16% "Lender Party Yield" term in the Settlement Agreement.[18]
(Settlement Agreement § 13.13(c).)  But Plaintiffs already knew that "[Wells Fargo's] actions
[were] making it more difficult to find viable options . . . to repay [Wells Fargo]" (Pl. Reply SOF
¶¶ 409-11), and already believed that the repurchase option in the Settlement Agreement was
"illusory," "since the parties recognized that the prospects for refinancing during the brief period
proposed were essentially non-existent" (*id.* ¶ 468).  Lacking the additional information,
Plaintiffs still "voted to expressly reject the terms of the Settlement Agreement."  (*Id.* ¶ 497.)
Plaintiffs' real problem was not a lack of information, but rather that Smith and Marcum ignored
Plaintiffs' clearly stated preferences.

      In addition, "the alleged misrepresentations and nondisclosures could not have been the
cause of [Plaintiffs'] alleged damages, which resulted solely from the [transfer of Lifetrade's
assets].  [Plaintiffs'] proposed allegations of breach of fiduciary duty therefore fail . . . ."  *Geler
v. Nat'l Westminster Bank USA*, 770 F. Supp. 210, 214 (S.D.N.Y. 1991); *see also Silverman v.
3D Total Sols., Inc.*, No. 18-CV-10231, 2019 WL 4248040, at *12 (S.D.N.Y. Sept. 9, 2019)
(finding no breach of fiduciary where the plaintiff did "not allege any damages that are traceable
to that failure to disclose"), *report and recommendation adopted*, 2020 WL 1285049 (S.D.N.Y.
Mar. 18, 2020); *accord Parker v. Marglin*, 869 N.Y.S.2d 21, 22 (1st Dep't 2008) (upholding
dismissal where "plaintiffs fail[ed] to show how the alleged concealment caused them the money
damages they seek to recover").  Most importantly, this is because Lifetrade's two managers—
Smith and Marcum—had authority to execute the Settlement Agreement on their own, with or

---

[18] The 16% term was an option premium to be paid by Lifetrade on top of the value of the portfolio in order to repurchase it.  Plaintiffs only mention the 16% premium in passing; they focus primarily on the short timeframe to exercise the option and the difficulty of securing financing from a third party.  (*See, e.g.*, Pl. SOF ¶ 520.)

without Plaintiffs' consent.  Of course, it is conceivable that the shareholders could have sued for an injunction.  But signing the Settlement Agreement was not a breach of Smith and Marcum's fiduciary duties, *see supra* Section III.A.1, so such a lawsuit would have been futile.  And, because Plaintiffs are suing now in a derivative capacity, only harm to Lifetrade is relevant; the fact that investors might have reallocated their funds if they had known the concealed information does not establish damage to the company.[19]

New York's business judgment rule again "adds some weight to [the Court's] analysis and conclusion."  *Lindner Fund, Inc. v. Waldbaum, Inc.*, 82 N.Y.2d 219, 224 (1993).  The rule "provides a measure of protection to a corporation's officers and directors when they act in the over-all best interests of all the shareholders," including when they preserve confidentiality in order to protect the status of sensitive negotiations or "avoid speculative or premature market fluctuations."  *Id.*; *see also Wey v. New York Stock Exch., Inc.*, 841 N.Y.S.2d 222, at *8 (Sup. Ct. 2007) (table) ("Generally, there is no duty to disclose confidential business negotiations.");  *Leighton v. Poltorak*, No. 17-CV-3120, 2018 WL 2338789, at *7 n.60 (S.D.N.Y. May 23, 2018) (collecting cases).[20]  In sum, because the confidential information is neither material nor the

---

[19] In fact, by the time of the Settlement Agreement, Lifetrade had already suspended redemptions, meaning that Plaintiffs had no recourse even with respect to their personal funds. *Ramiro Aviles*, 380 F.Supp.3d at 296.

[20] It is true that the business judgment rule applies only when corporate directors act in "good faith."  *Lindner Fund*, 82 N.Y.2d at 224.  But the confidentiality provision hid only one relatively minor term from the Settlement Agreement and prevented Smith and Marcum from opining on Wells Fargo's motives.  Plaintiffs do not explain what ulterior motives Smith and Marcum might have had for including such a provision in the Settlement Agreement, or how it would have prevented Plaintiffs from suing them.  Conversely, such confidentiality provisions can legitimately help facilitate sensitive or complicated negotiations.  *Cf. id.*  Therefore, as before, the Court concludes that the choice to include the provision is not tainted by bad faith or self-dealing such that the business judgment rule cannot apply.  *Cf. supra* Section III.A.1.

cause of any cognizable damages, it cannot serve as an independent basis for Plaintiffs' aiding
and abetting claims, which must therefore be dismissed.

### B.    Unconscionability

For reasons similar to those explained in Section III.A, Plaintiffs have failed to show that
the Settlement Agreement was unconscionable.[21]  "It is well settled that an unconscionable
contract is generally defined as one which is so grossly unreasonable as to be unenforceable
according to its literal terms because of an absence of meaningful choice on the part of one of the
parties ['procedural unconscionability'] together with contract terms which are unreasonably
favorable to the other party ['substantive unconscionability']."  *Lawrence v. Miller*, 11 N.Y.3d
588, 595 (2008) (cleaned up).  Such an agreement must be so unreasonable that "no person in his
or her senses and not under delusion would make on the one hand, and as no honest and fair
person would accept on the other, the inequality being so strong and manifest as to shock the
conscience and confound the judgment of any person of common sense."  *In re Est. of Hennel*,
29 N.Y.3d 487, 495 (2017) (quotation marks omitted).  Typically, an unconscionable "contract
[must have been] both procedurally and substantively unconscionable when made."  *Gendot
Assocs., Inc. v. Kaufold*, 866 N.Y.S.2d 361, 363 (2d Dep't 2008) (quoting *Gillman v. Chase
Manhattan Bank, N.A.*, 73 N.Y.2d 1, 10 (1988)).  There also "have been exceptional cases where
a provision of the contract is so outrageous as to warrant holding it unenforceable on the ground
of substantive unconscionability alone," *Ragone v. Atl. Video at Manhattan Ctr.*, 595 F.3d 115,
122 (2d Cir. 2010) (quoting *Gillman*, 7 N.Y.3d at 12), though Plaintiffs point to no example of a
situation where unconscionability was found solely based on procedural issues.

---

[21] Because Plaintiffs' fiduciary duty and unconscionability claims fail on the merits, the
Court need not consider Wells Fargo's *in pari delicto* defense or its arguments about whether
money damages are available based on an unconscionability claim.  (*See* ECF No. 1216 § II.)

Plaintiffs first point to Wells Fargo's conduct in the years leading up to the Settlement Agreement, arguing that the bank withheld information, pursued a "loan-to-own" strategy, and sought to leverage its position as Lifetrade's lender in order to drive the company into the ground. (Pl. Mem. at 10, 19, 21.) But the Court rejected these arguments—in the form of separate breach of fiduciary duty and breach of contract claims—over five years ago. *See Ramiro Aviles*, 380 F.Supp.3d at 299-300 ("Plaintiffs have not identified any affirmative misrepresentations that Wells Fargo is alleged to have made. . . . Even if secret motives, without more, can form the basis for a fraud claim, Plaintiffs have not plausibly alleged that Wells Fargo was under any duty to disclose its motives here."), 304 ("Plaintiffs . . . have not plausibly alleged that the Wells Fargo Defendants owed a fiduciary duty to Lifetrade separate and apart from any contractual duties they owed Lifetrade."), 305 ("Absent in all of this, however, is any indication of what specific contractual duties were violated, and how."). Regardless, even if Wells Fargo's sharp negotiating tactics were procedurally unconscionable, Plaintiffs would still need to effectively attack the substance of the Settlement Agreement.

But no rational factfinder could conclude that the agreement here was so outrageous as to be substantively unconscionable. Even accepting that the Settlement Agreement was highly advantageous for Wells Fargo, it was the best option for Lifetrade among many bad ones. *See supra* Section III.A.1. Everyone agrees that a public foreclosure in 2012 would have yielded far less than the value of the portfolio. *Id.* And Plaintiffs have pointed to no cases supporting the notion that Wells Fargo could have been forced to hold Lifetrade's portfolio on its books indefinitely in hopes that it would eventually become marketable. *Id.* On the flip side, the repurchase option and net proceeds clause in the Settlement Agreement were not entirely valueless. *Id.* Because the only alternatives to the Settlement Agreement were a public

foreclosure and bankruptcy, it was not unreasonable—much less unconscionable—for Smith and

Marcum to bet the house on a repurchase option with a low likelihood of ever being exercised,

and safeguard Lifetrade's investors with a chance to claw back any profits if Wells Fargo were

able to find a buyer.  Some chance for the company was, a reasonable manager might think,

better than a certain dead end.

Ultimately, it is unsurprising and legally unproblematic that a foreclosure settlement

would feel one-sided to the defaulting party.  The unconscionability doctrine is not intended to

guarantee that a party experiencing foreclosure will come out of the process whole.  Fittingly,

"[i]t is extremely rare for a court to find unconscionability in a contract between experienced

businessmen arising in a commercial setting."  *In re CBGB Holdings, LLC*, 439 B.R. 551, 560

(Bankr. S.D.N.Y. 2010); *see also Equitable Lumber Corp. v. IPA Land Dev. Corp.*, 38 N.Y.2d

516, 523 (1976) ("[T]he parties are commercial entities dealing at arm's length . . . [and] cannot

assume the posture of a commercially illiterate consumer beguiled into a grossly unfair bargain

by a deceptive vendor or finance company.").[22]  Because that is what Plaintiffs seek here, their

unconscionability claims must be dismissed.

---

[22] Lifetrade and its managers were clearly sophisticated commercial actors, whether or
not Smith and Marcum were the most astute businessmen.  The only fact that gives the Court
pause is Plaintiffs' allegation that "WF subsidized LT's legal fees, as window dressing, and on
the condition that lawyers not obstruct the SA."  (Pl. Opp. at 34.)  As with many of Plaintiffs'
most salacious claims, however, this one is purely speculative.  While it is true that Wells Fargo
paid $50,000 to one of the law firms retained by Lifetrade's lawyers, "[i]t is neither uncommon
nor contrary to ethical rules for a third party to pay for someone's legal fees, so long as the client
provides informed consent and the attorney's independence is not compromised."  *Bobulinski v.
Tarlov*, No. 24-CV-2349, 2024 WL 4893277, at *4 (S.D.N.Y. Nov. 26, 2024).  And Plaintiffs
provide no evidence that Wells Fargo imposed illicit conditions on the representation.  Rather,
they cite only a few lines of Marcum's testimony in which Marcum admits that many of
Lifetrade's lawyers were *not* paid by Wells Fargo (*see* ECF No. 1219-13 275:12-14), and part of
the relevant lawyer's testimony in which he describes an ordinary and unproblematic third-party
fee arrangement (*see* ECF No. 1247-42 at 114-16).  None of this is sufficient to create a genuine

### C.    Litigation Involving Marcum

In addition to the underlying litigation, Wells Fargo asserts a third-party claim for

contribution against Marcum (ECF No. 937), and Marcum responds with counterclaims (ECF

No. 1166).  Wells Fargo's third-party complaint and the first two of Marcum's counterclaims—

for contribution and indemnification—seek only conditional remedies in the event that Plaintiffs

were to prevail in the underlying lawsuit.  Because the Court is now dismissing the reminder of

Plaintiffs' claims, it must dismiss these third-party claims as well.

Marcum's other counterclaims seek affirmative relief.  Because Marcum elected not to

seek discovery (*see* ECF No. 1205 ¶ 3), the Court evaluates Wells Fargo's request to dismiss

these claims as a motion for summary judgment.

First, Marcum's breach of contract claim is dismissed for lack of an underlying contract.

*See Utica Mut. Ins. Co. v. Munich Reinsurance Am., Inc.*, 7 F.4th 50, 63 (2d Cir. 2021) ("The

existence of a contract is a necessary element of a claim for breach of contract.").  The Court has

already explained that "the convoluted string of relationships" tying Marcum to Lifetrade Ireland

"can hardly be considered an 'explicit, unequivocal statement'" that would be required to give

the release contractual effect.  (ECF No. 1161 at 8-9 (quoting *Golden Pac. Bancorp v. F.D.I.C.*,

273 F.3d 509, 515 (2d Cir. 2001).)[23]  While the Court also held that the contract language "may

even expressly preclude Marcum's release," and that this preclusion creates ambiguity, its

---

dispute as to whether Lifetrade's counsel was so compromised and unsophisticated that it was no
longer capable of executing an arm's length transaction.

[23] Marcum argues that Magistrate Judge Parker "expressly found" that the release was
enforceable.  (ECF No. 1233 at 19.)  Maybe so, but this Court's conclusion that the release is
unenforceable (ECF No. 1161 at 9), postdates Judge Parker's passing comment that "Wells
Fargo . . . released the funds and Smith and Marcum from individual liability" (ECF No. 922 at
3), and therefore controls.  Moreover, Judge Parker also decided—in the same opinion—to allow
Wells Fargo to pursue its contribution claim against Marcum, which strongly suggests that she
did not intend to conclude that the release was enforceable.  (*Id.* at 8-9.)

primary holding was that the release is unenforceable because it does not unequivocally

encompass Marcum. (*Id.*) "[W]hen a court has ruled on an issue, that decision should generally

be adhered to by that court in subsequent stages in the same case." *United States v. Uccio*, 940

F.2d 753, 758 (2d Cir.1991) (citing *Arizona v. California*, 460 U.S. 605, 618 (1983)). This

serves to "maintain consistency and avoid reconsideration of matters once decided during the

course of a single continuing lawsuit." 18 Wright, Miller & Cooper, *Federal Practice and

Procedure* § 4478 at 788 (3d ed.). The Court sees no reason to reconsider its previous decision.

      Marcum's misrepresentation and tortious interference claims are time-barred. The

relevant statute of limitations is six years. *See* N.Y. C.P.L.R. § 213(8). Marcum—one of two

individuals negotiating every contested transaction with Wells Fargo—was indisputably aware of

Wells Fargo's alleged misconduct before the Settlement Agreement was signed in 2013.

Moreover, even if Marcum were correct that the limitations period should be tolled "until the

fiduciary has openly repudiated his or her obligation," the breakdown in the fiduciary

relationship "had become 'clear and . . . known to them in 2016,'" still more than six years before

Marcum filed his counterclaims in October 2023. (ECF No 1233 at 19-20 (quoting ECF No. 117

at 90-91).) Marcum is also incorrect in seeking to invoke Section 203(d) of New York's Civil

Practice Law and Rules. Section 203(d) by its terms applies only "to the extent of the demand in

the complaint." N.Y. C.P.L:R. § 203(d). It therefore "allow[s] a defendant to assert an

otherwise untimely claim which arose out of the same transactions alleged in the complaint, but

only as a shield for recoupment purposes, and does not permit the defendant to obtain affirmative

relief." *DeMille v. DeMille*, 774 N.Y.S.2d 156, 158 (2d Dep't 2004); *see also Goldberg v.

Sitomer, Sitomer & Porges*, 469 N.Y.S.2d 81, 84 (1983), *aff'd*, 63 N.Y.2d 831 (1984) (same);

*Cal. Cap. Equity, LLC v. IJKG, LLC*, 54 N.Y.S.3d 578, 579 (1st Dep't 2017) (same); *Rothschild*

*v. Indus. Test Equip. Co., Inc.*, 610 N.Y.S.2d 58, 59 (2d Dep't 1994) (same); *accord Sawyer v. Wight*, 196 F. Supp. 2d 220, 229 (E.D.N.Y. 2002) (same).  Because Wells Fargo no longer has any viable claims against Marcum, Section 203(d) does not save Marcum's affirmative claims against Wells Fargo.

## IV.    Conclusion

For the foregoing reasons, Wells Fargo's motion for summary judgment as to Plaintiffs' remaining claims is GRANTED;

Plaintiffs' motion for summary judgment is DENIED;

Marcum's motion for summary judgment as to Wells Fargo's third-party claims is DENIED AS MOOT;

Marcum's contribution and indemnification claims as to Wells Fargo are DISMISSED AS MOOT;

Wells Fargo's motion for summary judgment as to Marcum's additional counterclaims is GRANTED;

Marcum's motion for oral argument, Wells Fargo's motions to exclude Plaintiffs' expert witnesses and strike Plaintiffs' expert disclosures, and Plaintiffs' motion to preclude the testimony of James Toole are DENIED AS MOOT.

The Clerk of Court is directed to close the motions at Docket Numbers 1198, 1199, 1200, 1201, 1204, 1207, 1208, and 1238.

SO ORDERED.

Dated:  January 23, 2025
        New York, New York

_____
J. PAUL OETKEN
United States District Judge